**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CITY OF RIVIERA BEACH GENERAL EMPLOYEES RETIREMENT SYSTEM, on behalf of itself and all others similarly situated,<br><br>　　　　　　　　Plaintiff,<br><br>　　　v.<br><br>MACQUARIE INFRASTRUCTURE CORPORATION, JAMES HOOKE, JAY DAVIS, LIAM STEWART, and RICHARD D. COURTNEY,<br><br>　　　　　　　　Defendants. | Civil Action No. _____<br><br>CLASS ACTION<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Plaintiff City of Riviera Beach General Employees Retirement System ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, *inter alia*, counsel's investigation, which includes review and analysis of: (a) Macquarie Infrastructure Corporation's ("Macquarie" or the "Company") regulatory filings with the United States Securities and Exchange Commission ("SEC"); (b) press releases and media reports issued and disseminated by the Company; (c) analyst and media reports concerning Macquarie; and (d) other public information regarding the Company.

**INTRODUCTION**

1.　　This securities class action is brought on behalf of purchasers of Macquarie stock between February 22, 2016 and February 21, 2018, inclusive (the "Class Period"). The claims asserted herein are alleged against Macquarie and certain of the Company's current and former

1

executives (collectively, "Defendants"), and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.     This matter arises from Defendants' misrepresentations and material omissions concerning Macquarie's International-Matex Tank Terminals ("IMTT") business and the sustainability of the Company's dividend to shareholders.  IMTT, which provides bulk liquid storage and handling services at 12 marine terminals in the United States and Canada, is Macquarie's most important business segment.

3.     Throughout the Class Period, the Company emphasized IMTT's "very strong" performance and "high" utilization rates.   At multiple investor conferences during the Class Period, the Company represented that the IMTT business experienced stable, "steady as she goes" performance, and "very, very stable" utilization rates.  Defendants specifically touted IMTT's consistently high utilization rates, which they claimed averaged 94% over the past 10 years.  For example, during an earnings call on February 22, 2017, regarding the Company's 2016 year-end financials, the Company's then-Chief Executive Officer, Defendant James Hooke ("Hooke"), emphasized IMTT's "very strong" utilization rates and assured investors that IMTT performance would remain strong, noting that "we have every incentive to keep those tanks as full as we can, and we will."  Similarly, at an investor conference on May 10, 2017, the Company's Head of Investor Relations, Defendant Jay Davis ("Davis"), reiterated that "utilization rates have remained very, very high."

4.     Macquarie executives further represented to investors that any declines in IMTT's storage utilization were temporary and due only to routine maintenance, such as tank cleaning and inspection.  During a May 18, 2017 investor conference, for example, the Company noted its "good visibility" into "macroeconomic factors influencing supply and demand more broadly" as evidence

of IMTT's stability.  Macquarie executives assured investors that utilization would remain high into 2018 because "the basic services nature of the business gives us good visibility."

5.      Significantly, the Company only disclosed to investors the categories of commodities serviced by IMTT (such as chemicals, biofuels, vegetable and animal oils, crude and asphalt, and refined petroleum products), but did not disclose to investors the specific products stored at IMTT's facilities.  This made it impossible for investors to independently determine how industrywide changes in commodities demand and usage might impact IMTT's liquid fuel storage business.  In particular, the Company never disclosed to investors IMTT's dependence on heavy residual oils, and specifically No. 6 fuel oil, also known as "bunker" fuel.

6.      No. 6 fuel oil is a heavy, viscous oil at the bottom of the distillation stream; it is the residual product that remains after the more valuable light oil products have been distilled from crude oil.  For years prior to the start of the Class Period, use of No. 6 fuel oil had been in decline.  Environmental concerns spurred regulations that promised to further curb use of such fuel oils.  Development of alternative fuel sources, such as shale oil, also have made No. 6 fuel oil less cost-effective than alternatives.

7.      The decline in the usage of heavy residual oil products, including No. 6 fuel oil, presented a material risk to the Company, which Defendants concealed from investors.  In addition to the risk of losing business and falling IMTT utilization rates, such widespread changes in the use of No. 6 fuel oil required Macquarie to repurpose its storage tanks to accommodate other commodities.  However, the Company downplayed its exposure to fluctuations in the use of petroleum products, assuring investors that IMTT had "no commodity exposure directly" because it "simply provides access to storage capacity."

8.     Macquarie also falsely assured investors regarding the sustainability of the Company's historically high dividend.  Macquarie has for years been known as a high dividend-paying stock.  For example, in early 2017, analysts named Macquarie a "Top Dividend Stock," noting the Company's strong quarterly dividend history, diversified business operations, and favorable long-term, multi-year growth rates.  Indeed, over the past five years Macquarie has consistently paid quarterly dividends of more than 5%, and, throughout the Class Period has paid dividends of at least 6.7% or more.  At the close of 2017, the Company's annualized dividend yield exceeded 15%.  As late as December 2017, Macquarie executives described the Company's dividend as "sacrosanct."

9.     On February 21, 2018, after the close of trading, Macquarie surprised the market by announcing disappointing fourth quarter earnings of $0.43 per share, well short of analysts' estimate of $0.51 per share, and that the Company would be slashing its dividend by 31%.  Macquarie blamed its poor performance on the declining use of heavy residual oil products, in particular, declining demand and prices for No. 6 fuel oil.  In response to this news, Macquarie's stock price fell from $63.62 per share on February 21, 2018, to $37.41 per share on February 22, 2018.

10.     As a result of Defendants' wrongful acts and omissions, and the resulting decline in the market value of Macquarie's stock, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to

28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

12.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Macquarie maintains its corporate headquarters in New York, New York, which is situated in this District, conducts substantial business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in this District.  In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

13.     Plaintiff City of Riviera Beach General Employees Retirement System provides retirement benefits to eligible general employees of the City of Riviera Beach, Florida.  Plaintiff purchased shares of Macquarie's common stock on the New York Stock Exchange ("NYSE") during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

14.     Defendant Macquarie Infrastructure Corporation, a Delaware corporation headquartered at 125 West 55th Street, New York, New York 10019, owns and operates a portfolio of infrastructure and infrastructure-like businesses.  The Company's common stock trades on the NYSE, which is an efficient market, under ticker symbol "MIC."  Macquarie currently has over 84 million shares of common stock outstanding, owned by at least hundreds or thousands of investors.

15.     Defendant James Hooke served as Chief Executive Officer of Macquarie from July 2014 to December 31, 2017.

16.     Defendant Jay Davis has served as the Head of Investor Relations and Vice President of Macquarie since March 2008.

17.     Defendant Liam Stewart ("Stewart") has served as the Chief Financial Officer of Macquarie since June 2015.

18.     Defendant Richard D. Courtney ("Courtney") has served as the Chief Executive Officer of IMTT since February 2015.

19.     Defendants Hooke, Davis, Stewart, and Courtney are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with Macquarie, possessed the power and authority to control the contents of Macquarie's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.  Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

## BACKGROUND

20.     Macquarie owns, operates, and invests in a diversified group of infrastructure businesses.  Macquarie is composed of four operating segments: (1) its IMTT business, a bulk liquid terminals business providing storage, handling, and related services at 10 marine terminals in the United States and 2 in Canada; (2) Atlantic Aviation, a provider of fuel, terminal, hangaring, and other services to 69 airports in the United States; (3) Contracted Power, which owns a gas-

fired power facility and controlling interests in wind and solar power facilities; and (4) MIC Hawaii, an energy business that processes and distributes gas, and owns renewable and distributed power facilities. According to the Company, each of these segments contributes to Macquarie's revenue streams, and ultimately, its dividend to shareholders.

21. IMTT is the most important of Macquarie's business segments. During the Class Period, IMTT generated the lion's share of Macquarie's revenues and income. According to Bloomberg, in 2017 Macquarie's IMTT business constituted over 30% of the Company's revenues and nearly 70% of its net income.

22. On July 7, 2014, Macquarie announced it had entered into an agreement to acquire the remaining 50% stake in IMTT still owned by IMTT's founders, giving the Company full ownership and control of IMTT. Macquarie announced it acquired a business with a "strong foundation" that provided shareholders with "a number of potentially significant benefits," including "enhanced dividend growth" and "better visibility into growth in distributable cash flow." After the announcement of the IMTT buy-out, Defendant Hooke, the Company's then-CEO, declared that the acquisition would "fortify MIC's stable, largely contracted revenue based business model." Thereafter, Macquarie continued to tout the strength of the IMTT business, including its lack of exposure to any one commodity. Defendants specifically denied suggestions that IMTT's high utilization rates were at risk due to macroeconomic trends and pressures in the oil industry. For example, on October 30, 2014, responding to an analyst question about the impact of lower oil prices on the IMTT business, Hooke stated that impact would be minimal because "we just don't have commodity exposure."

23. Consistent with its prior statements, throughout the Class Period, Macquarie repeatedly touted IMTT's "very strong" performance and "high" utilization rates. Defendants

maintained that any declines in IMTT's storage utilization were temporary and due only to routine maintenance, such as tank cleaning and inspection. Without disclosing the specific commodities stored at IMTT's facilities, Defendants assured investors that IMTT's business was not vulnerable to structural changes in commodity usage, including the market for refined petroleum products. Defendants further assured investors that the Company's historically high dividend was safe and sustainable.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS CAUSE SUBSTANTIAL LOSSES TO INVESTORS

24. The Class Period begins on February 22, 2016, when Macquarie issued a press release announcing its financial results for the fourth quarter and full year of 2015. In the press release, which was filed with the SEC on Form 8-K the following day, the Company announced a dividend of $1.15 per share for the fourth quarter. The press release noted that Macquarie's total dividends in 2015 increased 14.7% compared to 2014, and that the Company had increased its dividend in each of the last nine quarters. In addition, Defendant Hooke noted that the dividend also surpassed the Company's guidance, stating that the Company's "growth has been achieved despite the volatility in markets broadly and reinforces a basic premise of infrastructure – namely, that it is an inherently more stable asset class."

25. In the press release, Defendant Hooke also emphasized the strength of the Company's IMTT business. Hooke told investors that "[t]he performance of IMTT in both the quarter and the full year periods reflects the downstream services nature of the business overall, as well as the extent to which it is uncorrelated with the exploration and production (E&P) portion of the oil industry . . . . IMTT saw no signs of counter-party distress during 2015." The press release stated that IMTT had experienced "improvements in firm commitments including increased utilization rates of 94.9% at year end of 2015."

26.     The next day, February 23, 2016, the Company filed with the SEC its Form 10-K for the fiscal year ended December 31, 2015 ("2015 Form 10-K").  The Company reported total revenue of $1.639 billion and net income loss of $113.807 million, which included IMTT total revenue of $550 million and IMTT net income of $74.14 million.  The 2015 Form 10-K minimized the impact to IMTT of any volatility in petroleum prices, stating that: "[U]ncertainty among industry participants generally has led to a reduction in the average duration of storage and related services contracts.  While the shortening of contracts results in a modest increase in re-contracting risk, the essential services nature of the business and continued strong demand for the products stored serves to offset this risk."  The Company's 2015 Form 10-K further stated that "IMTT does not depend on a single customer, the loss of which would have a material adverse effect on IMTT."

27.     Also on February 23, 2016, during an earnings call, Defendant Hooke highlighted the stability of IMTT utilization rates, noting that IMTT's utilization rates remained high and were not sensitive to market fluctuations, particularly within the petroleum market: "[U]tilization remains high, firm commitments are up, and the cold snap in the Northeast, shortlived though it was, was a mild positive from a heating revenue point of view.   But none of this should come as a huge surprise.  This is not a business that is sensitive to what is going on in the exploration and production, or in interstate product movement.  It is a business that has some sensitivity to end-user demand, but least in the petroleum segment of its operations."  Defendant Hooke stated that IMTT was "seeing growth in end user demand" and emphasized that "IMTT is likely to continue to perform well and continue to serve as a platform for capital deployment."  He further touted as the strength of IMTT its lack of exposure to any one commodity: "In short, we feel confident in the continued stable contribution from IMTT to our overall results.  The Business is simply not the

macroeconomically sensitive enterprise that has been implied in the strong correlation of our share price with those in the MLP world."

28.    During the Company's May 12, 2016 Investor Day conference, Defendant Courtney continued to highlight the stability of IMTT's utilization rates, and dispelled concern regarding market changes impacting the demand for heavy residual oils: "Most of the problems that are happening right now is affecting the upstream, crude, exploration and the gathering.  For us, we are kind of downstream.  Our assets are in a different part of the logistics and distribution chain."

29.    On August 30, 2016, during the Three Part Advisors Midwest IDEAS Investor Conference, Defendant Davis continued to downplay the significance of petroleum IMTT, and the effect that changes in the petroleum market would have on IMTT.  Davis emphasized that IMTT "stores and handles a variety of refined petroleum, chemical and vegetable and animal oils."  Davis added that IMTT "is a downstream business, we are dealing in refined products and demand for refined products has likely been quite strong.  So this business has performed well throughout this period of time.  Bear that in mind when you see anomalous moves in the share price."  Defendant Davis further explained that "[d]emand for storage is high, as you can imagine.  You read about it every day usually in the context of crude oil but also as it pertains to refined product."  He also explained that an IMTT utilization rate between 94% and 96% is "normal."

30.    On February 21, 2017, the Company filed with the SEC its Form 10-K for the fiscal year ended December 31, 2016 ("2016 Form 10-K").  The 2016 Form 10-K reported total revenue of approximately $1.6 billion and net income of $154 million, and total IMTT revenue of $532.5 million and net income of $83.1 million, which constituted more than 32% and 53%, respectively, of the Company's total revenue and net income.  Regarding IMTT, the Company again represented

that "IMTT does not depend on a single customer, the loss of which would have a material adverse effect on IMTT."   The 2016 Form 10-K further emphasized the stability of IMTT customers, noting that IMTT's customers are "investment grade" and operate under "fixed periodic payment" contracts with IMTT: "For the year ended December 31, 2016, approximately 55% of IMTT's revenue was generated by its top ten customers of which seven were rated as investment grade and the other three were not rated.   Customers typically sign contracts which, among other things, provide for a fixed periodic payment (usually monthly) for access to and use of IMTTs facilities. . . . These amounts are payable whether the customer uses the facilities or not."

31.   The next day, on February 22, 2017, Macquarie held its earnings conference call for the 2016 fiscal year end, during which Defendant Hooke discussed IMTT's utilization rates and stability, and informed investors that IMTT's "utilization remained very strong," and "[s]torage prices were stable, with pricing on renewal stepping up in line with inflation." According to Hooke, "[u]tilization remained at the high end of historically normal levels at 96.4% at year end."   During the call, Defendants again assured investors that fluctuations in the petroleum market would not impact IMTT.   In response to an analyst question regarding whether IMTT "pricing expectations and negotiations for the asset going forward changed incrementally at all[,]" and whether IMTT utilization was reverting to historic mean levels "because of new storage capacity coming on in the South," Defendant Hooke represented that IMTT utilization rates "will revert to historically normal levels . . . because things generally revert to historically normal levels. There's nothing we see coming down the pipe that says that this is why we'll revert to historically normal levels.   It's just that eventually things will revert to the mean.   I would say that's where it's at."   Hooke further stated that "we have every incentive to keep those tanks as full as we can, and we will."

11

32.     Similarly, at the Oppenheimer Industrial Growth Conference on May 10, 2017, Defendant Davis stated that "utilization rates are at very high levels" and would remain high into 2018 because "the basic services nature of this business – its capital intensity and the very high barriers to entry into this business – provide us with good visibility into its cash generation and opportunities for growth over time."

33.     One week later, on May 18, 2017, at the Three Part Advisors East Coast IDEAS Investor Conference, Defendant Davis reiterated that "utilization rates have remained very, very high, and they're currently over 96%, which is to say we don't have space for anything else at this point in time."  Davis emphasized to investors that the Company maintains "good visibility" into "macroeconomic factors influencing supply and demand more broadly," as evidence of IMTT's stability.  Davis also stated that utilization rates would remain high into 2018 because "the basic services nature of the business gives us good visibility," and that IMTT facilities have "no commodity exposure directly" because they "simply provide[] access to storage capacity."

34.     On June 27, 2017, at the JPMorgan Energy Equity Investor Conference, Defendant Stewart continued to represent that "utilization for us remains at the high end of historical range" and "the market is one that's in relative equilibrium at the moment."  He explained that IMTT "benefit[s] from stable, generally growing demand and typically very favorable competitive dynamics."  And "[t]he effective execution of this strategy has led to attractive levels of growth in cash generation, dividends and the MIC share price.  Each of free cash flow and dividends have grown at a midteens pace over the past 5 years."  Thus, Stewart informed investors that the Company's "guidance for 2017, shown here at the midpoint for free cash flow and forecast 10% for dividends, is wholly consistent with our historic performance."

35.     During an August 3, 2017 earnings call, Defendant Hooke addressed IMTT's exposure to fluctuations in the petroleum market.  Dismissing an analyst's question about whether "there are any commodity-driven factors that would cause a decline in utilization," Hooke assured investors that IMTT's utilization was stable and essentially immune from fluctuations in commodity markets:  "No, no.  The totality of the change in utilization was driven by tanks offline for tank cleaning and inspection.  But the other I would – so there's no – well, there's nothing – there's no other commodity noise or other noise or counter-party issues there.  It's purely that."  Defendant Hooke noted that "IMTT's operating results for the second quarter were a case of steady as she goes, a reversion to the mean in storage utilization, stable pricing and one small construction project termination that resulted in recognition of some deferred revenue."

36.     On August 31, 2017, at the Three Part Advisors Midwest IDEAS Investor Conference, Defendant Davis likewise stated that "utilization has been very, very stable.  Generally speaking, where we are today at about 94% in utilization is consistent with historically normal."  And speaking to the Company's stability and the sustainability of its dividend, Davis emphasized that "what you've got there is a stable and growing cash generation from some very basic services kind of businesses where we're being traded today, of course, I think most people would suggest is an attractive yield leading to that mid- to high-teens kind of a total opportunity – total return kind of an opportunity, very much consistent with what we've been doing for the past 13 years."

37.     On November 1, 2017, the Company filed with the SEC its Form 10-Q for the third quarter of 2017 ("2017 3Q Form 10-Q").  The 2017 3Q Form 10-Q stated that Macquarie was issuing a quarterly dividend of $1.42 per share, representing a 10.1% increase over the dividend offered during the prior year period.  The Company also reported total revenue of approximately $453 million and net income of $36 million, and IMTT total revenue of approximately $134

million and net income of $20 million, which constituted more than 29% and 57%, respectively, of the Company's total revenue and net income.  Regarding IMTT, the Company's 2017 3Q Form 10-Q echoed Macquarie executives' repeated representations about IMTT's high utilization rates and stability: "We expect utilization levels to be approximately 94% over the long term, as they have been historically."

38.     During an earnings call the following day, November 2, 2017, Defendants continued to assuage investors' concerns about IMTT's utilization rates.  According to Defendant Hooke, the "primary driver" in a slight drop in IMTT utilization in the third quarter of 2017 was that "[t]wo of these tanks were out of service for a portion of the third quarter . . . ."  Hooke instructed investors to "keep in mind that the decline in utilization was not outside the historically normal utilization range of between 92% and 94%."  Hooke also emphasized the Company's conservative dividend policy, stating that "I think across the period I've been here, you've never seen us make radical lurching changes of, sort of, revisiting capital policy and dividend policy, et cetera.  I would be pretty surprised if anything changes going forward."  And in response to a question as to whether Macquarie will follow the market "pivot towards what the market values and not as much maximizing dividend growth but more retaining cash flow and having stronger financials," Hooke assured investors that:

> I don't think you'll see us imitate too many others over time.  I think our view is fads come and go as to what's popular.  Exuberant dividend growth at all costs where people were urging us to guide to 7 years' visibility of 20% plus dividend growth, we never did that. People slashing their dividend saying we're going to slash our dividend to deploy capital internally, I don't think you'll see us do that.  I don't think we will get into any of those fads.  I would say that some of the midstream firms are sort of having to take, today, some pain for some decisions they've taken in the past that we haven't taken.  Remember that sort of 60% of our business or so is not midstream.

39.     Similarly, during the November 16, 2017 Three Part Advisor Southwest IDEAS Investor Conference, Defendant Davis stated that IMTT's utilization rates were stable, noting that the "basic nature of this business, combined with inflation-linked escalators in those contracts, . . . provide us with very good visibility into the cash generating capacity of this business over a longer period of time."  Davis also emphasized the Company's history of authorizing "pretty consistent increases in the dividend," noting that the Company typically returns "between 75% and 85% of the cash produced" as a quarterly cash dividend.

40.     The statements identified in ¶¶24-39 were materially false and misleading, or omitted material information known to Defendants necessary to make the statements not false and misleading, when made.  Contrary to Defendants' statements regarding IMTT's "very strong" performance and "high utilization" rates, IMTT's performance and utilization were at risk of significant decline due to ongoing industrywide changes in the market for heavy residual oils, and in particular, declining demand and pricing for No. 6 fuel oil.  Similarly, Defendants' assurances that IMTT facilities had "no commodity exposure directly" because they "simply provide[] access to storage capacity" were materially false and misleading because IMTT relied significantly on demand for storage of heavy residual fuel oils, including No. 6 fuel oil.   Defendants' statements also misled investors regarding the need for Macquarie to undertake significant capital expenditures to repurpose IMTT storage tanks to accommodate alternative products.  All of these misrepresentations rendered investors unable to appreciate or assess the material risks to IMTT of shifting commodity demands, including the decline in demand for heavy residual fuel oils, and the resultant impact to the sustainability of the Company's dividend.

## THE TRUTH EMERGES

41.     On February 21, 2018, after the close of trading, Macquarie surprised the market by announcing disappointing fourth quarter earnings of $0.43 per share, well short of analysts' prior estimate of $0.51 per share, and that the Company would be slashing its dividend.  The Company cited as the main reason for its poor performance the loss of "half a dozen" IMTT contracts at its flagship Louisiana storage facility due to a decline in the No. 6 fuel oil segment. This was the first time the Company had disclosed the importance of the No. 6 fuel oil segment to the IMTT business, and to the Company's overall performance.

42.     Company executives attempted to downplay the loss of these IMTT customers as "an issue having to do with one product, in one market, in one of our businesses."  But the broader significance of the decline in No. 6 fuel oil to Macquarie's long-term business was made clear: Macquarie announced that it would be cutting its 2018 dividend by 31% to strengthen the Company's balance sheet and fund key business projects, primarily the repurposing of IMTT fuel tanks to accommodate new products.  As the Company's current CEO acknowledged on February 22, 2018, the Company was "better off repurposing these 6 Oil tanks now, given the long-term structural decline of this product."

43.     In response to this news, Macquarie's stock price fell from $63.62 per share on February 21, 2018, to $37.41 per share on February 22, 2018, a decline of over 41% in just one trading day, wiping out over $2 billion in shareholder equity.

## LOSS CAUSATION

44.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market.  These misleading statements and omissions artificially inflated the price of Macquarie stock and operated

as a fraud or deceit on the Class (as defined below). Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, Macquarie's stock price fell significantly. As a result of their purchases of Macquarie stock during the Class Period, Plaintiff and other members of the Class suffered significant harm.

## CLASS ACTION ALLEGATIONS

45. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Macquarie stock during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, directors, and officers of Macquarie and their families and affiliates.

46. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Macquarie has approximately 84.82 million shares of stock outstanding, owned by at least hundreds or thousands of investors.

47. Questions of law and fact common to the members of the Class, which predominate over questions which may affect individual Class members, include:

(a) Whether Defendants violated the Exchange Act;

(b) Whether Defendants omitted and/or misrepresented material facts;

(c) Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(e) Whether Defendants' misconduct impacted the price of Macquarie stock;

(f)     Whether Defendants' conduct caused the members of the Class to sustain harm; and

(g)     The extent of harm sustained by Class members and the appropriate measure of harm.

48.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained harm from Defendants' wrongful conduct.

49.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

50.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

51.     Macquarie's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

52.     Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Macquarie who knew that the statement was false.  None of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present-tense statements when made.

## **PRESUMPTION OF RELIANCE**

53.     At all relevant times, the market for Macquarie stock was an efficient market for, among other, the following reasons:

(a)     Macquarie stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Macquarie filed periodic public reports with the SEC and the NYSE;

(c)     Macquarie regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Macquarie was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

54.     As a result of the foregoing, the market for Macquarie stock promptly digested current information regarding Macquarie from all publicly available sources and reflected such information in the price of Macquarie stock.  Under these circumstances, all purchasers of Macquarie stock during the Class Period suffered similar injury through their purchase of Macquarie stock at artificially inflated prices and the presumption of reliance applies.

55.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972),

because the Class' claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the factors affecting the Company's dividend – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Company's dividend to investors, as set forth above, that requirement is satisfied here.

## <u>COUNT I</u>

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against Defendants**

56.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

57.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause economic harm to Plaintiff and other members of the Class.

58.     Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

59.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

60.     During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

61.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Macquarie's true condition from the investing public and to support the artificially inflated prices of the Company's stock.

62.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they purchased Macquarie stock and were harmed when the truth about Macquarie negatively impacted the price of those securities.  Plaintiff and the Class would not have purchased Macquarie stock at the prices they paid, or at all, had they been aware of the truth about Macquarie.

63.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered harm in connection with their respective purchases of the Company's stock during the Class Period.

64.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## <u>COUNT II</u>

**For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants**

65.     Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

66.     The Individual Defendants acted as controlling persons of Macquarie within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Macquarie, the Individual Defendants had the power and ability to control the actions of Macquarie and its employees.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensation to Plaintiff and other Class members against all Defendants, jointly and severally, for all harm sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.      Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  April 23, 2018               Respectfully submitted,


                                     BERNSTEIN LITOWITZ BERGER
                                        & GROSSMANN LLP


                                     */s/ Avi Josefson*
                                     Avi Josefson
                                     1251 Avenue of the Americas
                                     New York, NY 10020
                                     Tel:    (212) 554-1400
                                     Fax:    (212) 554-1444
                                     avi@blbglaw.com

                                     *Attorneys for Plaintiff City of Riviera Beach*
                                     *General Employees Retirement System*

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Betty Kendrick, on behalf of the City of Riviera Beach General Employees Retirement System ("Riviera Beach"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Chair of Riviera Beach.  I have reviewed the allegations of the complaint with the Fund's legal counsel, and based on the legal counsel's knowledge and advice, authorize its filing.

2. Riviera Beach did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Riviera Beach is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Riviera Beach's transactions in the Macquarie Infrastructure Corporation securities that are the subject of this action are set forth in the chart attached hereto.

5. Riviera Beach is currently seeking to serve as a lead plaintiff and representative party on behalf of a class in the following action filed under the federal securities laws during the three years preceding the date of this Certification:

   *Hawaii Structural Ironworkers Pension Trust Fund v.*
   *AMC Entertainment Holdings, Inc.,* No. 18-cv-299 (S.D.N.Y.)

6. Riviera Beach will not accept any payment for serving as a representative party on behalf of the Class beyond Riviera Beach's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this ___ day of April, 2018.

Betty Kendrick
Chair
*City of Riviera Beach General Employees*
*Retirement System*

**City of Riviera Beach General Employees Retirement System**
**Transactions in Macquarie Infrastructure Corporation**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 1/27/2017 | 111 | 77.1222 |
| Purchase | 1/27/2017 | 100 | 76.5978 |
| Purchase | 1/27/2017 | 100 | 75.9666 |
| Purchase | 1/27/2017 | 31 | 76.1499 |
| Purchase | 1/27/2017 | 89 | 77.1700 |
| Purchase | 1/27/2017 | 19 | 76.1601 |
| Purchase | 1/30/2017 | 57 | 74.0268 |
| Purchase | 1/30/2017 | 43 | 74.1525 |
| Purchase | 2/10/2017 | 74 | 79.8155 |
| Purchase | 2/10/2017 | 76 | 79.7600 |
| Purchase | 2/13/2017 | 128 | 79.6475 |
| Purchase | 2/13/2017 | 22 | 79.8438 |
| Purchase | 2/14/2017 | 50 | 78.6921 |
| Purchase | 2/14/2017 | 100 | 77.6744 |
| Purchase | 2/22/2017 | 45 | 77.1750 |
| Purchase | 2/22/2017 | 36 | 77.0550 |
| Purchase | 2/22/2017 | 64 | 77.0281 |
| Purchase | 2/22/2017 | 14 | 77.8712 |
| Purchase | 2/22/2017 | 55 | 77.1552 |
| Purchase | 2/22/2017 | 36 | 77.4750 |
| Purchase | 2/22/2017 | 100 | 76.9094 |
| Purchase | 2/23/2017 | 150 | 76.7050 |
| Purchase | 2/24/2017 | 100 | 75.7695 |
| Purchase | 2/24/2017 | 46 | 75.3708 |
| Purchase | 2/24/2017 | 33 | 75.4250 |
| Purchase | 2/24/2017 | 21 | 75.5987 |
| Purchase | 3/1/2017 | 93 | 75.6043 |
| Purchase | 3/1/2017 | 7 | 75.5853 |
| Purchase | 5/8/2017 | 100 | 80.2743 |
| Purchase | 5/18/2017 | 100 | 77.0039 |
| Purchase | 6/8/2017 | 15 | 76.2151 |
| Purchase | 6/8/2017 | 35 | 76.4628 |
| Purchase | 6/27/2017 | 50 | 79.0050 |
| Purchase | 7/7/2017 | 50 | 77.0411 |
| Purchase | 8/3/2017 | 48 | 76.2973 |
| Purchase | 8/3/2017 | 52 | 76.1300 |

**City of Riviera Beach General Employees Retirement System**
**Transactions in Macquarie Infrastructure Corporation**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 8/3/2017 | 150 | 76.1491 |
| Purchase | 8/3/2017 | 50 | 76.2347 |
| Purchase | 8/9/2017 | 54 | 75.3747 |
| Purchase | 8/9/2017 | 46 | 75.1400 |
| Purchase | 8/15/2017 | 50 | 72.7737 |
| Purchase | 8/16/2017 | 50 | 72.5765 |
| Purchase | 8/16/2017 | 50 | 71.9746 |
| Purchase | 8/23/2017 | 26 | 72.6109 |
| Purchase | 8/23/2017 | 24 | 72.7768 |
| Purchase | 9/7/2017 | 61 | 72.7200 |
| Purchase | 9/7/2017 | 39 | 72.7061 |
| Purchase | 10/4/2017 | 18 | 72.4607 |
| Purchase | 10/4/2017 | 32 | 72.4100 |
| Purchase | 10/18/2017 | 100 | 71.9072 |
| Purchase | 10/20/2017 | 52 | 71.2387 |
| Purchase | 10/20/2017 | 48 | 71.3700 |
| Purchase | 10/23/2017 | 10 | 69.0642 |
| Purchase | 10/23/2017 | 29 | 68.5863 |
| Purchase | 10/23/2017 | 40 | 69.1175 |
| Purchase | 10/23/2017 | 21 | 68.5650 |
| Purchase | 10/26/2017 | 50 | 69.1403 |
| Purchase | 11/2/2017 | 150 | 68.1668 |
| Purchase | 11/2/2017 | 20 | 66.7291 |
| Purchase | 11/2/2017 | 251 | 66.9072 |
| Purchase | 11/2/2017 | 100 | 66.8491 |
| Purchase | 11/2/2017 | 29 | 67.0800 |
| Purchase | 11/3/2017 | 90 | 67.0336 |
| Purchase | 11/3/2017 | 60 | 67.0596 |
| Purchase | 11/8/2017 | 50 | 68.0446 |
| Purchase | 11/10/2017 | 50 | 67.0803 |
| Purchase | 11/13/2017 | 100 | 65.8851 |
| Purchase | 11/16/2017 | 100 | 64.1312 |
| Purchase | 11/28/2017 | 200 | 65.4725 |
| Purchase | 11/29/2017 | 41 | 65.6271 |
| Purchase | 11/29/2017 | 50 | 65.6352 |
| Purchase | 11/29/2017 | 59 | 65.6374 |
| Purchase | 12/6/2017 | 42 | 65.9178 |

**City of Riviera Beach General Employees Retirement System**
**Transactions in Macquarie Infrastructure Corporation**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 12/6/2017 | 58 | 65.9484 |
| Purchase | 12/8/2017 | 100 | 65.5000 |
| Purchase | 12/15/2017 | 51 | 64.7000 |
| Purchase | 12/15/2017 | 49 | 64.8434 |
| Purchase | 1/3/2018 | 150 | 65.5941 |
| Purchase | 1/3/2018 | 100 | 64.9963 |
| | | | |
| Sale | 4/14/2016 | (100) | 70.1120 |
| Sale | 6/9/2016 | (93) | 74.0116 |
| Sale | 6/9/2016 | (7) | 74.0600 |
| Sale | 7/6/2016 | (200) | 73.9061 |
| Sale | 7/12/2016 | (8) | 75.8600 |
| Sale | 7/12/2016 | (51) | 75.8553 |
| Sale | 7/12/2016 | (41) | 76.2455 |
| Sale | 8/22/2016 | (138) | 79.9738 |
| Sale | 8/22/2016 | (62) | 79.9918 |
| Sale | 8/24/2016 | (200) | 80.8262 |
| Sale | 9/21/2016 | (60) | 80.1507 |
| Sale | 9/21/2016 | (65) | 80.0000 |
| Sale | 9/21/2016 | (175) | 80.0364 |
| Sale | 9/28/2016 | (200) | 84.2123 |
| Sale | 9/28/2016 | (100) | 83.6687 |
| Sale | 1/23/2018 | (250) | 65.8112 |
| Sale | 2/15/2018 | (121) | 65.1218 |
| Sale | 2/15/2018 | (729) | 65.1441 |