**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CITY OF RIVIERA BEACH GENERAL EMPLOYEES RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> MACQUARIE INFRASTRUCTURE CORPORATION, JAMES HOOKE, JAY DAVIS, LIAM STEWART, and RICHARD D. COURTNEY, <br><br> Defendants. | No. 1:18-cv-03608 <br><br> <u>CLASS ACTION</u> <br><br> **JURY TRIAL DEMANDED** |

<u>**CONSOLIDATED CLASS ACTION COMPLAINT FOR**</u>
<u>**VIOLATIONS OF THE FEDERAL SECURITIES LAWS**</u>

**TABLE OF CONTENTS**

<strong>Page(s)</strong>

I.      INTRODUCTION ..................................................................................................... 1

    A.      Background of the Fraud ............................................................................ 2

    B.      The Truth Is Revealed ............................................................................... 7

II.     JURISDICTION AND VENUE .............................................................................. 8

III.    PARTIES ................................................................................................................. 9

    A.      Lead Plaintiff ............................................................................................. 9

    B.      Corporate Defendants ................................................................................ 9

    C.      Officer Defendants .................................................................................. 10

    D.      Securities Act Defendants ....................................................................... 11

IV.     SUMMARY OF THE EXCHANGE ACT CLAIMS ............................................ 12

    A.      The Exchange Act Defendants Sell Macquarie's "Unsexy Business
           Model" To Investors By Promising "Steady, Predictable"
           Dividends ................................................................................................ 12

    B.      Macquarie Depends On IMTT To Fuel Its "Total Attractive
           Return" .................................................................................................... 17

    C.      The Exchange Act Defendants Conceal That Macquarie's "Total
           Return Opportunity" Is Not Sustainable. ............................................... 23

           1.      The No. 6 fuel oil industry faces a "paradigm shift." .............. 24

           2.      By the beginning of the Class Period, investors are unaware
                 of IMTT's exposure to the "brutal changes" in the No. 6
                 fuel oil industry. ....................................................................... 28

           3.      During the Class Period, the Exchange Act Defendants
                 conceal IMTT's reliance on No. 6 fuel oil. .............................. 30

           4.      Just weeks after IMO 2020 is confirmed, Macquarie
                 Management profits from nearly $235 million in sales to
                 investors. ................................................................................... 34

           5.      As IMTT's utilization begins to fall, Macquarie acquires
                 Epic Midstream in a largely-stock transaction. ........................ 41

    D.      The Exchange Act Defendants Continue To Falsely Tout IMTT's
           Utilization And Promise Macquarie's Dividend Even As
           Customers Cancel Valuable No. 6 Fuel Oil Storage Contracts ........... 42

i

      E.      Throughout The Class Period, The Market Relied On The Exchange Act Defendants' Misrepresentations About IMTT .............................. 47

V.        THE TRUTH EMERGES ......................................................................... 48

VI.     POST CLASS PERIOD EVENTS............................................................. 54

VII.    THE EXCHANGE ACT DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS ..................................................... 60

      A.      The Exchange Act Defendants' Materially False And Misleading Statements And Omissions In Earnings Releases, Conference Calls And Investor Presentations Concerning The Company's Reliance On No. 6 Fuel Oil And Dividend Growth Plan .................................... 61

             1.      Fourth Quarter and Year End 2015 Misrepresentations ......................... 61

             2.      2016 Misrepresentations ........................................................................ 65

             3.      2017 Misrepresentations ........................................................................ 69

      B.      The Exchange Act Defendants' Materially False and Misleading Statements and Omissions in Macquarie's Forms 10-K, 10-Q, and Offering Documents................................................................................ 79

VIII.   LOSS CAUSATION............................................................................... 83

IX.     SUMMARY OF SCIENTER ALLEGATIONS ..................................... 84

X.        PRESUMPTION OF RELIANCE ......................................................... 92

XI.     INAPPLICABILITY OF STATUTORY SAFE HARBOR ................... 94

XII.    CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT................... 95

XIII.   CLAIMS BROUGHT PURSUANT TO THE SECURITIES ACT ................ 98

      A.      Securities Act Parties ........................................................................... 99

      B.      False and Misleading Statements and Omissions in the Offering Documents ......................................................................................... 101

      C.      The Securities Act Defendants' Failure To Exercise Reasonable Care Or To Conduct A Reasonable Investigation In Connection With The Offering....................................................................................... 106

XIV.   CLASS ACTION ALLEGATIONS ..................................................... 111

XV.    PRAYER FOR RELIEF ....................................................................... 113

XVI.   JURY DEMAND ................................................................................. 114

APPENDIX A ................................................................................................. 116

Lead Plaintiff Moab Partners, L.P. ("Moab" or "Lead Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge. Lead Plaintiff's information and belief is based upon, inter alia, counsel's investigation, which includes, among other things, review and analysis of: (a) Macquarie Infrastructure Corporation's ("Macquarie" or the "Company") regulatory filings with the United States Securities and Exchange Commission ("SEC"); (b) press releases, conference call transcripts, and media reports issued and disseminated by the Company; (c) analyst and media reports concerning Macquarie; (d) interviews with witnesses, including former Macquarie employees; (e) consultation with industry experts and participants; and (f) other public information regarding the Company.

## I.   INTRODUCTION

1.     This securities class action arises from a series of material misrepresentations and omissions by Macquarie and its top executives regarding Macquarie's most important operating division, International-Matex Tank Terminals ("IMTT"), one of the largest independent bulk liquid storage terminals businesses in the United States. Throughout the Class Period, Macquarie faced clear and present risks from IMTT's concealed reliance on revenue from the storage of No. 6 fuel oil, a broadly defined group of high-sulfur heavy and residual fuel oils facing fast-approaching "brutal changes" that would effectively eliminate the only remaining demand for the commodity. Defendants omitted and actively misrepresented Macquarie's exposure to these risks. Indeed, as Macquarie's stock began to decline in 2017, investors directly asked Defendants about these risks, and Defendants falsely stated that they stored "very little" No. 6 fuel oil.

2.     The omissions and misrepresentations set forth below enabled Defendant Macquarie Infrastructure Management (USA) Inc. ("Macquarie Management"), the controlling manager of Macquarie's businesses, to cash out 40% of its ownership interest in Macquarie in a November 2016 secondary public offering for a total of $235 million (the "Offering"), and to thereafter accrue additional hundreds of millions of dollars in management fees based on the

Company's inflated share price and dividends. However, public investors suffered enormous losses when the truth about the Company was revealed. As discussed in more detail below, after four years of assurances that IMTT was stable and protected from commodity pressures, on February 21, 2018, the Company abruptly slashed the dividend that was its key selling point as a direct result of the cancellation of a material number of previously-concealed No. 6 fuel oil storage contracts and the consequential need to devote hundreds of millions of dollars to a never-before publicly discussed "planned repurposing" on a significant number of these now empty tanks.

3.     In response, Macquarie's stock price declined over 40% in a single trading day, dropping from $63.62 per share on February 21, 2018 to $37.41 per share on February 22, 2018— a stunning decline from its Class Period high of $84.13 per share in September 2016.

**A.     Background of the Fraud**

4.     For years, Macquarie has been known as—and actively cultivated a reputation as— a "total return opportunity" based on its stable and growing dividend. For example, in early 2017, analysts named Macquarie a "Top Dividend Stock," noting the Company's strong quarterly dividend history, diversified business operations, and favorable long-term, multi-year growth rates.

5.     However, by the start of the Class Period, Macquarie faced a major industry ban that threatened its ability to continue to deliver the historically high dividend that it promised investors. Specifically, the Exchange Act Defendants (defined below) knew that IMTT, Macquarie's top asset and largest profit-driver, was materially exposed to upcoming regulations strongly limiting the primary use of No. 6 fuel oil, a heavily-regulated commodity that secretly comprised well over 40% of IMTT's tank storage capacity but for which demand had been falling for years. Although—as Macquarie would later admit—the impending limits on No. 6 fuel oil were known to the public, during the Class Period Macquarie did not disclose but instead actively misled investors about the severe effects of those limits on its business operations.

6.     Not only did these regulations and the general decline in demand leave IMTT secretly vulnerable to a meaningful loss of revenue, but the noxious qualities of No. 6 fuel oil contaminated even the pores of steel and the tank, meaning that, at a minimum, IMTT's tanks

could not be used to store other commodities without a difficult, time-consuming, and expensive cleaning process. Even after cleaning, some of the tanks that IMTT had built to store No. 6 fuel oil were so massive that there simply *was no market* to store more in-demand commodities in them, as no other commodities traded in sufficiently large volumes. For that reason, one former employee described several of these tanks—IMTT's largest tanks, at its largest and most important terminal in St. Rose, Louisiana—as "obsolete" for storing anything lighter than No. 6 fuel oil, the heaviest of the heavy fuel oils and which faced imminent "brutal changes."

7.      Defendants had carefully guarded Macquarie's reliance on No. 6 fuel oil, leaving investors completely in the dark as to this fast-approaching threat. Macquarie last acknowledged exposure to No. 6 fuel oil in 2012, at which time Defendants stated that—consistent with the industry at large—they had "concluded that it would be IMTT's *long-term best interests to begin to convert* a portion of the residual oil storage at Bayonne [IMTT's second-largest terminal] *to clean product storage*."[1] For years afterward, Defendants made it impossible for investors to independently determine how industrywide changes might impact IMTT by scrupulously avoiding stating that they had *any* exposure to No. 6 fuel oil, instead describing the commodities stored only by very general categories (such as "chemicals, vegetable and animal oils, crude and asphalt, and refined petroleum products") and telling investors—as IMTT's CEO, Defendant Courtney, did at a May 12, 2016 Macquarie investor day—that IMTT had "flexibility" and "optionality" in its tanks.

8.      Rather than provide additional information, Defendants continuously assured investors that Macquarie's businesses were "boringly predictable" even in a "volatile and excited" world because of their "inherently more stable asset class" and "stable essential services nature." Indeed, Defendants told the market that IMTT in particular was not "sensitive to what is going on in the exploration and production, or in interstate product movement" and "is simply not [a] macroeconomically sensitive enterprise."

---

[1] Unless otherwise noted, all emphasis herein is added.

3

9.    Defendants continued to conceal IMTT's reliance on No. 6 fuel oil storage revenue even after the imminent end of demand for the commodity was confirmed. In October 2016, the International Maritime Organization ("IMO") confirmed that a long-scheduled, aggressive 0.5% sulfur cap on global shipping fuels would begin by the start of 2020. Because in recent years the only sustained demand for No. 6 fuel oil has come from shipping vessels, it was widely understood that IMO 2020 would cause "brutal changes" for all those in the supply chain for No. 6 fuel oil. While Macquarie ultimately acknowledged—*after* the Class Period—that IMO 2020 dramatically shifted the industry away from No. 6 fuel oil, *during* the Class Period Defendants conspicuously avoided discussing IMO 2020, despite their obligation under Item 303 of Regulation S-K (17 C.F.R. § 229.303) to disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

10.    Instead, just weeks after IMO 2020 was confirmed to proceed on schedule, Defendants told investors to "[r]emember" that "none of MIC's business are exposed directly to the price of crude oil or petroleum products" as Macquarie Management sold investors over $235 million of Macquarie common stock in a secondary public offering in the November 2016 Offering.

11.    As the Class Period progressed, the demand for No. 6 fuel oil continued to decline, but Defendants continued to tell investors—as Macquarie's head of investor relations, Defendant Davis, did at a May 10, 2017 Oppenheimer Industrial Growth Conference—that IMTT had "no commodity exposure other than the very broad macroeconomic factors influencing supply and demand more broadly." Then, during the Company's August 3, 2017 earnings call, Defendant Hooke played down declines in IMTT's storage utilization as temporary and due only to routine maintenance, such as tank cleaning and inspection, assured investors that IMTT remained "*a case of steady as she goes*," and emphatically denied that there were "any commodity-driven factors that would cause a decline in utilization."

4

12.     All the while, Defendants told investors that the Company would execute its growth goals and continue to deliver its dividend. For example, during Macquarie's November 2, 2017 earnings call, Defendant Hooke forcefully told investors not to expect Macquarie to "slash our dividend to deploy capital internally," but rather to expect that "[g]rowing distributions to shareholders in a steady, predictable fashion while investing for the future will continue to be part of [Macquarie's] strategy."

13.     As they did throughout the Class Period, at the end of that November 2, 2017 call, Defendants actively invited investors to contact them with further questions. As a result, throughout the Class Period, Defendants had regular discussions and exchanges with analysts and investors during which Defendants reiterated and provided additional color to their public statements made in SEC filings, press releases, and conference calls. Indeed, Macquarie would later acknowledge that, as a result of its "Proactive Investor Engagement," it had "*in excess of 1,200 individual interactions with current and potential shareholders*" in 2017 alone.

14.     As the Class Period neared its end, with Macquarie's stock price in decline, investors reached out to Macquarie with specific questions about IMTT's storage of fuel oils impacted by IMO 2020. In response, Defendants falsely misrepresented by *half* the amount of heavy fuel oil (i.e., No. 6 fuel oil) stored by IMTT, and also minimized the consequences of its storage of the commodity. For example, on or around this time, Defendant Davis directly told an investor that No. 6 fuel oil was only a small percent of IMTT's utilization.

15.     As another example, on September 22, 2017, Defendant Davis spoke on the phone with another institutional investor, who told Defendant Davis that the investor learned from one of Macquarie's competitors that No. 6 fuel oil was 20% of IMTT's capacity, and that the market for No. 6 fuel oil was weak at the time and specifically had "some real structural challenges given" IMO 2020. In response, Davis told the institutional investor that IMO 2020 should not have much of an impact—and in fact could end up a positive—and, if needed, Macquarie could convert IMTT's tanks for a nominal amount.

16.   Similarly, on November 7, 2017, Lead Plaintiff emailed Defendant Davis and sought information on the percentage of IMTT's storage that was in "heavy oil" and the impact, if any, of IMO 2020 on IMTT's heavy oil storage and tanks. In response, Defendant Davis told Lead Plaintiff—consistent with information made available to other investors—that only "20%" of IMTT's oil was heavy, and further minimized the impact of IMO 2020 by indicating that the banned heavy oil could easily "be blended with distillate to meet the new spec." Davis even stated that the new regulations "could well be a ***positive for storage demand*** at IMTT-Bayonne given the deep water access at the facility."

17.   Defendant Davis repeated similar messages to investors at a Three Part Advisors Investor Conference one week later, on November 16, 2017, telling the audience that Defendants have "very good visibility into the cash generating capacity of [IMTT] over a longer period of time," and that "*very little*" of IMTT's storage is in any "***heavy product***"—i.e., No. 6 fuel oil.

18.   Then, on November 28, 2017, Macquarie and Defendants Hooke, Stewart, and Davis hosted a dinner for approximately 12 institutional investors, during which they said that IMTT would be a "growth driver for 2018" as a result of pricing and operational improvements expected to push EBITDA margins higher.

19.   The following month, Defendants delivered an investor presentation entitled "Overview of the IMTT Segment." The presentation stated that IMTT's "[c]onsistently high utilization reflects essential services nature of IMTT's services," while any "[u]nused capacity is generally attributable to tank inspections, repairs, and modifications."

20.   These statements were blatant lies. In fact, the Company would later disclose that heavy and residual fuel oil—No. 6 fuel oil—constituted well over 40% of IMTT's storage. This amount was far from the "very little" that Defendant Davis had told an audience at an investor conference, and over twice what Davis had told Lead Plaintiff and other investors. Further, while Davis misleadingly implied to investors, including Lead Plaintiff, that compliance with IMO 2020 would be straightforward and even possibly a "positive," in fact Macquarie would later acknowledge that IMO 2020 had triggered a "structural decline in the 6 oil market" that caused

IMTT to begin losing storage contracts at least a month earlier, in October 2017. Ultimately, as Macquarie admitted, decline in No. 6 fuel oil caused utilization to fall to 89% by the end of the fourth quarter 2017, and would cause utilization to fall even farther, to an "***average in the mid-80% range***"—a double-digit decline that was not "generally attributable to tank inspections, repairs, and modifications." In addition, Davis's claim that No. 6 fuel oil could simply "be blended with distillate to meet the new spec" misled investors about the expensive cleaning required to scrub the highly noxious No. 6 fuel oil from IMTT's tanks before they could be used for other commodities. Even then, because IMO 2020 effectively killed the demand for high sulfur fuel oils (like No. 6 fuel oil), it could never be a "positive" for the Company: many of IMTT's No. 6 fuel oil tanks were so large that they were (in the words of a former employee) largely "obsolete" for storing less sulfuric commodities because no such commodities traded in sufficient volumes to make use of those tanks economical. Ultimately, IMTT was so imperiled by its exposure to No. 6 fuel oil that Macquarie had to slash its dividend to afford the hundreds of millions of dollars necessary to "repurpose" the tanks for other uses.

  **B.**  **The Truth Is Revealed**

  21.  On February 21, 2018, after the close of trading, Macquarie surprised the market by announcing a shocking decline in IMTT utilization, to the lowest level that Macquarie had ever publicly reported; fourth quarter earnings that fell well short of analysts' estimates; and a 31% cut to the Company's dividend—just weeks after telling analysts that the dividend was "sacrosanct."

  22.  The next day, Macquarie blamed the bad news directly on one culprit: No. 6 fuel oil. Revealing for the first time the depth of IMTT's exposure, Macquarie explained that it had to siphon money away from the dividend because the declining demand for No. 6 fuel oil would require Macquarie to spend hundreds of millions of dollars repurposing IMTT's storage tanks to accommodate other commodities. Analysts immediately noted their surprise, calling the Company's statements "troubling" and questioning management's credibility. In response to this news, Macquarie's stock price fell from $63.62 per share on February 21, 2018, to $37.41 per share on February 22, 2018. The stock price has not recovered since then. Instead, Macquarie

received a public reprimand from leading investment advisory group Institutional Shareholder Services, Inc., for creating a "credibility crisis" and "mistrust," and Macquarie Management was forced to cap its fee to pacify investor rebellion. All the while, the damage from Macquarie's concealed reliance on No. 6 fuel oil has continued to prove disastrous: on February 20, 2019, Macquarie disclosed that IMTT ended 2018 with utilization of just 82%, far below the constantly affirmed "historical mean" of 94% investors were told to expect during the Class Period.

23.     As a result of Defendants' wrongful acts and omissions, and the resulting decline in the market value of Macquarie's stock, Lead Plaintiff and other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

24.     The claims asserted herein arise under Sections 10(b), 20(a), and 20A of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), 78t-1; Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5; and Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o.

25.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337; Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and Section 22 of the Securities Act, 15 U.S.C. § 77v.

26.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b); Section 27 of the Exchange Act, 15 U.S.C. § 78aa(a); and Section 22 of the Securities Act, 15 U.S.C. § 77v. Macquarie maintains its corporate headquarters in New York, New York, which is situated in this District, conducts substantial business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in this District. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails, interstate telephone communications, and the facilities of the national securities markets.

### III.     PARTIES

#### A.     Lead Plaintiff

27.     Lead Plaintiff Moab Partners, L.P. is a sophisticated institutional investor located in New York, New York. As shown in Lead Plaintiff's certification (*see* ECF No. 37-1), Moab purchased over 500,000 shares of Macquarie common stock during the Class Period, including 18,800 shares of Macquarie common stock traceable to the Offering at a price of $81.90 per share directly from Securities Act Defendant Barclays. Moab suffered damages as a result of the violations of the federal securities laws alleged in this Complaint.

#### B.     Corporate Defendants

28.     Defendant Macquarie Infrastructure Corporation ("Macquarie" or the "Company") is a Delaware corporation headquartered at 125 West 55th Street, New York, New York 10019. Macquarie is a holding company that owns and operates a portfolio of infrastructure and infrastructure-like businesses. Outside of these operating segments, Macquarie does not have any employees, but instead relies on personnel assigned by Macquarie Management. The Company's common stock trades on the New York Stock Exchange ("NYSE"), which is an efficient market, under the ticker symbol "MIC." Macquarie currently has over 85 million shares of common stock outstanding, owned by at least hundreds or thousands of investors.

29.     Defendant Macquarie Infrastructure Management (USA) Inc. ("Macquarie Management") acts as manager of Macquarie and is responsible for Macquarie's day-to-day operations and affairs and oversight of the management teams of Macquarie's operating segments. In accordance with its management services agreement, Macquarie Management assigned certain of its employees, including Defendant James Hooke—Macquarie's CEO through most of the Class Period—and Defendant Liam Stewart—Macquarie's CFO throughout the Class Period—to Macquarie. In a secondary public offering conducted by Macquarie in November 2016, Macquarie Management sold 2,870,000 shares of Macquarie common stock, comprising nearly 40% of Macquarie Management's holdings, for a profit of over $234 million. Macquarie Management is named as a defendant in Count II (for violations of Section 20(a) of the Exchange Act), Count III

(for violations of Section 20A of the Exchange Act), and Count VI (for violations of Section 15 of the Securities Act).

### C. Officer Defendants

30.     Defendant James Hooke ("Hooke") was an employee of Defendant Macquarie Management assigned to serve as Chief Executive Officer of Macquarie from May 8, 2009 to December 31, 2017. Hooke also served as a Director of Macquarie from September 8, 2017 to September 5, 2018. Hooke also served as a member of IMTT's Board of Directors from May 2009 until July 2014, IMTT's interim-CEO from July 2014 until February 2015, and Executive Chairman of IMTT's Board of Directors from July 2014 until December 31, 2017. Hooke signed Macquarie's materially misstated public filings including the Registration Statement for the Offering filed with the SEC on April 5, 2016, and made other materially false and misleading statements to investors as set forth below. Hooke is named as a defendant in Count I (for violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder), Count II (for violations of Section 20(a) of the Exchange Act), Count III (for violations of Section 20A of the Exchange Act), Count IV (for violations of Section 11 of the Securities Act), and Count VI (for violations of Section 15 of the Securities Act).

31.     Defendant Jay Davis ("Davis") has served as the Head of Investor Relations and Vice President of Macquarie since March 2008. Davis made materially false and misleading statements to investors as set forth below. Davis is named as a defendant in Count I (for violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder) and Count II (for violations of Section 20(a) of the Exchange Act).

32.     Defendant Liam Stewart ("Stewart") is an employee of Defendant Macquarie Management who has been assigned to serve as Chief Financial Officer of Macquarie since June 2015. Stewart made materially false and misleading statements to investors as set forth below. Stewart is named as a defendant in Count I (for violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder), Count II (for violations of Section 20(a) of the Exchange Act), Count

IV (for violations of Section 11 of the Securities Act), and Count VI (for violations of Section 15 of the Securities Act).

33.     Defendant Richard D. Courtney ("Courtney") has served as the Chief Executive Officer and President of IMTT, a wholly-owned subsidiary of Macquarie, since February 2015. Courtney first joined IMTT in 1982, and previously served as IMTT's President and Chief Operating Officer. According to his profile on IMTT's website, prior to becoming CEO, "Courtney's previous responsibilities with IMTT have included budgeting and long-term forecasting, new venture and project analysis, treasury management, and tax planning." Courtney made materially false and misleading statements to investors as set forth below. Courtney is named as a defendant in Count I (for violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder) and Count II (for violations of Section 20(a) of the Exchange Act).

34.     Defendants Hooke, Davis, Stewart, and Courtney are collectively referred to hereinafter as the "Officer Defendants." The Officer Defendants, because of their positions with Macquarie, possessed the power and authority to control the contents of Macquarie's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Officer Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of the Officer Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

35.     Macquarie, Macquarie Management, and the Officer Defendants are collectively referred to as the "Exchange Act Defendants."

### D.     Securities Act Defendants

36.     Additional defendants—defined along with certain of the above-named Defendants as the "Securities Act Defendants"—are named in Section XIII.A. below.

## IV.    SUMMARY OF THE EXCHANGE ACT CLAIMS

### A.    The Exchange Act Defendants Sell Macquarie's "Unsexy Business Model" To Investors By Promising "Steady, Predictable" Dividends

37.    Macquarie owns, operates, and invests in a diversified group of infrastructure businesses that provide services to customers in the United States and Canada. Throughout the Class Period, Macquarie had four operating segments: (1) IMTT, a bulk liquid terminals business providing storage, handling, and related services at a dozen terminals in the United States and Canada; (2) Atlantic Aviation, a provider of fuel, terminal, hangaring, and other services to 70 airports throughout the United States; (3) Contracted Power, comprised of controlling interests in wind and solar power facilities in the United States, and—until October 12, 2018—a gas-fired facility; and (4) MIC Hawaii, comprised of companies that provide energy services in Hawaii.

38.    According to the Exchange Act Defendants, Macquarie's primary "objective" was to "consolidate all of the cash being produced" by their businesses—which the Exchange Act Defendants referred to as "free cash flow"—"and distribute the majority of that out to investors in the form of a quarterly cash dividend." The Exchange Act Defendants repeatedly assured the market that the dividend was "stable" and "predictable" because Macquarie's businesses were "characteristically providers of essential services" insulated from market fluctuations, which gave the Exchange Act Defendants "good visibility" into their "cash-generating capacity over time." As Defendant Hooke colorfully told investors at the start of the Class Period, "While the world around us is volatile and excited, MIC's businesses have been ***boringly predictable***. That is just the kind of unsexy business model we want."

39.    Further, the Exchange Act Defendants told investors that Macquarie would deliver consistent dividend growth because they "actively managed" Macquarie's operating segments. During an investor conference on August 30, 2016, Defendant Davis explained: "This is not a passive strategy. We are looking to grow the topline performance managing the expenses down or manage the rate of growth and expenses and optimize the capital structure in each of the businesses." Davis continued that, when "managed and capitalized well," IMTT and the other

businesses would deliver "*growing* streams of distributable cash flow that we then upstream to investors."

40.     Again more colorfully, on May 12, 2016, Defendant Hooke told investors that the Officer Defendants' management was so heavy-handed that Macquarie's operating segments compared it to "like walking around with a wedgie all the time . . . . [T]hat is the way we try and fulfill which is perennially ensure that there is a sense of accountability at the businesses we operate."

41.     By the start of the Class Period, Macquarie had reported nine consecutive quarters of dividend growth. In a press release on February 22, 2016—the start of the Class Period— Defendant Hooke bragged that this "growth has been achieved despite the volatility in markets broadly and reinforces a basic premise of infrastructure—namely, that it is an inherently more stable asset class."

42.     The market had reacted exuberantly to Macquarie's dividend policy. Investors flocked to the stock, causing the stock to rise from $3.40 when Defendant Hooke became CEO on May 8, 2009, to *$62.83* by the start of the Class Period.

43.     Likewise, analysts had praised the Company's dividend payout. For example, on January 11, 2016—just before the start of the Class Period—J.P. Morgan wrote that "MIC's portfolio of defensive businesses drives a predictable dividend stream . . . that should attract income-oriented investors seeking refuge from commodity price volatility." The report concluded, "Among all stocks under coverage MIC *remains a favorite*."

44.     Throughout the Class Period, the Exchange Act Defendants continued to stress the importance of Macquarie's dividend while they consecutively increased the payout, and analysts in turn continued to focus on the Company's dividend. For example, in its report on May 2, 2016, Oppenheimer wrote that "we continue to believe MIC's dividend is well funded and may grow at least 14% in 2016 . . . Maintain Outperform[.]"

45.    On February 3, 2017, the Company guided investors to expect Macquarie's free cash flow—the underlying source of its dividend—to grow 10%-15% in 2017 and 2018, and that Macquarie's quarterly dividends in 2017 would correspondingly grow 10%.

46.    The market reacted positively. For example, in its report dated February 21, 2017, Oppenheimer wrote, "[A]dding confidence in our thesis, management increased the dividend payment meaningfully and reiterated its target to grow . . . . MIC remains a compelling buy, in our view. Maintain Outperform[.]"

47.    The Exchange Act Defendants affirmatively denounced any skepticism that they would be unable to grow the increasing amount of free cash flow required to meet their guidance. During an earnings call on February 22, 2017, Defendant Hooke addressed "the conspiracy theorists amongst you," stating that Macquarie's guided dividends were actually "more conservative" than in 2016 and that the Exchange Act Defendants could deliver the promised dividend growth while continuing to fund Company's growth given the Company's "$1.4 billion of available credit."

48.    As the year continued—and the dividend payments increased as guided— the Exchange Act Defendants ever more firmly rejected investor skepticism. During Macquarie's earnings call for its second quarter 2017 results on August 3, 2017, an analyst asked whether investors "shouldn't necessarily expect, modify or think about your retained cash flow, either as a percent of capital deployment opportunities, or said another way, adjusting payout ratio to more internally fund?" In response, Hooke stated: "*No . . . .* I don't think we will suddenly say there's a great set of opportunities, we're going to massively reduce the payout ratio and stop growing the dividend . . . . I think you'll see *steady as she goes,* . . . reserving rights to do minor tweaks at the side."

49.    In November 2017, the Company announced that it was revising its 2017 guidance for free cash flow growth down to 9%, but otherwise left its guidance unchanged and remained, according to Defendant Hooke, "excited about our prospects in 2018." During Macquarie's November 2, 2017 earnings call, Hooke forcefully assured investors that Macquarie would not

"pivot towards what the market values and not as much maximizing dividend growth but more retaining cash flow," stating, "People slashing their dividend saying we're going to slash our dividend to deploy capital internally, I don't think you'll see us do that . . . . Growing distributions to shareholders in a steady, predictable fashion while investing for the future will continue to be part of MIC's strategy[.]"

50.     Throughout the Class Period, the Officer Defendants actively solicited investors to contact them directly. For example, at the end of earnings calls throughout the Class Period, Defendant Hooke consistently noted that the Officer Defendants would be "on the road participating in a number of road shows and conferences" and told investors to let the Officer Defendants know "[i]f there is someone you think we should be introduced to the MIC story[.]" Similarly, during a June 27, 2017 investor conference, Defendant Stewart told investors to contact Davis and another executive, who would be "happy to help with any additional insight into our operations or to assist with any modeling matters."

51.     As a result, the Officer Defendants frequently met directly with investors and analysts. In April 2018, the Company bragged about its "Proactive Investor Engagement" and "longstanding commitment to engagement with all shareholders," and disclosed that it had "*in excess of 1,200 individual interactions with current and potential shareholders*" in 2017 alone.

52.     During those interactions, the Officer Defendants reiterated and provided additional color to their public statements made in SEC filings, press releases, and conference calls. Analysts often relayed to investors those statements made by the Exchange Act Defendants, which confirmed the public nature of those statements. For example, on March 23, 2016, J.P. Morgan published an analyst report describing meetings with Defendant Hooke and other Macquarie management that the firm hosted for investors. J.P. Morgan wrote, "We walked away confident in MIC's strong positioning during this difficult market environment. The company retains numerous levers to achieve the stated dividend growth . . . and payout targets[.]"

53.     As another example, on August 12, 2016, RBC Capital Markets wrote a report describing "Highlights from investor meetings," stating that they "had MIC on the road this week

15

in NYC and the mid-Atlantic. We continue to view MIC as a solid total-return play, with increasing visibility to hit . . . dividend/share growth."

54.     Similarly, on November 3, 2016, Oppenheimer wrote of its "Thoughts from Management Meeting" that "Management remains bullish," and concluded that "[o]verall the MIC story is well intact. The underlying businesses all *appear stable, if not improving*; and, when coupled with attractive opportunities for growth capital, we believe the company has multiple years of . . . dividend growth. Maintain Outperform[.]"

55.     In its report on March 6, 2017, Barclays wrote its "[t]akeaways" from investor meetings it hosted with Defendants Hooke and Davis, including that Macquarie's growth in free cash flow that drove Macquarie's dividend growth "*may not be limited to 2017/2018*. The team seems to have a path to not only meet its growth objective, but *potentially exceed the growth target in 2018*[.]"

56.     As the Class Period neared its end, the Officer Defendants continued to directly engage investors and analysts, affirming the market's reliance on Macquarie's growth guidance and ever-increasing dividends. For example, on November 28, 2017, Macquarie hosted a dinner for approximately a dozen institutional investors, including Lead Plaintiff. At this dinner, which was attended by Defendants Hooke, Stewart, and Davis, as well as Macquarie's then-COO and future-CEO, Mr. Frost, the Officer Defendants present at the dinner told Lead Plaintiff and the other investors that Macquarie would have continued dividend growth in 2018.

57.     As another example, on or around December 7, 2017, Macquarie senior employees met with institutional investors during the Wells Fargo 2017 Pipeline, MLP, and Utility Symposium in New York City. Likely referencing that meeting, in its later report dated February 23, 2018, Wells Fargo stated that, "as recently as December the dividend was described as 'sacrosanct' to us."

58.     Macquarie's generous dividends did not just benefit investors, but also Macquarie Management. Pursuant to its management services agreement, Macquarie Management received fees based on the "New Investment Value" of Macquarie, calculated as: (a) Macquarie's market

16

capitalization; plus (b) the amount of the Company's borrowings; plus (c) the value of the Company's future investments; less (d) cash and cash equivalents held. Accordingly, Macquarie Management's fee benefitted directly from paying out as much cash to investors as possible.

59.     The fee arrangement also meant that Macquarie Management directly benefitted from increasing the Company's debt levels, further incentivizing Defendants to spend the Company's cash on the dividend above all else. In fact, during the Class Period—as Macquarie continued to funnel its available cash into dividend payments—Macquarie's leverage multiples rose from 4.1x o 4.8x. FE-1—who had worked as Chief Financial Officer at IMTT from the 1970s until 2011—stated that, when he was at IMTT, Macquarie had "virtually insisted" that IMTT not use operating cash flow, accumulated or current year, for its fixed assets for any reason other than maintenance. They wanted all new capital expenditures to be financed by borrowing. FE-1 described this as Macquarie's "law of the land."

60.     Finally, because Macquarie Management's fee was—in Macquarie's own words— "based primarily on our market capitalization," Macquarie Management also benefitted directly from continually increasing dividends and promising continued dividend growth because doing so caused the market to assign higher targets for the stock price, which drove the price of Macquarie shares higher—generating higher fees for Macquarie Management.

**B.     Macquarie Depends On IMTT To Fuel Its "Total Attractive Return"**

61.     Macquarie depended heavily on IMTT to provide the fuel for its dividend. During the Class Period, IMTT's contributions dwarfed those of the other operating segments, providing approximately 46% of Macquarie's EBITDA. Even more impressive, in what Defendants told investors was "***the true top line*** we use at MIC for IMTT and our other businesses," IMTT's net income amounted to 54% and 80% of the Company's total in 2016 and 2017, respectively. This meant that, of all the operating segments, IMTT provided the vast majority of Macquarie's free cash flow, and therefore contributed most to Macquarie's dividend.

62.     Investors understood that IMTT not only contributed the most to the dividend, but also that IMTT was critical to delivering on Macquarie's promised growth based on Defendants'

representations that—as Oppenheimer wrote in its May 12, 2016 report discussing a Macquarie investor day—"even in a somewhat challenged energy environment . . . the business remains rock-solid." For example, in its report dated June 27, 2017, J.P. Morgan wrote that "IMTT[] continues to play the biggest role in MIC growth" and "remain[s] the key driver of MIC's ongoing growth."

63.    IMTT was originally founded in 1939 by James J. Coleman, Sr. Over the following 75-years, Coleman and his family expanded IMTT to become one of the largest third-party providers of bulk liquid storage and handling services in the United States, operating over a dozen terminals handling petroleum, biofuels, chemicals, and vegetable/tropical oil products. Between 1975 to 1999, IMTT was operated in a partnership with the Van Ommeren Company, which later became Royal Vopak, N.V. ("Vopak"). Macquarie would later disclose Vopak as one of IMTT's "main terminal operation competitors."

64.    Macquarie first became involved with IMTT in 2006, when it acquired a 50% stake in IMTT. From the start, FE-1 (IMTT's former CFO) explained that Macquarie was "meticulous" in tracking IMTT's performance and would "watch everything," including through an on-site Macquarie employee. FE-1 stated that IMTT provided Macquarie with every "scintilla" of information they asked for, and, as a result, Macquarie "[c]ertainly had enough to manage and *micromanage* the business." FE-1 also explained that Macquarie "knew in great detail" about IMTT's contracts and what was stored in IMTT's tanks, information that was continuously available through an inventory system that FE-1 personally helped to develop, known as "BLIS" (an abbreviation for Bulk Liquid Information System). In addition, FE-1 explained that IMTT provided Macquarie with its annual budget, which was prepared near the end of each calendar year and formally approved in the early part of the year. FE-1 said that preparing the budget involved a conversation between marketing and accounting departments, and that Defendant Courtney—IMTT's Chief Operating Officer at the time—was very often directly involved.[2] FE-1 said that

---

[2] This is consistent with Defendant Courtney's profile on IMTT's website, which states that his "previous responsibilities with IMTT have included *budgeting and long-term forecasting*, new

built into the budget was an assessment of the likelihood of renewal for contracts expiring in that year, which was information typically provided directly by Courtney, who "absolutely" had "constant contact with customers, contracts, and trends." FE-1 also stated that, in addition to getting IMTT's budget, Macquarie did its own projections, which went further out than a year.

65.     In 2010, Defendant Hooke gave a presentation in support of an IMTT application for a credit facility, in which he corroborated the depth of Macquarie's involvement with IMTT. Hooke said that Macquarie was "**_completely joined at the hip with_**" IMTT, and that he and Macquarie had become very familiar with IMTT's operations: "[F]rom MIC's perspective . . . it's been a fortunate perspective for me to learn so much about the business from [Thomas Coleman, then-CEO of IMTT] and the rest of the management team."[3]

66.     However, FE-1 explained, the relationship between IMTT and Macquarie gradually deteriorated. FE-1 explained that IMTT and Macquarie disagreed on a number of issues, including the extent to which IMTT's cash flow should be reinvested into the business as opposed to distributed to Macquarie shareholders in the dividend.

67.     Years later, Defendant Hooke would acknowledge that—consistent with FE-1's information—Macquarie had "a disagreement over a number of issues" with the Coleman family, including "**_predominantly over the dividend policy_**." Macquarie pursued, and succeeded in, an arbitration against the Colemans for unpaid dividend amounts from IMTT. Then, according to Hooke, Macquarie's "articulated [dividend] strategy clearly [told] what we needed to settle the differences with the co-investor"—by taking complete control of IMTT.

68.     On July 16, 2014, Macquarie acquired the remaining 50% interest in IMTT for $1 billion, making IMTT the largest business in Macquarie's portfolio. In connection with the

---

venture and project analysis, treasury management, and tax planning." *See* https://www.imtt.com/about-us/executive-team/.

[3] *See Macquarie Terminal Holdings LLC v. Voting Trust of IMTT Holdings, Inc.*, Arbitration Award, ICDR File No. 50 125 T 00245 11.

acquisition, the Company completed concurrent public offerings of approximately $665.0 million in additional shares and $305.0 million in convertible debt on July 9, 2014.

69.     Immediately afterwards, the Exchange Act Defendants took total control of IMTT—so much so that, when allegations arose just months later concerning emissions of noxious fumes from St. Rose, a court in the Eastern District of Louisiana ruled that "[t]he level of control exercised by Hooke, May, and the IMTT Board [which was entirely controlled by Macquarie employees] indicates that the 'center of overall direction, control, and coordination'" for IMTT was actually Macquarie's offices in New York. *See Rowell v. Shell Chemical, L.P.*, No. 2:14-cv-02392-CJB-DEK, 2015 WL 7306435 (E.D. La. Nov. 18, 2015).

70.     In deposition testimony for *Rowell*, Defendant Hooke described how he and Macquarie had taken "proactive steps . . . to take control of IMTT" and put in place a "MIC delegated authority framework. . . . It was pretty important for us . . . to actually take ***full control*** and see exactly what was going on in the business and implement the changes that we wanted to."[4] As part of that effort, Macquarie appointed its CEO, Hooke, to also serve as IMTT's interim CEO—the first and only time that Hooke has ever been the CEO of one of Macquarie's operating segments. Hooke explained his unusual involvement, stating that this "was the biggest transaction MIC had ever done. And the success of IMTT following that transaction was probably the most important single event in [Macquarie's] history, other than probably its IPO . . . I wanted to make sure that went well." During his time as IMTT's interim-CEO, Defendant Hooke personally negotiated storage contracts.

71.     Macquarie's "full control" (in Defendant Hooke's words) continued throughout the Class Period. Even after Macquarie hand-selected Defendant Courtney to serve as IMTT's CEO in February 2015, Hooke continued to serve as IMTT's Executive Chairman until his exit from Macquarie in December 2017, and Courtney reported directly to Hooke. Macquarie also appointed Macquarie asset director James May as IMTT's CFO and to the IMTT Board of Directors. In a

---

[4] *Rowell v. Shell Chemical, L.P.*, No. 2:14-cv-02392-CJB-DEK, ECF No. 38-3 (E.D. La.).

deposition taken in *Rowell*, James May explained that, prior to Macquarie's complete control, he had served as Macquarie's "investor representative" to IMTT, through which he "very much . . . was involved with [IMTT] and . . . understood the company." After being appointed as IMTT's CFO, May became "involved in the decision-making processes for [IMTT]."[5] In addition, Macquarie took complete control of IMTT's board, which was responsible for approving major contracts and appointing IMTT executives, among other things.

72.     Further, the Exchange Act Defendants also appointed additional Macquarie personnel to head up an expanded financial planning and analysis function at IMTT and, as Defendant Hooke described during an August 2, 2016 earnings call, spent an "enormous amount of time" putting in place their exacting controls, including "rolling out proper maintenance CapEx management processes and systems."

73.     As part of this process, Defendants Hooke and Courtney, along with IMTT CFO James May and others, oversaw "Project One." In a memorandum bearing the logos of both IMTT and Macquarie, Hooke stated that Project One sought to "shar[e] . . . knowledge and best practice across terminals as fast as possible" and directly solicited feedback from IMTT employees:

October 7, 2014

 

To:         Terminal Managers; Department Heads; Sandra DeMartini; Chuck Marsh; Jos Wolke
CC:         Rick Courtney; James May; Todd Weintraub; Mike Morganti; Rene Gurdian; Hans Tharp
From:       James Hooke
Subject:    Project One - Roll Out of Best Practices

Further to the discussions we had at the Terminal Manager's meeting in mid-September, we would like to aggressively roll out best practice across IMTT. This should have a number of benefits, including:

-      Reducing costs by sharing of knowledge and best practice across terminals as fast as possible;

. . .

---

[5] *Rowell v. Shell Chemical, L.P.*, No. 2:14-cv-02392-CJB-DEK, ECF No. 38-4 (E.D. La.).

> The project will be overseen by a steering committee of Rick Courtney, James May, Dick Fisette, John Little, Dale Gibson and me.
>
> . . .
>
> Please let me know if you have any questions or you see any bad decisions about to be made. Please let me know if you have any ideas for this team or for other areas of improvement.
>
> [6]

74.     FE-2, who worked at IMTT from the 1970s until December 2015, most recently as terminal manager of IMTT's largest facility, St. Rose, described the changes after Macquarie's purchase of IMTT more bluntly: IMTT became "100% a Macquarie show."

75.     Macquarie's grip on IMTT tightened in 2016 with the introduction of Macquarie's "shared services model," which consolidated HR, accounting, and other services for all operating segments, and which the Exchange Act Defendants explicitly stated was designed to "share knowledge" and "capture efficiencies" among all of the businesses. On May 18, 2017, Defendant Davis explained that this shared services model was motivated by Defendants' desire to "actively manage each business, not a passive PE-type strategy where we just parachute in every quarter, look at the books and say, 'Nice job. See you next quarter.' This is ***active day-to-day management*** driving top line improvement, typically increasing or optimizing pricing, trying to drive volume increases and margin expansion."

76.     At the same time as Macquarie took even greater control of IMTT, it also reduced the disclosures it had historically provided about IMTT. For example, an analyst noted during the February 23, 2016 earnings call that Macquarie had "stopped disclosing year-on-year storage rates for IMTT," which Defendant Hooke said was done to stop investors from reading too much into a decline in utilization in 2014: "[P]eople were spooked as to is it really offline for cleaning and inspection? Will it ever come back or are you just saying that because your utilization is down?"

77.     As another example, in the first Form 10-K filed after obtaining complete ownership of IMTT in 2014, Macquarie also stopped providing granular capacity information

---

[6] *Rowell v. Shell Chemical, L.P.*, No. 2:14-cv-02392-CJB-DEK, ECF No. 38-4 (E.D. La.).

about St. Rose—its largest terminal—but instead disclosed only the aggregate capacity for the "Louisiana Terminals," a category that included St. Rose and three other terminals.

78.     Finally, after acquiring IMTT, Macquarie ended its historical practice of disclosing its growth capital expenditures for each operating segment, providing only Company-wide growth capital expenditures. The Exchange Act Defendants understood that this information was particularly critical to investors: as Defendant Davis stated on August 31, 2017, Macquarie's "attractive gains in cash flow generation, both cash flow generation and dividend growth" depended on the "effective execution" of growth capital.

79.     At the JPMorgan Energy Equity Investor Conference on June 26, 2017, Defendant Stewart acknowledged that Macquarie's filed financial statements were "not particularly helpful when it comes to determining the cash generated by the enterprise."

## C.     The Exchange Act Defendants Conceal That Macquarie's "Total Return Opportunity" Is Not Sustainable

80.     Contrary to their statements to investors, the Exchange Act Defendants knew that Macquarie could not sustain the dividend that it sold investors on.

81.     Specifically, the Exchange Act Defendants knew, but concealed from investors, that IMTT relied heavily on the involvement of it largest terminal, St. Rose, in a commodity that was widely known to be in decline: "No. 6 fuel oil." No. 6 fuel oil refers to a broadly defined group of heavy and residual fuel oils, sometimes simply known as "heavy" or "residual" fuel oil, that are generally what is left in the bottom of the barrel at the end of the petroleum refinement process.

82.     As a result of its concealed reliance on No. 6 fuel oil, Macquarie would lose revenue as the No. 6 fuel oil market dried up and contracts failed to renew, lose more revenue as it had to take St. Rose tanks offline, and then spend substantial capital to "repurpose" those tanks—all of which cannibalized the cash flow that Macquarie needed to fund the dividend promised to investors.

1.      **The No. 6 fuel oil industry faces a "paradigm shift."**

83.     IMTT had become heavily involved in storing No. 6 fuel oil in the 1970s. FE-2 and FE-1 explained that, during that time, IMTT had built at its St. Rose facility four massive tanks, each with a capacity of 500,000 barrels and a diameter larger than a football field, specifically with the intention of storing No. 6 fuel oil. FE-2 and FE-1 both stated that also around this time IMTT built eight additional 250,000 barrel tanks at St. Rose, which FE-2 said were also dedicated to No. 6 fuel oil. (FE-1 recalled that at least some were dedicated to No. 6 fuel oil.) FE-1 stated that building these tanks turned out to be a "major turning point" and "huge overall change in direction and scope" for IMTT—and ultimately transformed IMTT from a "relatively small and sleepy" company to a "force in the industry" worldwide.

84.     During the 1980s, FE-2 said, St. Rose became "the big gorilla" in the Port of New Orleans / Port of South Louisiana market for independent storage of No. 6 fuel oil. Since that time, however, use of No. 6 fuel oil has declined significantly:



85.     As explained by a December 9, 2011 "Today in Energy" article by the U.S. Energy Information Administration, "[c]hanges on both the residual fuel supply and demand side of the equation are contributing to the downward trend" in consumption.

86.     Supply was reduced because more competitive alternatives were developed, causing refineries to focus operations to maximize production of those more profitable products, including by installing 'cokers,' devices that convert No. 6 fuel oil, thereby reducing the amount of No. 6 fuel oil at the source.

87.     Meanwhile, demand was reduced because domestic and international governments, municipalities, and institutions increasingly took steps to ban or heavily limit the use of No. 6 fuel oil as a result of its numerous noxious qualities, including that it contains high amounts of pollutants such as sulfur; requires specialized heating systems for storage and use; degrades slowly; and complicates cleanup efforts with its viscous and sticky nature.

88.     These efforts had a significant impact on the market for No. 6 fuel oil. In a June 11, 2013 presentation at the 10th Annual Bunker and Residual Fuel Oil Conference, Tod D. McGreevy of industry consultants Muse, Stancil & Co. noted that "The U.S. power sector has all but eliminated residual oils as a fuel source," and stated that "Last year U.S. heavy product demand continued the downward trend that has been firmly in place since 2005, declining by more than 18% year on year." McGreevy also noted that, "[i]n response to declining domestic demand, U.S. refiners have reduced production of heavy fuel oil – Aggregate production of fuel oil is down by more than 35 percent since early in the last decade."

89.     By the start of the Class Period, the primary remaining users of No. 6 fuel oil were large shipping vessels—so much so that it is at times referred to simply as "bunker fuel." In a June 2014 article titled "Implications of Residual Fuel Oil Phase Out," Dr. David Ramberg of the Massachusetts Institute of Technology noted that, while "[m]ost, if not all, developed economics

prohibit burning high-sulfur fuel oil" (i.e., No. 6 fuel oil), "the decline in residual fuel oil usage is masked by increase in its use as a fuel for maritime bunkering."[7]



90.      However, Dr. Ramberg wrote, "the bunker market is poised for big changes by 2020." Dr. Ramberg was referring to actions taken by the International Maritime Organization ("IMO"), the United Nations agency charged with regulating global shipping. In response to heightening environmental concerns, in 2005 the IMO put into force Annex VI of the International Convention for the Prevention of Pollution from Ships ("MARPOL"), which would phase in increasingly stricter sulfur caps for shipping vessel fuel beginning with an immediate limit of 4.5%. In October 2008, the IMO revised MARPOL Annex VI with strengthened requirements, including a 3.5% sulfur limit beginning in 2012.

91.      However, because the sulfur content of even the heaviest fuel oil (i.e., No. 6 fuel oil) typically only goes up to 3%, these limits were considered easy to comply with and had very

---

[7]http://www.usaee.org/usaee2014/submissions/onlineproceedings/implications%20of%20rfo%20phase%20out-ramberg&vanvactor.pdf

attenuated impacts on the global markets. MARPOL Annex VI's next and last global sulfur limit, also adopted in October 2008, will be far more dramatic: a sulfur cap of 0.5% to begin by the start of 2020, commonly referred to as "IMO 2020."

92.     It is widely understood that IMO 2020 will effectively eliminate the use of No. 6 fuel oil for global shipping—the only sustained demand for the commodity—and therefore vastly reduce the overall demand for No. 6 fuel oil. For example, in 2014, Dr. Ramberg concluded that, given current trends, "total residual fuel oil demand will drop **by nearly half**" as a result of IMO 2020.

93.     Similarly, in its Medium-Term Market Report, dated February 11, 2015, the International Energy Agency wrote that, "The marine industry had long been one of the last strongholds of high-sulphur residual fuel oil (RFO) [i.e. No. 6 fuel oil] demand, but international regulations are catching up with the sector," and IMO 2020 "will greatly lighten the quality of the global demand barrel as most shippers . . . are expected to switch from RFO to lower-sulphur marine gasoil to meet the tighter standards." The report also predicted a "***fuel oil collapse as bunkers switch to lower sulphur fuels***" as a result of IMO 2020.

94.     The October / November 2014 issue of *Bunkerspot*, a periodical about the bunker fuel industry, explained that a downward trend in No. 6 fuel oil was already underway, writing that, as IMO 2020 "comes closer into view . . . owners and operators [of marine vessels] have been notably proactive in making the shift to 'greener' shipping . . . a momentous—and costly— transition[.]"

95.     Consequentially, IMO 2020 will not just impact global shipping, but rather all those involved in the supply chain for No. 6 fuel oil. On June 25-26, 2015, S&P Global Platt's hosted its annual Bunker and Residual Fuel Oil Conference. Among other speakers, fuel industry consultant Turner, Mason & Company gave a presentation entitled "The Outlook for Residual Fuel Production in 2020" at an industry conference, in which it discussed how the "[u]pcoming shift to low sulfur bunker fuel in 2020 [will] present problems and challenges for ship owners ***and refiners***."

96.     According to a July 30, 2015 article by MFame.com, a bunker fuel industry observer, as a result of the radical decrease in demand for heavy fuel oil "[c]ome 2020," "[m]any refineries are putting up coking plants to use up surplus heavy fuels"—in other words, getting rid of No. 6 fuel oil as it is created, and thereby reducing the supply that might need storage by bulk liquid terminal operators like IMTT.

97.     Most dramatically, industry observer *Seatrade Maritime News* described IMO 2020 in 2017 as ushering in "not step changes but ***brutal changes***" that required "***paradigm shifts*** on ship engines" and, in particular, a "need for huge logistics involving transport between refineries, ***storage*** and delivery vessels."

98.     Indeed, since its 2013 Form 10-K filed on February 14, 2014, World Fuel Services Corp.—a fuel distributor that also operates storage facilities—has listed IMO 2020 as an example of an "adverse condition[]" that could "reduce the demand for our products and services" and "have a material adverse effect on our business or on the businesses of our customers." Macquarie made no such disclosure.

### 2.     By the beginning of the Class Period, investors are unaware of IMTT's exposure to the "brutal changes" in the No. 6 fuel oil industry.

99.     By the start of the Class Period, the market was well aware of the declining use of No. 6 fuel oil and even its coming ultimate demise from IMO 2020. For example, in an article dated October 9, 2015, the U.S. Energy Information Administration wrote that "Health and environmental concerns related to the high sulfur content of residual fuel oil (RFO) have led to new policies and regulations that have ***significantly lowered expectations for future RFO use globally***. As the demand for RFO declines, the need for the refining upgrades to convert residual material to lighter, cleaner products will increase."

100.     Undisclosed to investors, declines in the No. 6 fuel oil industry had apparently already begun to impact IMTT. FE-3, an IT Operations Support / Network Engineer at IMTT's St. Rose facility from 2011-2016 relayed that, at IMTT's Christmas luncheon at the end of 2015, employees were told things were "a little bit bleak," and IMTT was not where it wanted to be as

far as customers buying storage as opposed to moving out of storage. FE-3 recalled that IMTT attributed this to general industry trends.

101.    On the day that the Class Period begins, February 22, 2016, the International Energy Agency published a Medium-Term Oil Market Report, stating that IMO 2020 was "due to come into force on 1 January 2020" and "will have global repercussions," including that "infrastructure will have to be constructed and adapted . . . *involv[ing] the reconfiguration of storage tanks to hold clean products rather than fuel oil*."

102.    However, *only* the Exchange Act Defendants knew that—unlike the rest of the industry, which had gradually shifted from No. 6 fuel oil in response to the declining market— Macquarie remained incredibly reliant on the commodity. In reality, as was revealed after the end of the Class Period, No. 6 fuel oil was the *largest* category of product stored by IMTT, amounting to at least 17.3 million barrels, or 40% of IMTT's total 45 million barrels of capacity.

103.    Until that disclosure, Macquarie had last acknowledged its exposure to No. 6 fuel oil in 2012—nearly four years before the start of the Class Period—as New York City was in the midst of implementing its own high-profile ban on No. 6 fuel oil.

104.    In 2011, New York City estimated the 1% of city buildings burning No. 6 and other heavy fuel oils caused 86% of the City's building-related soot pollution. As a result, New York City issued regulations in 2011 requiring buildings to convert to cleaner alternatives. The use of No. 6 fuel oil was nearly completely phased out by June 30, 2015, and as a result the use of No. 6 fuel oil across the New York area fell dramatically.

105.    Against this backdrop, Defendant Hooke acknowledged during Macquarie's May 3, 2012 earnings call that "[w]e've all read the articles" about ongoing "uncertainty" in oil production, and stated that there may be an impact on the "demand for storage of heavy oil residual product" (i.e., No. 6 fuel oil). However, Hooke said, IMTT could shift to storing the clean products in increasing demand (as a result of the shift to clean fuel oil), with "a one-off increase in capital expenditures to convert the heavy product tanks to service the clean product." Hooke said that "[t]hese sorts of conversions have been completed before, including at Bayonne," and would be

beneficial because "the storage rates for gasoline are higher than for residual product." However, Hooke said, the Exchange Act Defendants' strategy was to continue to watch the market—"to wait and see[.]"

106.    In Macquarie's next earnings call, on August 2, 2012, Defendant Hooke updated investors on the Exchange Act Defendants' monitoring, stating, "While the liquid hydrocarbon business is constantly evolving, and we see this evolution continuing in the Gulf Coast, the New York market is certainly more nuanced than normal." Based on their assessment, Hooke stated, the Exchange Act Defendants "don't see an immediate need to convert large amounts of existing heavy oil storage at Bayonne [IMTT's second largest terminal, after St. Rose] to clean products."

107.    However, before the end of the year, the Company told investors that they had changed their minds. On November 1, 2012, Defendant Hooke told investors that the Company had "continue[d] to access [sic] the desirability of converting some residual product storage at Bayonne," and "[o]ver the past couple of months we've concluded that it would be IMTT's ***long-term best interests to begin to convert*** a portion of the residual oil storage at Bayonne ***to clean product storage***" because "[w]e can achieve decidedly better rates on clean product storage and we believe that reducing the amount of ***six oil*** in New York harbor will enhance pricing for that product." As a result, Hooke said, IMTT would be converting "some 1.2 million barrels of storage capacity at Bayonne from ***residual oil or six oil*** to two oil," a lighter grade fuel. Defendant Hooke reminded investors that doing so would "involve[] cleaning the tanks and related pipes so we incur some up front OpEx to facilitate higher storage rates on the new contracts."

### 3.    During the Class Period, the Exchange Act Defendants conceal IMTT's reliance on No. 6 fuel oil.

108.    Defendant Hooke's discussion in 2012 of converting No. 6 fuel oil tanks would be the last time that the Exchange Act Defendants would publicly discuss the storage of No. 6 fuel oil was stored in IMTT's tanks until near the end of the Class Period, when Defendant Davis explicitly and falsely told investors that "very little" of IMTT's storage is in "heavy product" (i.e., No. 6 fuel oil), among other similar comments to investors.

109.    Otherwise, the Exchange Act Defendants only generically disclosed that half of IMTT's storage capacity was used for "refined petroleum products," which refers to a broad variety of products, ranging from No. 6 fuel oil to gasoline and kerosene. Particularly given that, in 2012, Hooke had discussed shifting from No. 6 fuel oil at IMTT's second-largest facility, Bayonne, and also acknowledged then that they saw the "evolution continuing in the Gulf Coast," investors reasonably interpreted the Exchange Act Defendants' silence about No. 6 fuel oil to mean that IMTT's Louisiana Terminals on the gulf coast—including IMTT's largest terminal, St. Rose— did not materially rely on the storage of No. 6 fuel oil but instead conformed with the general shift and continuing evolution away from the commodity.

110.    The Exchange Act Defendants affirmatively reinforced investors' wrong understanding by making false and misleading statements that IMTT had limited exposure to macroeconomic pressure, implicitly referencing trends such as the global decline in No. 6 fuel oil.

111.    On the first day of the Class Period, February 22, 2016, Macquarie issued a press release in which Defendant Hooke told investors that IMTT was "***uncorrelated*** with the exploration and production (E&P) portion of the oil industry." Macquarie made a similar claim in its 2015 Form 10-K filed the next day, that the "essential services nature of the business and ***continued strong demand for the products stored***" by IMTT offset any risk from "uncertainty among industry participants" because of "sizeable and largely unforeseen volatility in petroleum product prices."

112.    Defendant Hooke continued to emphasize this message during an earnings call the next day, stating that IMTT's utilization remains high [and] firm commitments are up . . . . But none of this should come as a huge surprise. ***This is not a business that is sensitive to what is going on in the exploration and production, or in interstate product movement***." Hooke further downplayed any impact to IMTT from changing petroleum demand in particular. While acknowledging that IMTT has "some sensitivity to end-user demand," Hooke said that sensitivity was "***least*** in the petroleum segment of its operations." Finally, Hooke concluded that, "In short, we feel confident in the continued stable contribution from IMTT to our overall results. The

Business is simply not [a] ***macroeconomically sensitive enterprise . . . .*** [W]e run unsexy businesses with limited volatility."

113.  The Exchange Act Defendants continued to make similar claims as the year went on. On May 2, 2016, in connection with the release of Macquarie's first quarter 2016 results, Defendant Hooke described IMTT and Macquarie's other operating segments as "***fundamentally sound businesses***, operating in segments of the economy that are proven to be ***quite robust over the long-term***" and delivering the "***stable performance for which the asset class is known***."

114.  During a Macquarie investor day on May 12, 2016, Defendant Courtney—IMTT's CEO—also misled investors about IMTT's susceptibility to the global changes in No. 6 fuel oil demand, stating, "Most of the problems that are happening right now is affecting the upstream, crude, exploration and the gathering. For us, we are kind of downstream. Our assets are in a different part of the logistics and distribution chain."

115.  Defendant Courtney—who according to FE-1 "absolutely" had "constant contact with customers, contracts, and trends"—also told investors that IMTT "only deal[s] with major oil companies, major chemical companies, utilities, major agricultural companies. We have few other customers. We've got them very well." Courtney also stated, "there have to be catastrophic [sic] for those ports not to be busy."

116.  Defendant Courtney further affirmatively misled investors about IMTT's considerable storage of No. 6 fuel oil by stating that "our assets and our infrastructure" give IMTT the "***flexibility***" and "***optionality***" to change when "one day our customer . . . want gasoline in his tanks, next day he may want distillate." To the contrary, FE-2 explained that cleaning the "sticky, gooey" No. 6 fuel oil from tanks was "difficult, time consuming, and expensive." Only after the end of the Class Period did Macquarie provide the following timeline for repurposing these tanks, showing that it could take up to ***nine months*** to repurpose tanks—during which time the tanks require millions in capital expenditures while generating no revenue themselves:

## IMTT – Tank Repurposing Stages



Tank repurposing involves three sequential stages:



| Stage | 1. Initial clean | 2. Clean conversion | 3. Repurpose |
|---|---|---|---|
| Objective | Return to a state for heavy and residual use | Take to a state for clean use | Make necessary structural modifications[2] |
| Length of time | 1-2 months | 1-2 months | 1-5 months |
| Capex classification | Maintenance capex | Mix of maintenance and growth capex[1] | Growth capex |

117.    Moreover, both FE-2 and FE-1 explained that the sheer size of some of IMTT's No. 6 fuel oil tanks at St. Rose limited their use. This is because storage imposes fixed costs proportionate to the size of the tank, irrespective of the volume of material actually stored inside. As a result, FE-2 explained that the 12 massive tanks that IMTT had built at St. Rose specifically to store No. 6 fuel oil—four 500,000 barrel tanks and eight additional 250,000 barrel tanks—had become largely "obsolete" for storing anything less sulfurous than No. 6 fuel oil, because no such commodities trade in sufficient volumes to make economical the high fixed costs of using those tanks. FE-1 similarly said it was "unequivocally a huge marketing challenge" to get any products lighter than No. 6 fuel oil (the heaviest fuel oil) stored in IMTT's "monster" 500,000 barrel No. 6 fuel oil tanks at St. Rose. Because those "monster" tanks were not easily repurposed or re-contracted, FE-1 said *any* "disturbance in the force"—even a "sneeze"—concerning those tanks immediately got attention, and contract renewal efforts began at least a year in advance of contract expiration.

118.    On August 30, 2016, Defendant Davis told an audience at the Three Part Advisors IDEAS Investor Conference that IMTT is "dealing in refined products and *demand for refined products has likely been quite strong*." By referencing the demand for refined products as a general category, Davis misled investors about IMTT's reliance on storing No. 6 fuel oil, the demand for which had been declining for years—and was about to plummet even further.

**4.    Just weeks after IMO 2020 is confirmed, Macquarie Management profits from nearly $235 million in sales to investors.**

119.    As the fourth quarter 2016 began, the fuel oil industry braced for confirmation that IMO 2020 would come into effect as planned. In an article dated October 4, 2016, *Reuters* wrote:

> The global shipping industry is bracing for a key regulatory decision that could mark a milestone in reducing maritime pollution, but which could nearly double fuel costs in a sector already reeling from its worst downturn in decades . . . .
>
> The issue has been brewing for more than a decade and shippers said the industry was now bracing for tighter regulation to be introduced sooner rather than later due to political pressure . . . .
>
> ***For traded oil markets, the shift to low-sulfur fuel will "substantially reduce demand for bunkers in the run up to 2020 and increase demand for gasoil and alternative fuels including LNG**,*" said Christopher Haines, head of oil and gas at BMI Research.

120.    On October 27, 2016, the IMO announced that it had concluded its review and, as expected, formally fixed the global 0.5% cap on sulfur in bunker fuel to begin in 2020.

121.    The IMO's decision was widely reported. For example, in an article published on October 27, 2016, *Reuters* quoted Alan Gelder of energy consultancy firm Wood Mackenzie as discussing "how disruptive this is going to be," and that "refineries will need to run in a way they have never run before . . . . Refineries that do not have the ability to convert the fuel oil into higher quality products will struggle to remain profitable as this big outlet for lower-quality fuel disappears."

122.    According to S&P Global Platts' October 2016 special report, the IMO's October 2016 decision had an immediate impact on demand: "Although we won't know the full price impact of the decision until we reach 2020, the forward curves are already pricing in the likelihood of a ***dramatically different fuel oil market***."

123.    On October 31, 2016, Dr. Rudy Kassinger published an article for industry consultants Turner, Mason & Company entitled, "2020 or 2025: The Decision Has Been Made." In it, Dr. Kassinger wrote, "While this move was widely expected . . . [t]his forthcoming change ***is the equivalent of opening Pandora's Box***." Dr. Kassinger also said that the "recent IMO

decision . . . will be one of the dominant issues facing the global refinery industry in the next ten years."

124.    Yet, in its earnings call the next day, on November 1, 2016, Macquarie did not mention IMO 2020. Instead, Defendant Hooke continued to suggest that IMTT was immune to these sorts of dramatic shifts in the market, stating:

> [C]ontracts for storage and services at IMTT continued to renew for longer durations than they had been early in the year. This suggests that producers, refiners, shippers and others probably believe that commodity prices going forward will not be either as low or as volatile as has been the case over the last couple of years. Remember, ***none of MIC's businesses are exposed directly to the price of crude oil or petroleum products***.

125.    During that call, Defendant Hooke also spoke personally about efforts to secure renewals in IMTT's storage contracts, stating that the Exchange Act Defendants' "first emphasis [in contract renewals] is adding tenor to customer contracts, and then our emphasis would be adding pricing. And then our emphasis after that would be on adding capacity . . . . [W]e continue to make nice progress on adding tenor to the contracts, so I'm sort of pleased with that." Hooke also showed his awareness of contract renewals on a granular level, discussing how contract renewal "***varies terminal to terminal, product category to product category,*** chemicals are a little different than ***petroleum***."

126.    Particularly in light of the momentous recent developments for IMO 2020, the implication of Hooke's statements was clear even without explicit reference—IMO 2020 did not pose any risk to IMTT or Macquarie.

127.    This implication is even clearer by comparison to statements made around this time by other operators of liquid storage terminals. For example, just days earlier, the CEO of World Fuel Services Corp., a fuel distributor that also operates storage facilities, discussed the company's ability to "navigate through" the "significant amount of changes coming into the marketplace" from IMO 2020, which is "certainly is going to change the fuel diet. It's going to become more complex. You're going to have global imbalances in terms of various products."

128.    Similarly, during a November 7, 2016 earnings call for Vopak—the company that previously operated IMTT in a partnership with the Coleman family, and which Macquarie had identified as one of IMTT's "main terminal operation competitors"—its CFO discussed "the implications for global imbalances of diesel and fuel oil" as a result of IMO 2020, which he said raised the questions "what does it mean for the storage of the products?" and "what we are doing . . . as a business?"

129.    However, because the Exchange Act Defendants had concealed Macquarie's heavy reliance on No. 6 fuel oil (and thereby its exposure to IMO 2020)—and, further, misleadingly told investors that it was macroeconomically protected—investors did not believe that Macquarie was facing the same questions posed by Vopak, and prices of Macquarie common stock actually climbed to Class Period **highs** during this time. For example, on October 5, 2016—the day after *Reuters* wrote about the industry bracing for IMO 2020—Macquarie reached its second-highest Class Period price of $85.

130.    Then, on November 1, 2016—just days after IMO 2020 was confirmed, and the same day as Hooke assured investors that "none of MIC's businesses are exposed directly to the price of . . . petroleum products"—Macquarie stock climbed to its ***all-time Class Period high*** of $85.45.

131.    Within days, on November 3, 2016, the Exchange Act Defendants announced the Offering: a secondary public offering of 2,870,000 shares of Macquarie common stock by Macquarie Management, comprising nearly 40% of Macquarie Management's holdings.

132.    The Offering was conducted pursuant to the Company's existing shelf registration statement filed with the SEC on April 5, 2016 (the "Registration Statement"), as updated by a prospectus supplement dated November 3, 2016 (the "Prospectus Supplement"; with the Registration Statement, the "Offering Documents"). The Offering Documents did not discuss IMTT's reliance on No. 6 fuel oil, IMO 2020, or even the decline in No. 6 fuel oil generally. In fact, the Offering Documents remarkably suggested that "strict environmental regulations" ***benefitted*** IMTT by providing one of "several barriers" to entry that protected IMTT from

competition. In reliance on these statements in the Offering Documents, investors purchased over $235,053,000 in Macquarie common stock from Macquarie Management.

133.   By comparison, beginning with its 2013 Form 10-K filed on February 14, 2014, World Fuel Services Corp.—a fuel distributor that also operates storage facilities—has explicitly discussed IMO 2020 in its Forms 10-K as an example of an "adverse condition[]" that could "reduce the demand for our products and services" and "have a material adverse effect on our business or on the businesses of our customers."

134.   As 2016 ended and 2017 began, the bulk liquid storage industry at large continued to discuss the impact of IMO 2020 and the declining No. 6 fuel oil market. For example, on December 19, 2016, the storage industry periodical *Tank Storage Magazine* devoted a full article to IMO 2020, describing it as "A Significant Change For All Supply Chain Players."

135.   Then, on February 8, 2017, *Tank Storage Magazine* stated that a survey of 171 storage operator industry experts "highlight[ed] that operators are very mindful of ever-stringent environmental standards, such as the recent International Maritime Organisation decision regarding sulphur fuel content[.]"

136.   On February 18, 2017, Vopak—the company that previously operated IMTT in a partnership with the Coleman family, and which Macquarie had identified as one of IMTT's "main terminal operation competitors"—disclosed in its 2016 Annual Report listed IMO 2020 as a "key theme" that its "overall business environment in 2016 has been influenced by."

137.   Later that month, on February 21, 2017, during its earnings call, Galp Energia—a corporation whose business includes, among other things, the storage of liquid fuels—described IMO 2020 as a "disruption that [Galp] will face across all the industry," and explained that consequentially the company was "taking in consideration that we are addressing the challenges of new conversion capacity"—"***This is a trend and we have to fine tune our strategy*** . . . . [W]e have to start to keep that in our mind and progressively allocate CapEx to this new economy . . . . So we have to be working and competing on that space."

138.    The next day, on February 22, 2017, *Tank Storage Magazine* published in its first issue of the year an editorial entitled "An Unpredictable Market," stating that "2017 could throw up its fair share of surprises for the global market—particularly with . . . moves towards implementing the IMO's 2020 marine fuel cap[.]"

139.    By that time, IMTT was already underway attempting to renew expiring No. 6 fuel oil contracts. FE-4—who began working at IMTT in 1982, and later reported directly to IMTT CFO (and Macquarie Management employee James May) as a Director of Insurance Risk—stated that, by the time he left IMTT in February 2017, IMTT was already working on the renewals of the various No. 6 fuel oil contracts, and would have been starting to get a feel of customers' needs. FE-4 also said that—consistent with FE-1's information—Defendant Courtney would have renegotiated the contracts.

140.    Nonetheless, Macquarie's 2016 Form 10-K, filed February 21, 2017, simply rehashed similar boilerplate risk factors as its prior year Form 10-K, claiming that the "essential services nature of the business and ***continued strong demand for the products stored***" by IMTT offset any risk from "uncertainty among industry participants" because of "historically low and volatile petroleum product prices."

141.    Particularly in light of IMO 2020's confirmation—and the concurrent impact on the market, described above—the Exchange Act Defendants' decision to repeat these generic risk disclosures told the market that IMTT had no exposure to IMO 2020 or the decline of the No. 6 fuel oil industry generally.

142.    The Exchange Act Defendants continued to affirmatively mislead the market about IMTT's protection from market trends. During Macquarie's first earnings call of the year on February 22, 2017, Defendant Hooke misleadingly told investors that "[s]torage prices were stable" and affirmatively said that there was "***nothing we see coming down the pipe***" that would cause utilization to "revert to historically normal levels . . . we have every incentive to keep those tanks as full as we can, and ***we will***."

143.    In contrast, on March 31, 2017, Odfjell—which Macquarie had previously identified as one of IMTT's "main terminal operation competitors"—published its 2016 annual report, in which the company stated that it "must carefully consider consequences of the new requirements on sulphur emissions coming into effect from 2020[.]"

144.    Nonetheless, on May 10, 2017, Defendant Davis discussed IMTT at an Oppenheimer Industrial Growth Conference, and again did not discuss IMO 2020 specifically but instead assured investors that IMTT's storage and logistics services were secure, with "***no commodity exposure other than the very broad macroeconomic factors influencing supply and demand more broadly***."

145.    Defendant Davis made similar misleading statements one week later, during the May 18, 2017 Three Part Advisors East Coast Investor Conference. Discussing IMTT, Davis stated, "***There is no commodity exposure directly***, other than that it results from macroeconomic factors influencing supply and demand more broadly." Davis also conspicuously omitted No. 6 fuel oil from his description of refined petroleum products stored by IMTT: "A little over half of the capacity . . . is in service for petroleum products, ***specifically refined petroleum products of gasoline, diesel, heating oil, things of that nature***."

146.    Defendant Davis also made other misleading statements at the May 18, 2017 conference. For example, in response to a question about "environmental . . . issues that arise out of the operation of this kind of business," Davis acknowledged that such issues are "an important consideration," but did not discuss IMO 2020 or other environmental concerns pushing the industry away from No. 6 fuel oil.

147.    In addition, Defendant Davis misled investors by stating that, "the easiest way to think of [IMTT] is as a multimodal distribution hub for liquid products. ***This is not the place where you would store it if you're playing contango or backwardation games. This is a distribution***

*center for these products.*"[8] This statement further suggested that IMTT was insulated from market fluctuations by conveying that IMTT's customers were not speculative commodity traders.

148.    All the while, the tank storage industry at large continued to focus on IMO 2020. On June 12, 2017, Tony Quinn of TankBank International (an international advisory and professional networking organization for bulk liquid storage) discussed the impact of IMO 2020 as part of a presentation called "A Global Perspective on Liquid Storage" that he gave at the International Liquid Terminals Association ("ILTA") 37th annual 2017 International Operating Conference & Trade Show. Senior IMTT employees certainly knew of, if not attended, Quinn's presentation: IMTT's COO throughout the Class Period, Michael Burgett, personally helped "shape the conference program content" as a member of the 2017 Conference Advisory Committee, and other IMTT personnel also presented at the conference, including Rene Gurdian (IMTT's Regional Terminal Manager, based at IMTT's headquarters in New Orleans, Louisiana) and Jordan Blasi (IMTT Fire Chief).

149.    Later that month, on June 27, 2017, Defendant Stewart spoke at the JPMorgan Energy Equity Investor Conference. With the industry and investors focused on IMO 2020, Stewart boasted that IMTT "benefits from stable, generally growing demand" and that "the opportunity set at IMTT is as good as it has been in quite some time," with frequent "*requests for additional capacity and capability.*" Notably, though Defendant Stewart did not address the decline in No. 6 fuel oil explicitly, he was asked specifically about the "renewal risk" in the "bulk liquid storage market in general" given "*the current environment*," and responded that "the market is one that's in relative equilibrium at the moment."

---

[8] "Backwardation" and "contango" are industry terms referring to the relationship between the current (spot) and futures prices of commodities. Backwardation is when the current price is higher than a future cost, and is seen as a sign of higher immediate demand. Conversely, contango is when the futures price is higher than the spot price.

### 5. As IMTT's utilization begins to fall, Macquarie acquires Epic Midstream in a largely-stock transaction.

150. By the end of the second quarter 2017, the increasing decline in demand for No. 6 fuel oil began to drag down IMTT's utilization, falling to 94%, down from 96% year-over-year. Nonetheless, during Macquarie's earnings call for the quarter, on August 3, 2017, Defendant Hooke told investors that IMTT remained "*a case of steady as she goes*" and emphatically denied that there were "any commodity-driven factors that would cause a decline in utilization," stating:

> *No, no.* The totality of the change in utilization was driven by tanks offline for tank cleaning and inspection. But the other I would – so there's no – well, there's nothing – *there's no other commodity noise or other noise or counter-party issues there*. It's purely that.

151. Defendant Hooke's outright denial that any "commodity-driven factors" threatened IMTT's utilization contrasted dramatically with statements made the very same day in the earnings call for PBF Energy, a petroleum refiner and supplier. During that call, PBF Energy's CEO stated that IMO 2020's impact on the market is "going to be significant . . . for a period of time . . . . I think it's a very, very significant thing going forward."

152. This contrast between Hooke's emphatic assurances during Macquarie's earnings call and the larger market assessment so misled investors that, in its report dated August 3, 2017, SunTrust remarkably wrote that it actually "expect[s] *a slight uptick* in [IMTT's] utilization for the remainder of the year."

153. In fact, at this time in particular, the Exchange Act Defendants needed the market's continued belief in Macquarie's strength (including Macquarie's commitment to its dividend): on the same day as they disclosed IMTT's slip in utilization, the Exchange Act Defendants also announced that Macquarie was acquiring Epic Midstream ("Epic") for $171.5 million, to be paid largely in shares of Macquarie stock. Similar to IMTT, Epic operates a portfolio of storage terminals—but, unlike IMTT, Epic was protected against the fallout in the heavy fuel oil industry because it principally stored jet fuel, including for the Department of Defense as part of a longstanding relationship. Accordingly, Epic offered Macquarie a chance to buffer the Company

against IMO 2020—as Defendant Hooke would later acknowledge, "jet fuel is the sort of reason for Epic."

154.    The use of stock to fund the majority of the transaction reflected the Exchange Act Defendants' growing awareness that Macquarie was facing a capital shortfall as IMTT would require enormous expenditures to repurpose the tanks that had been dedicated to storing No. 6 fuel oil. In fact, FE-5, Epic's Chief Commercial Officer from Feb 2016 to August 2017, participated in meetings with Macquarie and IMTT employees in early 2017—including Defendant Courtney—and recalled that Macquarie sought to fund the purchase entirely with stock.

155.    Accordingly, it was critical that the Exchange Act Defendants maintain the value of Macquarie's stock even in the face of the declining utilization rate. When the Epic Acquisition finally closed on August 8, 2017, Macquarie ultimately issued 1,650,104 shares of Macquarie stock for the Epic Acquisition—meaning each share was valued at approximately $75.75. In contrast, when the truth became known, the price of Macquarie shares would plummet 50% of that value, to just $37.41 per share. In other words, but for the Exchange Act Defendants' false and misleading statements and omissions, the Exchange Act Defendants would have had to have issued up to *twice* as much stock to complete the purchase.

156.    On August 31, 2017, Defendant Davis participated in the Three Part Advisors Midwest IDEAS Investor Conference, where Davis stated that only Macquarie's Atlantic Aviation segment had "exposure to cyclicality or macroeconomic sensitivity . . . [Atlantic Aviation is] definitely the *one* business in the portfolio that has more or a greater potential to have macroeconomic sensitivity." Davis also described as a "misperception" that Macquarie had "issues or potential exposures" from "volatility in the commodity price . . . given the basic services nature of the visibility we have into the cash-generating capacity of these businesses."

**D.      The Exchange Act Defendants Continue To Falsely Tout IMTT's Utilization And Promise Macquarie's Dividend Even As Customers Cancel Valuable No. 6 Fuel Oil Storage Contracts**

157.    Just one month after completing the Epic Acquisition, on September 11, 2017, Macquarie unexpectedly announced that Hooke would step down as CEO in early 2018. The news

surprised investors, who—as one analyst stated during Macquarie's earnings call two months later—"kind of always envisioned [Hooke] being at MIC for life, it felt like." However, months later, as the truth about the Exchange Act Defendants' fraud became known, some analysts began to see the timing of Hooke's departure as something more suspicious: for example, in its February 22, 2018 analyst report, J.P. Morgan noted that, "in the first quarter after the departure of former CEO James Hooke," there was a "sharp departure from prior messaging" around "underlying business issues."

158.    In connection with the release of its third quarter 2017 earnings in November 2017, Macquarie reported that it was lowering its 2017 free cash flow guidance to 9%, rather than the 10-15% previously provided, and disclosed that IMTT's utilization had continued to decline, now to 92.7% (down year-over-year from 96.7%). Nonetheless, Macquarie announced that it raised its quarterly dividend yet again, consistent with its guidance that the dividend would grow 10%.

159.    During Macquarie's November 2, 2017 earnings call—Hooke's last—Hooke forcefully downplayed the drop in IMTT utilization as related only to cleaning tanks, and stated that, "[i]n general, IMTT's operating results for the third quarter and year-to-date periods were *stable*." During the November 2, 2017 earnings call, Hooke also dismissed an analyst's suggestion that Macquarie might "pivot towards what the market values and not as much maximizing dividend growth but more retaining cash flow," stating:

> Exuberant dividend growth at all costs where people were urging us to guide to 7 years' visibility of 20% plus dividend growth, we never did that. ***People slashing their dividend saying we're going to slash our dividend to deploy capital internally, I don't think you'll see us do that.*** . . .
>
> [Y]ou've never seen us make radical lurching changes of, sort of, revisiting capital policy and dividend policy, et cetera. I would be pretty surprised if anything changes going forward . . . .
>
> [E]verything we've done to date, we can fund without going to the market for more capital . . . we fund–that standard 350 of growth CapEx.

160.    As throughout the Class Period, Defendant Hooke's statements contrasted significantly with those of their competitors. For example, just days later during its November 6,

2017 earnings call, Vopak—the company that previously operated IMTT in a partnership with the Coleman family, and which Macquarie had identified as one of IMTT's "main terminal operation competitors"—stated that "the fuel oil market structure remains challenging for our customers, mainly due to uncertainty around long-term demand for high sulfur fuel oil cost by the uncertain fuel oil demand implications of IMO 2020. In addition, the fuel oil market is in backwardation, not stimulating any additional trading activities. The uncertainties around the exact IMO 2020 consequences is a *global phenomenon affecting the whole industry from suppliers to traders, bunkering agencies, ship owners and also tank storage companies.*"

161.    At the end of the November 2017 earnings call, as the Officer Defendants had throughout the Class Period, Defendant Hooke invited investors to personally contact Defendant Davis. In fact, Macquarie would later disclose that Defendants engaged in "*in excess of 1,200 individual interactions with current and potential shareholders*" during 2017, including "investor interactions in November 2017" after the earnings call.

162.    Many of these direct communications were motivated by a decline in Macquarie's stock price, prompting several investors to specifically inquire about IMTT's storage of heavy fuel oil and exposure to IMO 2020.

163.    For example, as Defendants frequently referred to, they participated in numerous roadshows during the Class Period. (*See, e.g.*, ¶50.) During these presentations, which were at times attended and/or hosted by analyst firms covering Macquarie during the Class Period, Macquarie representatives were directly asked about IMO 2020, and responded that the Company did not see IMO 2020 as a big impact on IMTT.

164.    Similarly, in September 2017, an institutional investor told Defendant Davis that this investor learned from one of Macquarie's competitors that No. 6 fuel oil was 20% of IMTT's capacity, and that the market for No. 6 fuel oil was weak at the time and specifically had "some real structural challenges given" IMO 2020. During a phone call with this investor on September 22, 2017, Davis responded (as he did with other investors) that IMO 2020 should not have much

of an impact on Macquarie and in fact could end up a positive for the Company. Davis also said that, if needed, Macquarie could convert IMTT's tanks for a nominal amount.

165.    In other instances, the Officer Defendants falsely told investors that IMTT stored only *half* of the amount of heavy oil (i.e., No. 6 fuel oil) that it actually stored, and further minimized the consequences of that exposure. For example, on or around this time, Defendant Davis directly told an investor that No. 6 fuel oil was only a small percent of IMTT's utilization.

166.    Similarly, on November 10, 2017, Defendant Davis—Macquarie's head of investor relations—sent the following in response to a question from Lead Plaintiff:

> [Lead Plaintiff:] ***What percent of IMTT's storage is in heavy oil?*** We heard new regulations are coming out in 2020 that prevent fuel ships from using heavy oil unless improved scrubbers are also installed to clean exhaust – how will this impact demand for heavy oil? Can heavy oil storage tanks be easily converted?

> [Davis:] ***About 20%.*** Your information is consistent with our understanding of the proposed regulatory changes. The regs will require Sulphur content to move from a max of 3% today to .5% - what we are seeing in our facility is already at about 1.5%. Some ships will install scrubbers and continue to burn the less expensive, high Sulphur product. Since you cannot <u>not</u> produce black oil, going forward some of it will be blended with distillate to meet the new spec, refiners will also look for way to crack the #6, or the product will be exported for power gen (or purposes other than ship propulsion) in other parts of the world. The latter could well be a positive for storage demand at IMTT-Bayonne given the deep water access at the facility.

> Heavy tanks can be converted and we have converted some in the past – in late 2012 we converted about 1.2mm bbls of heavy storage to distillate. There is a maintenance capex cost associated with cleaning the tanks and associated pipes, and potentially a growth capex spend for new capability (floating roof, for example) depending on the end use.

167.    One week later, on November 16, 2017, Defendant Davis participated in another Three Part Advisors IDEAS Investor Conference, during which he similarly (and falsely) assured investors by misrepresenting IMTT's exposure to No. 6 fuel oil, stating that "[a] little over 1/2 of [IMTT's] capacity is in service in petroleum products, and as I say, ***very little*** of that is in crude or asphalt, any -- ***or heavy product***"—and stating that the Exchange Act Defendants have "very good visibility into the cash generating capacity of this business ***over a longer period of time***."

168.    On November 28, 2017, Macquarie hosted a dinner on November 28, 2017 for approximately a dozen institutional investors, including Lead Plaintiff. At this dinner, which was attended by Defendants Hooke, Stewart, and Davis, as well as Macquarie's then-COO and future-CEO, Mr. Frost, the Officer Defendants told Lead Plaintiff and the other guests that Macquarie would have continued dividend growth in 2018, citing among other things that IMTT would serve as a "growth driver for 2018" as a result of pricing and operational improvements expected to drive EBITDA margins higher.

169.    In December 2017, the Exchange Act Defendants gave an investor presentation entitled "Overview of the IMTT Segment," in which they stated that IMTT's "[c]onsistently high utilization reflects essential services nature of IMTT's services," while any "[u]nused capacity is generally attributable to tank inspections, repairs, and modifications."

170.    In fact, reconciling Macquarie's later disclosures indicates that significant No. 6 fuel oil storage contracts had not renewed by the beginning of November, at the latest, causing IMTT's utilization to decline to below the oft-stated historical average *before* Defendants' reassuring statements discussed above. Specifically, Macquarie later disclosed that IMTT utilization at the end of the third quarter 2017 was 93.2%, while the utilization at the end of the fourth quarter was 89.6%. To reconcile that decline with the reported average utilization rate for the fourth quarter of 90.6% means that there must have been at least 66 days of 89.6% utilization rate, or that the decline started as early *as October 25, 2017*.

| | | |
|---|---|---|
| IMTT Utilization at 9/30/2017 | 93.2% | (1) |
| IMTT Utilization at 12/31/2017 | 89.6% | (1) |
| Average Q4'17 IMTT Utilization | 90.6% | (1) |
| Total Days in Q4'17 | 92 | |
| | | |
| X = Days of 89.6% Utilization in Q4'17 | 90.6% = 89.6%*(X/92) + 93.2%*((92-X)/92) | |
| | | |
| Solving for X, Days of 89.6% Utilization in Q4'17 | 66.4 | |
| Implied Date of Lost IMTT Utilization (Counting Back From 12/31/2017) | 10/25/2017 | |

46

171.    Nonetheless, the Exchange Act Defendants did not disclose the contract non-renewals or give anything other than positive indications for IMTT, Macquarie, and the Company's dividend.

### E.    Throughout The Class Period, The Market Relied On The Exchange Act Defendants' Misrepresentations About IMTT

172.    Throughout, the market took note of the Exchange Act Defendants' claims about IMTT as positive signs for the Company and its dividend.

173.    For example, in its analyst report just before the start of the Class Period, on January 11, 2016, J.P. Morgan concluded that "Macquarie does not possess the same commodity price exposure and volumetric risk as others in our coverage universe . . . we believe investors should flock to, not flea from, MIC's niche businesses that diversify away from riskier portions of energy infrastructure. . . . Among all stocks under coverage MIC *remains a favorite*."

174.    J.P. Morgan's January 11, 2016 report also noted "macroeconomic sensitivity" as a risk only for Atlantic Aviation—not the Company's other operating segments, such as IMTT. J.P. Morgan would continue to state similarly in reports throughout the Class Period, including on November 1, 2016.

175.    For example, in an analyst report dated May 12, 2016, Oppenheimer discussed Macquarie's "bullish investor day," and stated that Defendant Courtney "presented a positive outlook [for IMTT] even in a somewhat challenged energy environment. While lower prices have affected sentiment, *the business remains rock-solid*."

176.    Similarly, in its analyst report dated October 31, 2016, Oppenheimer wrote that IMTT's "core business outperformed . . . . Utilizations now stand at ~96.7%, reflecting *strong demand* across the petroleum storage markets. . . . We continue to believe the company can grow its dividend double digits, as organic growth remains healthy[.]"

177.    An analyst report by Wells Fargo issued just weeks later, on November 18, 2016, also confirmed the effectiveness of the Exchange Act Defendants' deception: though the report discussed regulatory risks to Macquarie's Hawaii Gas segment, it did not discuss any similar risk

to IMTT—instead stating that, "[d]espite significant exposure to oil as a commodity, oil prices do not have a significant impact on cash flow as IMTT primarily works with downstream products. Refined oil product use tends to increase as oil prices (and gas prices) drop." Ultimately, the report concluded, "We consider the dividend to be secure, with 8+% annual growth potential. Finally, we consider MIC's management team to be knowledgeable and contemplative, with a conservative approach[.]"

178.    Similarly, on March 20, 2017, SunTrust Robinson Humphrey initiated analyst coverage of Macquarie with a "Buy" rating. SunTrust noted that IMTT provided 47% of Macquarie's free cash flow with "long-term fee-based contracts provide the segment with generally stable cash flows and MIC works to minimize any additional sources of risk to the business model . . . minimizing its risk to commodity movements."

179.    Finally, in its June 26, 2017 analyst report, J.P. Morgan wrote that IMTT "continues to play the biggest role in MIC growth . . . [and] remains the key driver of MIC's ongoing growth."

## V.    THE TRUTH EMERGES

180.    On February 21, 2018, after the close of trading, Macquarie announced disappointing fourth-quarter earnings of $0.43 per share, well short of analysts' prior estimate of $0.51 per share. In addition, IMTT's fourth quarter utilization rate was just 90.60% in the fourth quarter, ending the year at 89.6%—far below the consistently affirmed "historical mean" utilization rate of 94%.

181.    Macquarie also revealed a stunning collapse in its free cash flow: rather than the 10-15% growth in free cash flow that it had consistently guided investors to expect—or even the downward revision to 9% free cash flow growth that it gave in November 2017—Macquarie's free cash flow increased only 8%. Remarkably, Macquarie also now stated that it expected its free cash flow to *decline* by 8-10% during 2018—far from the 10-15% growth guidance previously provided.

182.    Most alarmingly, Macquarie revealed that it would be cutting its quarterly 2018 dividend guidance by 31%—ending over four years of consecutive quarterly dividend growth—primarily to fund the repurposing of IMTT fuel oil tanks to accommodate new products. The earnings announcement quoted Macquarie's new CEO Frost as stating, "[W]e have made the decision to reduce our 2018 dividend *in favor of internally funding the repurposing of the assets at International-Matex Tank Terminals* and to take advantage of the incentives to invest in growth projects that are a part of recent tax reform."

183.    In Macquarie's earnings call the following day, Frost blamed all this bad news on one culprit: No. 6 fuel oil.

184.    For the first time, Macquarie acknowledged the "structural decline in the 6 Oil market," a "broadly defined group of residual and heavy oils" for which, Frost said, "[p]rices are in backwardation, demand for the product is declining and less of it is being produced domestically as a consequence of the shale revolution and the lighter feedstocks going to U.S. refineries."

185.    However, even as Frost acknowledged the truth—that "it is well known to the market that 6 oil is a declining market"—Frost suggested that IMTT's tumbling utilization somehow uniquely caught Macquarie off-guard, stating: "In December and early January, a number of customers terminated contracts for a significant amount of 6 Oil capacity at IMTT's facility in St. Rose. Not only did they terminate those contracts, in some cases, they shut down their operations and *exited the industry*." Frost said this "was quite sudden and it did happen to a number of contracts, whether the notice period came up. And it is quite common that these do occur at the end of the year. But it was something that *was a surprise*."

186.    In reality, investors were the ones who were surprised. The Exchange Act Defendants had not once during the Class Period disclosed or even hinted at the importance of the No. 6 fuel oil segment to IMTT and to the Company's overall performance, nor had the Exchange Act Defendants ever revealed that "many" of IMTT's "long-term customers" were storing No. 6 fuel oil—a product for which, as Frost accurately stated, "the long-term trend . . . has been well understood" to be in decline. To the contrary, the Exchange Act Defendants had, as recently as

November 2017, actively misrepresented that the Company had "very little" involvement in heavy fuel oils. Further, throughout the Class Period, the Exchange Act Defendants had consistently reassured investors that these were exactly the sorts of market forces that IMTT was shielded against, such as when Defendant Hooke told investors on February 22, 2017—shortly after IMO 2020 was confirmed to proceed on schedule, immediately causing disruption in the No. 6 fuel oil market—that there was "***nothing we see coming down the pipe***" that would cause utilization to "revert to historically normal levels"—much less the lowest utilization that Macquarie had ever publicly reported, as it had now fallen to.

187.    Former employees FE-2 and FE-1 also expressed outright skepticism at management's purported "surprise" in February 2018. FE-1 stated that management's explanation "doesn't ring true," because "it defies logic that the decline in No. 6 fuel oil markets snuck up on them in one quarter"—the decline of an oil product like No. 6 fuel oil does not occur overnight and such a trend does not "show up between quarters." FE-1 said bluntly that FE-1 "flat-ass [doesn't] believe there was a change in market that caught them off guard and came on overnight." Because demand for IMTT's tanks had historically been robust, FE-1 stated that Macquarie would have seen a decline in demand coming, noting in particular that Defendant Courtney was "absolutely" in "constant contact with customers, contracts, and trends." Further, FE-1 explained, because St. Rose's "monster" 500,000 barrel tanks built to store No. 6 fuel oil could not be "easily repurposed or re-contracted," FE-1 said ***any*** "disturbance in the force"—even a "sneeze"—concerning those tanks immediately got attention, and contract renewal efforts began at least a year in advance of contract expiration.

188.    Similarly, FE-2 stated his understanding that, from a marketing standpoint, IMTT—a "100%" Macquarie show—would have been monitoring the length of its contracts and making sure their customers were satisfied, and would have had some feel for how long a customer is "destined" to stay or go.

189.    In fact, FE-4 confirmed that, by February 2017, IMTT was already working on the renewals of the No. 6 fuel oil contracts.

190.    FE-1 and FE-2 also both confirmed that Defendant Courtney—IMTT's CEO during the Class Period—would have been up to date on IMTT's involvement in No. 6 fuel oil. FE-1, who personally knew Defendant Courtney, said that Courtney's strength is knowing the market, the customers and the facility's tanks, and can talk "for hours" about which tanks are in service and what each customer is doing. FE-1 said that Courtney is "assuredly" as up to date on the No. 6 fuel oil market as anyone, and "absolutely" had "constant contact with customers, contracts, and trends."

191.    FE-2 reported directly to Defendant Courtney during 2015 and stated that Courtney would generally know that IMTT was storing a lot of No. 6 fuel oil. FE-2 stated that he would oversee the preparation of monthly reports on the utilization and in- and out-flow of St. Rose's storage tanks that would indicate whether those tanks stored No. 6 fuel oil, and these reports were provided to Courtney as well as IMTT's CFO (and Macquarie Management employee) James May. FE-2 also stated that Courtney and IMTT CFO / Macquarie Management employee May occasionally participated in monthly reporting meetings at IMTT, during which any abnormalities in IMTT's storage tanks' throughput would be discussed.

192.    What's more, while Frost and Defendant Stewart attempted to downplay the loss of these IMTT customers as "an issue having to do with one product, in one market, in one of our businesses," the guidance for projected utilization rates made clear the broader significance of No. 6 fuel oil to IMTT. After years of telling investors to expect a historical mean of 94%, Macquarie now revealed that they expect utilization to "*average in the mid-80% range*."

193.    The contrast was jarring: just months earlier, investors had heard that IMTT would revert to its historical utilization average of around 94% and that IMTT would be a growth driver for 2018, but now heard that a stunning decline in utilization would be "the *primary driver* behind the year-on-year [projected] decrease in EBITDA."

194.    The explanation for the projected utilization rate was almost as jarring. Frost claimed that the lower guided utilization rate resulted from "spen[ding] a considerable amount of time reviewing those contracts that are expected to come up for renewal." This revelation called

51

into question what the Exchange Act Defendants had been doing in the contract renewal efforts they had positively discussed throughout the Class Period—all while consistently reaffirming IMTT's projected utilization—as Defendant Hooke had done on November 1, 2016, when he personally asserted, "[W]e continue to make nice progress on adding tenor to the contracts, so I'm sort of pleased with that."

195.   In addition, Frost's explanation that "it is quite common that these [contract renewals] occur at the end of the year" made all the more misleading that, as 2017 drew to a close, the Exchange Act Defendants had affirmed IMTT's projected utilization and the Company's stability generally, knowing that a significant number of contracts for the storage of No. 6 fuel oil—a commodity facing "brutal changes" and for which demand had been declining—were up for renewal.

196.   Discussing the decision to cut the dividend, Frost stated:

We've spent the last month looking at various options for dealing with this issue in 2018. They all lead us back to one conclusion, we need to repurpose some of the IMTT tanks into the storage and handling of bulk liquids other than 6 Oil. This is nothing new. IMTT has repurposed tanks opportunistically in response to changing market conditions. We believe, we are better off repurposing these 6 Oil tanks now, given the long-term structural decline of this product . . . .

As a consequence of recent changes in demand, the handling of 6 Oil at St. Rose, we now expect IMTT's contribution to our 2018 results to be down . . . . We are reducing our forecast 2018 dividend to $1 per share per quarter. The capital retained as a result of reducing the dividend will be used to strengthen our balance sheet and fund the portion of the projects that we believe will generate incremental federal income tax shield and contribute to growth in cash generation in the future . . . .

Among these are expected to be the repurposing of some of IMTT's tanks to take advantage of favorable growth trends in certain bulk liquids.

197.   Once repurposed, Frost said, Macquarie would still "have exposure to the 6 Oil . . . [b]ut the type of customer that we are likely to have exposure to, we believe will provide ***more stability*** in terms of 6 Oil revenues."

198.   Again, these revelations sharply contrasted with the Exchange Act Defendants' statements during the Class Period, such as Defendant Hooke's statement in May 2016 that IMTT

was a "fundamentally sound business[], operating in segments of the economy that are proven to be quite robust over the long-term."

199.    In addition, the "favorable growth trends" that Frost said that IMTT would look to take advantage of were not recent trends, but in fact had been known and identified since well before the Class Period—including by Defendant Hooke himself in 2012.

200.    During the Class Period, the Exchange Act Defendants had repeatedly told investors that Macquarie could fund its continued growth in part with its ample credit facilities— for example, on February 21, 2017, Defendant Hooke had told "the conspiracy theorists" that the Exchange Act Defendants could deliver dividends while continuing to fund growth given Macquarie's "$1.4 billion of available credit." Now, however, Frost explained that Macquarie's weakened economic state from IMTT's concealed dependence on No. 6 fuel oil left the Company "limit[ed] to using internally-generated resources" to "deploy[] capital into attractive new projects, particularly those related to the repurposing of IMTT," which he said was "the highest priority for us at the moment."

201.    The news shocked the market, and in response Macquarie's stock price fell over 41% in a single trading day, from $63.62 per share on February 21, 2018, to $37.41 per share on February 22, 2018—a decline of over 54% from the Offering price of $81.90 per share.

202.    In its analyst report dated February 21, 2018, RBC Capital Markets wrote: "The customer losses, dividend cut and strategic re-purposing of IMTT come as a surprise to us as IMTT utilization was holding up decently in 2017 (and peers had not indicated this level of potential future distress)."

203.    In its report dated February 22, 2018, J.P. Morgan was even more critical about the "significant shift in the outlook for IMTT," writing that "IMTT woes surprise . . . IMTT utilization declined to 90.6% in 4Q17, below the 92-94% historical range previously . . . . *The rapid decline comes as a surprise given mgmt's prior steadfast commentary on the strength of the business*." Overall, J.P. Morgan concluded, "MIC likely moves into a 'show me' camp for investors."

204.    Similarly, in its report dated February 22, 2018, Alembic Global Advisors—who had hosted Defendant Davis for a roadshow just two months prior, on December 11-12, 2017—wrote that the "surprisingly disappointing." Noting the revelation that "[a] global shift in the production and consumption of refined petroleum products" would impact "IMTT's overall storage demand and price," Alembic wrote that, "[p]ost 3Q17, ***management was quite optimistic about IMTT***, so we were taken aback by its sudden weakness—this, a business long-viewed as MIC's most stable asset" and its "bellwether."

205.    Finally, in its report dated February 23, 2018, Wells Fargo downgraded its rating for Macquarie stock, writing that "***management's credibility has been called into question*** – as recently as December the dividend was described as '***sacrosanct***' to us."

## VI.   POST CLASS PERIOD EVENTS

206.    On May 3, 2018, Macquarie conducted an earnings call in which CEO Frost provided additional detail on the decline in IMTT's utilization and the decision to reduce MIC's dividend.

207.    First, Frost made clear that the Company's February 2018 disclosures about No. 6 fuel oil referred to heavy and residual oil generally, stating that in February "we used the word 6 Oil as a shorthand for a range of heavy and residual oils rather than discussing the specifics of a number of subcategories."

208.    Then, for the first time, Frost revealed that "IMTT's customers are a mix of commodity traders and system players, customers who use IMTT storage and handling facilities as part of production processes or supply chains." In fact, Frost continued, "[o]ver time, both the Lower Mississippi and Bayonne facilities have had a ***meaningful contingent*** of commodity traders as customers, as much as 20% both by contract number and lease capacity. Commodity traders typically move in and out of the market based on short-term opportunities." This revelation facially contradicted several claims made by the Exchange Act Defendants during the Class Period, including that IMTT "only deal[s] with major oil companies, major chemical companies, utilities,

major agricultural companies. We have few other customers" (¶115), and that "[t]his is not the place where you would store it if you're playing contango or backwardation games. This is a distribution center for these products" (¶147).

209.     The materiality of those false and misleading statements was further emphasized by Frost's revelation that, while purportedly "a substantial majority of IMTT customers are system players," "the counterparties who did not renew their [No. 6 fuel oil] contracts were mainly commodity traders, not system players."

210.     Frost also further elaborated on the timing, amounts, and location of the No. 6 fuel oil contract non-renewals, stating:

> Over the course of the fourth quarter, approximately 1.6 million barrels of storage capacity was not renewed. Additionally, in December 2017, IMTT was notified by 7 major commodity traders that contracts for approximately 1.8 million barrels of storage capacity coming up for renewal in December and January would not be renewed . . . . In addition, we were notified that another 1.6 million barrels currently under contract would only be under contract through the middle of December 2018 as a result of a refinery closure[.]

> [T]he capacity involved was located at IMTT's St. Rose facility.

211.     Frost also explicitly linked Macquarie's declining fortune to IMO 2020, stating that the commodity traders "exited the market as a consequence of a backwardation in heavy and residual oils. We believe heavy and residual oils are in backwardation in part as a result of the uncertainty surrounding the implementation of new regulations related to low sulfur fuel oil in 2020. Because they don't need the storage per se, traders have low barriers to exit."

212.     In addition, in connection with that May 3, 2018 earnings call, Macquarie released an investor presentation, filed with the SEC in a Form 8-K, which revealed that, as of March 31, 2018, heavy and residual oils were the largest product type stored by IMTT, amounting to 17.3 million of IMTT's total 45 million barrels of capacity, or nearly 40%.



213.    The presentation also stated, "Two third of existing [Heavy & Residual] capacity located in the Lower Mississippi River," where IMTT's St. Rose terminal is located. Further, a footnote to the presentation revealed that this information was as of March 31, 2018—i.e., prior to the calamitous fall in utilization and costly repurposing of, according to Frost, 1.3 million barrels of No. 6 fuel oil storage that Macquarie began in response to the non-renewals. In other words, No. 6 fuel oil was likely *half if not more* of IMTT's storage capacity during the Class Period, and at a minimum well over 40% at the time that the Exchange Act Defendants told investors the amount was "about 20%" (¶166) and "very little" (¶167). Indeed, even the amount that Frost told investors that Macquarie would "rightsize[]" heavy and residual capacity to—14 million barrels, or approximately 31% of the capacity—*still* exceeded what Defendants told investors during the Class Period.

214.    The presentation also revealed something else—though the Exchange Act Defendants had, on February 22, 2018, claimed that repurposing IMTT's tanks "is nothing new," information now provided by Macquarie suggested otherwise:



215.    Specifically, the chart above makes clear that IMTT's earlier drops in utilization that the Exchange Act Defendants purportedly corrected through repurposing were both far milder (i.e., stayed closer to the historical utilization average) and lasted only a brief time. In contrast, Macquarie now predicted a far-deeper—and much longer lasting—impact to utilization as a result of the concealed No. 6 fuel oil exposure.

216.    Analysts at Wells Fargo—who had previously written that management's credibility was called into question—were not swayed by the new disclosures, writing on May 4, 2018 that, "[w]hile the Q1 report offered additional transparency into the underlying businesses, most notably IMTT, we believe that MIC remains a 'show me' as management looks to restore credibility with the investment community."

217.     In May 2018, Institutional Shareholder Services, Inc. ("ISS"), a proxy advisory firm retained by investment funds to advise on shareholder votes, issued a report recommending that Macquarie shareholders vote against Defendant Hooke and the Company's two other current directors—Norman Brown and George Carmany—for re-election to the Board of Directors. Citing a "credibility crisis," ISS wrote in its report that the "[t]he extent of the one-day stock price drop [on February 22, 2018 (¶201)], which wiped out more than $2 billion in shareholder value, suggests, at a bare minimum, *a failed communications strategy*."

218.     ISS also took particular aim at the Company's explanation for IMTT's declining utilization, calling it "weak[]" and stating that Macquarie "has thus far failed to provide a conclusive, fact-based argument that definitively disproves the . . . assumptions or calculations" indicating that the Company must have known of the contract non-renewals earlier than December 2017 (¶170). ISS criticized the Company's refusal to provide utilization details as creating "mistrust," and also stated its alarm at "the fact pattern surrounding the Q4 earnings release" in February 2018 that disclosed the truth about the Officer Defendants' fraud (¶¶180-205), stating that "[a]nnouncing such an abrupt shift in the company's dividend strategy – which the board claims to have thoroughly debated – less than two months after a management changeover first announced in September 2017 further undermines shareholder confidence in the board's long-term focus."

219.     On May 16, 2018, Macquarie held its annual shareholder meeting, during which Frost further elaborated on IMTT's involvement in storing No. 6 fuel oil, stating:

> At the Lower Mississippi, we have a class of customers, which are either commodity traders or blenders that would trade or blend the 6 Oil product or a subcategory of this heavy and residual oil. *There is increasing uncertainty with respect to the global demand for that product as a result of the impending introduction of this IMO 2020, which is going to require the world fleet to burn lower sulfur fuel.* And given these are traders or blenders who would buy this product, mix it with other products and then sell it, given this uncertainty, it has been very difficult for these operators to make money. *And therefore, they are exiting the business or exiting the industry and, therefore, are no longer demanding storage or handling facilities with respect to this business.* . . . [T]hat is why we are looking at repurposing some of the storage and handling facilities,

which deal with this heavy and residual oil, into these cleaner products because we're seeing a growth market in that.

220.    Frost's explanation again contradicted numerous of the Exchange Act Defendants' statements during the Class Period as discussed above, including as to the types of IMTT's customers and the purported stability of IMTT's business in the face of now acknowledged "increasing uncertainty with respect to the global demand" for No. 6 fuel oil. Frost's statement also even more thoroughly linked IMTT's decline to IMO 2020 and the declining demand for No. 6 fuel oil.

221.    Also at that May 16, 2018 meeting, the Chairman of Macquarie's Board of Directors (and Securities Act Defendant) Martin Stanley explained further the relation of Macquarie's dividend cut to IMTT's No. 6 fuel oil exposure, stating that there "were a whole series of things that we took into account at the point that we made the decision to reduce the dividend, and it wasn't taken lightly. . . . We took into consideration the things that were going on with respect to IMTT in terms of the softening that we were seeing there and the cancellation of contracts. Not only the cancellation of certain contracts in the back end of last year but also a deep view of what was going on into the future."

222.    On September 5, 2018, Defendant Hooke resigned from Macquarie's Board of Directors.

223.    On October 31, 2018, in response to shareholder concerns, Macquarie announced revisions to its management services agreement with Macquarie Management. Pursuant to these revisions, Macquarie Management capped the amount of fees it received at no greater than 1% of Macquarie's market capitalization, and also waived fees to the Company's debt and future investments. Macquarie also announced that its CEO and CFO—employees of Macquarie Management—will be required to purchase and maintain a position in Macquarie not less than six times and two times their base compensation, respectively. In its press release announcing the change, Macquarie stated that its Board's Compensation Committee "will participate to a greater

extent in an annual process with the Manager of setting performance objectives, evaluating actual performance, and providing input to the Manager on annual compensation decisions."

224.    In its October 31, 2018 "Flash Comment," Wells Fargo—who had earlier written that management's credibility was in question—wrote that it viewed the "shareholder friendly changes" "favorably," but "question[ed] whether they will be enough to flip investor sentiment towards the stock and the structure in general."

225.    On November 15, 2018, Defendant Davis spoke at the Three Part Advisors Southwest IDEAS Conference, during which he again linked IMTT's decline in utilization to IMO 2020. Discussing IMTT's shift from No. 6 fuel oil, Davis stated that, "***Historically, most of that has been used in power generation and ship propulsion, but the rules around ship propulsion are changing.*** We had some traitors in that marketplace leave us. And we said, rather than sit with empty capacity, we're going to put it back into service, but it's going to be in clean petroleum, chemicals project -- products or agricultural products, ***get out of the heavy and resid***."

226.    On February 20, 2019, Macquarie released its fourth quarter and full-year 2018 financial results. The disclosure revealed that IMTT utilization in the fourth quarter 2018 was 82%—dramatically lower than the historical mean of 94% that the Exchange Act Defendants had guided during the Class Period, and even lower than the "mid-80% range" that Macquarie guided after the truth emerged in February 2018. Macquarie also revealed that at least 1.3 million barrels of IMTT storage capacity were out of service for ***nearly the entire year***, with less than half coming back into service only in December 2018, to carry out the repurposing required by its concealed reliance on No. 6 fuel oil storage. Due to IMTT's utilization decline and lower storage rates, IMTT's 2018 EBITDA was down 12.1% versus 2017—and Macquarie forecasted that IMTT EBITDA would decline ***another*** 12% in 2019.

## VII.    THE EXCHANGE ACT DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

227.    During the Class Period, Defendant Macquarie and the Officer Defendants each made materially false and misleading statements and omissions, which were disseminated to

investors in the Company's SEC filings, press releases, conference calls and investor presentations. These misrepresentations and omissions concealed, among other things, (a) IMTT's anticipated loss of revenue from the storage and heating of No. 6 fuel oil, a commodity comprising well over 40% of IMTT's refined petroleum storage capacity, which was scheduled to be largely phased out of its primary use by 2020; (b) the need to undertake significant capital expenditures to repurpose IMTT's unused No. 6 fuel oil storage tanks, which would cost hundreds of millions of dollars of capital expenditures and lost revenue; and (c) the falsity of statements concerning Macquarie's growth plan that hinged on the sustainability and stability of Macquarie's "sacrosanct" quarterly dividends, which were made possible throughout the Class Period by Macquarie's and the Officer Defendants' misrepresentations.

### A.   The Exchange Act Defendants' Materially False And Misleading Statements And Omissions In Earnings Releases, Conference Calls And Investor Presentations Concerning The Company's Reliance On No. 6 Fuel Oil And Dividend Growth Plan

#### 1.   Fourth Quarter and Year End 2015 Misrepresentations

228.   On February 22, 2016, the first day of the Class Period, Macquarie issued a press release announcing its financial results for the fourth quarter and full-year 2015. This press release was filed the next day, February 23, 2016, as an exhibit to a Form 8-K signed by Defendant Hooke. In the press release, Macquarie stated:

> Macquarie Infrastructure Corporation (NYSE:MIC) announced its financial results for the fourth quarter and full-year 2015 including an authorization of the payment of a cash dividend for the fourth quarter of 2015 of $1.15 per share ($4.60 per share annualized). For the full year 2015, dividends paid by MIC increased by 14.7% compared with 2014.

> MIC's fourth quarter 2015 dividend will be paid on March 8, 2016 to shareholders of record on March 3, 2016. MIC has increased its cash dividend in each of the last nine quarters.

229.   In the press release, Hooke discussed the dividend, stating, "We are pleased to have grown our dividend in excess of our guidance." Hooke continued, "What is most pleasing is that the increase has been underpinned by substantial growth in the Free Cash Flow generated by our businesses. *That growth has been achieved despite the volatility in markets broadly and*

*reinforces a basic premise of infrastructure – namely, that it is an inherently more stable asset class*." Hooke commented on Macquarie's dividend guidance, stating that "Given our pipeline of growth projects, and assuming the continued stable performance of our businesses, *we are confident in our ability to deliver value to our shareholders in the form of an attractive rate of growth in our dividend*."

230.    The Company described in the press release that "[r]efined petroleum product storage and handling represents approximately 55% of IMTT's total revenue," but did not break down in any detail the types of refined petroleum product stored by IMTT. Defendant Hooke continued, "[t]he performance of IMTT in both the quarter and the full year periods reflects the downstream services nature of the business overall, as well as the extent to which it *is uncorrelated with the exploration and production (E&P) portion of the oil industry*," and that "[w]hile upstream E&P companies are under considerable financial pressure, the vast majority of the hydrocarbons stored at IMTT have already been refined. *Given the refined product focus, IMTT saw no signs of counter-party distress during 2015*."

231.    The above statements (¶¶229-230) were materially false and misleading, omitted material facts, and lacked a reasonable basis when made. For example, it was misleading for Defendant Hooke to state that IMTT was "an inherently more stable asset class" and that he "saw no signs of counter-party distress during 2015" when in truth, the downward trend in the use of No. 6 fuel oil—a primary source of IMTT's revenue—and imminent further restrictions on its use posed a direct threat to Macquarie's "attractive rate of growth" and quarterly dividends. Moreover, it was materially misleading for Hooke to state that "IMTT saw no signs of counter-party distress" in its refined products when, in reality, the Company concealed that nearly half of its "refined petroleum product storage and handling" was tied to heavy fuel oils, and specifically No. 6 fuel oil, the use of which had been in decline and for which the only sustained demand, marine shipping, was set to be largely phased out in the coming years. By electing to speak publicly about the demand for fuel storage, the stable nature of the business, and the flexibility of the Company's storage services—and thereby putting these subjects into play—Defendants had a duty to fully,

completely, and truthfully disclose all material facts regarding this subject so as not to mislead investors. As a result of the foregoing undisclosed material facts, Defendants' public statements lacked a reasonable basis when made and were materially false and misleading at all relevant times.

232.    The next day, on February 23, 2016, Defendants Hooke and Davis participated in Macquarie's earnings conference call, during which Hooke made additional false and misleading statements. Hooke stated that "While the world around us is volatile and excited, MIC's businesses have been *boringly predictable*. That is just the kind of *unsexy business model* we want." Hooke continued, discussing IMTT and stating: "*This is not a business that is sensitive to what is going on in the exploration and production*, or in interstate product movement. It is a business that has some sensitivity to end-user demand, *but least in the petroleum segment of its operations*." Hooke affirmed to investors that Defendants "feel *confident in the continued stable contribution from IMTT to our overall results*," that IMTT "is simply *not [a] macroeconomically sensitive enterprise*," and that "in aggregate, we run unsexy businesses *with limited volatility*."

233.    Defendant Hooke's statements in the above paragraph (¶232) were materially false and misleading, omitted material facts, and lacked a reasonable basis when made. It was misleading for Defendant Hooke to stated that Macquarie's businesses were "boringly predictable," "unsexy," and with "limited volatility," and that IMTT had little sensitivity to "end-user demand" in the "petroleum segment," and was "simply not [a] macroeconomically sensitive enterprise," when in reality, and unknown to investors (but as ensuing admissions confirmed), well over 40% of IMTT's terminal tanks were devoted solely to the storage and handling of No. 6 fuel oil—a primary source of IMTT's revenue, the use of which had been in decline and for which the only sustained demand, marine shipping, was set to be largely phased out in a few years. As Macquarie later admitted, those specialized No. 6 oil tanks could not be refurbished or repurposed to store and handle any other lighter, more salable fuel without the expenditure of hundreds of millions of dollars over the course of many months. These statements were also false and misleading because the football field-sized tanks used to store and heat No. 6 fuel oil were unsuitable for any other use absent the investment of hundreds of millions of dollars

spent in repurposing, leaving Macquarie's "contribution from IMTT to [its] overall results" anything but stable and assured. By electing to speak publicly about the demand for fuel storage and the stable and "boringly predictable" nature of the business—and thereby putting these subjects into play—Defendants had a duty to fully, completely, and truthfully disclose all material facts regarding this subject so as not to mislead investors. As a result of the foregoing undisclosed material facts, Defendants' public statements lacked a reasonable basis when made and were materially false and misleading at all relevant times. Analysts commented on Macquarie's misleading statements. Oppenheimer reported on February 22, 2016 that "[m]anagement highlighted the stability of refined product mix (55% vs. ~3% for crude/asphalt). It also reported no signs of counterparty distress during 2015." Wells Fargo reported on February 23, 2016 that "the company increased its quarterly dividend rate to $1.15/share, up 2% from the prior quarter-- this is the 9th consecutive quarter of dividend increase. Dividend yield is 7.3% on the current share price. Year-over-year, MIC's dividend increased +14.7% and management reiterated its prior guidance with respect to dividend growth and expects to distribute between $5.00-5.10/sh in 2016. We believe the dividend growth rate is sustainable in the medium term without major acquisitions or an increase in leverage. The outlook should be a positive to investors that appeared concerned that core operations were deteriorating or that MIC was going to get aggressive with acquisitions – it doesn't appear either are happening based on the Q4'15 results and commentary from management."

234.    Moreover, on March 23, 2016, J.P. Morgan issued a "Model Update" on Macquarie, following an investors' meeting with Defendant Hooke and "other members of MIC management." In that report, J.P. Morgan reported that "We walked away confident in MIC's strong positioning during this difficult market environment. The company retains numerous levers to achieve the stated dividend growth (~13% for 2016) and payout targets (75-85%), while keeping leverage healthy (~4x debt/EBITDA) and continuing to develop a high quality growth backlog."

### 2.      2016 Misrepresentations

235.    On May 12, 2016, Defendants Hooke, Davis, and Courtney participated in Macquarie's Investor Day corporate analyst meeting, during which Defendant Courtney spoke about IMTT's Lower Mississippi ports, stating, "there have to be catastrophic [sic] for those ports not to be busy." He continued:

> [W]e are the best service provider, we pride ourselves in our assets and our infrastructure . . . . *We have to have flexibility* because we will change from -- one day our customer, one day he want[s] gasoline in his tanks, next day he may want distillate. *We have to have the flexibility, we have to have the optionality for traders.*

236.    Defendant Courtney's statements in the above paragraph (¶235) was materially misleading. It was misleading for Defendant Courtney to represent that IMTT had "flexibility" and "optionality" in its Louisiana terminal tanks when, in reality and unknown to investors (but as ensuing admissions confirmed), well over two-thirds of IMTT's Louisiana terminal tanks were devoted solely to the storage and handling of No. 6 fuel oil—a petroleum product that secretly constituted well over 40% of IMTT's storage capacity and was a primary source of IMTT's revenue, the use of which had been in decline and for which the only sustained demand, marine shipping, was set to be largely phased out in a few years. As Macquarie later admitted, those specialized tanks could not be refurbished or repurposed to store and handle any other lighter, more salable fuel without the expenditure of hundreds of millions of dollars over the course of many months. What's more, both FE-2 and FE-1 explained that the sheer size of IMTT's No. 6 fuel oil tanks at St. Rose—several of which were each as large as a football field—made it "unequivocally a huge marketing challenge" (in FE-1's words) to store products lighter than No. 6 fuel oil in those tanks, because no such commodities traded in those volumes, yet the tanks had fixed costs irrespective of the volume stored. FE-2 further explained that 12 tanks at St. Rose built specifically to store No. 6 fuel oil—four 500,000 barrel tanks and eight additional 250,000 barrel tanks—are now largely "obsolete" for storing anything other than No. 6 fuel oil. FE-1 stated in particular that the four 500,000 barrel tanks built to store No. 6 fuel oil were "monsters" that were "not easily

repurposed or re-contracted," and as a result *any* "disturbance in the force"—even a "sneeze"—concerning those tanks immediately got attention and contract renewal efforts began at least a year in advance of contract expiration.

237.    This fact meant that a primary source of IMTT revenue were tanks that were inflexible and without options. By electing to speak publicly about the flexibility of the Company's storage services and optionality for traders—and thereby putting these subjects into play—Defendants had a duty to fully, completely, and truthfully disclose all material facts regarding this subject so as not to mislead investors. As a result of the foregoing undisclosed material facts, Defendants' public statements lacked a reasonable basis when made and were materially false and misleading at all relevant times.

238.    Analysts commented favorably on Macquarie's May 2016 misleading statements. For example, Oppenheimer wrote on May 12, 2016 that "[Defendant] CEO Richard Courtney presented a positive outlook even in a somewhat challenged energy environment. While lower prices have affected sentiment, *the business remains rock-solid*." Oppenheimer continued, "With a ~6.7% yield, an investment-grade rating, *and management's growth commitment*, we believe MIC is attractive. FCF [free cash flow] should grow annually at an impressive 10%-15% rate."

239.    On August 1, 2016, Macquarie issued a press release announcing its financial results for the second quarter 2016. This press release was filed the next day, August 2, 2016, as an exhibit to a Form 8-K, signed by Defendant Hooke:

> Reflective of the performance of MIC's businesses during the period, the Company's board of directors has authorized a cash dividend of $1.25 per share, or $5.00 annualized, for the second quarter of 2016. The dividend will be payable August 16, 2016 to shareholders of record on August 11, 2016. The cash payment represents a 12.6% increase over the dividend paid for the second quarter of 2015.

240.    Defendants Hooke and Davis participated in an August 2, 2016 Macquarie earnings call, during which Defendant Hooke reported the Company's quarterly results, stating that the "cash generated by our businesses [is] a trend that is underpinned by *their essential services*

*nature*" and assured investors that "MIC's results for the second quarter were reflective of that *stable essential services nature of our businesses*," including IMTT.

241.    Defendants' statements above (¶240) concerning the "essential services nature" of IMTT were materially false and misleading, omitted material facts, and lacked a reasonable basis when made. Considered as a whole, Defendants' statements misled investors by presenting a materially false and misleading picture of Macquarie's IMTT business, operations and risks by, among other things, failing to disclose that IMTT's success relied on revenue from the storage of No. 6 fuel oil—a petroleum product that secretly constituted well over 40% of IMTT's storage capacity and was a primary source of IMTT's revenue, the use of which had been in decline and for which the only sustained demand, marine shipping, was set to be largely phased out in a few years. In fact, Macquarie later admitted that IMTT was uniquely exposed to petroleum product pricing when, on February 22, 2018, Macquarie's new CEO Timothy Frost explained that the sole reason for the Company's shocking revelations was its reliance on No. 6 fuel oil, the demand for which no longer supported its long-term storage, causing customers to terminate contracts and leave the market entirely. In particular, Defendants knew or recklessly disregarded: (i) that demand and pricing for heavy residual No. 6 fuel oil would be severely reduced as IMO 2020 fast-approached; (ii) a significant portion of IMTT's customers were commodity traders, who were likely to exit the heavy fuel oil business in advance of the coming phase out; (iii) and the tanks used to store No. 6 fuel oil could not be repurposed for the storage of other products without hundreds of millions of dollars of investments. By electing to speak publicly about the demand for fuel storage, the stable nature of the business, and the flexibility of the Company's storage services—and thereby putting these subjects into play—Defendants had a duty to fully, completely, and truthfully disclose all material facts regarding this subject so as not to mislead investors. As a result of the foregoing undisclosed material facts, Defendants' public statements lacked a reasonable basis when made and were materially false and misleading at all relevant times.

242.    On October 27, 2016, the IMO confirmed that its long-anticipated global sulfur cap would drop from 3.5% to 0.5% at the start of 2020, with wide-ranging consequences for the

shipping and oil industries. As discussed above, in Section IV.C., while IMO 2020 had long been discussed within the industry, the October 27, 2016 confirmation had an immediate and palpable impact on the No. 6 Fuel oil market. Nevertheless, just days later, on November 1, 2016, Defendants continued to misrepresent IMTT's exposure to this declining industry.

243.     On November 1, 2016, Defendants Hooke and Davis participated in a third quarter 2016 earnings call, during which Hooke discussed the quality and duration of IMTT's storage contracts, stating:

> Qualitatively, contracts for storage and services at IMTT continued to renew for longer durations than they had been early in the year. This suggests that producers, refiners, shippers and others probably believe that commodity prices going forward will not be either as low or as volatile as has been the case over the last couple of years. Remember, ***none of MIC's businesses are exposed directly to the price of crude oil or petroleum products***.

244.     Defendant Hooke's statement above (¶243) that "***none of MIC's businesses are exposed directly to the price of crude oil or petroleum products***" was materially false and misleading, omitted material facts, and lacked a reasonable basis when made because, contrary to Defendant Hooke's representation, Macquarie was acutely and directly exposed to the pricing of petroleum products to the extent that there would no longer be significant demand for No. 6 fuel oil—a petroleum product that secretly constituted well over 40% of IMTT's storage capacity and was a primary source of IMTT's revenue, the use of which had been in decline and for which the only sustained demand, marine shipping, was set to be largely phased out in a few years. In fact, Macquarie later admitted that IMTT was uniquely exposed to petroleum product pricing when, on February 22, 2018, Macquarie's new CEO Timothy Frost explained that the sole reason for the Company's shocking revelations was its reliance on No. 6 fuel oil, the demand for which no longer supported its long-term storage, causing customers to terminate contracts and leave the market entirely. By electing to speak publicly about IMTT's lack of exposure to commodity pricing, and the pricing of refined petroleum products specifically—and thereby putting these subjects into play—Defendants had a duty to fully, completely, and truthfully disclose all material facts regarding this subject so as not to mislead investors. As a result of the foregoing undisclosed

material facts, Defendants' public statements lacked a reasonable basis when made and were materially false and misleading at all relevant times.

### 3.     2017 Misrepresentations

245.     On February 3, 2017, Macquarie issued a press release titled "MIC Issues Initial Guidance for Financial Performance over 2017/2018." In this press release, Defendant Hooke stated: "We are pleased to reaffirm our guidance that we expect a continuation of double-digit growth in Free Cash Flow per share for the next two years," and further stated: "In addition to the organic growth of our portfolio of businesses, we *have taken into consideration an expected reduction in expenses* resulting from the implementation of our shared services strategy and the strength of our backlog of growth projects."

246.     Defendant Hooke's statement above (¶245) that Macquarie would continue "double-digit growth in Free Cash Flow per share" and in so doing, had "taken into consideration an expected reduction in expenses," was materially false and misleading, omitted material facts, and lacked a reasonable basis when made because, contrary to Defendant Hooke's representation, the Company's projected "double digit growth" in 2017 and 2018 in free cash flow was impossible in light of IMTT's reliance on No. 6 fuel oil—a petroleum product that secretly constituted well over 40% of IMTT's storage capacity and was a primary source of IMTT's revenue, the use of which had been in decline and for which the only sustained demand, marine shipping, was set to be largely phased out in a few years—and the hundreds of millions of dollars needed to repurpose the No. 6 fuel oil tanks that would be rendered useless in their current state in the near-future. By electing to speak publicly about the Company's growth plan and expenses—and thereby putting these subjects into play—Defendant Hooke had a duty to fully, completely, and truthfully disclose all material facts regarding this subject so as not to mislead investors. As a result of the foregoing undisclosed material facts, Defendant Hooke's public statements lacked a reasonable basis when made and were materially false and misleading at all relevant times.

247.     On May 10, 2017, Defendant Davis participated in the Oppenheimer Industrial Growth Conference, during which Davis stated that IMTT's storage and logistics services were

secure and assured investors that "*there's no commodity exposure other than the very broad macroeconomic factors influencing supply and demand more broadly.*" Davis emphasized the high current utilization rates at IMTT and stated: "So the basic services nature of this business -- its capital intensity and the very high barriers to entry into this business -- provide us with *good visibility into its cash generation and opportunities for growth over time . . . .* [W]e view this as a potentially attractive total return opportunity. The combination of what are *very stable returns* in form of cash generation from these businesses are anticipated to drive 10% to 15% growth in cash generation, and with a current yield of 6.5%, we think the combination of those things support that view."

248.    One week later, during the May 18, 2017 Three Part Advisors East Coast Investor Conference, Defendant Davis was specifically asked about "environmental . . . issues that arise out of the operation of this kind of business." In responding, Davis acknowledged that such issues are "an important consideration," but did not discuss IMO 2020 or other environmental concerns eliminating demand for No. 6 fuel oil. Davis also spoke about demand for storage at IMTT, stating:

> Basically, what they do is they provide storage and logistical services, most pursuant to medium-duration contracts of 3 to 5 years. IMTT doesn't take any title to the products that they're handling. It simply provides access to storage capacity and related services. *There is no commodity exposure directly, other than that it results from macroeconomic factors influencing supply and demand more broadly*. A *little over half of the capacity*, as is shown here, is in service for petroleum products, *specifically refined petroleum products of gasoline, diesel, heating oil, things of that nature*. Very little of the portfolio is in crude or asphalt or unrefined or minimally-refined product. About 1/4 is in service in chemicals, broad range of different kinds of products. And the remainder is in service in agricultural products: Corn oil, soybean oil, tropical oil, fish oil, things of that nature. . . .

> [T]he easiest way to think of [IMTT] is as a multimodal distribution hub for liquid products. *This is not the place where you would store it if you're playing contango or backwardation games. This is a distribution center for these products*.

249.    Defendant Davis's statements in the above paragraphs (¶¶247-48) were materially false and misleading, omitted material facts, and lacked a reasonable basis when made. First, contrary to Davis's statements that there was "no commodity exposure directly," Macquarie was

acutely and directly exposed to the pricing of petroleum products to the extent that there would no longer be significant demand for No. 6 fuel oil—a petroleum product that secretly constituted well over 40% of IMTT's storage capacity and was a primary source of IMTT's revenue, the use of which had been in decline and for which the only sustained demand, marine shipping, was set to be largely phased out in a few years. In fact, Macquarie later admitted that IMTT was uniquely exposed to petroleum product pricing when, on February 22, 2018, Macquarie's CEO Timothy Frost explained that the sole reason for the Company's shocking revelations was its reliance on No. 6 fuel oil, the pricing of which no longer supported its long-term storage causing customers to terminate contracts and leave the market entirely. Second, while Davis purported to describe all of the bulk liquids stored by IMTT—and specifically defined IMTT's refined petroleum products as "gasoline, diesel, heating oil, things of that nature"—this statement was materially false and misleading because Davis did not disclose as a refined petroleum product No. 6 fuel oil, which constituted well over 40% of IMTT's storage capacity and which was, in fact, on the road to extinction, posing an imminent threat to IMTT's business. Third, Davis's statements assuring investors that IMTT was simply a "distribution center" and not a location where traders engaged in pricing games like "contango or backwardation" was materially false and misleading and/or omitted material information known to Defendants necessary to make the statements not false and misleading, when made because in reality, a substantial number of IMTT's storage customers were commodity traders who ultimately, as CEO Frost admitted on May 3, 2018, "exited the market as a consequence of a backwardation in heavy and residual oils." By electing to speak publicly about these subjects—and thereby putting these subjects into play—Defendant Davis had a duty to fully, completely, and truthfully disclose all material facts regarding this subject so as not to mislead investors. As a result of the foregoing undisclosed material facts, Defendant Davis's public statements lacked a reasonable basis when made and were materially false and misleading at all relevant times.

250.    On June 27, 2017, Defendant Stewart spoke at the JPMorgan Energy Equity Investor Conference, during which Stewart specifically discussed IMTT, stating that "***the***

*opportunity set at IMTT is as good as it has been in quite some time*," noting that they received frequent "requests for additional capacity and capability." Notably, Defendant Stewart was asked specifically about the "renewal risk" in the "bulk liquid storage market in general" given "the current environment" at the June 27, 2017 conference. Stewart responded that "I think within our business as well, we've probably seen duration has -- over the last couple of years, duration has shortened slightly and the market is one that's in relative equilibrium at the moment."

251.    Defendant Stewart's statements in the above paragraph (¶250) were materially false and misleading, omitted material facts, and lacked a reasonable basis when made. Contrary to Stewart's statements that the "opportunity set" at IMTT was "as good as it has been in quite some time" and that there was no "renewal risk" at IMTT, Macquarie was acutely and directly exposed to ensured "brutal" decline in No. 6 fuel oil—a petroleum product that secretly constituted well over 40% of IMTT's storage capacity and was a primary source of IMTT's revenue—the use of which had been in decline and for which the only sustained demand, marine shipping, was set to be largely phased out in a few years. In fact, Macquarie later admitted that IMTT was uniquely exposed to "renewal risk" when, on February 22, 2018, Macquarie's CEO Timothy Frost explained that the sole reason for the Company's shocking revelations was its reliance on No. 6 fuel oil, the pricing of which no longer supported its long-term storage, causing customers to terminate contracts and leave the market entirely. By electing to speak publicly about these subjects—and thereby putting these subjects into play—Defendant Davis had a duty to fully, completely, and truthfully disclose all material facts regarding this subject so as not to mislead investors. As a result of the foregoing undisclosed material facts, Defendant Davis's public statements lacked a reasonable basis when made and were materially false and misleading at all relevant times.

252.    On August 3, 2017, Macquarie held an earnings call, in which Defendant Hooke described "***the stable performance of our existing businesses***," and stated, "For the most part, IMTT's operating results for the second quarter were a case of ***steady as she goes***, a reversion to the mean in storage utilization, stable pricing[.]" In response to an analyst question, Hooke played down a decline in IMTT's utilization as unrelated to "any commodity-driven factors":

**Question:** With utilization falling to 94% on the tank repairs and inspections, would that have been relatively flat adjusting out those tanks? Or are there any commodity-driven factors that would cause a decline in utilization?

**Hooke:** *No, no*. The totality of the change in utilization was driven by tanks offline for tank cleaning and inspection. . . . [T]here's nothing -- *there's no other commodity noise or other noise or counter-party issues there. It's purely that*.

253.    On August 31, 2017, Defendant Davis participated in the Three Part Advisors Midwest IDEAS Investor Conference, where Davis stated that only Macquarie's Atlantic Aviation segment had "exposure to cyclicality or macroeconomic sensitivity . . . [Atlantic Aviation is] definitely the *one* business in the portfolio that has more or a greater potential to have macroeconomic sensitivity." Davis also described as a "misperception" that Macquarie had "issues or potential exposures" from "volatility in the commodity price . . . given the basic services nature of the visibility we have into the cash-generating capacity of these businesses."

254.    Defendants Hooke's and Davis's statements in the above paragraphs (¶¶252-53) were materially false and misleading, omitted material facts, and lacked a reasonable basis when made. Contrary to Hooke's statements that IMTT's declining utilization was not due to "commodity noise or other noise or counter-party issues," that IMTT's business was "steady as she goes," and Davis's denial that there was any exposure to "volatility in the commodity price," Macquarie was acutely and directly exposed to the pricing of petroleum products to the extent that there would no longer be significant demand for No. 6 fuel oil—a petroleum product that secretly constituted well over 40% of IMTT's storage capacity and was a primary source of IMTT's revenue, the use of which had been in decline and for which the only sustained demand, marine shipping, was set to be largely phased out in a few years.

255.    In fact, Macquarie later admitted that IMTT was uniquely exposed to petroleum product pricing when, on February 22, 2018, Macquarie's CEO Timothy Frost explained that the sole reason for the Company's shocking revelations was its reliance on No. 6 fuel oil, the pricing of which no longer supported its long-term storage, causing customers to terminate contracts and leave the market entirely. By electing to speak publicly about these subjects—and thereby putting

these subjects into play—Defendants Hooke and Davis had a duty to fully, completely, and truthfully disclose all material facts regarding this subject so as not to mislead investors. As a result of the foregoing undisclosed material facts, Defendant Hooke's and Davis's public statements lacked a reasonable basis when made and were materially false and misleading at all relevant times.

256.    On November 2, 2017, Macquarie held an earnings call, during which Defendant Hooke stated that, "In general, IMTT's operating results for the third quarter and year-to-date periods were **stable**," and addressed a "decline in storage utilization" at IMTT by telling investors that the decline in utilization not problematic and due primarily to two tanks being "out of service for a portion of the third quarter." During that call, Hooke also forcefully rejected an analyst's suggestion that Macquarie might "pivot towards what the market values and not as much maximizing dividend growth but more retaining cash flow," stating:

> Exuberant dividend growth at all costs where people were urging us to guide to 7 years' visibility of 20% plus dividend growth, we never did that. ***People slashing their dividend saying we're going to slash our dividend to deploy capital internally, I don't think you'll see us do that.*** . . .

257.    Defendant Hooke's statements in the above paragraph (¶256) were materially false and misleading, omitted material facts, and lacked a reasonable basis when made. Contrary to Hooke's representations that IMTT's operating results were "stable," IMTT was already experiencing the inevitable impact of IMO 2020's restrictions on No. 6 fuel oil—a petroleum product that secretly constituted well over 40% of IMTT's storage capacity and was a primary source of IMTT's revenue, the use of which had been in decline and for which the only sustained demand, marine shipping, was set to be largely phased out in a few years. Further, Defendant Hooke's strong affirmation that Macquarie would not "slash our dividend to deploy capital internally" was false and misleading because, by this time, Hooke knew or was reckless in not knowing that contracts due to be renewed at the end of the year—primarily those storage contracts maintained by commodity traders who were likely to leave the No. 6 fuel oil market at the end of the year—had already been cancelled, and additional contracts were at great risk of cancellation. Hooke also knew, or was reckless in not knowing, that the costs of repurposing No. 6 fuel oil

storage tanks would amount to hundreds of millions of dollars of capital expenditures that would impact Macquarie's ability to pay out the dividends that had been all but guaranteed to investors. By electing to speak publicly about these subjects—and thereby putting these subjects into play—Defendant Hooke had a duty to fully, completely, and truthfully disclose all material facts regarding this subject so as not to mislead investors. As a result of the foregoing undisclosed material facts, Defendant Hooke's public statements lacked a reasonable basis when made and were materially false and misleading at all relevant times.

258.   On November 16, 2017, Defendant Davis participated in the Three Part Advisors Southwest IDEAS Investor Conference, during which he stated that some of the "common characteristics running through" IMTT and the Company's other segments are "***the limited commodity price exposure across the portfolio and inflation-linked revenues***." Defendant Davis then discussed IMTT in greater detail, stating:

> We operate pursuant to take-or-pay contracts, which is saying once a contract is in place, ***we're indifferent as to whether or not anything is ever actually in the tank***. So in essence, what we are is renting storage space on medium duration contracts. Across the portfolio, the average remaining contract life is a little in excess of 2 years at this point.
>
> Those contracted streams of revenue represent more than 80% of the revenue in this business. A little over 1/2 of the capacity is in service in petroleum products, and as I say, ***very little of that is in crude or asphalt, any -- or heavy product.*** . . .
>
> The basic services nature of this business, combined with inflation-linked escalators in those contracts, prices go up every year based on whatever inflation has been over the prior 12 months, provide us with ***very good visibility into the cash generating capacity of this business over a longer period of time***.

259.   Defendants Davis's statements in the above paragraph (¶258) were materially false and misleading, omitted material facts, and lacked a reasonable basis when made. First, contrary to Davis's statements about "the limited commodity price exposure across the portfolio" and Macquarie's "indifferen[ce]" to what is in the tanks, Macquarie was acutely and directly exposed to the pricing of petroleum products to the extent that there would no longer be significant demand for No. 6 fuel oil—a petroleum product that secretly constituted well over 40% of IMTT's storage

capacity and was a primary source of IMTT's revenue, the use of which had been in decline and for which the only sustained demand, marine shipping, was set to be largely phased out in a few years. In fact, Macquarie admitted just three months later that IMTT was uniquely exposed to petroleum product pricing when, on February 22, 2018, Macquarie's CEO Timothy Frost explained that the sole reason for the Company's shocking revelations was its reliance on No. 6 fuel oil, the pricing of which no longer supported its long-term storage, causing customers to terminate contracts and leave the market entirely.

260.   Second, Davis's statement that "very little" of IMTT's petroleum product storage capacity—which constituted half of IMTT's storage capacity—was "heavy product" was materially false and misleading because, in reality and as admitted by Macquarie just months later, well over *40%* of IMTT's storage capacity was exclusively devoted to "heavy product," i.e., No. 6 fuel oil. At this time—when IMO 2020 was just two years from implementation and, as described above in Section IV.C., the fuel oil industry was inundated with discussions of how IMO 2020 would impact the market for heavy No. 6 fuel oil, Davis's affirmative assurance that IMTT was not a significant source of revenue for IMTT was highly material to investors. Davis' false statement that "very little" of IMTT's storage contained heavy oil was consistent with statements made directly to investors. For example, just one week earlier, Davis lied to Lead Plaintiff about this same topic, stating that only 20% of IMTT's storage capacity contained heavy oil.

261.   Third, Davis's statement assurance that that the Exchange Act Defendants had "very good visibility into the cash generating capacity of this business over a longer period of time" was materially false and misleading because Davis did not discuss how this "very good visibility" revealed to Defendants that customers had already begun to cancel their No. 6 fuel oil storage contracts, and that more customers would continue to do so, leaving the Company with a significant decrease in revenues and an increase in hundreds of millions of dollars in capital expenditures needed to repurpose the No. 6 fuel oil storage tanks so that they could be used to store other commodities.

76

262.    By electing to speak publicly about these subjects—and thereby putting these subjects into play—Defendants Davis had a duty to fully, completely, and truthfully disclose all material facts regarding this subject so as not to mislead investors. Indeed, Davis made other, similar false and misleading statements and omissions in direct communications to investors, including in a November 10, 2017 email responding to a question from Lead Plaintiff, as follows:

> [Lead Plaintiff:] What percent of IMTT's storage is in heavy oil? We heard new regulations are coming out in 2020 . . . how will this impact demand for heavy oil? Can heavy oil storage tanks be *easily* converted?
>
> [Davis:] *About 20%.* Your information is consistent with our understanding of the proposed regulatory changes. The regs will require Sulphur content to move from a max of 3% today to .5% - what we are seeing in our facility is already at about 1.5%. Some ships will install scrubbers and continue to burn the less expensive, high Sulphur product. Since you cannot not produce black oil, going forward some of it will be blended with distillate to meet the new spec, refiners will also look for way to crack the #6, or the product will be exported for power gen (or purposes other than ship propulsion) in other parts of the world. The latter could well be a *positive for storage demand* at IMTT-Bayonne given the deep water access at the facility.
>
> Heavy tanks can be converted and we have converted some in the past – in late 2012 we converted about 1.2mm bbls of heavy storage to distillate. There is a maintenance capex cost associated with cleaning the tanks and associated pipes, and potentially a growth capex spend for new capability (floating roof, for example) depending on the end use.

263.    As with Defendants Davis's statements discussed in ¶¶258-261, Davis's statements in the above paragraph (¶262) were materially false and misleading, omitted material facts, and lacked a reasonable basis when made. First, the Company would later disclose that heavy fuel oil (i.e., No. 6 fuel oil) constituted well over 40% of IMTT's storage—over twice what Davis told Lead Plaintiff and other investors. Second, Davis misleadingly implied that compliance with IMO 2020 would be straightforward and even possibly a "positive," when in fact Macquarie would later acknowledge that IMO 2020 triggered a "structural decline in the 6 oil market" that had caused IMTT to begin losing storage contracts at least a month before this email, in October 2017. Third, Davis's claim that No. 6 fuel oil could simply "be blended with distillate to meet the new spec" misled investors about the expensive cleaning required to scrub the highly noxious No. 6 fuel oil

from IMTT's tanks before they could be used for other commodities. Finally, because IMO 2020 effectively killed the demand for high sulfur fuel oils (like No. 6 fuel oil), it could never be a "positive" for the Company: many of IMTT's No. 6 fuel oil tanks were so large that they were (in the words of a former employee) largely "obsolete" for storing less sulfuric commodities, but no such commodities traded in sufficient volumes to make use of those tanks economical. Ultimately, IMTT was so imperiled by the decline in No. 6 fuel oil that Macquarie had to slash its dividend to afford the hundreds of millions of dollars necessary to "repurpose" the tanks for other purposes.

264.    Similarly, on December 22, 2017, Defendants made publicly available an investor presentation entitled "Overview of the IMTT Segment." In the presentation, which is dated December 2017, Macquarie discussed IMTT's "Capacity Utilization," stating that the "[*c*]*onsistently high utilization reflects essential services nature of IMTT's services*," "[u]tilization has averaged 94% during the past 10 years," and that "[u]nused capacity is generally attributable to tank inspections, repairs, and modifications."

265.    Macquarie's statements in the above paragraph (¶264) were materially false and misleading, omitted material facts, and lacked a reasonable basis when made. In fact, as Macquarie would later admit, IMTT's utilization rate had by this time already plummeted as a result of the cancellation of No. 6 fuel oil storage contracts. Ultimately, as a result of the cancellation of No. 6 fuel oil contracts, by the end of the year—just nine days after the presentation was made publicly available—IMTT's utilization rate was just 89%, well below the historical average of 94% bragged about in the December 2017 presentation and not "generally attributable to tank inspections, repairs, and modifications."

266.    Further, considered as a whole, Macquarie's statement in the December 2017 presentation above (¶264) misled investors by presenting a materially false and misleading picture of Macquarie's IMTT business, operations and risks by, among other things, failing to disclose that IMTT's utilization was not imperiled by "tank inspections, repairs, and modifications" but instead by IMTT's reliance on the storage of No. 6 fuel oil—a petroleum product that secretly constituted well over 40% of IMTT's storage capacity and was a primary source of IMTT's

78

revenue, the use of which had been in decline and for which the only sustained demand, marine shipping, was set to be largely phased out in a few years. By electing to speak publicly about the demand for fuel storage, the stable nature of the business, and the flexibility of the Company's storage services—and thereby putting these subjects into play—the Exchange Act Defendants had a duty to fully, completely, and truthfully disclose all material facts regarding this subject so as not to mislead investors.

267.    As a result of the foregoing undisclosed material facts, Defendant Macquarie's, Hooke's and Davis's statements discussed above lacked a reasonable basis when made and were materially false and misleading at all relevant times.

**B.    The Exchange Act Defendants' Materially False and Misleading Statements and Omissions in Macquarie's Forms 10-K, 10-Q, and Offering Documents**

268.    Defendants Macquarie, Hooke, and Stewart made materially false and misleading statements concerning the demand for fuel storage at IMTT, Macquarie's growth plan, and the risks posed by changing market conditions caused by the IMO 2020 regulations in the Company's Forms 10-K filed February 23, 2016 (the "2015 Form 10-K") and February 21, 2017 (the "2016 Form 10-K"), the Prospectus dated April 5, 2016 and the Prospectus Supplement dated November 3, 2016 (collectively, the "Offering Documents"), as well as in the Company's Forms 10-Q filed May 2, 2016 (the "Q1 2016 Form 10-Q"), August 1, 2016 (the "Q2 2016 Form 10-Q"), October 31, 2016 (the "Q3 2016 Form 10-Q"), May 3, 2017 (the "Q1 2017 Form 10-Q"), August 2, 2017 (the "Q2 2017 Form 10-Q"), and November 1, 2017 (the "Q3 2017 Form 10-Q").

269.    In each of the Forms 10-K and the Offering Documents listed above (¶268), which were signed by Defendants Hooke and Stewart, Macquarie discussed the strength of IMTT's business and the various circumstances that could affect the "demand for storage" at IMTT:

> IMTT is one of the larger independent providers of bulk liquid terminal services in the U.S., based on capacity. IMTT stores or handles primarily refined petroleum products, various commodity and specialty chemicals, renewable fuels and vegetable and animal oils (collectively liquid commodities). . . .
>
> Bulk liquid terminals provide an important link in the supply chain for a broad range of liquids such as refined petroleum products, commodity and specialty chemicals and/or crude oil (not a material product for IMTT). . . .

Both domestic and international factors influence demand for bulk liquid terminals in the United States. Demand for storage rises and falls according to local and regional consumption. In addition, import and export activity accounts for a material portion of the business. Shippers require storage for the staging, aggregation and/or distribution of products before and after shipment. The extent of import/export activity depends on macroeconomic trends such as currency fluctuations as well as industry-specific conditions, such as supply and demand imbalances in different geographic regions. ***Demand for storage is also driven by fluctuations in the current and perceived future price and demand for the product being stored and the resulting temporal price arbitrage.***

270.   The statements in the preceding paragraph (¶269) were materially false and misleading, omitted material facts, and lacked a reasonable basis when made. It was misleading to discuss how "demand for storage" was "driven by fluctuations in the current and perceived future price and demand for the product being stored" and other factors, when, in truth, and as alleged in detail above, Defendants concealed that the implementation of IMO 2020 would severely curtail "the demand for storage" of well over 40% of the tanks throughout IMTT. By electing to speak publicly about these subjects—and thereby putting these subjects into play—Defendants Macquarie, Hooke, and Stewart had a duty to fully, completely, and truthfully disclose all material facts regarding this subject so as not to mislead investors. As a result of the foregoing undisclosed material facts, these public statements lacked a reasonable basis when made and were materially false and misleading at all relevant times.

271.   In the 2015 Form 10-K and the 2016 Form 10-K, Defendants Macquarie, Hooke, and Stewart minimized the impact on IMTT of any volatility in petroleum prices, stating that while "uncertainty among industry participants generally has led to a reduction in the average duration of storage and related services contracts," and "the shortening of contracts results in a modest increase in re-contracting risk, ***the essential services nature of the business and continued strong demand for the products stored serves to offset this risk***." The 2015 Form 10-K and 2016 Form 10-K further stated that "IMTT does not depend on a single customer, the loss of which would have a material adverse effect on IMTT."

272.   The statements in the preceding paragraph (¶271) were materially false and misleading, omitted material facts, and lacked a reasonable basis when made. It was misleading to discuss how "continued strong demand for the products stored serves to offset" the risk of losing storage contracts, when, in truth, and as alleged in detail above, Defendants concealed that the implementation of IMO 2020 would severely curtail "re-contracting risk" of well over 40% of the tanks throughout IMTT. By electing to speak publicly about these subjects—and thereby putting these subjects into play—Defendants Macquarie, Hooke, and Stewart had a duty to fully, completely, and truthfully disclose all material facts regarding this subject so as not to mislead investors. As a result of the foregoing undisclosed material facts, these public statements lacked a reasonable basis when made and were materially false and misleading at all relevant times.

273.   In the Q1 2016 Form 10-Q, the Q2 2016 Form 10-Q, the Q3 2016 Form 10-Q, and the 2016 Form 10-K, Defendants Macquarie, Hooke, and Stewart stated that IMTT "expects utilization rates to revert to historical levels of 94% to 96% in the medium term."

274.   The statements in the preceding paragraph (¶273) were materially false and misleading, omitted material facts, and lacked a reasonable basis when made. In fact, the Company's reliance on No. 6 fuel oil—a petroleum product that secretly constituted well over 40% of IMTT's storage capacity and was a primary source of IMTT's revenue, the use of which had been in decline and for which the only sustained demand, marine shipping, was set to be largely phased out in a few years—would cause the Company's utilization rates to fall to 89% by the end of the Class Period, at which time Defendants guided investors to expect utilization rates of approximately 85%. In fact, the Company disclosed on February 20, 2019 that the utilization rate sank to just 82% in the fourth quarter 2018. By electing to speak publicly about these subjects—and thereby putting these subjects into play—Defendants Macquarie, Hooke, and Stewart had a duty to fully, completely, and truthfully disclose all material facts regarding this subject so as not to mislead investors. As a result of the foregoing undisclosed material facts, these public statements lacked a reasonable basis when made and were materially false and misleading at all relevant times.

81

275.    In the Q2 2016 Form 10-Q, the Q3 2016 Form 10-Q, and the 2016 Form 10-K, Defendants Macquarie, Hooke, and Stewart stated that, "Consistent with strong demand patterns across petroleum product storage markets, capacity utilization was higher than historically normal levels[.]"

276.    The statements in the preceding paragraph (¶275) were materially false and misleading, omitted material facts, and lacked a reasonable basis when made. In fact, as alleged in detail above, the market for No. 6 fuel oil—a petroleum product that secretly constituted well over 40% of IMTT's storage capacity and was a primary source of IMTT's revenue—had been in decline for years, and for which the only sustained demand, marine shipping, was set to be largely phased out in a few years. By electing to speak publicly about these subjects—and thereby putting these subjects into play—Defendants Macquarie, Hooke, and Stewart had a duty to fully, completely, and truthfully disclose all material facts regarding this subject so as not to mislead investors. As a result of the foregoing undisclosed material facts, these public statements lacked a reasonable basis when made and were materially false and misleading at all relevant times.

277.    Further, Macquarie's SEC filings failed to disclose material information required to be disclosed by Item 303 of Regulation S-K (17 C.F.R. § 229.303), which requires the disclosure of commitments, demands, events, trends, or uncertainties reasonably likely to affect the registrant's liquidity as one of the key items requiring comprehensive disclosure. Specifically, Item 303 requires the disclosure of: "any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way"; "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and . . . the extent to which income was so affected"; and "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

278.    Item 303's obligations required Macquarie to disclose that its profits, revenues, and dividends were at risk due to the implementation of IMO 2020, which would decrease profits, lead

to lost contracts and poor utilization rates, cause the Company to incur hundreds of millions of dollars in capital expenditures to refurbish and repurpose the No. 6 fuel oil tanks, and cause Macquarie to slash dividends if and when the Company was forced to, or chose to, admit that their misleading statements and omissions about the impact of IMO 2020 had inflated its Class Period results. Indeed, Defendants acknowledged as early as 2012 that they had "concluded that it would be IMTT's long-term best interests to begin to convert a portion of the residual oil storage . . . to clean product storage," but nonetheless failed to comply with their Item 303 disclosure obligations.

## VIII.   LOSS CAUSATION

279.    The Exchange Act Defendants' wrongful conduct, as alleged herein, directly and proximately caused Lead Plaintiff and the Class to suffer substantial losses.

280.    During the Class Period, Lead Plaintiff and the Class purchased or otherwise acquired shares of Macquarie common stock at artificially inflated prices and were damaged thereby when the price of those shares declined when the truth was revealed and when the risks that the Exchange Act Defendants concealed with their false statements materialized. The price of Macquarie shares declined significantly (causing investors to suffer losses) when the Exchange Act Defendants' misrepresentations, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed and/or the foreseeable risks that had been fraudulently concealed by the Exchange Act Defendants materialized.

281.    Specifically, the Exchange Act Defendants' materially false and misleading statements and omissions rendered investors unable to appreciate or assess the material risks to IMTT of shifting commodity demands, including the decline in demand for heavy residual fuel oils, and the resultant impact to the sustainability of the Company's dividend. When those statements and omissions were corrected, and the risks concealed by them materialized, investors suffered losses as the price of Macquarie stock declined. As a result of the disclosure of the truth of the Exchange Act Defendants' fraud, Macquarie's common stock price suffered statistically

significant declines, falling over 40% from $63.62 per share on February 21, 2018, to $37.41 per share on February 22, 2018.

282.   Accordingly, as a result of their purchases of Macquarie stock during the Class Period, Lead Plaintiff and other members of the Class suffered significant harm.

## IX.   SUMMARY OF SCIENTER ALLEGATIONS

283.   As alleged herein, numerous facts give rise to the strong inference that, throughout the Class Period, the Exchange Act Defendants knew or recklessly disregarded that their statements and omissions, as set forth in Section VII, were materially false and misleading when made. The information in this section is a summary of certain of the allegations detailing the Exchange Act Defendants' scienter that are set forth more fully above, though all allegations must be considered holistically in evaluating the Exchange Act Defendants' scienter. The cumulative knowledge regarding the matters addressed herein of all members of the Company's senior management team, including the Officer Defendants, is properly imputed to Macquarie.

284.   *First*, the Exchange Act Defendants' scienter is supported by the numerous instances where their statements have now been directly contradicted by the Company's admissions. For example, on November 10, 2017, Defendant Davis told Lead Plaintiff that "about 20%" of IMTT's storage is in heavy fuel oil, i.e. No. 6 fuel oil. Then, less than week later, on November 16, 2017, Davis similarly told investors at a Three Part Advisors Investor Conference that "*very little*" of IMTT's storage is in any "heavy product"—i.e., No. 6 fuel oil. In fact, Macquarie's May 3, 2018 presentation revealed that, at a minimum, well over 40% of IMTT's storage capacity during the Class Period was devoted to heavy and residual fuel oils.

285.   As another example, on May 12, 2016, Defendant Courtney told investors at Macquarie's Investor Day that IMTT "only deal[s] with major oil companies, major chemical companies, utilities, major agricultural companies. We have few other customers. We've got them very well." Similarly, a year later, on May 18, 2017, Defendant Davis told investors at the Three Part IDEAS Investor Conference that IMTT "is not the place where you would store it if you're

playing contango or backwardation games." In fact, as Macquarie would later admit on May 3, 2018, commodity traders not only constituted a "meaningful contingent" of IMTT's customers, but in fact that concealed customer base caused IMTT's disastrous plunge in utilization, as "the counterparties who did not renew their [No. 6 fuel oil] contracts were mainly commodity traders, not system players."

286.    Finally, during Macquarie's November 2, 2017 earnings call, Defendant Hooke told investors that: "[i]n general, IMTT's operating results for the third quarter and year-to-date periods were ***stable***" and IMTT's decline in utilization was not outside the historical norms; and Macquarie would not "slash[] their dividend . . . to deploy capital internally." Similarly, on November 28, 2017, Defendants Hooke, Stewart, and Davis told Lead Plaintiff and about twelve other institutional investors that IMTT would serve as a "growth ***driver*** for 2018" as a result of pricing and operational improvements expected to drive EBITDA margins higher. In fact, reconciling Macquarie's later reported declines in utilization reveals that the non-renewals likely happened at least as early as October 2017—i.e., before the Exchange Act Defendants' false and misleading statements just discussed. Specifically, Macquarie disclosed that IMTT's utilization at the end of the third quarter 2017 was 93.2%, while the utilization at the end of the fourth quarter was 89.6%. To reconcile that decline with the reported average utilization rate for the fourth quarter of 90.6% means that there must have been at least 66 days of 89.6% utilization rate, or that the decline started as early as ***October 25, 2017***.

287.    Particularly given IMTT's importance (and the obvious importance of the No. 6 fuel oil contracts) and the Officer Defendants' direct and personal control of IMTT—which FE-2 said was "100% a Macquarie show"—information about the non-renewal of the contracts would have been available to the Exchange Act Defendants immediately (¶¶64-72, 288-291). Thus, the Exchange Act Defendants undoubtedly knew of these non-renewals before they made their false and misleading statements. Indeed, ISS noted the suspiciousness of this timing in its May 2016 recommendation that shareholders vote against management, stating that Macquarie "has thus far failed to provide a conclusive, fact-based argument that definitively disproves the . . . assumptions

or calculations" described above showing that the non-renewals began as early as October 25, 2017. (¶¶217-19.)

288.  **Second,** the Exchange Act Defendants' scienter is supported by their direct and personal involvement in IMTT's operations, from which they knew or should have known of IMTT's exposure to No. 6 fuel oil and the risks posed to it the Company as a result. The Officer Defendants at all relevant times told investors that Macquarie "actively managed" Macquarie's operating segments, including IMTT. Defendant Hooke said their involvement was so heavy-handed that IMTT and the other operating segments compared it to "like walking around with a wedgie all the time." Only four years after acquiring 50% of IMTT, Defendant Hooke himself said that Macquarie was already "***completely joined at the hip with***" IMTT and that "from MIC's perspective . . . it's been a fortunate perspective for me to learn so much about the business from [Thomas Coleman, then-CEO of IMTT] and the rest of the management team."

289.  Defendant Hooke served on IMTT's Board of Directors from 2006 until 2015, as interim-CEO of IMTT from July 2014 until 2015, and as Executive Chairman from July 2014 until December 31, 2017. On taking complete control of IMTT in July 2014, Macquarie also installed a longstanding Macquarie Management employee, James May, as CFO. Even after Macquarie appointed Defendant Courtney to serve as IMTT's CEO in February 2015, Defendant Hooke continued to serve as IMTT's executive chairman until his exit from Macquarie in December 2017.

290.  As IMTT's CEO throughout the Class Period, Defendant Courtney was directly involved in IMTT's operations. FE-2 stated that Defendant Courtney occasionally participated in IMTT's monthly reporting meetings, during which any abnormalities in IMTT's storage tanks' throughput would be discussed. Similarly, FE-1, who personally knows Courtney, said that Courtney knew well IMTT's customers and tanks, and can talk "for hours" about which tanks are in service and what each customer is doing. According to FE-1, Courtney "absolutely" had "constant contact with customers, contracts, and trends."

291.  As Defendant Hooke's comments on November 1, 2016—just after the confirmation that IMO 2020 would proceed on schedule—made clear (¶125), the Officer

Defendants' personal involvement and awareness extended to IMTT's contract renewal efforts, further exposing them to IMTT's No. 6 fuel oil exposure. Likewise, Defendant Davis confirmed that Defendants personally monitored environmental developments related to IMTT, stating on May 18, 2017 that "environmental . . . issues that arise out of the operation of [IMTT]" are "an important consideration" and "one that we spend a lot of time" on.

292.   **Third**, the Exchange Act Defendants' scienter is supported by Defendants' personal knowledge of the years' long decline in No. 6 fuel oil market. Not only was the decline readily apparent to the Officer Defendants given—as they repeatedly stressed—their "long-term view," but in fact the Officer Defendants' personally knew of the decline. For example, in 2012, Defendant Hooke stated that Macquarie had "concluded that it would be IMTT's ***long-term best interests to begin to convert*** a portion of the residual oil storage at Bayonne [IMTT's second-largest terminal] ***to clean product storage***." Further, according to FE-1 (who personally knew Defendant Courtney), Courtney is "assuredly" as up to date on the No. 6 fuel oil market as anyone and "absolutely" had "constant contact with customers, contracts, and trends." Ultimately, Macquarie conceded on February 22, 2018 that the decline was "well known." The importance of this knowledge is all the greater in light of the role that No. 6 fuel oil storage played for IMTT: not only did it secretly constitute well over 40% of IMTT's storage capacity and provide a primary source of IMTT's revenue, but also—as explained by FE-1—IMTT's building of No. 6 fuel oil tanks turned out to be a "major turning point" and "huge overall change in direction and scope" for IMTT—and ultimately transformed IMTT from a "relatively small and sleepy" company to a "force in the industry" worldwide.

293.   **Fourth,** the Exchange Act Defendants' scienter is further supported by their reduced disclosures about IMTT after acquiring IMTT in 2014, notwithstanding the Exchange Act Defendants' statement in announcing the purchase that full ownership would provide "better visibility." As discussed above, these reduced disclosures included no longer providing year-on-year storage rates for IMTT, the capacity of individual terminals, and growth capital expenditures for each operating segment. Indeed, at the JPMorgan Energy Equity Investor Conference on June

26, 2017, Defendant Stewart acknowledged that "MIC's financial reports are . . . not particularly helpful when it comes to determining the cash generated by the enterprise." Particularly given the "well-known" declines in the No. 6 fuel oil market, these reduced disclosures left investors particularly vulnerable to the Exchange Act Defendants' fraud.

294.    *Fifth*, the Exchange Act Defendants' scienter is further shown by the critical importance to investors of Macquarie's dividend and "free cash flow" metrics, both of which were directly related to the fraud.

295.    At all relevant times, the Exchange Act Defendants told investors that Macquarie's "steady, predictable dividends" made Macquarie an "attractive total return kind of opportunity," and the Exchange Act Defendants announced an increase in the dividend paid to investors in every earnings release during the Class Period. Indeed, during an earnings call on May 3, 2012, Defendant Hooke explicitly "agree[d]" that "many . . . investors are very focused on this dividend and would like to see it paid," stating "We know that our shareholders want to see it and want to see it in full. . . . We've heard that message from shareholders loud and clear." In November and December 2017, Defendants again increased the dividend and assured investors of its stability— telling analysts from Wells Fargo that it was "sacrosanct"—even after expiring, unrenewed No. 6 fuel oil contracts began to cause a freefall in IMTT's utilization. Ultimately, the Company was forced to slash its dividend to repurpose IMTT's tanks as a consequence of the materialization of risks concealed by the Exchange Act Defendants' fraud.

296.    Similarly, the Exchange Act Defendants told investors that "free cash flow" was an important metric by which to measure Macquarie. For example, in its 2016 Form 10-K, Macquarie stated, "In analyzing the financial performance of our businesses, we focus primarily on cash generation and Free Cash Flow in particular. We believe investors use Free Cash Flow as a measure of our ability to sustain and potentially increase our quarterly cash dividend and to fund a portion of our growth." While on February 3, 2017—and consistently reaffirmed throughout the year— the Exchange Act Defendants had guided investors to expect free cash flow growth of 10-15% in

2018, Macquarie ultimately revealed on February 21, 2018 that, as a result of its concealed exposure to No. 6 fuel oil, it expected its free cash flow to *decline* by 8-10% during 2018.

297.    *Sixth*, the Exchange Act Defendants' scienter is further supported because IMTT was critical to achieving Macquarie's "attractive, total return opportunity" of steady, predictable dividends and dividend growth. In July 2014, Defendants Macquarie and Hooke told investors that Macquarie's purchase of IMTT would provide shareholders with "*enhanced dividend growth*," and concurrently "[w]ith the signing of the acquisition agreement" announced an increase in Macquarie's dividend.

298.    *Seventh*, the Exchange Act Defendants' scienter is further confirmed by Macquarie's acquisition of Epic in August 2017. As Defendant Hooke expressly confirmed, "jet fuel is the sort of reason for Epic," and the Exchange Act Defendants pursued Epic to diversify away from their disastrous reliance on No. 6 fuel oil, the demand for which would be decimated by IMO 2020. The Exchange Act Defendants stated that they began actively pursuing the acquisition in early 2017, and FE-5 stated he began meeting with Macquarie about the acquisition as early as January or February 2017—as the demand for No. 6 fuel oil began to decline in response to confirmation that IMO 2020 would proceed on schedule.

299.    Further, Macquarie funded the Epic Acquisition largely with Macquarie stock, providing additional motivation for the Exchange Act Defendants' fraud. In fact, FE-5 stated that Macquarie initially sought to fund the acquisition *entirely* with stock—a reflection of the Exchange Act Defendants' awareness that Macquarie's capital would need to be spent on repurposing the No. 6 fuel oil tanks.

300.    *Eighth*, Defendant Davis's scienter is further supported because of the suspiciousness of his November 16, 2017 presentation at the Three Part Advisors Investor Conference. Throughout the Class Period, Defendant Davis spoke at investor conferences hosted by Three Part Advisors on June 28, 2016, August 30, 2016, May 18, 2017, August 31, 2017, and November 16, 2017. During these presentations, he provided substantially identical information. For example, on June 28, 2016, Davis stated, "About 55% of what is handled by [IMTT's] facilities

is refined petroleum products." Similarly, on May 18, 2017, Davis stated, "A little over half of [IMTT's] capacity . . . is in service for petroleum products, specifically refined petroleum products of gasoline, diesel, heating oil, things of that nature. Very little of the portfolio is in crude or asphalt or unrefined or minimally-refined product."

301.    However, during Davis's November 16, 2017 presentation—after the non-renewals of IMTT's No. 6 fuel oil contracts that caused IMTT's utilization to plummet (¶170)—Defendant Davis for the first and only time addressed "heavy product"—i.e., No. 6 fuel oil—stating: "A little over 1/2 of [IMTT's] capacity is in service in petroleum products, and as I say, *very little of that is in* crude or asphalt, any *-- or heavy product*." In other words, at a time when the Exchange Act Defendants knew that IMTT's heavy fuel oil was plummeting, Davis deviated from his ordinary practice and explicitly—but falsely—assured investors that IMTT was not exposed to the ongoing decline in the No. 6 fuel oil market.

302.    The inference of scienter from Defendant Davis's conspicuous deviation from his routine presentation is strengthened by further context. Specifically, in response to declines in Macquarie's share price at around that time, investors had direct contact with the Officer Defendants, including Davis specifically—as the Officer Defendants explicitly invited throughout the Class Period (*see, e.g.*, ¶¶50-57)—and asked questions about, among other things, IMTT's exposure to IMO 2020 and No. 6 fuel oil. For example, on or around this time, Defendant Davis directly told an investor that No. 6 fuel oil was only a small percent of IMTT's utilization. Similarly, on November 10, 2017, Davis sent the following in response to a question from Lead Plaintiff:

> [Lead Plaintiff:] What percent of IMTT's storage is in heavy oil? We heard new regulations are coming out in 2020 . . . how will this impact demand for heavy oil? Can heavy oil storage tanks be *easily* converted?
>
> [Davis:] *About 20%.* Your information is consistent with our understanding of the proposed regulatory changes. The regs will require Sulphur content to move from a max of 3% today to .5% - what we are seeing in our facility is already at about 1.5%. Some ships will install scrubbers and continue to burn the less expensive, high Sulphur product. Since you cannot not produce black oil, going forward some of it will be blended with distillate to meet the new spec, refiners will also look for

way to crack the #6, or the product will be exported for power gen (or purposes other than ship propulsion) in other parts of the world. The latter could well be a *positive for storage demand at IMTT*-Bayonne given the deep water access at the facility.

Heavy tanks can be converted and we have converted some in the past – in late 2012 we converted about 1.2mm bbls of heavy storage to distillate. There is a maintenance capex cost associated with cleaning the tanks and associated pipes, and potentially a growth capex spend for new capability (floating roof, for example) depending on the end use.

303.    Thus, Defendant Davis's comments at the November 16, 2017 conference were part of his ongoing efforts to mislead investors about the risks faced by Macquarie from IMTT's exposure to No. 6 fuel oil.

304.    *Ninth*, the Exchange Act Defendants' scienter is further supported by Macquarie Management's fee arrangement with Macquarie. During the Class Period, that agreement stated that Macquarie Management's fees are based on the "New Investment Value" of the Company, which is calculated based on: (a) Macquarie's market capitalization; plus (b) the amount of the Company's borrowings; plus (c) the value of the Company's future investments; less (d) cash and cash equivalents held. Accordingly, Macquarie Management benefitted directly from paying out as much cash to investors as possible, because any held cash weighed against its fees.

305.    Likewise, Macquarie Management directly benefitted from the Company's rising leverage over the Class Period. This is consistent with FE-1's statement that, when he was at IMTT, Macquarie Management had "virtually insisted" that IMTT not use operating cash flow, accumulated or current year, for its fixed assets for any reason other than maintenance. They wanted all new capital expenditures to be financed by borrowing. FE-1 described this as Macquarie's "law of the land."

306.    Finally, the management agreement uniquely incentivized and rewarded the Exchange Act Defendants' fraud because it tied Macquarie Management's fee directly to Macquarie's stock price. As a result of this unusual arrangement, Macquarie Management directly benefitted from continually increasing dividends and promising continued dividend growth

because doing so caused the market to assign higher targets for the stock price, which drove the price of Macquarie shares higher—and generated higher fees for Macquarie Management.

307.   **Tenth,** the Exchange Act Defendants' scienter is further demonstrated by Macquarie Management's realization of substantial financial benefits in insider sales of Macquarie common stock at a highly suspicious time. On or around November 3, 2016, Macquarie conducted the Offering, selling public investors 2.87 million of shares of Macquarie common stock to raise nearly $234 million (after fees paid to the Underwriter, Barclays) exclusively for the benefit of Macquarie Management. This sale reduced Macquarie Management's holdings by nearly 40%.

308.   The timing of this sale is highly suspicious because, just weeks earlier, the demand for No. 6 fuel oil began to decline in response to confirmation that IMO 2020 would proceed on schedule. However, as the Exchange Act Defendants had concealed IMTT's reliance on revenue from storing No. 6 fuel oil, Macquarie stock actually reached its Class Period **high** at that time.

309.   The suspiciousness of this sale is further heightened by its unusual nature by historical comparison. In the two years prior to the Class Period (i.e., from February 2014 to January 2016), Macquarie Management made just one other sale, in June 2015, in which it sold only 27.6% of its holdings.

310.   **Eleventh**, the Exchange Act Defendants' scienter is further supported by the suspicious timing of Defendant Hooke's resignation as Macquarie's CEO. Defendant Hooke announced his departure—literally leaving the country to return to Australia—in September 2017, when the risks of IMTT's concealed reliance on No. 6 fuel oil were beginning to cause IMTT's utilization rates to decline. Indeed, ISS noted that "the fact pattern . . . rais[ed] questions."

## X.   PRESUMPTION OF RELIANCE

311.   At all relevant times, the market for Macquarie stock was an efficient market for the following reasons, among others:

> (a)   Macquarie stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

      (b)     Macquarie stock traded at high weekly volumes;

      (c)     As a regulated issuer, Macquarie filed periodic public reports with the SEC and the NYSE;

      (d)     Macquarie was eligible to, and did, file registration statements with the SEC on Form S-3;

      (e)     Macquarie regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

      (f)     Macquarie was followed by several securities analysts employed by major brokerage firms, including Oppenheimer, J.P. Morgan, Barclays, Wells Fargo, RBC Capital Markets, Alembic Global Advisors, and SunTrust Robinson Humphrey. Each of these reports was publicly available and entered the public marketplace.

312.    As a result of the foregoing, the market for Macquarie stock promptly digested current information regarding Macquarie from all publicly available sources and reflected such information in the price of Macquarie stock. Under these circumstances, all purchasers of Macquarie stock during the Class Period suffered similar injury through their purchase of Macquarie stock at artificially inflated prices and the presumption of reliance applies.

313.    In the alternative, Lead Plaintiff is also entitled to a class-wide presumption of reliance under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are predicated on the Exchange Act Defendants' omissions of material fact that there was a duty to disclose. Specifically, reasonable investors would have considered the following facts, among others, important in making investment decisions: (i) that Macquarie's most important division, IMTT, faced significant risk

from its undisclosed exposure to No. 6 fuel oil, including as a result of IMO 2020; and (ii) that IMTT's reliance on lessening demand for storage of heavy residual fuel oils, including No. 6 fuel oil, meant that Macquarie would need to undertake significant capital expenditures to repurpose IMTT storage tanks to accommodate alternative products.

314.    Because this action involves the Exchange Act Defendants' failure to disclose material adverse information regarding the factors affecting the Company's dividend— information that the Exchange Act Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Company's dividend to investors, as set forth above, that requirement is satisfied here.

## XI.    INAPPLICABILITY OF STATUTORY SAFE HARBOR

315.    The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint. The statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made. Further, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

316.    Alternatively, to the extent that the statutory safe harbor otherwise would apply to any of the allegedly false or misleading forward-looking statements, Defendants are liable for these statements because, at the time each of these statements was made, the speaker knew the statement was false or misleading and the statement was authorized or approved by an executive officer, director, or other control person of Macquarie who knew that the statement was false. These and similar arguably forward-looking statements cannot be protected under the PSLRA safe harbor.

## XII.  CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5,
Against Macquarie, Macquarie Management, and the Officer Defendants**

317.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

318.    During the Class Period, the Exchange Act Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (ii) cause economic harm to Lead Plaintiff and other members of the Class.

319.    The Exchange Act Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

320.    The Exchange Act Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

321.    During the Class Period, the Exchange Act Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

322.    The Exchange Act Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or recklessly disregarded the true facts that were available to them. The Exchange Act Defendants engaged in this misconduct to conceal

Macquarie's true condition from the investing public and to support the artificially inflated prices of the Company's stock.

323.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they purchased Macquarie stock and were harmed when the truth about Macquarie negatively impacted the price of those securities. Lead Plaintiff and the Class would not have purchased Macquarie stock at the prices they paid, or at all, had they been aware of the truth about Macquarie.

324.    As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered harm in connection with their respective purchases of the Company's stock during the Class Period.

325.    By virtue of the foregoing, the Exchange Act Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

### COUNT II

**For Violations of Section 20(a) of the Exchange Act,**
**Against Macquarie Management and the Officer Defendants**

326.    Lead Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

327.    Macquarie Management was a control person of Macquarie within the meaning of Section 20(a) of the Securities Act by virtue of its role as Manager of Macquarie. This relationship was governed by a Management Services Agreement that provided, inter alia, that Macquarie Management was responsible for and oversaw the management of the Company's operating businesses and, thus, was able to, and did, exercise substantial control over Macquarie's operations, including control of the materially false and misleading statements, omissions, and course of conduct complained of in this action.

328.    The Officer Defendants acted as controlling persons of Macquarie within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations

of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Macquarie, the Officer Defendants had the power and ability to control the actions of Macquarie and its employees.

329.    By reason of such conduct, Macquarie Management and the Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act.

<strong>COUNT III</strong>

<strong>For Violations of Section 20A of the Exchange Act,<br>Against Macquarie Management</strong>

330.    Lead Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

331.    This count is asserted against Defendant Macquarie Management for violations of Section 20A of the Exchange Act, 15 U.S.C. § 78t-1, on behalf of all members of the Class.

332.    While Macquarie's securities traded at artificially inflated and distorted prices, Macquarie Management profited by selling more than 2.87 million shares of Macquarie common stock while in possession of adverse, material non-public information about Macquarie, profiting nearly $234 million in illegal insider trading proceedings, as detailed above (¶¶307-09).

333.    By contrast, Lead Plaintiff purchased Macquarie common stock contemporaneously with several of Macquarie Management's sales, as follows:

| Macquarie Management's Open Market Sales[9] | | | Lead Plaintiff's Contemporaneous Purchases | | |
|---|---|---|---|---|---|
| Sale Date(s) | Shares Sold | Price | Purchase Date(s) | Shares Purchased | Price |
| 11/9/2016 | 2,870,000 | $81.48 | 11/3/2016<br>11/4/2016<br>11/7/2016 | 18,800<br>940<br>470 | $81.90<br>$80.76<br>$81.77 |

---

[9] Macquarie Management disclosed the sale of all 2,870,000 shares sold in the Offering in a single Form 4 filed on November 10, 2016. Consistent with the Offering Documents, while the per share purchase price in the Offering was $81.90, Macquarie Management's per share proceeds after underwriting discounts and commissions was $81.48. The Offering Documents were dated as of November 3, 2016, marking the beginning of the Offering. Macquarie Management's Transaction

334.     Lead Plaintiff and all other members of the Class who purchased shares of Macquarie stock contemporaneously with the sales of Macquarie common stock by Macquarie Management have suffered damages because:

      a)  In reliance on the integrity of the market, they paid artificially inflated prices as a result of the violations of §§10(b), 20(a), and 20A of the Exchange Act as alleged herein; and

      b)  they would not have purchased the Macquarie stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by Defendants' false and misleading statements and omissions alleged herein.

335.     By reason of the foregoing, Macquarie Management violated §20A of the Exchange Act and are liable to Lead Plaintiff and the other members of the Class for the substantial damages suffered in connection with their purchase of Macquarie common stock during the Class Period.

## XIII.   CLAIMS BROUGHT PURSUANT TO THE SECURITIES ACT

336.     In this part of the Complaint, Lead Plaintiff asserts a series of strict liability and negligence claims based on the Securities Act on behalf of the Class (as defined in ¶¶399-400). Lead Plaintiff expressly disclaims any allegations of fraud or intentional misconduct in connection with these non-fraud claims, which are pleaded separately in this Complaint from Plaintiffs' Exchange Act claims. To the extent that any challenged statement is construed as a statement of opinion or belief made in connection with the Offering, any such statement is alleged to have been materially misstated statements of opinion or belief when made at and at the time of the Offering.

337.     This action was brought within one year after the discovery of the untrue statements and omissions (and within one year after such discovery should have been made in the exercise of reasonable diligence) and within three years of the Offering.

338.     On or around November 3, 2016, Macquarie announced an offering of Macquarie common stock by Macquarie Management (the "Offering"). The Offering was conducted pursuant

---

Date of November 9, 2016 corresponds with Macquarie's disclosures in the Offering Documents that the underwriter would deliver the shares on or about November 9, 2016.

to the Company's existing shelf registration statement filed with the SEC on April 5, 2016 (the "Registration Statement"), as updated by a prospectus supplement dated November 3, 2016 (the "Prospectus Supplement"; with the Registration Statement, the "Offering Documents"). On November 4, 2016, Macquarie announced that the price of Macquarie common stock in the Offering would be $81.90 per share, raising over $235,053,000 in gross proceeds for the benefit of Macquarie Management.

339.   As described in further detail below, the Offering Documents contained or incorporated by reference (and thereby made anew) materially untrue or misleading statements and/or omissions concerning IMTT and the sustainability of the Company's dividend to shareholders. As a result, the Offering Documents contained untrue statements of material fact and omitted to state material facts required to make the statements therein not misleading

### A.   Securities Act Parties

340.   Lead Plaintiff is described in full at ¶27.

341.   Each of the following Defendants is statutorily liable under Sections 11, 12, and/or 15 of the Securities Act for the materially untrue statements contained in and incorporated (and thereby made anew) in the Offering Documents.

342.   Securities Act Defendant Macquarie is described in full at ¶28.

343.   Securities Act Defendant Macquarie Management is described in full at ¶29. Macquarie Management was the exclusive selling shareholder in the Offering.

344.   The Securities Act Defendants listed in the table below (the "Securities Act Individual Defendants") served, at times relevant to the claims alleged in this Complaint, as officers or directors of the Company and signed (or authorized their signatures to be affixed to) the Registration Statement as directors or officers of Macquarie in the positions stated below:

| Name | Position |
| --- | --- |
| James Hooke | Chief Executive Officer (Principal Executive Officer) |
| Liam Stewart | Chief Financial Officer (Principal Financial Officer) |

| Robert Choi | Chief Accounting Officer (Principal Accounting Officer) |
| --- | --- |
| Martin Stanley | Director and Chairman of the Board |
| Norman H. Brown, Jr. | Director |
| George W. Carmany III | Director |
| Henry E. Lentz | Director |
| Ouma Sananikone | Director |
| William H. Webb | Director |

345.    Each of the Securities Act Individual Defendants, either personally or by attorney-in-fact, signed the Registration Statement filed with the SEC on April 5, 2016.

346.    Each of the Securities Act Individual Defendants, by virtue of his or her management or directorship positions, had the duty to exercise due care and diligence and the duty of full and candid disclosure of all material facts related to the Company. The Securities Act Individual Defendants were required to exercise reasonable care and prudent supervision over the dissemination of information concerning the business, operations, and financial reporting of Macquarie. By virtue of these duties, these officers and directors were required to supervise the preparation of and dissemination of the Offering Documents.

347.    All of the Securities Act Individual Defendants were control persons of Macquarie within the meaning of Section 15 of the Securities Act by reason of their own involvement in the daily business of Macquarie and as senior executives or directors of Macquarie. The Securities Act Individual Defendants, at the time they held positions with Macquarie, were able to, and did, exercise substantial control over the operations of Macquarie, including control of the materially false and misleading statements, omissions, and course of conduct complained of herein.

348.    It is appropriate to treat all of the Securities Act Individual Defendants as a group for pleading purposes and to presume that the false and misleading information conveyed in the

Offering Documents as alleged in this Complaint is the collective action of the narrowly defined group of Securities Act Defendants identified above.

349. As officers, directors, and controlling persons of a publicly held company and under the federal securities laws, the Securities Act Individual Defendants had a duty (a) to disseminate promptly complete, accurate, and truthful information with respect to Macquarie; (b) to correct any previously issued statements that had become materially misleading or untrue; and (c) to disclose any trends that would materially affect Macquarie's earnings and present and future operating results, so that the market price of Macquarie publicly traded securities would be based upon truthful and accurate information.

350. Securities Act Defendant Barclays Capital Inc. ("Barclays") served as the underwriter for the Offering, as well as Macquarie's financial advisor, and assisted in the preparation and dissemination of the false and misleading Offering Documents. Barclays was paid at least $1.2 million for its service in connection with the Offering.

351. Securities Act Defendants Macquarie, Macquarie Management, the Securities Act Individual Defendants, and Barclays are collectively referred to herein as the "Securities Act Defendants."

**B.      False And Misleading Statements And Omissions In The Offering Documents**

352. The background of the Company, its Class Period activities, and its eventual disclosures and admissions on February 21, 2018 and thereafter are set forth in detail above (¶¶180-226). Those allegations are incorporated herein except that Lead Plaintiff expressly disclaims any allegations of fraud in these non-fraud Securities Act claims. The following facts are meant to summarize and supplement the facts set forth above.

353. The Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained in them not misleading, and failed to make adequate disclosures required under the statute, rules, and regulations governing the preparation of public offering documents for securities.

354.     In relevant part, the Offering Documents described the strength of IMTT's business

as follows:

> IMTT is one of the larger independent providers of bulk liquid terminal services in
> the United States, based on capacity. IMTT stores and handles primarily refined
> petroleum products, various commodity and specialty chemicals, renewable fuels
> and vegetable and animal oils (collectively liquid commodities). . . .
>
> Bulk liquid terminals provide an important link in the supply chain for a broad
> range of liquids such as refined petroleum products, commodity and specialty
> chemicals and/or crude oil (not a material product for IMTT). . . .
>
> Both domestic and international factors influence demand for bulk liquid terminals
> in the United States. Demand for storage rises and falls according to local and
> regional consumption. In addition, import and export activity accounts for a
> material portion of the business. Shippers require storage for the staging,
> aggregation and/or distribution of products before and after shipment. The extent
> of import/export activity depends on macroeconomic trends such as currency
> fluctuations as well as industry-specific conditions, such as supply and demand
> imbalances in different geographic regions. ***Demand for storage is also driven by
> fluctuations in the current and perceived future price and demand for the product
> being stored and the resulting temporal price arbitrage.***

355.     Rather than disclose any risks posed by changing industry attitudes towards No. 6

fuel oil, the Offering Documents actually suggested that IMTT benefitted from "strict

environmental regulations" as "barriers" to entry that protected IMTT from competition.

356.     The statements in the preceding paragraphs (¶¶354-55) were materially false and

misleading, omitted material facts, and lacked a reasonable basis when made. It was misleading to

discuss how "demand for storage" was "driven by fluctuations in the current and perceived future

price and demand for the product being stored" and other factors, when, in truth, and as alleged in

detail above, the Securities Act Defendants failed to disclose that the implementation of IMO

2020—confirmed to proceed on schedule just weeks before the Offering—would severely curtail

"the demand for storage" of well over 40% of the tanks throughout IMTT. By electing to speak

publicly about these subjects—and thereby putting these subjects into play—the Securities Act

Defendants had a duty to fully, completely, and truthfully disclose all material facts regarding this

subject so as not to mislead investors. As a result of the foregoing undisclosed material facts, these

statements in the Offering Documents lacked a reasonable basis when made and were materially false and misleading at all relevant times.

357.    The Offering Documents also incorporated by reference the Company's Form 10-K for the fiscal year ended December 31, 2015, filed on February 23, 2016 (the "2015 Form 10-K"), which minimized the impact on IMTT of any volatility in petroleum prices, stating that while "uncertainty among industry participants generally has led to a reduction in the average duration of storage and related services contracts," and "the shortening of contracts results in a modest increase in re-contracting risk, *the essential services nature of the business and continued strong demand for the products stored serves to offset this risk*." The 2015 Form 10-K further stated that "IMTT does not depend on a single customer, the loss of which would have a material adverse effect on IMTT."

358.    The statements in the preceding paragraph (¶357) were materially false and misleading, omitted material facts, and lacked a reasonable basis when made. It was misleading to discuss how "continued strong demand for the products stored serves to offset" the risk of losing storage contracts, when, in truth, and as alleged in detail above, the Securities Act Defendants failed to disclose that the implementation of IMO 2020—confirmed to proceed on schedule just weeks before the Offering—would severely curtail "re-contracting risk" of 40% of the tanks owned by IMTT and was a primary source of IMTT's revenue. By electing to speak publicly about these subjects—and thereby putting these subjects into play—the Securities Act Defendants had a duty to fully, completely, and truthfully disclose all material facts regarding this subject so as not to mislead investors. As a result of the foregoing undisclosed material facts, these statements incorporated by reference into the Offering Documents (and thereby made anew) lacked a reasonable basis when made and were materially false and misleading at all relevant times.

359.    The Offering Documents also incorporated by reference the Company's Forms 10-Qs for the quarters ended March 31, 2016, June 30, 2016, and September 30, 2016, which stated that IMTT "expects utilization rates to revert to historical levels of 94% to 96% in the medium term."

360.    The statements in the preceding paragraph (¶359) were materially false and misleading, omitted material facts, and lacked a reasonable basis when made. In fact, the Company's reliance on No. 6 fuel oil—a petroleum product that secretly constituted well over 40% of IMTT's storage capacity and was a primary source of IMTT's revenue, of which use had been in decline and for which the only sustained demand, marine shipping, was set to be largely phased out in a few years—would cause the Company's utilization rates to fall to 89% by the end of the Class Period, at which time Macquarie guided investors to expect utilization rates of approximately 85%. In fact, the Company disclosed on February 20, 2019 that the utilization rate sank to just 82% in the fourth quarter 2018. By electing to speak publicly about these subjects— and thereby putting these subjects into play—the Securities Act Defendants had a duty to fully, completely, and truthfully disclose all material facts regarding this subject so as not to mislead investors. As a result of the foregoing undisclosed material facts, these statements incorporated by reference into the Offering Documents (and thereby made anew) lacked a reasonable basis when made and were materially false and misleading at all relevant times.

361.    In addition, the Q2 2016 Form 10-Q and Q3 2016 Form 10-Q, both incorporated by reference, also stated that, "Consistent with strong demand patterns across petroleum product storage markets, capacity utilization was higher than historically normal levels[.]"

362.    The statements in the preceding paragraph (¶361) were materially false and misleading, omitted material facts, and lacked a reasonable basis when made. In fact, as alleged in detail above, the market for No. 6 fuel oil—a petroleum product that secretly constituted well over 40% of IMTT's storage capacity and was a primary source of IMTT's revenue—had been in serious decline, which only accelerated with the confirmation that IMO 2020 would proceed on schedule, which would end the only sustained demand for the commodity. By electing to speak publicly about these subjects—and thereby putting these subjects into play—the Securities Act Defendants had a duty to fully, completely, and truthfully disclose all material facts regarding this subject so as not to mislead investors. As a result of the foregoing undisclosed material facts, these

statements incorporated by reference into the Offering Documents (and thereby made anew) lacked a reasonable basis when made and were materially false and misleading at all relevant times.

363. Further, the Offering Documents failed to disclose material information required to be disclosed by Item 303 of Regulation S-K (17 C.F.R. § 229.303), which requires the disclosure of commitments, demands, events, trends, or uncertainties reasonably likely to affect the registrant's liquidity as one of the key items requiring comprehensive disclosure. Specifically, Item 303 requires the disclosure of: "any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way"; "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and . . . the extent to which income was so affected"; and "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

364. Similarly, the Offering Documents failed to disclose material information required to be disclosed by Item 503 of SEC Regulation S-K (17 C.F.R. § 229.503), which requires disclosure of "the most significant factors that make the offering speculative or risky."

365. The obligations of Item 303 and 503 required the Offering Documents to disclose that Macquarie's profits, revenues, and dividends were at risk due to the implementation of IMO 2020, which would decrease profits, lead to lost contracts and poor utilization rates, cause the Company to incur hundreds of millions of dollars in capital expenditures to refurbish and repurpose the No. 6 fuel oil tanks, and cause Macquarie to slash dividends if and when the Company was forced to, or chose to, admit that their misleading statements and omissions about the impact of IMO 2020 had inflated its Class Period results. Indeed, Defendants acknowledged as early as 2012 that they had "concluded that it would be IMTT's long-term best interests to begin to convert a portion of the residual oil storage . . . to clean product storage," but nonetheless failed to comply with their Item 303 and Item 505 disclosure obligations in the Offering Documents.

**C.     The Securities Act Defendants' Failure To Exercise Reasonable Care Or To Conduct A Reasonable Investigation In Connection With The Offering**

366.    None of the Securities Act Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were accurate and complete and not misstated in all material respects.

367.    Due diligence is a critical component of the issuing and underwriting process. Directors, officers, accountants and underwriters are able to perform due diligence because of their expertise and access to the Company's non-public information. Underwriters must not rely on management statements; instead, they should play a devil's advocate role and conduct a verification process. At a minimum, due diligence for every public offering should involve: (1) interviews of upper and mid-level management; (2) a review of the auditor's management letters; (3) a review of items identified therein; (4) a review of the company's SEC filings (particularly those incorporated by reference); (5) a critical review of the company's financial statements, including an understanding of the company's accounting and conversations with the company's auditors without management present; (6) a review of the company's internal controls; (7) a review of negative facts and concerns within each underwriter's organization and within the underwriter syndicate; (8) a review of critical non-public documents forming the basis for the company's assets, liabilities, earnings, and the Company's potential negative trends (or lack thereof) as required to be disclosed under the securities laws. Red flags uncovered through this process must be investigated. Officers and auditors must participate in the underwriters' due diligence, and non-officer directors are responsible for the integrity of the due diligence process in their capacity as the ultimate governing body of the issuer.

368.    Had the Securities Act Defendants exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

369.    Barclays did not conduct a reasonable investigation of the statements contained in and incorporated by reference in the Offering Documents and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated. In particular,

Barclays did not conduct a reasonable investigation into the accuracy of the statements regarding IMTT, the demand for storage of No. 6 fuel oil, and the sustainability of the Company's dividend.

370. Barclays could not simply rely on the work of Macquarie's outside auditors because the investing public relies on the underwriters to obtain and verify relevant information and then make sure that essential facts are disclosed. Thus, Barclays must conduct its own, independent (and reasonable) investigation. Had Barclays conducted a reasonable investigation, it would have known that the Offering Documents contained material misstatements and omissions concerning IMTT and the sustainability of the Company's dividend.

371. Similarly, the Securities Act Individual Defendants who signed the Registration Statement and failed to conduct a reasonable investigation of the statements contained in the Registration Statement and documents incorporated therein by reference and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated. Had these Securities Act Individual Defendants conducted a reasonable investigation, they would have known that the Offering Documents contained material misstatements and omissions concerning IMTT and the sustainability of the Company's dividend.

372. These Securities Act Defendants were sophisticated in financing and internal control issues given their collective industry experience and yet failed to reasonably inquire as to the Company's misstatements and omissions notwithstanding numerous "red flags," including the "brutal changes" to the industry from IMO 2020, which was confirmed to proceed on schedule just before the Offering.

**COUNT IV**

**Against Macquarie, the Securities Act Individual Defendants, and Barclays for
Violations of Section 11 of the Securities Act**

373. Lead Plaintiff repeats and realleges every allegation contained above.

374. This Count is brought by Lead Plaintiff under Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all purchasers of Macquarie common stock in connection with, and traceable to, the Offering, and does not sound in fraud.

375.    The Offering Documents were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and failed adequately to disclose material facts, as alleged above.

376.    The Company is the registrant for the Offering. As issuer of the shares, Macquarie is strictly liable to Lead Plaintiff and to the members of the Class for the misstatements and omissions in the Offering Documents.

377.    As signatories of the Offering Documents, the Securities Act Individual Defendants were responsible for their contents and dissemination.

378.    Barclays served as the underwriter for the Offering and qualifies as the underwriter according to the definition contained in Section 2(a)(11) of the Securities Act, 15 U.S.C. § 77b(a)(11). As such, it participated in the solicitation, offering, and sale of the securities to the investing public under the Offering Documents.

379.    None of these Securities Act Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true, did not omit any material facts, and were not misleading.

380.    These Securities Act Defendants issued, caused to be issued, and participated in the issuance of materially false and misleading written statements to the investing public that were contained in the Offering Documents, which misrepresented or failed to disclose, inter alia, the facts alleged above. By reasons of the conduct alleged, each of these Securities Act Defendants violated Section 11 of the Securities Act.

381.    Lead Plaintiff and other members of the Class acquired Macquarie common stock either in or traceable to the Offering Documents.

382.    Lead Plaintiff and the Class have sustained damages. The value of Macquarie's common stock has declined substantially after and as a result of the alleged violations.

383.    At the times when they purchased Macquarie common stock, Lead Plaintiff and the other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged in this Complaint and could not have reasonably discovered those facts before Macquarie's

subsequent announcements. Less than one year has elapsed from the time when Lead Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time when Lead Plaintiff filed this Complaint. Less than three years have elapsed from the time when the securities upon which this Count is brought were bona fide offered to the public to the time when Lead Plaintiff filed this Complaint.

**COUNT V**

**Against Macquarie and Barclays for
Violations of Section 12(a)(2) of the Securities Act**

384.    Lead Plaintiff repeats and realleges every allegation contained above.

385.    This Count is brought by Lead Plaintiff under Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of all purchasers of Macquarie common stock in connection with, and traceable to, the Offering, and does not sound in fraud.

386.    Macquarie and Barclays were sellers, offerors, and solicitors of sales of the securities offered using the Offering Documents in the Offering.

387.    The Offering Documents contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and failed to disclose material facts. Macquarie's and Barclays' actions of solicitation included participating in the preparation and distribution of the false and misleading Offering Documents.

388.    Macquarie and Barclays owed to the purchasers of Macquarie common stock, including Lead Plaintiff and other Class members, the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents to insure that the statements were true and that the Offering Documents did not omit to state a material fact required to be stated in order to make the statements contained in the Offering Documents not misleading. Macquarie and Barclays knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Offering Documents.

389.    Lead Plaintiff and other members of the Class purchased or otherwise acquired Macquarie securities in or traceable to the Offering. Lead Plaintiff and other members of the Class

109

did not know, and in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Offering Documents.

390.    Lead Plaintiff, individually and representatively, offers to tender to Macquarie and Barclays those securities that Lead Plaintiff and other Class members continue to own, on behalf of all members of the Class who continue to own the securities, in return for the consideration paid for those securities together with interest on the amount owed to Lead Plaintiff and the Class under Section 12(a)(2).

391.    By reason of the conduct alleged in this Complaint, Macquarie and Barclays violated Section 12(a)(2) of the Securities Act. Accordingly, Lead Plaintiff and members of the Class who hold Macquarie securities purchased in the Offering have the right to rescind and recover the consideration paid for their Macquarie shares and elect to rescind and tender their Macquarie securities to Macquarie and Barclays. Class members who have sold their Macquarie common stock are entitled to rescissionary damages.

392.    Less than three years have elapsed from the time when the securities upon which this Count is brought were sold to the public to the time of the filing of this action. Less than one year has elapsed from the time when Lead Plaintiff discovered or reasonably could have discovered the facts upon which this Count is based to the time of the filing of this action.

### COUNT VI

### Against Macquarie Management and the Securities Act Individual Defendants for Violations of Section 15 of the Securities Act

393.    Lead Plaintiff repeats and realleges every allegation contained above.

394.    This Count is brought by Lead Plaintiff under Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of all purchasers of Macquarie common stock in connection with, and traceable to, the Offering, and does not sound in fraud.

395.    Macquarie Management was a control person of Macquarie within the meaning of Section 15 of the Securities Act by virtue of its role as Manager of Macquarie. This relationship was governed by a Management Services Agreement that provided, inter alia, that Macquarie

Management was responsible for and oversaw the management of the Company's operating businesses and, thus, was able to, and did, exercise substantial control over Macquarie's operations, including control of the materially false and misleading statements, omissions, and course of conduct complained of in this action.

396.    Each of the Securities Act Individual Defendants was a control person of Macquarie by virtue of his or her position as a director or senior officer of the Company. Each of the Securities Act Individual Defendants was a control person of Macquarie within the meaning of Section 15 of the Securities Act by reason of his or her own involvement in the daily business of Macquarie and as a senior executive or director of Macquarie. The Securities Act Individual Defendants, at the time they held positions with Macquarie, were able to, and did, exercise substantial control over Macquarie's operations, including control of the materially false and misleading statements, omissions, and course of conduct complained of in this action.

397.    Each of the Securities Act Individual Defendants was a culpable participant in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged in Counts I and II above, based on having signed the Offering Documents and having otherwise participated in the process that allowed the Offering to be completed.

398.    As a result of the foregoing, Lead Plaintiff and the other members of the Class have suffered damages.

## XIV.   CLASS ACTION ALLEGATIONS

399.    Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and on behalf of a Class of persons who: (i) purchased or otherwise acquired Macquarie stock during the Class Period, and were damaged thereby; and/or (ii) purchased or otherwise acquired Macquarie common stock either in or traceable to the Offering, and were damaged thereby.

400.    Excluded from the Class are the Defendants, members of the immediate family of each Defendant, any person, firm, trust, corporation, officer, director or other individual or entity

in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any of these excluded persons.

401. This action is properly maintainable as a class action for the following reasons:

(a) The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. While the exact number of Class members is unknown to Lead Plaintiff at this time, and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least hundreds of thousands of members in the Class. Approximately 2.87 million shares of stock were sold in the Offering, and, as of February 20, 2018, Macquarie has over 85 million shares of stock outstanding, owned by at least hundreds or thousands of investors. Further, Macquarie's stock was actively traded throughout the Class Period on NYSE, an efficient market.

(b) Questions of law and fact common to the members of the Class, which predominate over questions which may affect individual Class members, include:

• Whether Defendants violated the federal securities laws;

• Whether Defendants omitted and/or misrepresented material facts;

• Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

• Whether the Exchange Act Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

• Whether Defendants' false and misleading statements and omissions impacted the price of Macquarie stock; and

112

- Whether the members of the Class have sustained damages and, if so, the proper measure of damages.

(c)     Lead Plaintiff's claims are typical of those of the Class. Lead Plaintiff was damaged from his purchases of Macquarie common stock during the Class Period, including both purchases on the open market as well as either in or traceable to the Offering. Lead Plaintiff has no interests that are adverse or antagonistic to the interests of the Class.

(d)     Lead Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in litigation of this nature. Accordingly, Lead Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

(e)     Lead Plaintiff anticipates that there will not be any difficulty in the management of this litigation as a class action.

402.     For the reasons stated above, a class action is superior to other available methods for the fair and efficient adjudication of the claims asserted in this Complaint. Because of the size of the individual class members' claims, few, if any, class members could afford to seek legal redress individually for the wrongs complained of in this action.

## XV.     PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding damages to Lead Plaintiff and other Class members against all Defendants, jointly and severally, for all harm sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest on the damages;

(c)      Awarding Lead Plaintiff and the Class rescission on Count V to the extent they still hold Macquarie securities, or if sold, awarding rescissionary damages in accordance with Section 12(a)(2) of the Securities Act;

(d)      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(e)      Awarding any equitable, injunctive, or other further relief that the Court may deem just and proper.

## XVI.   JURY DEMAND

Lead Plaintiff demands a trial by jury on all issues.

DATED: February 20, 2019                    Respectfully submitted,

_/s/ Salvatore J. Graziano_

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

Salvatore J. Graziano
Lauren A. Ormsbee
Jesse L. Jensen
1251 Avenue of the Americas
New York, NY 10020
Tel:     (212) 554-1400
Fax:     (212) 554-1444
salvatore@blbglaw.com
lauren@blbglaw.com
jesse.jensen@blbglaw.com

*Counsel for Lead Plaintiff Moab Partners, L.P., and Lead Counsel for the Class*

**OLSHAN FROME WOLOSKY LLP**

Lori Marks-Esterman
John G. Moon
Nicholas S. Hirst
1325 Avenue of the Americas
New York, New York 10019
Tel:     (212) 451-2300
Fax:     (212) 451-2222
lmarksesterman@olshanlaw.com

114

jmoon@olshanlaw.com

*Additional Counsel for Lead Plaintiff Moab
Partners, L.P.*

**APPENDIX A**

**FE Key**

| FE No. | Tenure | Relevant Position(s) or Role(s) |
|---|---|---|
| 1 | 1970s-2011 | IMTT CFO |
| 2 | 1970s-2015 | IMTT Terminal Manager, St. Rose |
| 3 | 2011-2016 | IMTT IT Operations Support / Network Engineer, St. Rose |
| 4 | 1982-2017 | IMTT Director of Insurance Risk |
| 5 | 2016-2017 | Epic Midstream Chief Commercial Officer |