**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CITY OF RIVIERA BEACH GENERAL EMPLOYEES RETIREMENT SYSTEM, on behalf of itself and al others similarly situated,<br><br>                       Plaintiff,<br>   v.<br><br>MAQUARIE INFRASTRUCTURE CORPORATION, et al.,<br><br>                    Defendants. | Case No. 1:18-cv-03608-VSB<br><br>ORAL ARGUMENT REQUESTED |

**MEMORANDUM OF LAW IN SUPPORT OF MACQUARIE INFRASTRUCTURE CORPORATION'S AND THE INDIVIDUAL DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND .................................................................................................... 5

LEGAL STANDARD ............................................................................................ 10

ARGUMENT ...................................................................................................... 11

    I.       PLAINTIFF'S EXCHANGE ACT CLAIMS SHOULD BE DISMISSED ......... 11

          A.      Plaintiff Fails To Plead An Actionable Misstatement Or Omission......... 11

                 1.       Plaintiff's "omission" theory is not viable.................................... 12

                 2.       Plaintiff has failed to allege an actionable misstatement.............. 16

                 3.       Plaintiff fails to adequately allege that any of the other affirmative statements identified in the Complaint were false ..... 22

          B.      Plaintiff Fails To Adequately Allege Scienter .......................................... 25

                 1.       Plaintiff fails to plead that MIC or the Management Defendants had a motive to commit fraud ....................................................... 26

                   2.       Plaintiff fails to plead that defendants engaged in conscious or reckless misbehavior................................................................... 27

          C.      Plaintiff Fails Adequately To Plead Loss Causation ............................... 29

          D.      Plaintiff Fails To Allege "Control Person" Liability Under Section 20(a) ........................................................................................................ 30

    II.      PLAINTIFF'S SECURITIES ACT CLAIMS SHOULD BE DISMISSED......... 31

          A.      Plaintiff's Securities Act Claims Sound In Fraud And Therefore Must Be Pled With Particularity, Which They Are Not ........................... 31

          B.      Plaintiff Has Not Sufficiently Pled Its Standing To Assert Securities Act Claims................................................................................ 32

          C.      Plaintiff Has Failed To Plead An Actionable Misstatement Or Omission ................................................................................................. 33

          D.      Plaintiff Has Not Alleged That MIC Was A Statutory Seller..................... 34

          E.      Plaintiff's Claim Under Section 15 Should Be Dismissed ....................... 35

CONCLUSION.................................................................................................... 35

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*In re Aratana Therapeutics Inc. Sec. Litig.*,
   315 F. Supp. 3d 737 (S.D.N.Y. 2018)................................................................13, 17, 20, 21

*In re Ariad Pharm., Inc. Sec. Litig.*,
   842 F.3d 744 (1st Cir. 2016) ...........................................................................................32, 33

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)................................................................................................................33

*Backhaus v. Streamedia Commc'ns, Inc.*,
   No. 01 Civ. 4889, 2002 WL 1870272 (S.D.N.Y. Aug. 14, 2002) .........................................33

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988)....................................................................................................12, 15, 16

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..........................................................................................................10, 33

*In re BioScrip, Inc. Sec. Litig.*,
   No. 13-cv-6922 (AJN), 2015 WL 1501620 (S.D.N.Y. Mar. 31, 2015)...................................34

*In re Bos. Sci. Corp. Sec. Litig.*,
   686 F.3d 21 (1st Cir. 2012) ..............................................................................................13, 15

*In re Century Aluminum Co. Sec. Litig.*,
   729 F.3d 1104 (9th Cir. 2013) .........................................................................................32, 33

*City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*,
   679 F.3d 64 (2d Cir. 2012)....................................................................................................21

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
   752 F.3d 173 (2d Cir. 2014)..................................................................................................27

*City of Warwick Mun. Emps. Pension Fund v. Rackspace Hosting, Inc.*,
   No. 17 CIV. 3501 (JFK), 2019 WL 452051 (S.D.N.Y. Feb. 5, 2019)....................................17

*In re Corning Inc. Sec. Litig.*,
   No. 04-cv-2845, 2005 WL 714352 (2d Cir. Mar. 30, 2005)..................................................28

*Cosmas v. Hassett*,
   886 F.2d 8 (2d Cir. 1989).......................................................................................................25

*Cozzarelli* v. *Inspire Pharms., Inc.*,
　549 F.3d 618 (4th Cir. 2008) ............................................32

*In re Daou Sys., Inc. Sec. Litig.*,
　411 F.3d 1006 (9th Cir. 2005) .........................................32

*In re Deutsche Telekom AG Sec. Litig.*,
　No. 00 Civ. 9475 (SHS), 2002 WL 244597 (S.D.N.Y. Feb. 20, 2002) ...............................35

*In re Duane Reade Inc. Sec. Litig.*,
　No. 02 CIV.6478 NRB, 2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003).............15, 16, 22, 24

*Dura Pharm., Inc. v. Broudo*,
　544 U.S. 336 (2005).........................................................29, 30

*ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
　553 F.3d 187 (2d Cir 2009)........................................25, 26, 27

*Starr ex rel. Estate of Sampson v. Georgeson S'holder, Inc.*,
　412 F.3d 103 (2d Cir. 2005)........................................3, 13

*In re Federated Dep't Stores, Inc. Sec. Litig.*,
　No. 00 CV 6362, 2005 WL 696894 (S.D.N.Y. Mar. 25, 2005).............28

*In re Focus Media Holding Ltd. Litig.*,
　701 F. Supp. 2d 534 (S.D.N.Y. 2010)...............................18

*Frankfurt-Tr. Inv. Lux. AG v. United Techs. Corp.*,
　336 F. Supp. 3d 196 (S.D.N.Y. 2018)...............................17

*Frederick v. Mechel OAO*,
　475 F. App'x 353 (2d Cir. 2012) ...................................26

*Freidus v. Barclays*,
　734 F.3d 132 (2d Cir. 2013).........................................33

*Glaser v. The9, Ltd.*,
　772 F. Supp. 2d 573 (S.D.N.Y. 2011)..............................28

*Gustafson v. Alloyd Co., Inc.*,
　513 U.S. 561 (1995).....................................................32

*In re Initial Pub. Offering Sec. Litig.*,
　399 F. Supp. 2d 261 (S.D.N.Y. 2005)..............................30

*Janbay v. Canadian Solar, Inc.*,
　No. 10 Civ. 4430, 2013 WL 1287326 (S.D.N.Y. Mar. 28, 2013) ..........29

*Janus Capital Grp., Inc. v. First Deriv. Traders*,
    564 U.S. 135 (2011)......................................................................................11

*Johnson v. Sequans Commc'ns S.A.*,
    No. 11 Civ. 6341 (PAC), 2013 WL 214297 (S.D.N.Y. Jan. 17, 2013) .....................17, 22, 33

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)............................................................................25

*Kleinman v. Elan Corp., plc*,
    706 F.3d 145 (2d Cir. 2013)............................................................................12

*Ladmen Partners, Inc. v. Globalstar, Inc.*,
    No. 07 Civ. 0976 (LAP), 2008 WL 4449280 (S.D.N.Y. Sept. 30, 2008)..............................31

*Lentell v. Merrill Lynch & Co., Inc.*,
    396 F.3d 161 (2d Cir. 2005)............................................................................30

*Leykin v. AT & T Corp.*,
    423 F. Supp. 2d 229 (S.D.N.Y. 2006)..................................................................30

*Lipow v. Net1 UEPS Techs., Inc.*,
    131 F. Supp. 3d 144 (S.D.N.Y. 2015)...............................................................13, 14

*In re Lululemon Sec. Litig.*,
    14 F. Supp. 3d 553 (S.D.N.Y. 2014)................................................................11, 24

*Malin v. XL Capital Ltd.*,
    499 F. Supp. 2d 117 (D. Conn. 2007)...............................................................28, 29

*Medina v. Tremor Video, Inc.*,
    640 F. App'x 45 (2d Cir. 2016) .......................................................................14

*Monroe Cty. Emps.' Ret. Sys. v. YPF Sociedad Anonima*,
    15 F. Supp. 3d 336 (S.D.N.Y. 2014)...................................................................13

*In re Morgan Stanley Info. Fund Sec. Litig.*,
    592 F.3d 347 (2d Cir. 2010)............................................................................33

*In re N. Telecom Ltd. Sec. Litig.*,
    116 F. Supp. 2d 446 (S.D.N.Y. 2000)..................................................................26

*Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*,
    723 F.3d 192 (2d Cir. 2013)............................................................................31

*Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp.*,
    951 F. Supp. 2d 479 (S.D.N.Y. 2013)..............................................................21, 30

iv

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    135 S. Ct. 1318 (2015) ...................................................................................................19, 21

*Perry v. Duoyuan Printing*,
    No. 10-cv-7235, 2013 WL 4505199 (S.D.N.Y. Aug. 22, 2013) ............................................34

*Pinter v. Dahl*,
    486 U.S. 622 (1988) ............................................................................................................34

*In re Pretium Res. Inc. Sec. Litig.*,
    256 F. Supp. 3d 459 (S.D.N.Y. 2017) (Broderick, J.) ................................................... *passim*

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) .......................................................................................... *passim*

*Rombach v. Chang*,
    No. 00 CV 0958 (SJ), 2002 WL 1396986 (E.D.N.Y. June 7, 2002) ......................................33

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
    573 F.3d 98 (2d Cir. 2009) ...........................................................................................25, 27

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.,
Inc.*,
    75 F.3d 801 (2d Cir. 1996) ..................................................................................................24

*In re Sanofi Sec. Litig.*,
    87 F. Supp. 3d 510 (S.D.N.Y. 2015) ..............................................................................18, 19

*In re Sierra Wireless, Inc. Sec. Litig.*,
    482 F. Supp. 2d 365 (S.D.N.Y. 2007) ..................................................................................17

*Slayton v. Am. Express Co.*,
    604 F.3d 758 (2d Cir. 2010) ................................................................................................19

*Stratte-McClure v. Morgan Stanley*,
    776 F.3d 94 (2d Cir. 2015) ..................................................................................................15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) .......................................................................................................11, 25

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016) .................................................................................18, 19, 21, 22

*In re UBS AG Sec. Litig*,
    No. 07 Civ. 11225 (RJS), 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012) .............................33

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016) ................................................................................................17

*Waterford Twp. Police & Fire Ret. Sys. v. Reg'l Mgmt. Corp.*,
    No. 14 CV 3876-LTS, 2017 WL 395206 (S.D.N.Y. Jan. 27, 2017), *aff'd*, 723
    F. App'x 20 (2d Cir. 2018) ........................................................................................20

*Williams v. Citibank, N.A.*,
    565 F. Supp. 2d 523 (S.D.N.Y. 2008) ......................................................................24

*Yung v. Lee*,
    432 F.3d 142 (2d Cir. 2005) ......................................................................................32

**STATUTES**

15 U.S.C. § 77*l* ................................................................................................................32

15 U.S.C. § 77z-2 ...........................................................................................................33

15 U.S.C. § 78u-4 .........................................................................................11, 25, 28, 29

15 U.S.C. § 78u-5 ...........................................................................................................17

**RULES**

Fed. R. Civ. P. 9(b) ................................................................................10, 11, 31, 32

Fed. R.Civ. P. 12(b)(6) ..................................................................................................10

Defendant Macquarie Infrastructure Corporation ("MIC" or the "Company") and the Individual Defendants[1] respectfully submit this memorandum of law in support of their motion to dismiss the Consolidated Class Action Complaint (the "Complaint," ECF No. 56).

## PRELIMINARY STATEMENT

This is a classic "fraud by hindsight" case, in which plaintiff has attempted to reverse engineer a securities fraud claim based on nothing more than the announcement of negative corporate news, followed by a stock drop. As demonstrated below, however, the allegedly undisclosed facts and "concealed" risks at the heart of plaintiff's theory of liability were all disclosed and/or otherwise widely known to the market throughout the putative class period. To be sure, MIC management remained optimistic – in public and in private – that the temporary challenges the Company came to face at the end of 2017 at one of its portfolio companies could be avoided or mitigated, but that hardly constitutes securities fraud, as this Court and others have repeatedly observed.

MIC owns, operates and invests in a diversified and profitable group of infrastructure businesses in the United States and Canada. Compl. ¶37. MIC's business model involves investing in businesses that generate significant free cash flow, with a goal of distributing the majority of this positive cash flow to its shareholders in the form of dividends. *Id.* ¶38. One of its largest and most profitable operating businesses is International-Matex Tank Terminals ("IMTT"), a bulk liquid terminals business that has been providing customers with storage and handling services for petroleum products and other bulk liquids since 1939. *Id.* ¶¶1, 37, 63. On February 21, 2018, MIC announced its results for the fourth quarter of 2017, along with a decision to reduce

---

[1] The Individual Defendants are James Hooke, Jay Davis, Liam Stewart, Richard D. Courtney, Robert Choi, Martin Stanley, Norman W. Brown, George W. Carmany III, Henry E. Lentz, Ouma Sananikone and William H. Webb.

its 2018 dividend guidance. *Id.* ¶¶180-82. This was a decision MIC's Board elected to make in the long term interests of the Company and its stockholders – it was not forced on the Company by liquidity, solvency or debt covenant constraints. As the Company explained at the time, one (but hardly the only) factor impacting MIC's decision to reduce dividend guidance for the upcoming year was a decline in the demand for storage of No. 6 fuel oil ("No. 6 oil"), a broadly defined group of heavy and residual fuel oils (also commonly referred to as "black oil") that had long been among the products stored at IMTT's terminals. *Id.* ¶¶20, 84. In 2016 and 2017, nearly all of IMTT's tanks designed to store No. 6 oil were leased out. At the end of 2017, however, due to market conditions and resulting changes in demand for the storage of No. 6 oil, a number of existing IMTT customers (namely, commodity traders) did not renew their storage contracts. This factor, coupled with a number of others – including strong incentives created by recent U.S. tax reform to invest in MIC's portfolio, a desire to enhance balance sheet flexibility, and other market shifts – prompted MIC to retain a higher percentage of its cash flow and reduce its 2018 dividend guidance. Ex. FF at 2-5.[2] Part of the resulting increase in retained cash flow would be (and has been) used to internally fund the repurposing of some of IMTT's tanks (which, until that time, had been continuously contracted out for years) to accommodate other products. Compl. ¶¶22, 182, 196. MIC's stock price declined upon the announcement of this news.

The crux of plaintiff's prolix and repetitive Complaint in this case – totaling 402 paragraphs and 115 pages – is that, for two full years prior to the above announcements, MIC and its management fraudulently concealed from investors: (i) "IMTT's . . . reliance on revenue from the storage of No. 6 fuel oil" (*id.* ¶1); (ii) that a regulation known as "IMO 2020," announced eight

---

[2] Unless otherwise specified, all "Ex." citations refer to the exhibits to the Declaration of John Schreiber, dated April 22, 2019 ("Schreiber Decl.").

months *after* the class period commenced and which will not take effect until 2020, "would severely curtail 'the demand for storage'" of No. 6 oil (*id*. ¶¶9, 270); and (iii) that MIC might "need to undertake significant capital expenditures to repurpose" some of IMTT's tanks in response to changes in regulations and/or market conditions (*id*. ¶¶2, 227).  The fundamental problem with this theory is that each of these allegedly concealed "facts" was disclosed and/or otherwise widely-known to the market all along.  For instance:

- The Complaint acknowledges that "IMTT had become heavily involved in storing No. 6 fuel oil in the 1970s" (*id*. ¶83); even before the class period, MIC disclosed that 43% of IMTT's revenue at its largest group of terminals, and 32% at its second largest, came from "black oil," which the Company explained "includes # 6 oil" (Ex. A at 11); and throughout the class period, MIC continued to disclose that IMTT maintained "substantial market share in the storage of black oil" (*i.e.*, No. 6 oil) and other products (Ex. Q at 8);

- The Complaint alleges that, during the class period, No. 6 oil "was widely known to be in decline" (Compl. ¶81) and that "it is widely understood that IMO 2020 would … reduce the overall demand for No. 6 fuel oil" (*id*. ¶92); and

- MIC disclosed throughout the class period that (i) "IMTT's agreements [with customers] may be terminated or expire at the end of the current term" and that such termination/expiration could adversely affect MIC's financial condition and results, and (ii) changes in regulations and/or market conditions could cause MIC to incur "significant capital expenditures." Ex. F at 30-31.  Indeed, as the Complaint acknowledges, prior to the class period, MIC expressly disclosed the prospect that MIC might need to incur "a one-off increase in capital expenditures to convert the heavy product tanks to service the clean product" in response to a change in "demand for storage of heavy oil residual product" (*i.e.*, No. 6 oil).  Compl. ¶105.

These disclosures are fatal to plaintiff's claims.  *See, e.g.*, *In re Pretium Res. Inc. Sec. Litig*., 256 F. Supp. 3d 459, 476 (S.D.N.Y. 2017) (Broderick, J.) (dismissing 10b-5 claim where, as here, the defendant had in fact disclosed "the very information Plaintiffs contend [the defendant] to have omitted") (citing *Starr ex rel. Estate of Sampson v. Georgeson S'holder, Inc*., 412 F.3d 103, 110 (2d Cir. 2005) (affirming dismissal of 10b-5 claim on ground that alleged omissions were immaterial since prior company disclosures contained the precise information allegedly withheld)).

3

While the foregoing alone dooms the Complaint, it suffers from other fatal flaws as well. For example, with respect to plaintiff's claim under Section 10(b) of the Exchange Act and SEC Rule 10b-5, the Complaint fails adequately to allege any actionable affirmative misstatements by defendants during the class period. Indeed, the majority of the affirmative statements the Complaint identifies are immaterial statements of corporate optimism, opinion or belief. Many of them are also forward-looking and therefore not actionable under the "bespeaks caution" doctrine and the Private Securities Litigation Reform Act's ("PSLRA") safe harbor and/or otherwise not adequately pleaded to be false.

Even if the Complaint adequately pled an actionable misstatement or omission (which it does not), it would still be subject to dismissal for failure to plead with particularity facts supporting a strong inference of scienter. The Complaint does not, for instance, adequately plead that MIC or any of the Individual Defendants deliberately misled investors or profited from the sale of MIC stock during the class period, and plaintiff's other attempts to plead scienter are unavailing. Loss causation is also lacking, given that the February 21, 2018 earnings and dividend announcement did not reveal the "truth" of any alleged misstatement, let alone a fraud, and therefore does not constitute a "corrective disclosure."

Plaintiff's Securities Act claims based on MIC's November 2016 secondary offering – evidently added as an afterthought – are, if anything, even more attenuated. Not only does plaintiff fail adequately to allege any actionable misstatement or omission in the applicable offering documents (for many of the same reasons noted above), but the notion that any reasonable investigation should – or even could – have alerted defendants *in the fall of 2016* to what they did not know (and could not have known) until the end of 2017 defies logic. These and other infirmities in plaintiff's Securities Act claims are likewise discussed in greater detail below.

# BACKGROUND[3]

**The Parties**

Lead Plaintiff Moab Partners, L.P. ("Moab" or "plaintiff") is an activist investor that claims to have purchased over 500,000 shares of MIC common stock during the class period (February 22, 2016 through February 21, 2018), including 18,800 MIC shares "traceable" to a secondary offering (the "Secondary Offering") of MIC shares conducted pursuant to a registration statement filed on April 5, 2016 (the "Registration Statement"), as updated by a prospectus supplement dated November 3, 2016 (the "Prospectus," and, collectively with the "Registration Statement," the "Offering Documents").  Compl. ¶27.[4]  Moab seeks to represent a putative class consisting of all purchasers of MIC stock (i) between the dates of February 22, 2016 and February 21, 2018, and/or (ii) in or traceable to the Secondary Offering.  *Id*. ¶399.

As noted above, defendant MIC is a holding company that owns and operates a portfolio of profitable infrastructure-related businesses that generate significant free cash flow, including IMTT, one of the largest providers of third-party bulk liquid terminal services in the U.S.  *Id.* ¶28; Ex. II at 6.  IMTT's 19 terminals store or handle refined petroleum products (including No. 6 oil or "black oil"), commodity and specialty chemicals, renewable fuels, vegetable and tropical oils and other bulk liquids.  Ex. II at 6.  IMTT typically does not purchase or market the products it handles.  Its customers include oil refiners and marketers, chemical manufacturers, food processors, and commodity traders.  *Id.* at 9; *see also* Ex F at 9; Ex. Q at 9.  In 2017, IMTT

---

[3] The "facts" set forth herein are taken from the Complaint, documents incorporated by reference therein, publicly-available SEC filings and other documents and information of which this Court may take judicial notice, copies of which are attached as Exhibits to the accompanying Schreiber Declaration.  *See Pretium*, 256 F. Supp. 3d at 466 n.1.

[4] Before joining this lawsuit, Moab waged an unsuccessful public proxy fight against MIC's incumbent directors, in which it advanced many of the same (flawed) arguments that permeate its Complaint.

generated $261.1 million of free cash flow,[5] or 47% of the $558 million of free cash flow generated by MIC.  Over 80% of MIC's free cash flow was distributed to investors in the form of dividends. Ex. EE at 66, 69, 107.

The Individual Defendants are all current or former officers and/or directors of MIC or IMTT during the relevant time frame.[6]  There are two other named defendants, Macquarie Infrastructure Management (USA) Inc. ("MIMUSA") and Barclays Capital Inc. ("Barclays"). MIMUSA is a member of the Macquarie Group that provides services to MIC under the terms of a publicly-disclosed Management Services Agreement.  Ex. F at 5; Compl. ¶29.  Barclays served as underwriter for the Secondary Offering.  Compl. ¶350.

**Relevant Aspects of MIC's and IMTT's Businesses**

As the Complaint alleges, IMTT has been heavily involved in the storage of No. 6 oil – a high-sulfur fuel oil – since the 1970s.  *Id.* ¶83.  MIC repeatedly disclosed IMTT's reliance on leases for the storage of No. 6 oil before and during the class period.  For instance, even prior to the class period, MIC disclosed that 43% of IMTT's revenue at its largest group of terminals, and 32% at its second largest terminal, was derived from the storage of "black oil," which the Company explained "includes # 6 oil."  Ex. A at 11.  And MIC continued to disclose throughout the class period that IMTT maintained "substantial market share in the storage of black oil" (*i.e.*, No. 6 oil) and other products.  *See, e.g.*, Ex. C at 7; Ex. F at 8; Ex. Q at 8.  Indeed, the Complaint makes clear

---

[5] IMTT also generated $326.2 million of EBITDA in 2017.  *See* Ex. EE at 7.

[6] Defendant James Hooke was CEO of MIC and Chairman of IMTT's Board until December 31, 2017, when he returned to his native Australia after 11 years in the U.S., including more than eight at the helm of MIC.  He was also a director of MIC from September 8, 2017 to September 5, 2018.  Compl. ¶30.  Defendant Jay Davis was and is MIC's Head of Investor Relations.  *Id.* ¶31.  Defendant Liam Stewart was and is MIC's CFO.  *Id.* ¶32. Defendant Richard Courtney was and is CEO and President of IMTT.  *Id.* ¶33.  Defendant Robert Choi was and is MIC's Chief Accounting Officer.  *Id.* ¶344.  The remaining Individual Defendants – who, along with Mr. Choi, are named only in connection with plaintiff's claims under Sections 11 and 15 of the Securities Act – were (and in most cases still are) outside directors of MIC.  *Id.*

that Lead Plaintiff Moab was specifically aware during the class period that IMTT stored No. 6 oil.  Compl. ¶166.

As alleged in the Complaint, global demand for No. 6 oil has been in decline since the late 1980s.  *Id.* ¶84.  During this same time, however, IMTT's business of storing No. 6 oil actually grew, so much so that, throughout most of the class period, IMTT enjoyed utilization rates above historic levels.  *See, e.g.*, *id.* ¶117; Ex. I at 10; Ex. Q at 71; Ex. R at 10.  In other words, at least prior to the end of 2017, there had never been any direct correlation between overall global demand for No. 6 oil[7] and the demand for storage of that commodity at IMTT's facilities.

On October 27, 2016 (eight months *after* the start of the class period), the International Maritime Organization (the "IMO") formally announced IMO 2020, a regulation purporting to place a 0.5% cap on sulfur in bunker fuel beginning in 2020.  The Complaint alleges that this development was "widely reported" (Compl. ¶¶120-21) and that it was "widely understood" that the new cap would eventually "cause 'brutal changes' for all those in the supply chain for No. 6 fuel oil" (*id.* ¶9),[8] the market for which "was widely known to be in decline."  *Id.* ¶81.

Throughout the class period, MIC steadily increased its quarterly dividend to shareholders. *Id.* ¶182.  On February 21, 2018, however, MIC announced a reduction in 2018 quarterly dividend guidance.  *Id.*  The next day, during an earnings call, MIC's current CEO, nonparty Christopher Frost, explained that there were a number of factors that contributed to MIC's decision to lower

---

[7] No. 6 oil has two primary end-users: power plants and the shipping industry.  While the demand for No. 6 oil has been in decline for power plants, the global demand for No. 6 oil in the shipping industry has continued to grow.  *See, e.g.*, Compl. ¶89.

[8] Plaintiff's citation to a piece published by the Seatrade Maritime News for the proposition that IMO 2020 is expected to cause "brutal changes" in the market (Compl. ¶97) is misleading.  The reference to expected "brutal changes" actually refers to a "severe product shortage and inflated prices" for low sulfur fuel—not heavy oil. *See* Ex. O at 3.  Regarding heavy oil, the piece makes clear the uncertainty in the market regarding the impact of IMO 2020.  *Id.*

its dividend, including strong incentives created by recent U.S. tax reform[9] to invest in MIC's portfolio, issues with respect to access to capital markets to fund the growth of its businesses, and a desire to enhance balance sheet flexibility.  Ex. FF at 2; Ex. GG at 3.  Although a sudden and unexpected decline in demand for storage of No. 6 oil at IMTT's facilities in late 2017 and early 2018 was identified as one of the reasons for the Board's decision to reinvest a larger percentage of MIC's free cash flow in 2018 in its various infrastructure businesses (not just IMTT), it was by no means the only (or even primary) reason given.  Ex. FF at 2-3.

Plaintiff's Complaint ignores the other reasons for the decision and also mischaracterizes what actually occurred at IMTT.  Specifically, from December 2017 to January 2018, a larger-than-expected number of IMTT's customers provided notice of their intent not to renew existing contracts for significant levels of No. 6 oil storage.  *Id.*  While the reasons for the non-renewals were varied and complex, in general, they "reflected both continuing changes in domestic and global demand for the product, and market conditions for trading customers."  Ex. EE at 70.[10] IMTT's general storage utilization dropped from an average of 93.3% over 2017 to 89.6% at the end of 2017.  Ex. FF at 3. [11]

During the February 22, 2018 earnings call, Mr. Frost went on to explain that a decision had been made to repurpose some of IMTT's storage tanks to handle bulk liquids other than No.

---

[9] On December 22, 2017, the Tax Cuts and Jobs Act of 2017 was signed into law.

[10] The most significant market condition affecting trading customers relates to something that is referred to in the futures market as "backwardation."  "Backwardation" occurs when the "futures prices for the commodities are below the current, or spot, prices."  *See* Ex. EE at 68.  At the end of 2017-2018, the market for No. 6 oil had been in backwardation for an extended period of time, causing a number of commodities traders to cease, or at least pause, their trading of the commodity, thereby curtailing their need to lease storage space.  *See id.*

[11] This decline in IMTT's utilization rate was not, in itself, a material event *for MIC*, whose overall adjusted EBITDA decreased by only 5.5% from 2017-2018.  *See* Ex. EE at 90.  The decrease in MIC's EBITDA was due to a number of factors beyond the reduced storage utilization at IMTT, including (i) the previously disclosed write-down and operating losses of another MIC business; (ii) higher costs related to the evaluation of various investment and acquisition/disposition opportunities; and (iii) approximately $4 million in costs incurred for advisory services in connection with addressing various shareholder matters.

6 oil, a process that would contribute to storage utilization remaining below the historical average for the next year or two as tanks were taken out of service for retrofit. *Id.* The repurposing, which was part of a broader strategy to increase revenue within MIC's operating businesses, was intended to help diversify IMTT's customer base and increase revenue by adding "higher-value higher-revenue products." Ex. GG at 7. Although the need to repurpose storage tanks in response to changes in customer demand was "nothing new" for IMTT – it had previously done so in response to changing market conditions (*see* Ex. FF at 3) – the extent of contract non-renewals at the end of 2017 and early 2018 came as "very much a surprise to IMTT." *Id.* at 9.[12]

All of these risks were, however, disclosed to shareholders during – and in some cases even prior to – the class period. For example, in virtually every MIC 10-K or 10-Q filing, MIC disclosed, among other things, that:

- "IMTT's agreements [with customers] may be terminated or expire at the end of the current term" and that such termination/expiration could adversely affect MIC's financial condition and results (*see, e.g.*, Ex. F at 30, Ex. Q at 31, Ex. G at 52 (noting that "there have been no material changes to the risk factors" set forth in the 2015 10-K), Ex. I at 54 (same); Ex. L at 59 (same), Ex. EE at 32; Ex. R at 49 (noting that "there have been no material changes to the risk factors" set forth in the 2016 10-K); Ex. V at 54 (same); Ex. Z at 57 (same));

- Changes in regulations and/or market conditions could cause MIC to incur "significant capital expenditures" (Ex. F at 31; Ex. Q at 32; Ex. G at 52; Ex. I at 54; Ex. L at 59; Ex. EE at 33; Ex. R at 49; Ex. V at 54; Ex. Z at 57); and

- MIC might need to incur "a one-off increase in capital expenditures to convert the heavy product tanks to service the clean product" in response to a change in "demand for storage of heavy oil residual product" (*i.e.*, No. 6 oil). Ex. B at 7; Compl. ¶105.

**Plaintiff's Claims**

The Complaint asserts claims: (i) under Section 10(b) of the Exchange Act and SEC Rule

---

[12] The Complaint lacks any factual allegations specifying the identity or even the number of customers who decided not to renew their contracts or the timing in which any such final determinations were communicated to IMTT or MIC.

10b-5 against MIC and the Management Defendants[13] (Compl. ¶¶317-25); (ii) under Section 20(a) of the Exchange Act against MIMUSA and the Management Defendants (*id.* ¶¶326-29); (iii) under Section 20A of the Exchange Act against MIMUSA (*id.* ¶¶330-35); (iv) under Section 11 of the Securities Act against MIC, Barclays, and the Individual Defendants (*id.* ¶¶373-83); (v) under Section 12(a)(2) of the Securities Act against MIC and Barclays (*id.* ¶¶384-92); and (vi) under Section 15 of the Securities Act against MIMUSA and the Individual Defendants (*id.* ¶¶393-98). For the reasons stated herein, these claims should be dismissed with prejudice.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), the factual allegations in a complaint must "raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. Plaintiff's claims in this case are subject to even stricter pleading standards under Rule 9(b) and the PSLRA. Specifically, Rule 9(b) requires that "[i]n all averments of fraud ... the circumstances constituting fraud … shall be stated with particularity." To satisfy this standard, the complaint must: (1) identify each allegedly fraudulent statement; (2) identify the speaker; (3) state where and when the statements were made; and (4) explain why the statements were fraudulent. *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004).

The PSLRA heightened the pleading standard even further by requiring plaintiffs to: (1) "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading;" (2) "state with particularity all facts on which the belief is formed" where "an allegation regarding the statement or omission is made on information and belief;" and

---

[13] The Management Defendants identified in the Complaint are Hooke, Stewart, Davis and Courtney.

(3) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(1)-(2); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007) (to qualify as "strong," "the inference of scienter must  be  more than  merely 'reasonable' or 'permissible' – it must be cogent and  compelling … in light of other explanations").  Although the PSLRA's pleading standards apply only to Exchange Act claims, Securities Act claims that "sound in fraud" – as plaintiff's do here – must still satisfy Rule 9(b)'s particularity requirements.  *See Rombach*, 355 F.3d at 171.

## ARGUMENT

## I.     PLAINTIFF'S EXCHANGE ACT CLAIMS SHOULD BE DISMISSED

To state a claim for securities fraud under Section 10(b) and Rule 10b-5, a plaintiff must plead with specificity: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Pretium,* 256 F. Supp. 3d at 471 (citation omitted).  As demonstrated below, the Complaint fails adequately to plead at least three of these elements.

### A.     Plaintiff Fails To Plead An Actionable Misstatement Or Omission

"A Section 10 plaintiff must not only assert that a representation is material but also that it is false and 'demonstrate with specificity why and how that is so.'" *Pretium*, 256 F. Supp. 3d at 471 (quoting *Rombach*, 355 F.3d at 174).  As this Court has observed, "[f]alsity is a failure to be truthful – it is not a misapprehension, misunderstanding, or mistake of fact at the time a statement was made." *Id.* at 472 (quoting *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014)).[14]   Section 10 does not "create an affirmative duty to disclose any and all material

---

[14] It is well-settled that only a defendant who has "made" the allegedly material misstatement can be liable for a violation of Rule 10b-5.  *See Janus Capital Grp., Inc. v. First Deriv. Traders*, 564 U.S. 135, 141 (2011).  Here,

information." *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 152 (2d Cir. 2013) (citation omitted);

*Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not

misleading."). "Rather, an omission is actionable under the securities laws only when the

[defendant] is subject to a duty to disclose the omitted facts." *Pretium*, 256 F. Supp. 3d at 472

(internal quotation marks and citation omitted). As described below, plaintiff has failed adequately

to allege any actionable omission or affirmative misstatement here, warranting dismissal.

### 1.    Plaintiff's "omission" theory is not viable

At its core, plaintiff's theory of liability is that MIC fraudulently concealed from investors

(i) IMTT's reliance on revenue from the storage of No. 6 oil, (ii) that the implementation of IMO

2020 would curtail the demand for storage of No. 6 oil, and (iii) that repurposing IMTT's tanks in

response to changes in market conditions and/or regulations could require significant capital

expenditures by MIC. *See* Compl. ¶¶1, 2, 9, 227, 270. As discussed above, however, each of these

facts was disclosed or otherwise known to the market throughout the class period. MIC disclosed

the fact and extent of IMTT's storage of No. 6 oil well before the class period started, and

continued throughout the class period to identify No. 6 oil as among the products IMTT stored for

which it maintained a "substantial market share." *See supra* at 6-7. Moreover, plaintiff repeatedly

acknowledges that IMO 2020 and its possible impacts were widely known to the market, and that

MIC itself discussed IMO 2020 and the uncertainties it posed throughout the class period. *See*

Compl. ¶¶9, 163, 166. Finally, as discussed, MIC repeatedly disclosed that changes in regulations

and/or market conditions could lead MIC to incur "significant capital expenditures," including to

---

plaintiff attributes only one alleged misstatement to Mr. Courtney – who was (and is) neither an officer nor a
director of MIC – and that was by mistake. It is clear from the referenced transcript that Mr. Courtney was not
the individual who made the statement in question (Ex. H at 19-20) and, in any event, the statement is clearly
one of corporate optimism, if not outright puffery, and thus is inactionable. *See* Compl. ¶235; *infra* at Section
I.A.2.a. This alone requires dismissal of plaintiff's 10b-5 claim against Mr. Courtney, as do the other arguments
set forth herein.

repurpose IMTT tanks in response to changes in customer demand.  *See supra* at 9.

As this Court has held, the disclosure – in both sum and substance – of the very information allegedly omitted obviously defeats an omission claim.  *See Pretium*, 256 F. Supp. 3d at 475-76 ("[The defendant's] disclosure of the very information Plaintiffs contend [the defendant] to have omitted therefore renders these purported omissions immaterial as a matter of law.") (citing cases); *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 759-60 (S.D.N.Y. 2018) (no viable claim for securities fraud where "defendants amply disclosed" the alleged risk); *Lipow v. Net1 UEPS Techs., Inc*., 131 F. Supp. 3d 144, 168-69 (S.D.N.Y. 2015) (no duty "to disclose information where it is equally available, widely reported, or so basic that any investor could be expected to know it") (internal quotation marks omitted); *Monroe Cty. Emps.' Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 349 (S.D.N.Y. 2014) ("[T]here is no duty to disclose information that has been widely reported in readily available media.") (internal quotation marks omitted).  Here, as in *Pretium*, the "same documents on which the [Complaint] relies for the purported misstatements disclose the information [plaintiff] claim[s] [MIC] omitted," and plaintiff "should have discovered the truth" with "minimal diligence."  256 F. Supp. 3d at 476 (quoting *Starr*, 412 F.3d at109).  This alone renders any purported omissions immaterial as a matter of law.

Plaintiff cannot credibly contend that MIC was required to disclose more any sooner than it did.  As plaintiff grudgingly acknowledges (Compl. ¶170), it was not until late in the fourth quarter 2017 that IMTT became aware that a larger-than-normal number of IMTT's commodity trader customers had unexpectedly decided not to renew their contracts with IMTT at year-end or in early 2018.  And MIC disclosed the non-renewals in its very next quarterly filing.  It was not required to do so any sooner.  *See In re Bos. Sci. Corp. Sec. Litig.*, 686 F.3d 21, 27-28, n.2 (1st Cir. 2012) (companies required to make interim public disclosures only "in particular

13

circumstances" not applicable here).  Plaintiff's theory of the case appears to be that MIC was required – as early as February 2016 – to make a dire public prediction that the forthcoming implementation of IMO 2020 and/or other market conditions would result in an unprecedented decline in IMTT's utilization rates (thereby requiring a dividend cut and repurposing of tanks) at or before the end of 2017.  That theory is implausible on its face.

As the Complaint's allegations make clear, such a prediction in 2016 (or even at the end of the third quarter of 2017) would have been contradicted – not supported – by the data available to MIC at the time.  As noted above, while global demand for No. 6 oil had been declining for years, *demand for storage of No. 6 oil at IMTT's facilities had been increasing over that same time frame*.  *See* Ex. I at 10; Ex. Q at 71; Ex. R at 10.  And, significantly, even after IMO 2020 was announced in 2016, nearly all of IMTT's No. 6 oil tanks remained leased out until the end of 2017.  In other words, there had, at least prior to the end of 2017, never been a correlation between IMTT's utilization rate, on the one hand, and the overall global demand for No. 6 oil and/or the forthcoming implementation of IMO 2020, on the other.

Moreover, and in any event, even if the available data points had started to trend more pessimistic (and they did not until the end of 2017), companies are not required to jump the gun and speculate about possible market downturns and/or potential negative impacts of a forthcoming regulation.  *See, e.g.*, *Libow*, 131 F. Supp. 3d at 170 (explaining that "defendants cannot be held liable for failing to disclose what would have been pure speculation" and holding that "where an outcome is merely speculative, the duty to disclose does not attach"); *Medina v. Tremor Video, Inc.*, 640 F. App'x 45, 49 (2d Cir. 2016) ("With the benefit of hindsight, it may be possible to say that seeds of what was to come were available to defendants at the time.  But we cannot attribute to defendants, based on hindsight alone, knowledge that events that may well have appeared

14

unremarkable at the time, were omens of future material problems."). Here, during the class period (and even now), the impact that IMO 2020 would ultimately have on IMTT's business was (and is) uncertain. *See, e.g.*, Compl. ¶166 (explaining that the shipping industry could use scrubbers to continue using No. 6 oil after IMO 2020). Public companies are entitled – indeed, expected – to investigate, analyze and assess potentially negative information before making statements to the market. *See, e.g.*, *Bos. Sci. Corp.*, 686 F.3d at 27-28 (companies have no obligation to "disclose immediately all information that may conceivably affect stock prices," because, among other things, "the burden and risks to management of an unlimited and general obligation would be extreme and could easily disadvantage shareholders in numerous ways"); *In re Duane Reade Inc. Sec. Litig.*, No. 02 CIV.6478 NRB, 2003 WL 22801416, at *7 n.15 (S.D.N.Y. Nov. 25, 2003) (there is no obligation to disclose even material facts immediately; instead, "the timing of disclosure is a matter for the business judgment of the corporate officers entrusted with the management of the corporation"), *aff'd sub nom. Nadoff v. Duane Reade, Inc.*, 107 F. App'x 250 (2d Cir. 2004).

Nor does plaintiff's reliance on Item 303 of Regulation S-K (Compl. ¶ 277) do anything to salvage its omission theory. As the Second Circuit has held, "a failure to make a required Item 303 disclosure in a 10-Q filing is … actionable *only* if it satisfies the materiality requirements outlined in [*Basic*], and if all of the other requirements to sustain an action under Section 10(b) are fulfilled." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100 (2d Cir. 2015) (emphasis added). Here, as discussed above, the risks that plaintiff claims were concealed in violation of Item 303 were, in fact, disclosed by MIC and/or were already publicly known, thus rendering any purported omission immaterial as a matter of law. *See Basic*, 485 U.S. at 231-32 ("[T]o fulfill the materiality requirement there must be a substantial likelihood that the disclosure of the omitted fact would

have been viewed by the reasonable investor as having significantly altered the total mix of information made available."). Obviously, further disclosure of facts that are already in the public domain cannot "alter[] the total mix of information" available to an investor. *Id.*

### 2.   Plaintiff has failed to allege an actionable misstatement

Plaintiff's affirmative misstatement theory is really just the flip side of its omission theory – *i.e.*, the affirmative statements identified in the Complaint are purportedly false and misleading because they allegedly omitted the facts discussed above regarding IMTT's storage of No. 6 oil, the potential impacts of IMO 2020 and the possible need to repurpose IMTT's tanks. As such, plaintiff's affirmative misstatement claims fail for the same reasons already discussed. The challenged affirmative statements identified in the Complaint – a complete list of which is set forth in Exhibit JJ to the accompanying Schreiber Declaration – are inactionable as a matter of law for other reasons as well, as discussed below.

### a.   Statements of corporate optimism are immaterial

The Complaint challenges a number of positive statements by MIC and the Management Defendants during the class period, including, *inter alia*, describing MIC's operating segments as "fundamentally sound businesses" (Compl. ¶113), expressing confidence "in our ability to deliver value to our shareholders" (*id.* ¶229), and boasting that IMTT is "the best service provider" (*id.* ¶235).[15] Such general statements of corporate optimism are per se inactionable and cannot form the basis of a securities fraud claim. *See Rombach*, 355 F.3d at 174 ("[E]xpressions of puffery and corporate optimism do not give rise to securities violations."); *see also In re Duane Reade*, 2003 WL 22801416, at *4 ("A company's statements of hope, opinion, or belief about its future performance or general market conditions are not actionable under the securities laws."). After

---

[15] *See also* Compl. ¶¶229, 232, 235, 240, 245, 247, 250, 264, 271, 273.

all, generic positive statements "convey[] no meaningful, objective data that an investor would rely upon." *Frankfurt-Tr. Inv. Lux. AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 227 (S.D.N.Y. 2018) (internal quotation marks omitted); *see Aratana*, 315 F. Supp. 3d at 757 (same); *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 373 (S.D.N.Y. 2007) (statements that defendants "expect[ed] OEM to continue to be a strong segment" are inactionable puffery).

> **b.    Defendants' forward-looking statements are not actionable**

Plaintiff also appears to challenge a number of statements reflecting defendants' expectations regarding IMTT's future outlook and/or MIC's future dividends.[16] Such statements are non-actionable forward-looking statements protected by the PSLRA's safe harbor provision and the "bespeaks caution" doctrine. *See* 15 U.S.C. §78u-5(c); *Johnson v. Sequans Commc'ns S.A.*, No. 11 Civ. 6341 (PAC), 2013 WL 214297, at *15 (S.D.N.Y. Jan. 17, 2013) (statements based on company's current ideas about its intentions and expectations for drivers of future growth are inactionable).

Under the "bespeaks caution" doctrine, when forward-looking statements are accompanied by sufficient cautionary language, any alleged omission or misrepresentation is rendered immaterial as a matter of law. *Johnson*, 2013 WL 214297, at *9. The PSLRA safe harbor similarly renders forward-looking statements "inactionable if '(1) the forward-looking statement is identified and accompanied by meaningful cautionary language, (2) the forward looking statement is immaterial, or (3) the plaintiff fails to prove that [the forward-looking statement] was made with actual knowledge that it was false or misleading.'" *City of Warwick Mun. Emps. Pension Fund v. Rackspace Hosting, Inc.*, No. 17 CIV. 3501 (JFK), 2019 WL 452051, at *3 (S.D.N.Y. Feb. 5, 2019) (quoting *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 245 (2d Cir. 2016)); *see* 15 U.S.C.

---

[16] *See, e.g.*, Compl. ¶¶229, 243, 245, 247, 256, 273.

17

§78u-5(c).  While a statement that satisfies any of these categories is protected by the safe harbor (*see In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 530 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016)), the statements here satisfy all three.

Each of MIC's SEC filings and earnings call transcripts – *i.e.*, the sources of the majority of the Complaint's alleged misstatements and/or omissions – states clearly that it contains forward-looking statements, identifies them as such, and supplies meaningful cautionary language.  *See*, *e.g.*, Ex. J at 2; Ex. Q at 1-2.[17]  As just one example, MIC's 2016 10-K disclosed, among other things, that "IMTT's business is dependent on the demand for bulk liquid terminals capacity in the locations where it operates," a demand which could be affected by "changes in government regulations."  Ex. Q at 30.  MIC also disclosed that "[t]he performances of our businesses ... may limit our ability to make regular dividends in the future to our stockholders[.]" *Id.* at 47.  MIC's and the Management Defendants' forward-looking statements concerning their expectations for IMTT and the MIC dividend are, accordingly, protected under the safe harbor and the "bespeaks caution" doctrine.  *See Sanofi*, 87 F. Supp. 3d at 536 (cautionary language sufficient where the "statements conveyed substantive information about the risk that ultimately materialized" and identified "important factors that could cause actual results to differ"); *Rombach*, 355 F.3d at 175-76 (cautionary language, even where "formulaic," is sufficient to invoke PSLRA safe harbor).

Nor does plaintiff adequately allege that, at the time these forward-looking statements were made, MIC and/or the Management Defendants believed the statements to be false.  Because "the

---

[17] To determine if statements are accompanied by meaningful cautionary language, a court is to "identify the allegedly undisclosed risk and then read the allegedly fraudulent materials – including the cautionary language – to determine if a reasonable investor could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist."  *Sanofi*, 87 F. Supp. 3d at 530 (citation omitted); *see In re Focus Media Holding Ltd. Litig.*, 701 F. Supp. 2d 534, 540 (S.D.N.Y. 2010) (explaining that the "bespeaks caution" doctrine is interpreted the same way).  Here, as discussed above, the purported "undisclosed risks" were all in fact disclosed.

scienter requirement for forward-looking statements is stricter than for statements of current fact," liability "attaches only upon proof of knowing falsity."  *Slayton v. Am. Express Co.*, 604 F.3d 758, 773 (2d Cir. 2010) (citation omitted).  As discussed in Section I.B below, plaintiff has failed to provide any particularized allegations establishing scienter on the part of MIC or the Management Defendants.

### c.   Plaintiff fails to adequately allege that any of defendants' other opinion statements are actionable under the *Omnicare* test

Even if the Court were to find that the challenged statements discussed above are not immaterial statements of corporate optimism and/or forward-looking statements protected under the PLSRA safe harbor and/or "bespeaks caution" doctrine, they clearly qualify as statements of opinion or belief as to which liability is not adequately pled under the Supreme Court's decision in *Omnicare*.  "[S]ubjective statements of opinion are generally not actionable as fraud."[18]  *Sanofi*, 87 F. Supp. 3d at 528; *see Omnicare,* 135 S. Ct. at 1332.  In *Omnicare*, the Supreme Court held that a statement of opinion may, however, be actionable if (i) "the speaker did not hold the belief she professed," 135 S. Ct. at 1327; (ii) "the supporting fact[s] she supplied were untrue," *id.*; or (iii) the opinion "omit[ted] material facts about the issuer's inquiry into or knowledge concerning a statement of opinion," and those facts "conflict[ed] with what a reasonable investor would take from the statement itself."  *Id.* at 1329.  As described below, plaintiff fails to plead any actionable statement of opinion under this test.

To plead an actionable statement of opinion under the first part of the *Omnicare* test, there must be sufficient allegations that "the defendant's opinions were both [objectively] false and not

---

[18] As the Supreme Court has explained, "[a] fact is a thing done or existing," while an opinion "is a belief, a view, or a sentiment which the mind forms of persons or things."  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1325 (2015) (internal alteration omitted).  The majority of the statements of which plaintiff complains are indisputably statements opinion or belief.  *See, e.g.*, Compl. ¶¶229, 230, 232, 235, 240, 243, 245, 247, 248, 250, 252, 253, 256, 258, 262, 264, 269, 271, 273.

honestly believed when they were made." *Pretium*, 256 F. Supp. 3d at 472 (internal quotation marks omitted); *see Tongue*, 816 F.3d at 210 (quoting *Omnicare*, 135 S. Ct. at 1327). It is well-established in this Circuit that a plaintiff may not merely "allege that an opinion was unreasonable, irrational, excessively optimistic, [or] not borne out by subsequent events." *Aratana*, 315 F. Supp. 3d at 754 (citation omitted).

Yet that is all plaintiff alleges here. Plaintiff alleges no facts demonstrating that the numerous statements of opinion identified in the Complaint were false – let alone known to be false – *at the time they were made*.[19] *See, e.g., Waterford Twp. Police & Fire Ret. Sys. v. Reg'l Mgmt. Corp.*, No. 14 CV 3876-LTS, 2017 WL 395206, at *2 (S.D.N.Y. Jan. 27, 2017), *aff'd*, 723 F. App'x 20 (2d Cir. 2018) (denying leave to amend where plaintiff failed to meet its burden "to allege facts demonstrating plausibly that [defendant's] statements were known to be false when made"). On the contrary, while the Complaint focuses on certain optimistic opinions expressed by MIC and the Management Defendants concerning MIC's future dividends and the stability of IMTT's business, plaintiff concedes that IMTT's tanks were nearly fully leased until the end of 2017 and that the impact of IMO 2020 on IMTT remained uncertain. *See* Compl. ¶¶150, 158, 166;

---

[19] For example, plaintiff makes much about the following statement by Mr. Hooke in response to a question regarding future dividends: "People slashing their dividend saying we're going to slash our dividend to deploy capital internally, I don't think you'll see us do that." Compl. ¶256. There is no allegation that Mr. Hooke knew, at the time he expressed his personal views as the outgoing CEO, that MIC's Board would decide (for various reasons, many of which were unrelated to the unexpected developments at IMTT) to reduce dividend guidance for 2018 almost four months later. Mr. Hooke's comments were made some two months before the tax reform bill that changed the incentives for MIC to redeploy capital towards internal projects rather than dividends was signed into law and took effect. (As noted, the tax bill became law on December 22, 2017, and most of the changes introduced by the bill went into effect on January 1, 2018.) And, contrary to plaintiff's unsupported assertion that, at the time Mr. Hooke made this statement, IMTT "contracts … had already been cancelled, and additional contracts were at great risk of cancellation" (*id.* ¶257), there is not a single factual allegation that any existing IMTT contract was "cancelled" prior to the expiration of its term, nor that Mr. Hooke "knew" at the time, contrary to fact, that a significant number of contracts had either already expired by November 2, 2017 or would not be renewed. Any suggestion that Mr. Hooke somehow did not believe what he was saying is, accordingly, specious.

Ex. K at 2 (cited at Compl. ¶123).[20]  In short, the Complaint makes no serious attempt to allege that defendants "did not believe in their statements of opinion ... at the time they made them." *City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 68 (2d Cir. 2012); *see Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp.*, 951 F. Supp. 2d 479, 497 (S.D.N.Y. 2013) (dismissing complaint where "plaintiffs allege[d] no facts whatsoever to support their argument that defendants did not honestly believe their [statements] when made"); *Aratana*, 315 F. Supp. 3d at 761 (finding claim inactionable where "there are simply no concrete allegations suggesting that defendants … actually disbelieved their own estimates").  And, obviously, facts that defendants learned only at the end of 2017 or the beginning of 2018 cannot call into question the sincerity of the opinions they expressed as much as two years earlier.  *Aratana*, 315 F. Supp. 3d at 754 ("The Second Circuit has firmly rejected this 'fraud by hindsight' approach.").

Plaintiff's attempt to plead liability under the omission prong of the *Omnicare* test fares no better.  Under *Omnicare*, a statement of opinion can be actionable on an omissions theory only if the plaintiff pleads that the defendant's statement – considered in context by a reasonable investor and taking into account all other available information – implied some fact about how the defendant formed its opinion or belief, when the true facts were otherwise.  *See* 135 S. Ct. at 1328-29.  To do so, plaintiff was required to "identify particular (and material) facts going to the basis for the [defendant's] opinion ... whose omission makes the opinion statement at issue misleading

---

[20] The most plaintiff does in this regard is to offer a flawed math equation intended to suggest that some IMTT customers may not have renewed their contracts by the very end of October 2017 – already three-quarters of the way through the class period.  *See* Compl. ¶286.  Putting aside that plaintiff's assertion is simply wrong, the allegation is conclusory, factually immaterial, and does not provide particularized facts necessary to support a claim.  Non-renewals are a normal part of business at IMTT.  As MIC disclosed, IMTT's customers only leased tanks on an average of approximately two years (*see, e.g.*, Ex. V at 11), meaning turnover was not uncommon.  Thus, the fact that some customers (none of which the Complaint identifies) may have decided not to renew at the end of October, even if true, proves nothing.  Plaintiff has failed to plead with particularity facts sufficient to establish that the unusually large numbers of non-renewals that occurred in late December 2017 and early January 2018 actually occurred much sooner.  Plaintiff's inability to do so lays bare the mistake in its math.

to a reasonable person reading the statement fairly and in context."  *Tongue*, 816 F.3d at 209

(quoting *Omnicare*, 135 S. Ct. at 1332).  As the Second Circuit has expressed, "meeting the

standard under *Omnicare* 'is no small task for an investor.'"  *Id.* at 210 (quoting *Omnicare*, 135 S.

Ct. at 1332).  "Issuers must be forthright with their investors, but securities law does not impose

on them an obligation to disclose every piece of information in their possession."  *Id.* at 214.  Thus,

"a statement of opinion 'is not necessarily misleading when an issuer knows, but fails to disclose,

some fact cutting the other way.'"  *Pretium*, 256 F. Supp. 3d at 472 (quoting *Tongue*, 816 F.3d at

210).  Plaintiff does not come close to meeting this exacting standard.  Indeed, as discussed above,

the allegedly omitted "facts" at the core of plaintiff's Complaint were specifically disclosed and/or

otherwise widely known to the market during the entire class period.  *See supra* at 6-9, 12-16.

### 3.  Plaintiff fails to adequately allege that any of the other affirmative statements identified in the Complaint were false

Of the remaining purported misstatements, plaintiff stumbles at the very first hurdle:

pleading a *false* representation, much less a material one.  For instance, plaintiff points to a number

of disclosures of historical facts and data[21] – relating to MIC's and IMTT's financial results,

IMTT's utilization rates, and the tenure of IMTT's contracts – and asserts that they are somehow

affirmative misrepresentations because they do not disclose that "IMTT's success relied on

revenue from the storage of No. 6 fuel oil."  Compl. ¶241; *see also id.* ¶¶231, 233.  Plaintiff,

however, does not even attempt to argue that these disclosures were themselves inaccurate, and it

is well-settled that accurate statements of historical fact/financial data are not actionable.  *See, e.g.*,

*Johnson*, 2013 WL 214297, at *15 ("[D]isclosure of accurate historical data does not become

misleading even if less favorable results might by predictable by the company in the future."); *In*

---

[21] *See, e.g.*, Compl. ¶¶229, 230, 232, 243, 247, 248, 250, 252, 256, 258, 262, 264, 269, 271, 275.

*re Duane Reade*, 2003 WL 22801416, at *6 (dismissing claim because "[a]ccurate recitations of past earnings do not create liability under Section 10(b)" and "Defendants may not be held liable under the securities laws for accurate reports of past successes, even if present circumstances are less rosy") (citation omitted).[22]

Plaintiff also takes completely out of context two non-public statements made by Mr. Davis in November 2017 – near the very end of the class period – and asserts that they are "blatant lies." Compl. ¶20.  That is hardly the case.[23]   Plaintiff first focuses on Mr. Davis's response to a November 2017 email from a Moab representative.  *See id*. ¶166.  The questions to which Mr. Davis was responding in that non-public email exchange are – and would reasonably be assumed by Mr. Davis to be – focused on IMTT's business *in the New York harbor market and its Bayonne facility, in particular* (Ex. BB at 1), which accounts for roughly 35% of IMTT's overall storage capacity.[24]  *See* Ex. Q at 8.  And, consistent with that focus, Mr. Davis's response of "[a]bout 20%" to the question regarding the percent of storage in "heavy oil" goes on to expressly refer to "*storage demand at IMTT-Bayonne*."  Ex. BB at 1.  The fact, as disclosed in a post-class period investor slide presentation, that approximately 39% of IMTT's overall product capacity was in "Heavy & Residual" oils (*see* Compl. ¶212) nearly five months later does not render Mr. Davis's earlier email response false, let alone fraudulent.  As MIC explained in connection with that investor

---

[22] Plaintiff points to a number of other statements that are likewise not adequately alleged to be false.  For example, the Complaint appears to take issue with such literally true statements as that IMTT is not "exposed directly to the price of crude oil or petroleum products" or that IMTT "does not depend on a single customer, the loss of which would have a material adverse effect on IMTT."  *See, e.g.*, Compl. ¶¶244, 272.  Plaintiff is required to "demonstrate with specificity why and how" these statements are false.  *Pretium*, 256 F. Supp. 3d at 471-72 (quoting *Rombach*, 355 F.3d at 174).  It has failed to (and cannot) do so.

[23] Such end-of-class period non-public statements made to only a small group of investors – and, in one instance, just *one investor* over email – could never, in any event, form the basis for class-wide liability.

[24] Indeed, the five enumerated questions in plaintiff's November 7, 2017 email to Mr. Davis are preceded by an introductory paragraph that refers to "weaknesses in the NY harbor" and related "questions" that "came up from our calls" with "other storage players."  Ex. BB at 1.

presentation:

> As shown on slide 11, a significant portion of Lower Mississippi storage and handling facilities are positioned for heavy and residual oils. *In Bayonne, the facilities are mainly positioned for gasoline and distillates, or what we refer to as clean petroleum products, and to a lesser extent to heavy and residual products.*

Ex. HH at 7 (emphasis added). In fact, the slide presentation itself states that "approximately [t]wo thirds of [IMTT's] existing capacity [for heavy and residual products is] located in the Lower Mississippi River" region, meaning that the other approximately one-third of such capacity is spread out over Bayonne and four other terminals that are currently positioned to serve heavy and residual products. *Id*. at 10-11 (slide deck). In other words, while approximately 39% of IMTT's overall product capacity was in heavy and residual oils, that percentage was obviously considerably lower at the Bayonne terminal in New York harbor. *See Williams v. Citibank, N.A.*, 565 F. Supp. 2d 523, 527 (S.D.N.Y. 2008) ("The court need not accept as true an allegation that is contradicted by documents on which the complaint relies.") (citation omitted). Moreover, and in any event, even if Mr. Davis had somehow misunderstood the specific question or misapprehended the specific percentages in question, this would still not be actionable. *See Lululemon*, 14 F. Supp. 3d at 571 (a statement is not false where there is a misunderstanding or mistake of fact when made).

Second, plaintiff points to a November 16, 2017 statement by Mr. Davis made to a small group of investors. Plaintiff focuses on only a portion of Mr. Davis's comment and contends that he made an "active[] misrepresent[ation] that the Company had 'very little' involvement in heavy fuel oils." Compl. ¶186. When viewed in the context of his full remarks,[25] however, it is clear

---

[25] As is clear from the transcript of Mr. Davis's statements, "heavy product" – as he uses the term here – refers to crude or asphalt products. As Mr. Davis states: "In aggregate, the business operates about 50 million barrels of liquid storage and handling capacity, and they provide liquid storage and handling for liquid petroleum products primarily refined petroleum products, we do very little in crude, chemicals and agricultural products; agricultural products including things like corn oil, soybean oil, tropical oils or fish oil and that type of thing." Then, four sentences later, he reiterates: "A little over half of the capacity is in service and petroleum products, and as I say, very little of that is in crude or asphalt, any heavy product." Ex. CC at 3 (emphasis added).

that Mr. Davis was referring to crude and asphalt products (as opposed to No. 6 oil) when he stated that IMTT stores "very little" of such heavy product. And, again, even if Mr. Davis misspoke or was misunderstood, this would still not qualify as an alleged misstatement, as "[f]alsity is a failure to be truthful – it is not a misapprehension, misunderstanding or mistake of fact at the time a statement was made." *Lululemon*, 14 F. Supp. 3d at 571 (quoting *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 813 (2d Cir. 1996)).[26]

## B.   Plaintiff Fails To Adequately Allege Scienter

A well-pleaded securities fraud claim must also "state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2) (emphasis added). "The requisite state of mind in a section 10(b) and Rule 10b-5 action is an intent to deceive, manipulate, or defraud." *Pretium*, 256 F. Supp. 3d at 473 (quoting *ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir 2009)). As the Supreme Court has made clear, a strong inference of scienter "must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

A strong inference of scienter "can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198. Conscious misbehavior "encompasses deliberate illegal behavior," while "conscious recklessness" is "a state of mind

---

[26] The Complaint refers to two other statements by defendants as "blatant lies" as well. The first is a statement relating to MIC's expectations that IMTT would be a "growth driver for 2018." Compl. ¶18. As described above, such forward-looking statements of corporate optimism are not actionable. The second is a December 2017 presentation which discusses, in the most general terms, IMTT's historical data. *See id.* ¶19; *see also id.* ¶¶169, 170, 264. Not only is this not actionable for the reasons discussed above, but the very first page of the presentation states that "[t]he contents of this presentation reflect financial and operating information through the period ended September 30, 2017" (Ex. DD at cover n.1), *i.e.*, before any non-renewals of IMTT contracts are alleged to have occurred.

*approximating actual intent, and not merely a heightened form of negligence.*"  *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109-10 (2d Cir. 2009) (citation omitted).  If motive to commit fraud has not been shown, "the strength of the circumstantial allegations must be correspondingly greater."  *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (citation omitted).[27]

### 1.    Plaintiff fails to plead that MIC or the Management Defendants had a motive to commit fraud

To raise a strong inference of scienter through the "motive and opportunity" prong, plaintiff must allege that the Management Defendants "benefitted in some concrete and personal way from the purported fraud."  *ECA*, 553 F.3d at 198 (citation omitted).  "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry."  *Id.*   Critically, none of the Management Defendants are alleged to have sold *any*, let alone a material amount of, MIC stock during the class period, which demonstrates that they lacked any motive to commit fraud.  *See Rombach*, 355 F.3d at 177 (no motive established where plaintiffs failed to allege "that defendants sold stock or profited in any way during the relevant period"); *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 462 (S.D.N.Y. 2000) ("[S]ignificantly, the individual defendants had nothing to gain from making the alleged misrepresentations.  They sold no shares during the class period.").

Plaintiff instead attempts to plead motive and opportunity by alleging that MIMUSA's fee structure somehow incentivized MIC to inflate its share price in order to generate the highest possible fees for MIMUSA.  Compl. ¶¶304-06.  Quite the contrary.  MIMUSA's contractual fee

---

[27] Prior to the passage of the PLSRA, a plaintiff could allege scienter as to individual defendants and the company if the misleading statements and/or omissions related to a core operation of the company.  *See Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989).  "However, since the enactment of the PSLRA, the Second Circuit has expressed doubt as to whether the core operation doctrine has survived."  *Pretium*, 256 F. Supp. 3d at 473-74 (citing *Frederick v. Mechel OAO*, 475 F. App'x 353, 356 (2d Cir. 2012)).

structure was publicly disclosed and, during the class period, MIMUSA voluntarily reinvested the vast majority of its fees in new primary shares of MIC (*see* Ex. N at S-17 to S-18; Ex. II at 60), thus further aligning its interests with those of MIC shareholders.  Similarly unavailing is plaintiff's attempt to establish a strong inference of scienter by alleging that MIMUSA "realiz[ed] ... substantial financial benefits" from its sale of MIC stock during the Secondary Offering.  Compl. ¶307.  MIC, after all, would not announce lowered dividend guidance for more than a year following the Secondary Offering, during which time MIC's free cash flow *increased* and IMTT's tanks remained nearly fully leased out.  *See id.* ¶182.

Plaintiff's references to the importance that MIC's investors placed on its dividend and "free cash flow" (*Id.* ¶¶295-96) and the role that IMTT played in "achieving [MIC's] dividend growth" (*Id.* ¶297) are likewise insufficient to create a strong inference of scienter.  As noted above, "[m]otives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high … do not constitute 'motive' for purposes of this inquiry."  *ECA*, 553 F.3d at 198.

### 2. Plaintiff fails to plead that defendants engaged in conscious or reckless misbehavior

As noted above, conscious misbehavior encompasses deliberate illegal behavior, while "conscious recklessness" is "a state of mind approximating actual intent, and not merely a heightened form of negligence."  *S. Cherry St.*, 573 F.3d at 109-10 (emphasis omitted).  Here, plaintiff attempts to meet this standard by suggesting that certain statements made during the class period – pertaining, for instance, to the fluid composition of IMTT's customer base, the stability of IMTT's operating results, and IMTT's role as a "growth driver" for MIC – later turned out to

be wrong.  Compl. ¶¶284-86.[28]  This is woefully insufficient.  *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 188 (2d Cir. 2014) ("We do not recognize allegations of 'fraud by hindsight.'"); *In re Corning Inc. Sec. Litig.*, No. 04-cv-2845, 2005 WL 714352, at *1 (2d Cir. Mar. 30, 2005) ("This court has repeatedly held that a company need not be clairvoyant, nor does it have to take an overly pessimistic view of its business.").

Nor are the allegations attributed to certain unnamed "former employees" – including, for example, that (i) "IMTT was not where it wanted to be as far as customers buying storage" due to "industry trends" (Compl. ¶100); (ii) Management Defendants had "direct and personal involvement in IMTT's operations" (*id.* ¶288); (iii) contract non-renewals "would have been available to the [Management] Defendants immediately" (*id.* ¶287); and (iv) certain Management Defendants "occasionally participated" in meetings "during which any abnormalities in IMTT's storage tanks' throughput would be discussed" and had "constant contact with customers, contracts, and trends" (*id.* ¶290) – sufficient to establish a strong inference of scienter.  Such allegations are the sort of "[g]eneric and conclusory allegations based upon ... conjecture [that] are undisputedly insufficient to satisfy the heightened pleading standard of 15 U.S.C. §78u-4(b)(1)." *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 140 (D. Conn. 2007); *see In re Federated Dep't Stores, Inc. Sec. Litig.*, No. 00 CV 6362, 2005 WL 696894, at *5 (S.D.N.Y. Mar. 25, 2005) (allegations that policies "were discussed in some unspecified manner is not a fact constituting

---

[28] Plaintiff does not (and cannot) allege that these statements were false when made.  For example, Mr. Courtney's statement in May of 2016 that IMTT has "few other customers" than "major oil companies, major chemical companies, utilities [and] major agricultural companies" is not inconsistent with the statement – made two years later – that IMTT's customers include a "meaningful contingent" of commodity traders. Compl. ¶285. That is particularly so where the later statement reiterated that "a substantial majority of IMTT customers are system players." *Id.* ¶ 209.  Furthermore, for the reasons stated above in Section I.A.3, plaintiff has not pled any sort of "contradiction" between statements made in November 2017 and later in May 2018 regarding the percentage of No. 6 oil stored by IMTT.  And, as discussed above at 21 n.20, plaintiff's speculative argument that IMTT's utilization rate "must have" started to decline on October 25, 2017 is factually inaccurate, is not supported by particularized factual allegations, and should not be credited by this Court.

strong circumstantial evidence that [d]efendants acted recklessly," and such "vague allegations of 'discussions' do not support an inference that Defendants had access to specific information contradicting their public statements"); *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 591 (S.D.N.Y. 2011) ("[C]onfidential source allegations must show that individual defendants actually possessed the knowledge highlighting the falsity of public statements; conclusory statements that defendants 'were aware' of certain information, and mere allegations that defendants 'would have' or 'should have' had such knowledge is insufficient.").[29]   Plaintiff's failure to plead facts giving rise to a strong inference of scienter provides an independent basis to dismiss its Exchange Act claims.[30]

### C.   Plaintiff Fails Adequately To Plead Loss Causation

Even assuming the Complaint adequately pleaded some actionable misstatement or omission *and* a strong inference of scienter (which, as shown above, it does not), plaintiff's Section 10(b) claim would still be subject to dismissal for yet a third independent reason: the failure to plead loss causation.  As the Supreme Court held in *Dura Pharmaceuticals, Inc. v. Broudo*, the PSLRA "expressly imposes on plaintiffs 'the burden of proving' that defendants' misrepresentations 'caused the loss for which the plaintiff seeks to recover.'" 544 U.S. 336, 345-46 (2005) (quoting 15 U.S.C. §78u-4(b)(4)).  To satisfy this requirement, a plaintiff must allege

---

[29] Neither FE-3, FE-4 nor FE-5 are alleged to have had any direct contact with any Management Defendant, "rendering [plaintiff's] scienter allegations insufficient as a matter of law." *Janbay v. Canadian Solar, Inc.*, No. 10 Civ. 4430, 2013 WL 1287326, at *11 (S.D.N.Y. Mar. 28, 2013).  And any alleged interactions that FE-1 or FE-2 had, in their professional capacities, with any Management Defendant occurred outside the class period (Compl. Ex. A), and cannot speak to the any defendant's state of mind during the class period.  *See Malin*, 499 F. Supp. 2d at 141 (confidential-witness allegations insufficient where they "relate[] to the time prior to the start of the Class Period").

[30] Plaintiff's remaining attempts to allege scienter likewise fail.  The Complaint alleges no specific facts indicating that MIC's purchase of Epic Midstream in August 2017 (Compl. ¶¶298-99) reflected anything other than an attempt to diversify its business profile.  Equally irrelevant for these purposes is the fact that Mr. Hooke, an Australian who had spent the previous 11 years in the U.S. (including eight years as MIC's CEO), announced in September 2017 – five months before the end of the class period – that he would be resigning as MIC's CEO to return home to Australia to become CEO of an Australian public company (*id.* ¶310).  *See* Ex. Y at Ex. 99.1.

(and ultimately prove) that the "facts" underlying a purported misrepresentation or omission were subsequently revealed – *i.e.*, that there was a corrective disclosure – and that this revelation caused a drop in the stock price during the time the plaintiff owned its shares. *Id.* at 347. In other words, the plaintiff must plead that "the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss." *See id.* at 347.

"[A] decline in stock price following a public announcement of 'bad news' does not, without more, demonstrate loss causation." *Okla. Firefighters*, 951 F. Supp. 2d at 503-04 (citing *Leykin v. AT & T Corp.*, 423 F. Supp. 2d 229, 245 (S.D.N.Y. 2006); *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 261, 266 (S.D.N.Y. 2005) (disclosures that have "a *negative* effect on stock prices, but not a *corrective* effect" do not satisfy *Dura*). Rather, a plaintiff must plead that "the truth became known" and a corrective disclosure entered the market, or that the risks concealed by a defendant's omission materialized, causing a stock price drop from which the plaintiff claims a loss. *Dura*, 544 U.S. at 346-47; *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005). Where "the connection [between the loss and the alleged misstatement or omission] is attenuated … a fraud claim will not lie." *Lentell*, 396 F. 3d at 174.

Here, MIC's announcements in late February 2018 regarding dividend guidance and the need to repurpose some of IMTT's storage tanks did not reveal the truth underlying any prior misstatement, let alone a fraud. And, as discussed above, the allegedly concealed risks at issue here had in fact been disclosed all along. *See supra* at 6-9. To be sure, what was announced in February 2018 was viewed as "bad news" by MIC investors, but that is insufficient to establish – or even plead – loss causation. *See Okla. Firefighters*, 951 F. Supp. 2d at 503-04; *Initial Pub. Offering*, 399 F. Supp. 2d at 266.

### D.    Plaintiff Fails To Allege "Control Person" Liability Under Section 20(a)

The Management Defendants incorporate by reference the arguments advanced by

MIMUSA concerning plaintiff's claim under Section 20(a).  Plaintiff's Section 20(a) claims against the Management Defendants must be dismissed because plaintiff has failed adequately to allege (i) a primary violation of Section 10(b) and Rule 10b-5, (ii) culpable participation by any, let alone each, of the Management Defendants in the alleged fraud, or (iii) actual control.[31]

## II.   PLAINTIFF'S SECURITIES ACT CLAIMS SHOULD BE DISMISSED

Plaintiff also asserts claims under Sections 11, 12(a)(2) and 15 of the Securities Act based on alleged misstatements and omissions in the Offering Documents issued in connection with MIC's November 2016 Secondary Offering.  *See* Compl. ¶¶352-65.  In a thinly-veiled attempt to separate these claims from those asserted under the Exchange Act, plaintiff alleges that had the defendants conducted a "reasonable investigation" or exercised "reasonable care," they would have discovered material misstatements or omissions in the Offering Documents.  Compl. ¶¶366-68.  Even if the Court determines that these claims sound in negligence – which they do not – the Securities Act claims still must fail as plaintiff does not adequately plead, under any standard, that the Offering Documents contained materially false or misleading statements.

### A.   Plaintiff's Securities Act Claims Sound In Fraud And Therefore Must Be Pled With Particularity, Which They Are Not

The essence of plaintiff's claims, under both the Exchange Act and the Securities Act, is that defendants "concealed [IMTT's] reliance" on No. 6 oil in the face of impending "brutal changes" to the market.  *E.g.*, Compl. ¶1.  These claims plainly "sound in fraud" and therefore must satisfy Rule 9(b)'s particularity requirements.  *See, e.g.*, *Rombach*, 355 F.3d at 171; *Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 198 (2d Cir. 2013).[32]

---

[31] Plaintiff's allegations of control person liability against Mr. Courtney, who is not even alleged to have worked for MIC (*see* Compl. ¶33), are particularly insufficient.

[32] Plaintiff attempts to sidestep this conclusion by purporting to disclaim "any allegations of fraud or intentional misconduct" (Compl. ¶¶336, 352), despite otherwise outright alleging fraud and intentional misconduct throughout the Complaint.  Such boilerplate disclaimers are ineffectual and serve only to underscore that

Application of Rule 9(b)'s heightened pleading standard to claims under Sections 11 and 12 requires, as a threshold matter, that plaintiff "demonstrate[s], *with particularity,* (1) that the [Offering Documents] contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment." *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1027-28 (9th Cir. 2005) (emphasis added) (internal quotation marks omitted); *see also Cozzarelli* v. *Inspire Pharms., Inc.,* 549 F.3d 618, 629 (4th Cir. 2008) (where Rule 9(b) applies to a claim under Section 11 or 12, the plaintiff is required to "explain[] with the necessary particularity why the statements [in the offering materials] were false or misleading"). As demonstrated above and below, plaintiff fails to adequately plead any of these elements with the requisite particularity.

## B.      Plaintiff Has Not Sufficiently Pled Its Standing To Assert Securities Act Claims

Plaintiff's Securities Act claims should be dismissed as a threshold matter based on plaintiff's failure adequately to allege its own standing to assert them. Section 12(a)(2) provides that a seller shall be liable only "to the person purchasing such security *from him*." 15 U.S.C. §77*l*(a) (emphasis added). Interpreting that provision, the Supreme Court has held that Section 12(a)(2) liability is limited to public offerings and does not extend to a "private or secondary sale." *See Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 578, 582 (1995); *Yung v. Lee*, 432 F.3d 142, 149 (2d Cir. 2005). In other words, only plaintiffs who purchased securities directly in the Secondary Offering, and not in the aftermarket, may properly assert a Section 12(a)(2) claim.

---

plaintiff's scienter allegations are baseless. *See, e.g.*, *Rombach*, 355 F.3d at 172 (rejecting "effort to characterize claims by the label used in the pleading" because "[t]hese nominal efforts are unconvincing where the gravamen of the complaint is plainly fraud" and "the wording and imputations of the complaint are classically associated with fraud [such as] that the Registration statement was 'inaccurate and misleading'"); *Ladmen Partners, Inc. v. Globalstar, Inc.*, No. 07 Civ. 0976 (LAP), 2008 WL 4449280, at *11 n.10 (S.D.N.Y. Sept. 30, 2008) (applying Rule 9(b) despite "boilerplate disclaimer" that allegations did not sound in fraud).

Although a plaintiff who purchased shares in the aftermarket may, by contrast, have standing to sue under Section 11, it must be able to specifically "trace [its] shares back to the relevant offering." *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1106 (9th Cir. 2013); *see In re Ariad Pharm., Inc. Sec. Litig.*, 842 F.3d 744, 755 (1st Cir. 2016). Where, as here, "a company has issued shares under more than one registration statement, the plaintiff must prove that [its] shares were issued under the allegedly false or misleading registration statement, rather than some other registration statement." *Century*, 729 F.3d at 1106; *see Ariad.*, 842 F.3d at 755. Multiple circuit courts of appeals have held that, with the Supreme Court's elimination of pure notice pleading, a plaintiff can no longer plead Section 11 standing by alleging merely that it purchased shares "traceable" to a particular offering. *See Century*, 729 F.3d at 1107-08 (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Twombly*, 550 U.S. 544); *Ariad.*, 842 F.3d at 755-56.

Here, plaintiff alleges that it purchased "18,800 shares of Macquarie common stock *traceable* to the Offering." Compl. ¶27 (emphasis added). This is insufficient to establish standing under either Section 11 or 12(a)(2). *See Freidus v. Barclays,* 734 F.3d 132, 141 (2d Cir. 2013); *In re UBS AG Sec. Litig,* No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *27 (S.D.N.Y. Sept. 28, 2012); *see also Century*, 729 F.3d at 1107-08; *Ariad.*, 842 F.3d at 755-56. This provides a threshold, independent basis to dismiss all of plaintiff's Securities Act claims.

### C.    Plaintiff Has Failed To Plead An Actionable Misstatement Or Omission

The Court should also dismiss plaintiff's Section 11 and 12(a)(2) claims for failure to plead an actionable misstatement or omission in the Offering Documents themselves. *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010). This is true regardless of the applicable pleading standard.[33]

---

[33] The same test for materiality applies under either the Securities Act or the Exchange Act, and the "bespeaks caution" doctrine applies to both. *See Johnson*, 2013 WL 214297, at *9; *see also see also* 15 U.S.C. § 77z-

The alleged misstatements and omissions purportedly contained in the Offering Documents are substantially identical to those that form the basis for Plaintiff's Exchange Act claims. *Compare* Compl. ¶¶354, 357, 359, 361, *with id.* ¶¶269, 271, 273, 275.  For the reasons stated above in Section I.A, those alleged misstatements and omissions are inactionable as a matter of law.[34]  If anything, plaintiff's Securities Act claims are even more attenuated, resting as they do on the illogical notion that any reasonable investigation should – or even could – have alerted defendants *in the fall of 2016* to what they did not know (and could not have known) would happen until December 2017 and January 2018, let alone how MIC's dividend policy would be impacted thereby.  Plaintiff's Securities Act claims should, accordingly, be dismissed.

### D.      Plaintiff Has Not Alleged That MIC Was A Statutory Seller

Plaintiff's Section 12(a)(2) claim is subject to dismissal for yet another independent reason. To state a claim under that provision, a plaintiff must allege with particularity that it bought the security from a "statutory seller."  *See, e.g.*, *In re BioScrip, Inc. Sec. Litig,* No. 13-cv-6922 (AJN), 2015 WL 1501620, at *28 (S.D.N.Y. Mar. 31, 2015).  A defendant qualifies as a statutory seller only if it: "(1) passed title, or other interest in the security, to the buyer for value, or (2) successfully solicit[ed] the purchase [of a security], motivated at least in part by desire to serve his own financial interests or those of the securities' owner."  *Perry v. Duoyuan Printing,* No. 10-cv-7235, 2013 WL

---

2(i)(1); *Backhaus v. Streamedia Commc'ns, Inc.*, No. 01 Civ. 4889 (LMM/THK), 2002 WL 1870272, at *4 (S.D.N.Y. Aug. 14, 2002).  Even if the Court were to find that the Securities Act claims sound in negligence, plaintiff still fails to plead that any possible investigation or exercise of "reasonable care" would have alerted defendants to a misstatement or omission in the Offering Documents.  *See Rombach v. Chang*, No. 00 CV 0958 (SJ), 2002 WL 1396986, at *14 (E.D.N.Y. June 7, 2002), *aff'd*, 355 F.3d 164 (2d Cir. 2004).

[34] The Offering Documents contained their own risk disclosures and cautionary language.  *See, e.g.*, Ex. N at S-13 ("[W]e are dependent upon the ability of our businesses to make distributions to our Company to enable it to . . . pay dividends to stockholders in the future.  The ability of our operating subsidiaries and the businesses we own to make distributions to our Company is subject to limitations based on their operating performance."), S-14 ("Many factors that are beyond our control may significantly affect the market price and marketability of our common stock.... These factors include, but are not limited to, ... changes in regulatory policies[.]").

4505199, at *12 (S.D.N.Y. Aug. 22, 2013) (quoting *Pinter v. Dahl,* 486 U.S. 622, 642, 647 (1988)).

Here, plaintiff alleges in only the most conclusory fashion that "[MIC] and Barclays were sellers, offerors, and solicitors of sales of the securities offered using the Offering Documents in the Offering." Compl. ¶386.  The Complaint, however, offers no factual allegations to support this conclusion.  Nor could it.  As the Prospectus establishes, MIMUSA was the sole selling shareholder in the Offering.  *See* Ex. N at cover page, S-17.  Regardless, it is well-settled that such "bald allegations of solicitation are insufficient to sustain [defendant's] liability as a 'seller'" under Section 12(a)(2).  *In re Deutsche Telekom AG Sec. Litig.*, No. 00 Civ. 9475 (SHS), 2002 WL 244597, at *5 (S.D.N.Y. Feb. 20, 2002) (dismissing Section 12(a)(2) claim where "there is no factual allegation that [defendant] had direct contact with any plaintiff … [nor any] factual allegation of specific conduct on the part of [defendant] to solicit purchases of the security").  Accordingly, the Complaint fails adequately to allege that MIC acted as a statutory seller, providing another independent basis for dismissal of plaintiff's Section 12(a)(2) claim.

### E.     Plaintiff's Claim Under Section 15 Should Be Dismissed

The Individual Defendants incorporate the arguments advanced by MIMUSA regarding plaintiff's Section 15 claim.

### CONCLUSION

For the reasons stated above, the Complaint should be dismissed in its entirety.

Dated:  April 22, 2019                              Respectfully submitted,

                                                                  **WINSTON & STRAWN LLP**

                                                                  _ s/ John E. Schreiber           _
                                                                  Richard W. Reinthaler
                                                                  John E. Schreiber
                                                                  Kerry C. Donovan
                                                                  Frank S. Restagno
                                                                  200 Park Avenue

New York, New York 10166
Telephone: (212) 294-6700
Facsimile:  (212) 294-4700
rreinthaler@winston.com
jschreiber@winston.com
kcdonovan@winston.com
frestagno@winston.com

*Attorneys for Macquarie Infrastructure
Corporation and the Individual Defendants*