**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CITY OF RIVIERA BEACH GENERAL EMPLOYEES RETIREMENT SYSTEM, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MACQUARIE INFRASTRUCTURE CORPORATION, et al.<br><br>Defendants. | Case No. 1:18-cv-03608-VSB |

**LEAD PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN**
**OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

Date: June 21, 2019

**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**

Salvatore J. Graziano
Lauren A. Ormsbee
Jesse L. Jensen
James M. Fee
1251 Avenue of the Americas
New York, NY 10020
Tel:    (212) 554-1400
Fax:    (212) 554-1444
salvatore@blbglaw.com
lauren@blbglaw.com
jesse.jensen@blbglaw.com
james.fee@blbglaw.com

*Counsel for Lead Plaintiff Moab Partners, L.P., and*
*Lead Counsel for the Class*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................................................... iii

PRELIMINARY STATEMENT .................................................................................................... 1

STATEMENT OF FACTS ............................................................................................................ 6

    A.    Defendants Emphasize Macquarie's "Boringly Predictable" and "Unsexy Business Model," Fueled By IMTT .......................................................................... 6

    B.    Defendants Conceal IMTT's Exposure to a Coming "Paradigm Shift" in the No. 6 Fuel Oil Market Through IMO 2020 ............................................................. 8

        1.    The No. 6 fuel oil market faces "brutal changes." ....................................... 8

        2.    Defendants mislead investors about IMTT's reliance on No. 6 fuel oil. .............................................................................................................. 9

        3.    Macquarie Management sells $235 million of its own holdings through an Offering immediately after IMO 2020 is confirmed. ............. 11

        4.    Defendants use stock to fund the Epic Acquisition. ................................. 12

        5.    Defendants mislead investors voicing concern over IMO 2020. .............. 15

    C.    The Truth Is Revealed ............................................................................................. 16

ARGUMENT ............................................................................................................................... 18

I.      THE COMPLAINT PLEADS CLAIMS UNDER THE EXCHANGE ACT ....................... 18

    A.    The Complaint Pleads Claims Under Section 10(b) ............................................. 18

        1.    The Complaint Pleads Actionable Misstatements and Omissions ............ 18

        2.    The Complaint Pleads Scienter ................................................................. 34

        3.    The Complaint Alleges Loss Causation ..................................................... 44

    B.    The Complaint Pleads Control Person Liability Under Section 20(a) ................... 45

        1.    The Complaint pleads control. ................................................................... 45

        2.    The Complaint pleads culpable participation. ........................................... 47

    C.    The Complaint Pleads Claims Under Exchange Act Section 20A. ...................... 47

        1.    The Complaint sufficiently pleads a predicate violation. ......................... 48

        2.     The Complaint sufficiently pleads contemporaneous trading. ................. 50

II.    THE COMPLAINT PLEADS CLAIMS UNDER THE SECURITIES ACT ...................... 51

      A.    The Securities Act Claims Are Not Subject To Heightened Standards................ 51

      B.    The Complaint Pleads Claims Under Securities Act Sections 11 and 12(a)(2). ............................................................................................................. 52

      C.    The Complaint Pleads Control Person Liability Under Section 15. ..................... 54

      D.    Defendants' Other Securities Act Arguments Fail ............................................... 54

            1.     Lead Plaintiff has standing........................................................................ 54

            2.     Macquarie is a statutory seller. ................................................................. 55

CONCLUSION............................................................................................................................. 56

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re Alstom SA Sec. Litig.*,
    406 F. Supp. 2d 433 (S.D.N.Y. 2005)................................................................................46, 47

*In re APAC Teleservice, Inc. Sec. Litig.*,
    1999 WL 1052004 (S.D.N.Y. Nov. 19, 1999)....................................................................28, 48

*Argent Classic Convertible Arbitrage Fund L.P. v. Countrywide Fin. Corp.*,
    2009 WL 8572340 (C.D. Cal. Mar. 19, 2009).........................................................................11

*Balestra v. ATBCOIN LLC*,
    2019 WL 1437160 (S.D.N.Y. Mar. 31, 2019)..........................................................................56

*In re Bear Stearns Cos., Inc. Sec., Deriv., and ERISA Litig.*,
    763 F. Supp. 2d 423 (S.D.N.Y. 2011)...............................................................29, 34, 48, 51

*Billhofer v. Flamel Tech., SA*,
    663 F. Supp. 2d 288 (S.D.N.Y. 2009).......................................................................................44

*In re BioScrip, Inc. Sec. Litig.*,
    95 F. Supp. 3d 711 (S.D.N.Y. 2015)...................................................................20, 30, 54, 55

*Citiline Holdings, Inc. v. iStar Fin. Inc.*,
    701 F. Supp. 2d 506 (S.D.N.Y. 2010)................................................................................45, 53

*City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*,
    423 F. Supp. 2d 348 (S.D.N.Y. 2006).......................................................................................28

*City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*,
    814 F. Supp. 2d 395 (S.D.N.Y. 2011)................................................................................35, 52

*Cornwell v. Credit Suisse Grp.*,
    689 F. Supp. 2d 629 (S.D.N.Y. 2010).......................................................................................41

*Darquea v. Jarden Corp.*,
    2007 WL 1610146 (S.D.N.Y. May 31, 2007) .....................................................................20, 36

*DeMaria v. Andersen*,
    318 F.3d. 170 (2d Cir. 2003).....................................................................................................54

*In re Deutsche Bank AG Sec. Litig.*,
    328 F.R.D. 71 (S.D.N.Y. 2018) ................................................................................................50

*In re Deutsche Telekom AG Sec. Litig.*,
    2002 WL 244597 (S.D.N.Y. Feb. 20, 2002).............................................................................56

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JPMorgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)......................................................................................................36

*Ellison v. Am. Image Motor Co., Inc.*,
  36 F. Supp. 2d 628 (S.D.N.Y. 1999).........................................................................................36

*In re EVCI Colleges Holding Corp. Sec. Litig.*,
  469 F. Supp. 2d 88 (S.D.N.Y. 2006).........................................................................................35

*Fed. Hous. Fin. Ag. for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*,
  873 F.3d 85 (2d Cir. 2017)...................................................................................................55, 56

*In re Federated Dep't Stores, Inc. Sec. Litig.*,
  2005 WL 696894 (S.D.N.Y. Mar. 25, 2005) ............................................................................41

*Freidus v. Barclays Bank PLC*,
  734 F.3d 132 (2d. Cir. 2013).....................................................................................................55

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*,
  268 F. Supp. 3d 526 (S.D.N.Y. 2017).................................................................37, 49, 50, 52

*Freudenberg v. E*Trade Financial Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010).............................................................................. passim

*Galestan v. OneMain Holdings, Inc.*,
  348 F. Supp. 3d 282 (S.D.N.Y. 2018)..................................................................................26, 41

*Ganino v. Citizens Util. Co.*,
  228 F.3d 154 (2d Cir. 2000)..................................................................................................23, 27

*In re Hi-Crush Partners L.P. Sec. Litig.*,
  2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ...............................................................45, 46, 47

*Indiana Pub. Retirement Sys. v. SAIC, Inc.*,
  818 F.3d 85 (2d Cir. 2016)........................................................................................................19

*In re Initial Pub. Offering Sec. Litig.*,
  241 F. Supp. 2d 281 (S.D.N.Y. 2003)........................................................................................52

*Japan Halon Co., Ltd. v. Great Lakes Chem. Corp.*,
  155 F.R.D. 626 (N.D. Ind. 1993)...............................................................................................48

*Jayne v. Royal Jordanian Airlines Corp.*,
  502 F.Supp. 848 (S.D.N.Y. 1980) .............................................................................................48

*Kalin v. Xanboo, Inc.*,
  526 F. Supp. 2d 392 (S.D.N.Y. 2007)........................................................................................46

*Ladmen Partners, Inc. v. Globalstar, Inc.*,
  2008 WL 4449280 (S.D.N.Y. 2008) ........................................................................... 52

*Lapin v. Goldman Sachs Grp., Inc.*,
  506 F. Supp. 2d 221 (S.D.N.Y. 2006) .................................................................. 23, 27

*In re Lehman Bros. Mortg.-Backed Sec. Litig.*,
  650 F.3d 167 (2d Cir. 2011) ....................................................................................... 54

*In re Lehman Bros. Sec. and ERISA Litig.*,
  799 F. Supp. 2d 258 (S.D.N.Y. 2011) ....................................................................... 55

*Lipow v. Net1 UEPS Tech., Inc.*,
  131 F. Supp. 3d 144 (S.D.N.Y. 2015) .................................................................. 20, 26

*Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*,
  363 F. Supp. 3d 476 (D. Del. 2019) .......................................................................... 30

*Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015) ....................................................................................... 23

*In re Lululemon Sec. Litig.*,
  14 F. Supp. 3d 553 (S.D.N.Y. 2014) ......................................................................... 22

*Malin v. XL Capital Ltd.*,
  499 F. Supp. 2d 117 (D. Conn. 2007) ....................................................................... 41

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ..................................................................................................... 20

*In re MBIA, Inc., Sec. Litig.*,
  700 F. Supp. 2d 566 (S.D.N.Y. 2010) .................................................................. 22, 26

*Medina v. Tremor Video, Inc.*,
  640 Fed. App'x. 45 (2d Cir. 2016) ............................................................................. 20

*Meyer v. Jinkosolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014) ....................................................................................... 20

*In re MF Global Holdings Ltd. Sec. Litig.*,
  982 F. Supp. 2d 277 (S.D.N.Y. 2013) .................................................................. 26, 55

*Monroe Cty. Emps.' Ret. Sys. v. YPF Sociedad Anonima*,
  15 F. Supp. 3d 336 (S.D.N.Y. 2014 .......................................................................... 26

*In re Mylan N.V. Sec. Litig.*,
  2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) ................................................. 20, 26, 39

*N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*,
709 F.3d 109 (2d Cir. 2013)...............................................................................................24, 51

*Nakahata v. New York-Presbyterian Healthcare System, Inc.*,
723 F.3d 192 (2d Cir. 2013).......................................................................................................52

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
455 Fed. App'x. 10 (2d Cir. 2011)..............................................................................30, 39, 42

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)................................................................................................28, 34

*O'Connor & Assocs. v. Dean Witter Reynolds, Inc.*,
559 F. Supp. 800 (S.D.N.Y. 1983) .............................................................................................51

*Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp.*,
951 F. Supp. 2d 479 (S.D.N.Y. 2013).........................................................................................45

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
135 S. Ct. 1318 (2015)..............................................................................................30, 31, 32

*In re Oxford Health Plans, Inc.*,
187 F.R.D. 133 (S.D.N.Y 1999) ..........................................................................................46, 51

*In re Parmalat Sec. Litig.*,
594 F. Supp. 2d 444 (S.D.N.Y. 2009).........................................................................................36

*Patriot Expl., LLC v. SandRidge Energy, Inc.*,
951 F. Supp. 2d 331 (D. Conn. 2013).........................................................................................29

*Pearlstein v. Blackberry Ltd.*,
2018 WL 1444401 (S.D.N.Y. Mar. 19, 2018) ...........................................................................31

*In re Pfizer Inc. Sec. Litig.*,
584 F. Supp. 2d 621 (S.D.N.Y. 2008).........................................................................................51

*In re Pretium Res. Inc. Sec. Litig.*,
256 F. Supp. 3d 459 (S.D.N.Y. 2017)............................................................................... passim

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
930 F. Supp. 68 (S.D.N.Y. 1996) ...............................................................................................29

*In re Refco, Inc. Sec. Litig.*,
503 F. Supp. 2d 611 (S.D.N.Y. 2007)............................................................................... passim

*Ressler v. Liz Claiborne, Inc.*,
75 F. Supp. 2d 43 (E.D.N.Y. 1998) ............................................................................................49

*Rothman v. Gregor*,
  220 F.3d 81 (2d Cir. 2000)........................................................................................36

*Rowell v. Shell Chemical, L.P.*,
  2015 WL 7306435 (E.D. La. Nov. 18, 2015) ...................................................36, 39

*In re Salix Pharm., Ltd.*,
  2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)............................................33, 39, 42

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001)...................................................................................39, 50

*In re Scottish Grp. Sec. Litig.*,
  524 F. Supp. 2d 370 (S.D.N.Y. 2007)......................................................................42

*Seven Seas Cruises S. De R.L. v. V. Ships Leisure SAM*,
  2011 WL 13220299 (S.D. Fla. June 21, 2011) ........................................................48

*Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  495 F.2d 228 (2d Cir. 1974)......................................................................................51

*Sharette v. Credit Suisse Int'l*,
  127 F. Supp. 3d 60 (S.D.N.Y. 2015).........................................................................18

*Sheet Metal Workers Local 32 Pension Fund v. Terex Corp.*,
  2018 WL 1587457 (D. Conn. Mar. 31, 2018) ...................................................41, 42

*In re Sierra Wireless, Inc. Sec. Litig.*,
  482 F. Supp. 2d 365 (S.D.N.Y. 2007)......................................................................28

*In re Signet Jewelers Ltd. Sec. Litig.*,
  2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018)............................................31, 40, 44

*In re SLM Corp. Sec. Litig.*,
  740 F. Supp. 2d 542 (S.D.N.Y. 2010)......................................................................36

*Stevelman v. Alias Res. Inc.*,
  174 F.3d 79 (2d Cir. 1999)..................................................................................38, 49

*In re SunEdison, Inc. Sec. Litig.*,
  329 F.R.D. 124 (S.D.N.Y. 2019) ..............................................................................54

*In re Take-Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008).................................................................49, 51

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)...................................................................................................34

*Turocy v. El Pollo Loco Holdings, Inc.*,
   2018 WL 3343493 (C.D. Cal. July 3, 2018)............................................................................51

*U.S. v. Bestfoods*,
   524 U.S. 51 (1998).................................................................................................................46

*United States v. Restrepo*,
   986 F.2d 1462 (2d Cir. 1993)..................................................................................................30

*In re Vivendi Universal, S.A. Sec. Litig.*,
   381 F. Supp. 2d 158 (S.D.N.Y. 2003)..............................................................................27, 37

*Weintraub v. Texasgulf Inc.*,
   564 F. Supp. 1466, 1470 (S.D.N.Y. 1983).............................................................................46

*Wilson v. Comtech Telecommc'ns. Corp.*,
   648 F.2d 88 (2d Cir. 1981)......................................................................................................51

**STATUTES**

15 U.S.C. § 78t–1(a) ......................................................................................................................47

Lead Plaintiff Moab Partners, L.P. respectfully submits this omnibus memorandum of law in opposition to Defendants' motions to dismiss.[1]

## PRELIMINARY STATEMENT

During the Class Period (February 22, 2016 through February 21, 2018), Defendants actively concealed that Macquarie's most important operating segment, International-Matex Tank Terminals ("IMTT"), depended heavily on revenue from the storage of "No. 6 fuel oil," a high-sulfur heavy and residual fuel oil. By no later than October 2008, when regulations known as "IMO 2020" were adopted, Defendants knew that the market for No. 6 fuel oil would be essentially eliminated by the year 2020. Yet, Defendants actively concealed Macquarie's exposure to IMO 2020 by removing all references to the Company's reliance on this commodity from their public statements by the start of the Class Period. Moreover, Defendants repeatedly misrepresented the stability of IMTT's business, claiming that IMTT was not "sensitive to what is going on" in the fuel oil market and was "simply not [a] macroeconomically sensitive enterprise." Defendants profited heavily from these material misrepresentations and omissions. In November 2016, just days after IMO 2020 was reaffirmed to proceed on schedule, Defendant Macquarie Management, the Company's controlling manager, earned nearly $235 million from selling 40% of its Macquarie holdings in a secondary public offering. After years of deception—and only after the surprise departure of longtime CEO, Defendant Hooke—the Company's new management finally disclosed Macquarie's heavy reliance on No. 6 fuel oil when it announced that it was slashing its

---

[1] Consistent with the Court's April 17, 2019 Order (ECF No. 98), this omnibus opposition addresses the motions to dismiss filed by Defendants Macquarie Infrastructure Corporation ("Macquarie" or the "Company") and the Individual Defendants (with Macquarie, the "Macquarie Defendants") (ECF No. 100) and by Macquarie Infrastructure Management (USA) ("Macquarie Management") (ECF No. 102), as well as the Notice of Joinder filed by Defendant Barclays. (ECF. No. 105.) Because Defendants' briefs collectively totaled 56 pages, this Opposition may likewise be up to 56 pages in length. References to "¶" refer to the Consolidated Class Action Complaint (ECF No. 56) (the "Complaint"); references to "MIC _" refer to the Macquarie Defendants' brief; and "MIMUSA _" refer to Macquarie Management's brief. Unless otherwise noted, all emphasis is added, and internal citations or quotes are omitted.

"sacrosanct" dividend due to the cancellation of a material number of No. 6 fuel oil contracts, which forced the Company to devote hundreds of millions of dollars to repurpose the otherwise unusable storage tanks. The market reacted with shock: Macquarie's stock dropped 41% in a single day, wiping out over $2 billion in shareholder value.

The Complaint more than adequately alleges that Defendants defrauded Macquarie's investors by publicly misrepresenting IMTT as "boringly predictable" in a "volatile and excited" world and claiming that IMTT had "flexibility" and "optionality" in its tanks to weather any changes in the bulk liquid storage markets, while concealing its heavy exposure to No. 6 fuel oil. These statements were false and misleading: Defendants alone knew the extent of IMTT's dependence on the demand for No. 6 fuel oil storage and that the looming decimation of the No. 6 fuel oil market as a result of IMO 2020 would result in lost revenue and significant capital expenditures to repurpose its No. 6 fuel oil tanks.

Moreover, Defendants' concealment was deliberate. In 2012, Defendant Hooke directly addressed the "uncertainty" in the "demand for storage of heavy oil residual product" (i.e., No. 6 fuel oil), but told investors that "it would be in IMTT's long-term best interests to convert a portion of the residual oil storage at Bayonne [IMTT's second largest facility] to clean product storage . . . from *residual oil or six oil*." Thereafter, Defendants did not again discuss No. 6 fuel oil—until, just months before the end of the Class Period, they falsely claimed that IMTT stored "very little" "heavy oil" (a category including, but not limited to, No. 6 fuel oil).

Defendants' years of silence contrasted with their competitors. For example, in November 2016, one of IMTT's prior owners and now main competitor, Vopak, told its investors that IMO 2020's "implications for global imbalances of diesel and fuel oil" raised existential questions about the No. 6 fuel oil storage market. In contrast, Defendants fraudulently claimed there was "nothing

we see coming down the pipe" that could cause IMTT's utilization to fall below its historically normal levels—enabling Macquarie Management to cash out approximately 40% of its holdings for a nearly $235 million profit.

On February 21, 2018, Macquarie shocked the market by announcing that IMTT's performance had plummeted. In his first earnings call since replacing Defendant Hooke, Macquarie's new CEO Frost explained: "So what happened? ***The answer has to do with 6 Oil***." Investors learned that a material number of previously concealed No. 6 fuel oil storage contracts had been canceled as Macquarie's customers exited the dying market, including speculative commodity traders that Defendants had previously denied having as customers. Macquarie also announced that its dividends—which Defendants had repeatedly touted as a "sacrosanct" selling point—would be slashed to fund the hundreds of millions of dollars needed to repurpose the "obsolete" storage tanks. Macquarie's stock price fell over 41% in a single trading day.

In their motions, Defendants wrongly contend that this case primarily concerns alleged omissions of information that was known all along. MIC 2-3, 12-16. As an initial matter, the Complaint is replete with affirmative misrepresentations ***and*** omissions that deliberately concealed (a) the risks posed by Macquarie's dependence on revenue from No. 6 fuel oil; (b) IMTT's claimed immunity from market trends and fluctuations; and (c) the impending need to slash Macquarie's dividend to accommodate the hundreds of millions of dollars of capital expenditures necessary to repurpose No. 6 fuel oil tanks and the resulting lost revenues. *See* ¶¶227-78; *infra* Section I.A.1. Regardless, Defendants' "truth-on-the-market" defense fails. Defendants do not contest that: (1) IMTT was heavily reliant on No. 6 fuel oil storage contracts; (2) IMO 2020 was anticipated to cause "brutal changes" in the No. 6 fuel oil industry; (3) Defendants had not mentioned Macquarie's storage of No. 6 fuel oil since November 2012, when they had actually stated that

3

they would reduce IMTT's exposure in response to market trends; and (4) Macquarie's stock plunged 41% when Defendants finally disclosed the Company's exposure to the imploding market for No. 6 fuel oil. These uncontested allegations paint a clear case of securities fraud, yet Defendants audaciously argue that investors already fully knew the risk.

Ironically, Defendants' "truth-on-the-market" argument relies on blatantly false mischaracterizations of the truth. For example, Defendants claim multiple times that IMO 2020 was not "formally announced" until October 2016, "eight months after the start of the class period." *E.g.*, MIC 2, 7. But the truth, which is accurately stated in the Complaint, is that IMO 2020 had been adopted *eight years earlier*, in October 2008. ¶91. Defendants' primary argument is similarly flawed. Defendants claim that Macquarie disclosed its significant exposure to No. 6 fuel oil during the Class Period, but they rely entirely on an incomplete excerpt of a single sentence in Macquarie's 2016 and 2017 Forms 10-K which states in full context only that IMTT's large total storage capacity in certain of its terminals resulted in "substantial market share in the storage of black oil, bulk liquid chemicals and vegetable oils on the Lower Mississippi River"—which says nothing more than that IMTT's regional storage *capacity* made it a large player in that area, and facially says nothing about No. 6 fuel oil. MIC 2, 3, 6, 12. Without any basis, Defendants repeatedly insist that "black oil" and No. 6 fuel oil are synonymous; at best, No. 6 fuel oil could be considered part of the large family of "black oil"—but even then, before the Class Period, Defendants had told investors that they were converting *away* from No. 6 fuel oil, and during the Class Period Defendants actively misrepresented any indication otherwise. Thus, Defendants' decision to eliminate any mention of No. 6 fuel oil from their public statements was not only misleading, but clearly intentional. A list of these and other demonstrable false statements in

4

Defendants' motions is set forth in Exhibit B to the accompanying Declaration of Jesse L. Jensen, dated June 21, 2019. Defendants' other falsity arguments fare no better. *Infra* Section I.A.1.

Defendants' other arguments also fail. Considered holistically, the Complaint easily raises a strong inference of scienter at least as compelling as any non-fraudulent inference. Defendants do not dispute that they were "completely joined at the hip" with IMTT, and accordingly had access to, but chose not to disclose, the very large amount of No. 6 fuel oil stored in IMTT's tanks. Nor do Defendants meaningfully contest the numerous other *indicia* of scienter, including Macquarie Management's profit of nearly $235 million in insider sales and Defendant Hooke's abrupt resignation. *Infra* Section I.A.2. Defendants' loss causation argument borders on frivolous: there is a single corrective event, which Macquarie's new CEO specifically explained "has to do with 6 Oil" and caused a 41% stock price decline ***in a single trading day***—readily satisfying the pleading standards. *Infra* Section I.A.3. Further, Macquarie Management inexplicably claims it did not have control over Macquarie while quoting the management services agreement which expressly states that Macquarie Management "is responsible for MIC's day-to-day operations and affairs and oversight," and makes other arguments about Plaintiff's contemporaneous trading are simply wrong. *Infra* Sections I.B., I.C.

Throughout, Defendants misplace their reliance on this Court's decision in *In re Pretium Resources Inc. Securities Litigation*, which involved projections in an inherently risky business— a gold mine—where the defendants "spun the tale of El Dorado, touting . . . immense gold reserves and untold riches yet to be discovered." 256 F. Supp. 3d 459, 478 (S.D.N.Y. 2017). But, just like those who sought El Dorado, the *Pretium* defendants actually believed there to be such riches. This case represents the opposite: Defendants told the market that IMTT was "boringly predictable" and actively concealed Macquarie's substantial exposure to No. 6 fuel oil; and while the mine

touted in *Pretium* was still operational and the projections not yet proven false, *id.*, here Macquarie has admitted that its concealed exposure caused significant financial harm. ¶¶183-85.

## STATEMENT OF FACTS

### A.    Defendants Emphasize Macquarie's "Boringly Predictable" and "Unsexy Business Model," Fueled By IMTT

Macquarie operates several infrastructure businesses in different operating segments, which Defendants "actively managed" to deliver "growing streams of distributable cash flow that [they] then upstream to investors" through a quarterly dividend. ¶39. Defendant Hooke assured investors that these operating segments were "boringly predictable" even when "the world around us is volatile and excited"—"just the kind of unsexy business model we want." ¶38. By the start of the Class Period, Macquarie had posted nine consecutive quarters of dividend growth. This growth, according to Hooke, was "achieved despite the volatility in markets broadly and reinforces a basic premise of infrastructure—namely, that it is a more stable asset class." ¶41.

The market embraced Defendants' "unsexy business model." Since 2009, Macquarie's stock price had increased from $3.40 per share in 2009 to $62.83 per share at the start of the Class Period on February 22, 2016. ¶42. Just before the Class Period began, on January 11, 2016, J.P. Morgan wrote that "[a]mong all stocks under coverage MIC *remains a favorite*," as "MIC's portfolio of defensive businesses [i.e., IMTT] drives a predictable dividend stream . . . that should attract income-oriented investors seeking refuge from commodity price volatility." ¶43.

During the Class Period, IMTT was Macquarie's most important operating segment, providing the majority of the free cash flow that funded Macquarie's "predictable dividend stream." ¶43. Investors took note, reporting that "IMTT[] continues to play the biggest role in MIC growth" and "remain[s] the key driver of MIC's ongoing growth." ¶62.

IMTT is one of the largest third-party providers of bulk liquid storage and handling services in the United States. ¶63. Macquarie first became involved with IMTT in 2006, upon acquiring a 50% ownership stake. From the start, Macquarie controlled IMTT through "active day-to-day management" (¶75), with Hooke claiming in 2010 that Macquarie was "completely joined at the hip with" IMTT. ¶¶64-65. IMTT's former CFO from the 1970s until 2011 (FE-1) elaborated that Macquarie was "meticulous" in tracking IMTT's performance, and "knew in great detail" the terms of IMTT's contracts and what was stored in IMTT's tanks, relying in part on an on-site employee and an inventory system (known as "BLIS") that FE-1 had personally helped develop. ¶64. FE-1 also explained that IMTT provided Macquarie with an annual budget that included predictions for upcoming contract renewals, and that frequently Defendant Courtney—who "absolutely" had "constant contact with customers, contracts, and trends"—was directly involved in the preparation of these budgets. *Id.*

In July 2014, Macquarie paid an additional $1 billion to acquire total ownership and control over IMTT. ¶68. As Hooke later testified in an unrelated dispute concerning IMTT's St. Rose terminal, the "the success of IMTT following that transaction was probably the most important single event in [Macquarie's] history, other than probably its IPO . . . [i]t was pretty important for us . . . to actually take full control and ***see exactly what was going on in the business*** and implement the changes that we wanted to." ¶70. Among other things, this included Hooke's appointment (while still Macquarie's CEO) as interim-CEO of IMTT—the only time that Hooke has ever been the CEO of one of Macquarie's operating segments. *Id*. Even after Macquarie installed Defendant Courtney as IMTT's CEO in February 2015, Courtney reported directly to Hooke, who continued to serve as IMTT's Executive Chairman until his abrupt exit from Macquarie in December 2017. ¶71. Macquarie also appointed Macquarie asset director James May

as IMTT's CFO and to IMTT's Board of Directors. *Id*. In November 2015, at Defendants' urging, a federal district court ruled that "the level of control exercised by Hooke, May, and the IMTT Board [which was entirely controlled by Macquarie] indicates that the 'center of overall direction, control, and coordination'" for IMTT was ***Macquarie's offices*** in New York. ¶69.

### B. Defendants Conceal IMTT's Exposure to a Coming "Paradigm Shift" in the No. 6 Fuel Oil Market Through IMO 2020

#### 1. The No. 6 Fuel Oil Market Faces "Brutal Changes."

No. 6 fuel oil refers to a broadly defined group of fuel oils left over at the end of the petroleum refinement process, which Defendants and others at times referred to as "heavy" and/or "residual" fuel oil. ¶¶81, 105-107, 184. Former employees revealed that, beginning in the 1970s, IMTT became heavily involved in storing No. 6 fuel oil, building four "monster" 500,000-barrel capacity tanks (each with a diameter larger than a football field) and eight additional 250,000-barrel tanks at its St. Rose, Louisiana facility, all dedicated to No. 6 fuel oil. ¶83.

By the early 2000s, the use of No. 6 fuel oil had declined significantly. Governments and institutions have increasingly limited—and even banned outright—the use of No. 6 fuel oil because of its noxious qualities, while at the same time more competitive alternatives have been developed. ¶87. In response, refineries have refocused operations to maximize production of more profitable products, including by installing devices ('cokers') to reduce No. 6 fuel oil as it is created. ¶86. The primary remaining users of No. 6 fuel oil are large shipping vessels, but that market will soon be effectively eliminated by a 0.5% sulfur cap on bunker fuel beginning in 2020, known as "IMO 2020."[2] Because the sulfur content of the heaviest fuel oil (i.e., No. 6 fuel oil) is typically not lower than 3%, it has been widely understood since IMO 2020's adoption in 2008

---

[2] Several times, Defendants' falsely claim that IMO 2020 was not "announced" until after the Class Period begins. *See, e.g.,* MIC 7. This is either willful ignorance or deliberate deception. *See* Jensen Decl. Ex. B.

that the regulation would effectively eliminate the only remaining sustained demand for No. 6 fuel oil, causing a market "*collapse*" that will impact the entire supply chain, including storage facilities like IMTT. ¶¶92-99. As industry observer *Seatrade Maritime News* explained in 2017, IMO 2020 would usher in "not step changes but brutal changes" that required "paradigm shifts" and a "need for huge logistics involving transport between refineries, *storage* and delivery vessels." ¶97.[3] Indeed, on the first day of the Class Period, the International Energy Agency noted that the "*reconfiguration of storage tanks to hold clean products rather than fuel oil*" was one of the "global repercussions" when IMO 2020 "come[s] into force on 1 January 2020." ¶101.

### 2. Defendants Mislead Investors about IMTT's Reliance on No. 6 Fuel Oil.

While the industry continued to shift away from No. 6 fuel oil, that same commodity secretly comprised IMTT's *largest* storage product during the Class Period—*over 40%* of IMTT's capacity. ¶102. Yet Defendants had last specifically acknowledged No. 6 fuel oil exposure nearly *four years before the start of the Class Period*—when they acknowledged the coming paradigm shift *and* told investors that they were pivoting *away* from No. 6 fuel oil. ¶105. Specifically, during Macquarie's May 3, 2012 earnings call, Defendant Hooke first stated that "[w]e've all read the articles" about ongoing "uncertainty" in oil production and acknowledged its potential impact on the "demand for storage of heavy oil residual product" (i.e., No. 6 fuel oil), but said that Defendants would "wait and see" about whether to "convert the heavy product tanks." *Id*. During the next earnings call, on August 2, 2012, Hooke again stated that Macquarie still did not "see an immediate need to convert large amounts of existing heavy oil storage at Bayonne to clean products." ¶106.

---

[3] It is difficult to comprehend Defendants' position that Plaintiff is being "misleading" about this article. MIC 7 n.8. The article states, in black and white, that an "International Bunker Industry Association [representative] warned that the global Sulphur regulation [IMO 2020] is 'not step changes but brutal changes,' requiring 'paradigm shifts on ship engines' that are designed to run on HFO," clearly defined as heavy fuel oil (i.e., No. 6 fuel oil). Schreiber Ex. O.

But, on November 1, 2012, Hooke did an about-face, stating, "Over the past couple of months we've concluded that it would be IMTT's long-term best interests to begin to convert a portion of the residual oil storage at Bayonne . . . from residual oil or six oil to two oil." ¶107.

In the following years, Defendants' public statements conspicuously avoided any mention of No. 6 fuel oil or Macquarie's exposure thereto. Instead, Defendants only generically disclosed that half of IMTT's storage capacity was used for "refined petroleum products," a broad category encompassing not just No. 6 fuel oil, but also a wide range of other commodities ***not*** suffering from the general decline in the No. 6 fuel oil market or negatively impacted by IMO 2020. *E.g.* ¶109. As a result, investors reasonably believed that Defendants had done what they said in 2012, and pivoted IMTT away from No. 6 fuel oil. ¶110.

Reaffirming investors' mistaken impression that No. 6 fuel oil was not material to IMTT, Defendants falsely claimed that IMTT was "simply not [a] macroeconomically sensitive enterprise," that the "essential services nature of the business and continued strong demand for the products stored" offset any risk from "uncertainty among industry participants" or "volatility in petroleum product prices," and that IMTT is not "sensitive to what is going on in the exploration and production, or in interstate product movement," with any "sensitivity to end user demand . . . least in the petroleum segment of its operations." ¶¶111-12. In sum, Defendants assured investors that they "fe[lt] confident in the continued stable contribution from IMTT to our overall results . . . . [W]e run unsexy businesses ***with limited volatility***." ¶112.

Defendants also misled investors about the risk from No. 6 fuel oil in other ways. During an investor day on May 12, 2016, Defendant Courtney told investors that IMTT "only deal[s] with major oil companies, major chemical companies, utilities, major agricultural companies" and had "few other customers. We've got them very well." ¶115. In fact, a meaningful contingent of

10

customers were speculative commodity traders—directly contrary to Defendants' claims that IMTT was insulated from market volatility. ¶208. Defendant Courtney also misleadingly told investors that IMTT's "assets and [] infrastructure" give IMTT the "flexibility" and "optionality" to change when "one day our customer . . . want[s] gasoline in his tanks, next day he may want distillate." ¶116.[4] In fact, FE-1 (IMTT's former CFO) and FE-2 (who worked at IMTT from the 1970s until December 2015, most recently as St. Rose terminal manager) explained that the sheer size of some of IMTT's No. 6 fuel oil tanks made those tanks "obsolete" for storing *anything* other than No. 6 fuel oil. ¶117. Because those "monster" tanks were not easily repurposed or re-contracted, FE-1 said that any "disturbance in the force"—even a "sneeze"—immediately got internal attention, and contract renewal efforts began at least a year in advance. *Id*.

### 3.   Macquarie Management Sells $235 Million of its Own Holdings through an Offering Immediately after IMO 2020 is Reaffirmed.

On October 27, 2016, it was officially reaffirmed that IMO 2020 would go into effect on January 1, 2020, as had been scheduled since 2008. ¶120. That day, *Reuters* reported on the "disruptive" news and impact of IMO 2020, "as this big outlet for lower-quality fuel disappears." The market responded immediately, with S&P Global Platts reporting that "forward curves are already pricing in the likelihood of a *dramatically different fuel oil market*." ¶¶121-22. On October 31, 2016, industry consultants Turner, Mason & Company wrote, "While this move was widely expected," the development was "the equivalent of opening Pandora's Box" and "will be one of the dominant issues facing the global refinery industry in the next ten years." ¶123.

---

[4] Defendants claim that Defendant Courtney did not make these statements (MIC 11 n.14), but the transcript they attach is clearly in error, misattributing Courtney's statements to a person who had not yet been introduced—yet who purportedly interrupted Courtney's long line of responses to speak about IMTT, despite having no role there. Schreiber Ex. H at 19-20. *See Argent Classic Convertible Arbitrage Fund L.P. v. Countrywide Fin. Corp.*, 2009 WL 8572340, at *3–4 (C.D. Cal. Mar. 19, 2009) (rejecting factual argument about attribution of statements in an analyst call). If Defendants truly believed this argument, they would not have buried it in a footnote. In any event, Courtney made additional statements for which he was unquestionably the speaker. ¶¶ 114-15, 285.

Evidencing their determination to hide Macquarie's exposure to IMO 2020, Defendants did not mention the regulation during Macquarie's earnings call the very next day. ¶124. In contrast, Vopak—one of IMTT's "main terminal operation competitors" who had previously owned IMTT—discussed IMO 2020's "implications for global imbalances of diesel and fuel oil" during its earnings call at this time, stating that IMO 2020 raised the questions "what does it mean for the storage of the products?" and "what we are doing . . . as a business?" ¶128. By comparison, Defendant Hooke's conspicuous omission of IMO 2020 (while affirmatively assuring that "none of MIC's businesses are exposed directly to the price of crude oil or petroleum products") told investors that Macquarie was **not** facing those existential questions, and Macquarie common stock climbed to its all-time Class Period high just days later. ¶130.

With the risks still concealed, Defendants announced the Offering on November 3, 2016, the sole purpose of which was to sell 40% of Macquarie Management's holdings of Macquarie stock. ¶131. The Offering Documents were misleading, suggesting that "strict environmental regulations" **benefitted** IMTT by protecting it from competition. ¶132. Investors, including Lead Plaintiff, purchased over $235 million of Macquarie common stock through the Offering's underwriter, Defendant Barclays. *Id*.

### 4.    Defendants Use Inflated Stock to Fund the Epic Acquisition.

In 2017, the impact of IMO 2020 continued to ripple throughout the fuel oil industry, including storage tank operators like IMTT. ¶134. For example, on February 8, 2017, the storage industry periodical *Tank Storage Magazine* stated that a survey "highlight[ed] that [tank] operators are very mindful of . . . the recent International Maritime Organisation decision regarding sulphur fuel content" (i.e., IMO 2020). ¶135. On February 21, 2017, Galp Energia—whose business includes liquid fuel storage—described its response to the "disruption . . . across all the industry"

from IMO 2020, which included "addressing the challenges of new conversion capacity" by "allocat[ing] CapEx to this new economy." ¶137.

Nonetheless, Defendants continued to deny Macquarie's significant exposure. Macquarie's 2016 Form 10-K, filed February 21, 2017, rehashed similar boilerplate risk factors as the prior year, and claimed that the "essential services nature of the business and continued strong demand for the products stored" by IMTT offset any risk from "uncertainty among industry participants" because of "volatile petroleum product prices." ¶140. During Macquarie's earnings call the next day, Defendant Hooke told investors there was "nothing we see coming down the pipe" that would cause IMTT's high utilization to fall even "to historically normal levels." ¶142.

Defendants knew these statements were untrue. According to FE-4—who reported directly to IMTT CFO (and Macquarie Management employee) James May—by this time Defendant Courtney and IMTT were already working on the renewals of the various No. 6 fuel oil contracts at issue and starting to get a feel for customers' needs. ¶139. Defendants were also frantically trying to diversify away from No. 6 fuel oil by pursuing an acquisition of Epic Midstream ("Epic"). Epic operated a portfolio of storage terminals that principally stored jet fuel, including for the Department of Defense, and was thus protected against the expected decline in the heavy fuel oil industry. ¶153. In early 2017, FE-5, Epic's then-Chief Commercial Officer, participated in meetings with Macquarie and IMTT employees (including Courtney), and recalled that Macquarie sought to fund the purchase entirely with its (artificially inflated) stock. ¶154.

Even as they sought to mitigate a No. 6 fuel oil disaster, Defendants continued to conceal the problem. At a May 18, 2017 investor conference, Defendant Davis stated that half of IMTT's capacity stored "specifically refined petroleum products of gasoline, diesel, heating oil, things of that nature"—omitting No. 6 fuel oil, IMTT's *largest single commodity stored*. ¶145. Davis also

13

misrepresented IMTT's entanglement in speculative commodity trading, stating that "the easiest way to think of [IMTT] is as a multimodal distribution hub for liquid products. This is not the place where you would store it if you're playing contango or backwardation games. This is a distribution center for these products." ¶147 & n.8. The following month, Defendant Stewart dismissed any "renewal risk" in the "bulk liquid storage market in general" given "the current environment"—implicitly addressing IMO 2020—and falsely claimed that "the opportunity set at IMTT is as good as it has been in quite some time," with frequent "requests for additional capacity and capability" and "stable, generally growing demand." ¶149.

In fact, by the end of the second quarter of 2017, IMTT's utilization (the amount of tank space in use) began to drop as demand for No. 6 fuel oil continued to decline. ¶150. Yet, during an August 3, 2017 earnings call, Defendant Hooke told investors that IMTT remained "a case of steady as she goes" and emphatically denied "any commodity-driven factors that would cause a decline in utilization." ¶150. In response to a direct question about utilization, Hooke assured investors that "[T]here's no other commodity noise or other noise or counter-party issues there. It's purely that." *Id*. This outright denial that any "commodity-driven factors" threatened IMTT's utilization contrasted with statements that same day by PBF Energy, a petroleum refiner and supplier, that IMO 2020's impact is "a very, very significant thing going forward." ¶151. Hooke's contrasting upbeat assurances so misled investors that a SunTrust analyst wrote that it "expect[s] a slight uptick in [IMTT's] utilization for the remainder of the year." ¶152. The need for Defendants' continued deception is easily explained: it was critical that Defendants prop up the value of Macquarie's stock in the face of the declining utilization rate, because Defendants had arranged to purchase Epic for $171.5 million to be paid largely in shares of Macquarie stock. ¶153.

On September 11, 2017, just weeks after completing the Epic Acquisition, Macquarie abruptly announced that Defendant Hooke would step down as CEO in early 2018. The news surprised investors, who (as one analyst stated) "kind of always envisioned [Hooke] being at MIC for life." ¶157. In fact, Hooke announced his exit as IMTT's falling utilization had begun dragging the Company down—and as investors asked direct questions about No. 6 fuel oil and IMO 2020.

### 5.     Defendants Mislead Investors Voicing Concern over IMO 2020.

At the end of the Class Period on February 21, 2018, Macquarie disclosed that IMTT's utilization had declined to 89.6%—well below its historical norm—no later than October 25, 2017. ¶170. Yet, when Macquarie released its third quarter earnings on November 1, 2017, Defendants announced that Macquarie had *raised* its quarterly dividend again, consistent with guidance. ¶158. In his final earnings call, Defendant Hooke also forcefully downplayed any decline in IMTT's utilization as related only to tank cleaning, claiming that IMTT's performance was "*stable*," and dismissed a suggestion that Macquarie might "pivot towards what the market values and not as much maximizing dividend growth but more retaining cash flow" by stating: "*People slashing their dividend saying we're going to slash our dividend to deploy capital internally, I don't think you'll see us do that* . . . [Y]ou've never seen us make radical lurching changes of, sort of, *revisiting capital policy and dividend policy* . . . I would be pretty surprised if anything changes going forward." ¶159. Hooke continued, consistent with statements made by Defendant Davis to an investor in September 2017, "[E]verything we've done to date, we can fund without going to the market for more capital." ¶¶159, 164. Defendants' misleading disclosures continued to contrast with their competitors': Vopak stated in its earnings call on November 6, 2017 that "the fuel oil market is in backwardation," as IMO 2020 "is a *global phenomenon affecting the whole industry* . . . *[including] tank storage companies.*" ¶160.

15

The increasing industry focus on IMO 2020's incoming implementation gave investors pause. On November 7, 2017, Lead Plaintiff—a significant investor in the Company—asked Defendant Davis directly, "What percent of IMTT's storage is in heavy oil?," "how will [IMO 2020] impact demand for heavy oil?," and "Can heavy oil storage tanks be easily converted?" ¶166.[5] Responding on November 10, 2017, Davis said that "[*a*]*bout 20%*" of IMMT's storage was in heavy oil, when it was in fact double that. *Id*. Davis then deflected on the negative impact of IMO 2020 and downplayed costs of conversion, stating that IMO 2020 "could well be a positive for storage demand at IMTT-Bayonne given the deep water access at the facility." *Id*.

On November 16, 2017, Defendant Davis participated in a Three Part Advisors IDEAS Investor Conference, during which he falsely claimed that "[a] little over 1/2 of [IMTT's] capacity is in service in petroleum products, and as I say, *very little* of that is in crude or asphalt, any -- or *heavy product*," while reassuring investors that Defendants have "very good visibility into the cash generating capacity of this business over a longer period of time." ¶167. On November 28, 2017, Macquarie (including Defendants Hooke, Stewart, and Davis, as well as Macquarie's then-COO and future-CEO, Frost) hosted a dinner for approximately a dozen institutional investors, including representatives of Lead Plaintiff. At this dinner, Defendants assured investors that Macquarie would see continued dividend growth in 2018, touting that IMTT would serve as a "growth driver for 2018." ¶168.

## C.    The Truth Is Revealed

The truth about Defendants' concealed reliance on No. 6 fuel oil finally emerged with the Company's first earnings release after Defendant Hooke's surprise departure. On February 21,

---

[5] Citing this email, Defendants claim that "Lead Plaintiff Moab was specifically aware during the Class Period that IMTT stored No. 6 oil." MIC 7. Defendants' suggestion is misleading: Moab's question, paired with Davis's response, confirms both that investors were not aware of the extent of any exposure, and that management sought to conceal it.

2018, Macquarie revealed that IMTT's utilization ended the year at 89.6%—far below the consistently affirmed "historical mean" utilization rate of 94%. ¶22. Macquarie also announced that it was cutting its quarterly 2018 dividend guidance by 31% to free up cash needed to repurpose IMTT tanks away from No. 6 fuel oil. ¶182.

The following day, Macquarie's new CEO Frost blamed all this bad news on one culprit: the "broadly defined group of residual and heavy oils" referred to as No. 6 fuel oil. ¶184. For the first time since 2012 (when Defendant Hooke told investors that IMTT was converting away from No. 6 fuel oil), Macquarie now acknowledged the "***structural decline in the 6 Oil market***"— "[p]rices are in backwardation, demand for the product is declining and less of it is being produced domestically"—and its impact on Macquarie: "a number of customers terminated contracts for a significant amount of 6 Oil capacity at IMTT's facility in St. Rose . . . in some cases, they shut down their operations and ***exited the industry***" ¶¶184-85. Investors were in disbelief: just months earlier, Defendants had stated that Macquarie's dividend was "sacrosanct" and IMTT would be a "growth driver" for 2018, but now, "[a]s a consequence of recent changes in demand [in] the handling of 6 Oil at St. Rose," IMTT would be "the primary driver behind the year-on-year [projected] decrease in EBITDA." ¶193. Wells Fargo wrote bluntly that "***management's credibility has been called into question***" (¶205), and Macquarie's stock price fell over 41%, from $63.62 per share on February 21, 2018, to $37.41 per share on February 22, 2018. ¶201.

Additional disclosures over the coming months confirmed Defendants' fraud. On May 3, 2018, Macquarie disclosed for the first time that heavy and residual oils were the largest product type stored by IMTT, amounting to nearly 40% of IMTT's total capacity as of March 31, 2018. ¶208. In other words, No. 6 fuel oil was likely ***half if not more*** of IMTT's storage capacity during

17

the Class Period, and at a minimum would have been well over 40% at the time that Defendants described the amount to investors as "very little" (¶167), or "about 20%" (¶166).

Macquarie CEO Frost also explained that "the counterparties who did not renew [No. 6 fuel oil] contracts were mainly commodity traders, not system players," revealing for the first time a "meaningful contingent of commodity traders . . . as much as 20% both by contract number and lease capacity." ¶¶208-209. These traders "typically move in and out of the market based on short-term opportunities" and have "low barriers to exit" because "they don't need the storage per se," and consequentially "exited the market as a consequence of a backwardation in heavy and residual oils . . . [from] the uncertainty surrounding the implementation of new regulations related to low sulfur fuel oil in 2020"—i.e., IMO 2020. ¶¶208, 211. These revelations directly contradicted Defendants' false statements during the Class Period that that IMO 2020 could serve as a boon to IMTT by increasing the barriers to entry for its competitors (¶132) and that IMTT "only deal[s] with major" companies and was "not the place where you would store it if you're playing contango or backwardation games" (¶208).

## ARGUMENT

## I.    THE COMPLAINT PLEADS CLAIMS UNDER THE EXCHANGE ACT

### A.    The Complaint Pleads Claims Under Section 10(b)

#### 1.    The Complaint Pleads Actionable Misstatements and Omissions.

On a motion to dismiss, the Court must "accept[] all factual allegations as true and draw[] all reasonable inferences in the plaintiff's favor." *Freudenberg v. E*Trade Financial Corp.*, 712 F. Supp. 2d 171, 179 (S.D.N.Y. 2010). The Complaint sufficiently pleads falsity by pleading facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 89 (S.D.N.Y. 2015).

Throughout the Class Period, Defendants directly misrepresented their most important operating segment, IMTT, as "boringly predictable" and not sensitive to volatility or macroeconomic trends. *E.g.,* ¶¶8, 38, 110, 112, 129, 144-45, 150, 230, 232-33, 247-48, 269, 354. Defendants' repeated assurances that, e.g., IMTT's performance was "uncorrelated with" and "not a business that is sensitive to what is going on in the exploration and production" (¶¶111-12), there is "no other commodity noise or other noise or counter-party issues there," and "is not the place where you would store [product] if you're playing contango or backwardation games" (¶¶145, 147, 150), falsely told investors that none of IMTT's stored commodities were susceptible to any known market trends or events. Likewise, Defendants' SEC filings during the Class Period spoke only of "continued strong demand for the products stored" at IMTT, and made no mention of this "increasing uncertainty"—violating their obligation under Item 303 of Regulation S-K to discuss "any known trends or any known . . . events or uncertainties that have had or that the registrant reasonably respects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." ¶¶268-278. *See Indiana Pub. Retirement Sys. v. SAIC, Inc.*, 818 F.3d 85, 94 n. 7 (2d Cir. 2016) ("Item 303 imposes an 'affirmative duty to disclose . . . [that] can serve as the basis for a securities fraud claim under Section 10(b).'").

Defendants' statements were false and misleading because Macquarie actively concealed from investors that IMTT's single largest product (constituting ***over 40%*** of its storage capacity) was No. 6 fuel oil, a highly toxic heavy, or residual, fuel that faced a near-cataclysmic ban on the bulk of its worldwide use through IMO 2020. ¶227. Defendants—and the world—knew that IMO 2020 would have a serious and immediate negative impact on demand for No. 6 fuel oil. ¶¶241-42. Defendants' fraudulent scheme to erase any mention of No. 6 fuel oil while emphasizing the lack of "commodity exposure" facing IMTT is actionable. The law is clear that Defendants have

19

a duty to disclose information necessary "'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011) (quoting 17 C.F.R. §240.10b-5(b)) (discussing failure to disclose adverse information while claiming "very strong momentum").

In their motion, Defendants contend that Plaintiffs' allegations boil down to a failure to make "dire public predictions" about "the forthcoming implementation of IMO 2020 and/or other market conditions"—essentially, a "fraud by hindsight" defense. MIC 14. To be clear, neither Plaintiffs nor the securities laws require Defendants to make "dire" predictions about future events. But they do require Defendants to be forthright about the present facts, risks, and threats facing the Company when affirmatively disclosing its business and environment.[6] There can be no serious doubt that Defendants knew (a) IMTT's heavy reliance on revenue generated from No. 6 fuel oil; and (b) that IMO 2020 already did and would continue to have a significant and negative impact on the No. 6 fuel oil market. While Defendants concede that during the Class Period they "assess[ed]" whether IMO 2020 would impact IMTT's business (MIC 15), Defendants concealed that this "uncertainty" threatened over 40% of IMTT's storage capacity. *See* ¶¶8, 112, 232-33.[7]

---

[6] *See, e.g.*, *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014) (failure to disclose made "comforting statements" misleading by "caus[ing] a reasonable investor to make an overly optimistic assessment of the risk"); *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *6 (S.D.N.Y. Mar. 28, 2018) ("statements explaining income put the sources of [their] revenue at issue" (emphasis in original)); *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 737 (S.D.N.Y. 2015) ("Defendants . . . argue that they were under no obligation to disclose the loss of the major client . . . . This may well have been true, but for Defendants decision to affirmatively state that they anticipated 'relatively flat' revenues[.]"); *Darquea v. Jarden Corp.*, 2007 WL 1610146, at *8 (S.D.N.Y. May 31, 2007) ("While Defendants were permitted to remain optimistic about the future and to maintain a hopeful outlook, their public statements of optimism should have been subject to what the current data indicated.").

[7] Defendants' authorities are inapposite. *See Medina v. Tremor Video, Inc.*, 640 Fed. App'x. 45, 49 (2d Cir. 2016) (only "hindsight" turned "events that may well have appeared unremarkable at the time" into "omens of future material problems"—here, Defendants do not contend IMO 2020 was "unremarkable," nor could they); *Lipow v. Net1 UEPS Tech., Inc.*, 131 F. Supp. 3d 144, 170 (S.D.N.Y. 2015) (no duty to speculate about a regulatory investigation).

After the focus on IMO 2020 in the fuel industry intensified in late 2017, Defendants affirmatively denied any exposure to No. 6 fuel oil market pressures in response to direct questioning. On November 10, 2017, Defendant Davis stated that only "20%" of IMTT's storage was heavy oil and downplayed the risk of IMO 2020, stating that the new regulations "could well be a positive for storage demand at IMTT-Bayonne given the deep water access at the facility." ¶¶16, 166, 262. On November 16, 2017, Davis told the audience at an investor conference that Defendants had "very good visibility into the cash generating capacity of [IMTT] over a longer period of time," and that "*very little*" of IMTT's storage is in any "***heavy product***"—i.e., No. 6 fuel oil. ¶¶17, 167, 258. These statements were false: the Company would later disclose that, during the Class Period, heavy and residual fuel oil—i.e., No. 6 fuel oil—constituted well ***over 40%*** of IMTT's storage. ¶¶212-13. Defendants now claim Defendant Davis "was misunderstood" in his November statements, but their attempts to provide alternative interpretations of the statements fail or, at best, raise issues of fact unsuitable on a motion to dismiss. MIC 22-25.[8]

For example, Defendants claim that Davis's false statement that "[a]bout 20%" of IMTT's storage was in heavy oil was "focused on IMTT's business in the New York harbor market and its Bayonne facility in particular." MIC 23. Not so. The question Davis was responding to could not have been clearer: "What percent of IMTT's storage is in heavy oil?" ¶166. Likewise, Defendants claim that the "full context" for Davis's statement that "very little" of IMTT's storage is in "heavy product" shows that Davis was referring only to "crude and asphalt products (as opposed to No. 6

---

[8] The Court should give no credence to the characterizations of Davis's statements as "end-of-class period non-public statements made only to a small group of investors," which have neither factual basis nor legal relevance. MIC 23 n.23. Defendants do not refute that Davis's statements were materially consistent with Defendants' public statements and their thousands of other "individual interactions with current and potential shareholders" during the Class Period, such as that, around this time, Defendant Davis similarly told another investor that No. 6 fuel oil was only a small percent of IMTT's utilization and told another investor that IMO 2020 should not have much of an impact and that converting IMTT's tanks would only cost a nominal amount. ¶¶13-15.

fuel oil)." MIC 24-25. This tortured explanation is nonsensical: Davis stated that "[a] little over half of the capacity is in service and petroleum products, and as I say, very little of *that* is in crude or asphalt, any – or *heavy* product." The plain language makes clear that "*that*" is referring to "service and petroleum products" (which encompasses No. 6 fuel oil), and Defendants provide no basis for the Court to make the factual determination that "heavy products" refers exclusively to crude and asphalt, when in fact it refers to neither. In the unlikely event that either statement can truly be construed as a misunderstanding, Defendants are sophisticated professionals whose statements to investors must be taken at face value, especially at this stage of the litigation. *See, e.g., In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 582 (S.D.N.Y. 2010) (rejecting the defendants' argument that "a few analysts or investors were confused"). The cases cited by Defendants do not state otherwise.[9]

Defendants also actively concealed their reliance on No. 6 fuel oil through other false and misleading statements. For example, on May 12, 2016, Defendant Courtney told investors that IMTT had "flexibility" and "optionality" in its tanks because "one day our customer, one day he want[s] gasoline in his tanks, next day he may want distillate." ¶116. Yet, as Macquarie has now admitted, well over two-thirds of IMTT's Louisiana terminal tanks were effectively "obsolete" for anything other than No. 6 fuel oil, and could not be repurposed to store lighter, more salable fuel without the expenditure of hundreds of millions of dollars over the course of many months. ¶236.

    a.    Defendants' "Truth-on-the-Market" Defense Fails.

Defendants argue that their alleged misstatements and omissions are immaterial as a matter of law based on the assertion that "MIC disclosed the fact and extent of IMTT's storage of No. 6

---

[9] *See, e.g., In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 579 (S.D.N.Y. 2014) (cited at MIC 11, 24, 25) (statements not false where, unlike here, their "intended limitations" were clear from context).

fuel oil well before the class period started" and then continued to "identify No. 6 fuel oil as among the products IMTT stored for which it maintains a 'substantial market share.'" MIC 12. This affirmative "truth-on-the-market" affirmative defense fails in all respects.

As an initial matter, "[t]he truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality." *Ganino v. Citizens Util. Co.*, 228 F.3d 154, 167 (2d Cir. 2000). *See also Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 238 (S.D.N.Y. 2006) ("[D]efendants' burden [of establishing truth-on-the-market defense is] extremely difficult, perhaps impossible, to meet"—even "at the summary judgment stage."). Here, numerous facts undermine the suggestion that any "corrective information" was "conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." *Ganino*, 228 F.3d at 167.

First, Defendants' entire defense is based on the false premise that Macquarie "continued throughout the Class Period to identify No. 6 oil as among the products IMTT stored for which it maintained a 'substantial market share.'" MIC 12. Defendants manufacture this purported "truth" based on a misleading excerpt from a sentence in their Forms 10-K. The full sentence states, "With combined storage capacity of 20.5 million barrels, the four sites give IMTT substantial market share in the storage of black oil, bulk liquid chemicals and vegetable oils on the Lower Mississippi River." MIC at 2, 6, 12; Ex. F at 8; Ex. Q at 8. Each of the three commodity categories is incredibly broad and unspecified in amount—and ***none*** is synonymous with No. 6 fuel oil. *See* WEBSTER'S THIRD NEW INT'L DICTIONARY, UNABRIDGED (2019) https://www.merriam-webster.com/dictionary/black%20oil (last visited June 21, 2019) ("black oil" refers to "any of various dark-colored oils obtained especially from petroleum (such as heavy crude lubricating

oils")). Even if No. 6 fuel oil (a specific commodity that was the subject of specific regulations) is considered part of the broad "black oil" family, these undefined disclosures **still** did not meaningfully reveal any exposure—especially in light of Defendants' earlier statements that IMTT had **already** begun to convert away "from residual oil or six oil." ¶¶88-98.[10] *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 176 (2d Cir. 2015) (ruling that "[i]t is not our task at this stage to construe the abundant industry jargon here in any definitive fashion").

Defendants' other factual arguments neither have merit nor are proper on a motion to dismiss. Defendants downplay the impact of IMO 2020 during the Class Period by claiming "non-renewals are a normal part of business at IMTT" and "turnover was not uncommon." MIC 20-21 n. 20. Yet, these excuses directly conflict with Defendants' Class Period statements that IMTT's "essential services nature" protected it from material fluctuations, as reflected in IMTT's "consistently high utilization." ¶264. Further, Macquarie's own later disclosures show that IMTT's utilization fell well below the historical mean no later than October 25, 2017 (¶286)—disproving Defendants' false arguments that that "demand for storage of No. 6 fuel oil at IMTT's facilities had been increasing" and "nearly all of IMTT's No. 6 fuel oil tanks remained leased out until the end of 2017." MIC 14.[11] Further, citing information from former employees (including Defendant

---

[10] At most, Defendants note that Macquarie stated in 2009 that black oil non-exclusively "*includes*" No. 6 fuel oil. MIC 3, 6. There is no import to this unquantified disclosure, last made **seven years** before the Class Period starts—particularly because Defendants had expressly stated in 2012 that they were converting **away** from No. 6 fuel oil. ¶¶88-98. *See also, e.g.*, *N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC,* 709 F.3d 109, 127 (2d Cir. 2013) ("[T]here are serious limitations on a corporation's ability to charge its stockholders with knowledge of information omitted from a document . . . on the basis that the information is public knowledge and otherwise available to them."); *Freudenberg*, 712 F. Supp. 2d at 180 (S.D.N.Y. May 11, 2010) ("The purpose of the disclosure requirements is to inform, not to challenge the reader's critical wits.").

[11] Defendants cannot hide behind the purported disclaimer that their December 22, 2017 presentation concerned information "through the period ended September 30, 2017." MIC 25 n. 26. Even accepting Defendants' (contested) version of events, the contract non-renewals occurred "in late December 2017" (MIC 21 n. 20)—a material omission when telling investors that IMTT's "consistently high utilization reflects essential services nature of IMTT's services" with any "unused capacity . . . generally attributable to tank inspections, repairs, and modifications." ¶264.

Hooke himself, who acknowledged in 2012 that Defendants had "concluded that it would be IMTT's long-term best interests" to convert away from No. 6 fuel oil), the Complaint shows that Defendants knew the risks that utilization would decline much earlier. ¶¶107, 187.

Defendants also falsely claim that "MIC itself discussed IMO 2020 and the uncertainties it posed throughout the Class Period." MIC 12. To the contrary, Defendants conspicuously and deliberately avoided the subject. For example, on October 26, 2016, IMO 2020's long-planned implementation was affirmed, a widely-discussed development that immediately impacted global fuel oil markets. Yet Defendants made no mention of this event during Macquarie's third quarter 2016 earnings call just one week later, instead emphasizing that "*none* of MIC's businesses are exposed directly to the price of crude oil or petroleum products" (¶243)—implying that IMTT was immune to this recent industry-wide disruption. Likewise, on May 18, 2017, Defendant Davis conspicuously avoided addressing IMO 2020 as he was asked about "environmental . . . issues that arise out of the operation of" IMTT, and instead stated that IMTT has "no commodity exposure directly, other than that it results from macroeconomic factors influencing supply and demand more broadly . . . . [T]he easiest way to think of [IMTT] is as a multimodal distribution hub for liquid products. This is not the place where you would store it if you're playing contango or backwardation games. This is a distribution center for these products." ¶248. In fact, Defendants later revealed that speculative commodity traders involved in No. 6 fuel oil were a "meaningful contingent" of IMTT's customers, and they "exited the market as a consequence of a backwardation" from IMO 2020 (¶¶211, 285)—a risk that Defendants' lies concealed from investors, even though Defendants now concede that "the market for no. 6 oil had been in backwardation for *an extended period of time*" by the end of the Class Period. MIC 8 n.10.

Defendants directly acknowledged IMO 2020 only a handful of times, only in the last few months of the Class Period, and only to falsely allay investor concern. Rather than discussing the "uncertainties it posed," as Defendants contend (MIC 12), Defendants misstated its exposure to No. 6 fuel oil by at least 100% and painted IMO 2020 as possibly a "positive", falsely claiming that the banned No. 6 fuel oil could easily "be blended with distillate to meet [IMO 2020]." ¶262. There can be doubt that a reasonable investor could have been misled by these statements. *See Mylan*, 2018 WL 1595985, at *4 ("[T]he test is whether a reasonable investor could have been misled about the nature of the risk when he invested.").

Finally, Defendants' claim that the market knew the truth is rebutted by the market's explicit surprise at the end of the Class Period. Analysts at Wells Fargo wrote that "***management's credibility has been called into question***," while J.P. Morgan wrote, "The rapid decline comes as a surprise given mgmt's prior steadfast commentary on the strength of the business," and Alembic Global Advisors was "taken aback by [the] sudden weakness" in "IMTT's overall storage demand and price" from a "global shift in the production and consumption of refined petroleum products." ¶¶203-205.[12] Macquarie's stock price fell over 41% in a single trading day. ¶201. *See, e.g., Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 303 (S.D.N.Y. 2018) (crediting analyst reports as demonstrating that "defendants 'omitted information that made the statement misleading to a reasonable investor'"); *In re MF Global Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 317

---

[12] The cases Defendants cite do not hold otherwise, as it was not widely known that IMTT was sitting on large amounts of No. 6 fuel oil—because Defendants ***did not disclose*** that fact. *See* MIC 13 (*citing In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737 (S.D.N.Y. 2018) (disclosure of reliance on securing FDA approval for new product rendered plaintiff's surprise that FDA approval required insufficient); *In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 475-76 (S.D.N.Y. 2017) (disclosure of map showing atypical mineralization of certain part of excavation area mooted investors' surprise entire area not as rich); *Lipow*, 131 F. Supp. 3d at 168-69 (disclosure of potential regulatory scrutiny of one party tender process and resulting contract cancellation sufficiently speculative to not require disclosure of material risk); *Monroe Cty. Emps.' Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 355-56 (S.D.N.Y. 2014) (nationalization of company widely covered and prevented plaintiffs' claim defendants hid risk)).

(S.D.N.Y. 2013) (rejecting "fraud-by-hindsight" argument based on "the contemporaneous response to . . . disclosure of its risk exposure"); *In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d at 582 ("Considering . . . the market reaction . . . the Court concludes that there are sufficient facts pled to question whether Defendants provided the 'truth-on-the-market' with the 'degree of intensity and credibility' sufficient to counter-balance the allegedly misleading statements."); *Lapin*, 506 F. Supp. 2d 221 at 236 (crediting "a sizable drop in [stock price] when the [disclosures] were announced to the investing public"); *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 182 (S.D.N.Y. 2003) ("[D]efendants' claim that the market knew or should have known . . . is belied by the precipitous drop in . . . securities prices that followed immediately after . . . information of [the] actual financial condition started to emerge.").

b.     Defendants' Other Challenges To Falsity Fail.

Relying on an extra 22-page chart (Schreiber Ex. JJ), Defendants attempt several additional falsity defenses. Even if credited, these arguments fail.

(1)     No Statements Were Mere Puffery.

Defendants challenge several statements as mere puffery, but provide no explanation for why these statements are immaterial. MIC 17-18. Materiality is a fact-specific inquiry generally not appropriate for resolution on a motion to dismiss, and a complaint may not be dismissed as mere puffery unless the alleged misstatements "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino*, 228 F.3d at 162. Here, Defendants label as puffery some (but not all) of their assertions that IMTT was "stable" and provided services of an "essential services nature." Schreiber Ex. JJ. But both assertions provided investors with meaningful, objective information about the nature of IMTT's business, and Defendants do not cite any decisions dismissing analogous language as mere

27

puffery.[13] Moreover, the law is clear that statements are not mere puffery where—as alleged here—they are "misrepresentations of existing facts" and the speaker "knew that the contrary was true." *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000). *See also Freudenberg*, 712 F. Supp. 2d at 190 ("'Quality' in this context is not an amorphous concept. Defendants denied that [their business] had become more risky—even though it is alleged that the risks had increased."); *City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*, 423 F. Supp. 2d 348, 359 (S.D.N.Y. 2006) (that segment remained a "sound business" and a "growth proposition" not puffery).

### (2)    No "Safe Harbor" Applies.

For a small number of statements, Defendants seek refuge under the "safe harbor" afforded to forward-looking statements accompanied by meaningful cautionary language. Schreiber Ex. JJ. These attempts fail in every respect. For example, Defendants label as "forward-looking" the following statement by Defendant Hooke on November 1, 2016:

> Qualitatively, contracts for storage and services at IMTT continued to renew for longer durations than they had been early in the year. This suggests that producers, refiners, shippers and others probably believe that commodity prices going forward will not be either as low or as volatile as has been the case over the last couple of years. Remember, none of MIC's businesses are exposed directly to the price of crude oil or petroleum products.

Schreiber Ex. JJ; ¶243. Every assertion in this statement is an historical fact. Even Hooke's claim about "commodity prices going forward" is Hooke's informed interpretation of what IMTT's performance over the prior year currently "suggests" about IMTT's customers. *See, e.g.*, *In re APAC Teleservice, Inc. Sec. Litig.*, 1999 WL 1052004, at *8 (S.D.N.Y. Nov. 19, 1999) ("Linking future success to present and past performance does not render statements immune[.]").

---

[13] *See, e.g.*, *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 374 (S.D.N.Y. 2007) (cited at MIC 17) (statement that the defendants "expect[ed] OEM to continue to be a strong segment" was puffery where, unlike here, the plaintiffs "did not contradict, undermine or refute the statement of historical fact").

Further, Defendants' supplemental chart does not meet their "'burden of demonstrating . . . meaningful cautionary language'" that "provide[s] company-specific information or link[s] specific risks to specific factors . . . so as to make the cautionary statements more than boilerplate warnings." *Patriot Expl., LLC v. SandRidge Energy, Inc.*, 951 F. Supp. 2d 331, 358 (D. Conn. 2013) (quoting *Slayton v. American Exp. Co.*, 604 F.3d 758, 773 (2d Cir. 2010)).[14] For example, as to Hooke's November 1, 2016 statement, Defendants quote only boilerplate language concerning forward-looking statements, but the purported cautionary language does not warn that the commodity that constituted over 40% of IMTT's storage utilization was fast-approaching a cliff—as it was just affirmed days earlier that IMO 2020 would seal the fate of No. 6 fuel oil. ¶20.[15] Likewise, Defendants concede that, even then, their Forms 10-K explicitly disclosed "no material changes to the risk factors." MIC 9. As Judge Pollack famously stated, "Bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996). With respect to Defendants' assertion on November 28, 2017 that IMTT would be a "growth driver for 2018" (even as IMTT's utilization secretly plummeted due to its concealed reliance on storing No. 6 fuel oil) (¶168), Defendants cannot even point to *any* cautionary language.

---

[14] *See also, e.g.*, *In re Bear Stearns Cos., Inc. Sec., Deriv., and ERISA Litig.*, 763 F. Supp. 2d 423, 487 (S.D.N.Y. 2011) ("Warnings of specific risks . . . do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described.").

[15] Some of these boilerplate warnings facially do not apply: for example, Defendants highlight their statement that "IMTT's business is dependent on the demand for bulk liquid terminals capacity *in the locations where it operates*" (MIC 18) (emphasis added), but this obvious reminder that IMTT (like all businesses) is affected by "demand" actually *excludes* the risk that Defendants concede materialized here: the declining global demand for No. 6 fuel oil as a result of worldwide regulatory efforts such as IMO 2020. MIC 7-9.

Finally, even with sufficient cautionary language, there is no "safe harbor" for a knowingly false or misleading statement. The Complaint alleges exactly that: for example, as to Hooke's November 1, 2016 statement that "commodity prices going forward will not be either as low or as volatile as has been the case over the last couple of years," the Complaint alleges that by that time Defendants were aware that IMO 2020 had already begun to disrupt the No. 6 fuel oil market. ¶243-44. *See New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 Fed. App'x. 10, 14 & n.3 (2d Cir. 2011) ("more than just offer rosy predictions" where the defendants "allegedly stated that present inventory was under control or omitted it as a contributor to the company's costs, despite recklessly disregarding that the opposite was true."); *BioScrip*, 95 F. Supp. 3d at 736 ("Defendants' cautionary statements were, if anything, misleading in light of the fact that they bespoke caution concerning an event already certain to occur[.]").

### (3)     The Complaint Satisfies *Omnicare*.

Defendants label nearly all false statements as "opinion/belief," apparently challenging the statements under the Supreme Court's ruling in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 135 S. Ct. 1318 (2015). Schreiber Ex. JJ. However, other than one statement discussed only in a footnote,[16] Defendants do not explain which parts of these statements are purportedly opinion or why they are otherwise deficient.

In any event, to the extent the Court agrees that these statements contain opinion, *Omnicare* makes clear that they are not protected. As Defendants acknowledge, even an earnest opinion can be actionable if it "omits material facts about the issuer's inquiry into or knowledge . . . and if

---

[16] The Court may decline to "consider an argument mentioned only in a footnote to be adequately raised." *United States v. Restrepo*, 986 F.2d 1462, 1463 (2d Cir. 1993). *See also Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 363 F. Supp. 3d 476 (D. Del. 2019) (declining to dismiss "because Defendants' only arguments on this issue were buried in a couple of footnotes and further obscured by the high number of footnotes overall," as "[c]ourts traditionally do not consider arguments presented entirely in the footnotes" (collecting authorities)).

those facts conflict with what a reasonable investor would take from the statement itself." *Omnicare*, 135 S. Ct. at 1328-29. The Supreme Court explained that an investor "expects not just that the issuer believes the opinion (however irrationally), but that it ***fairly aligns*** with the information in the issuer's possession." *Id*. at 1329. Defendants' concealed knowledge that over 40% of IMTT's utilization was provided by a commodity for which Defendants have now admitted "the long term-trend . . . has been well understood" to be in decline (¶186) does not "fairly align[]" with their statements that, *e.g.*, IMTT is "not a business that is sensitive to what is going on in the exploration and production" and with any "sensitivity to end-user demand . . . least in the petroleum segment of its operations." ¶232.

This misalignment grows even larger after October 27, 2016, when it was reaffirmed that IMO 2020 would proceed on schedule. Even as the Company's peers and industry observers like *Tank Storage Magazine* warned of "surprises for the global market" from IMO 2020, Defendants did not affirmatively mention IMO 2020 until after the Class Period, and instead told investors that there was "nothing we see coming down the pipe" that would cause IMTT's utilization to "revert to historically normal levels"—much less plummet further. ¶¶138-142. Even if considered opinions—which they are not—these statements failed to disclose Defendants' contradictory knowledge, including that IMTT relied heavily on No. 6 fuel oil, the market for which commentators had observed had ***already*** been impacted by news of IMO 2020's confirmation. ¶¶92-97. *See In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *14 (S.D.N.Y. Nov. 26, 2018) (*Omnicare* satisfied where plaintiffs alleged known weaknesses in defendants' business practices through "robust factual matter, reports of confidential former employees, and other corroborative information and third-party accounts"); *Pearlstein v. Blackberry Ltd.*, 2018 WL 1444401, at *3 (S.D.N.Y. Mar. 19, 2018) (*Omnicare* satisfied where public statements

"contradicted data that defendant[s] had received" and "had access to," and "fail[ure] to disclose the adverse[] data could plausibly be misleading to a reasonable investor"). Defendants do not refute their knowledge of IMO 2020 and its likely impact, but instead fall back on their repeated argument that the truth had been "specifically disclosed." MIC 22.[17] As discussed above, IMTT's specific and material exposure to IMO 2020 was completely unknown and **unknowable** to investors, thanks to Defendants' deliberate concealment. *Supra* Section I.A.1.a.

Defendants' only specific *Omnicare* analysis concerns Defendant Hooke's statements in November 2017 about Macquarie's dividend. Specifically, after an analyst asked if Macquarie might "pivot towards what the market values and not as much maximizing dividend growth but more retaining cash flow," Hooke stated, "People slashing their dividend saying we're going to slash our dividend to deploy capital internally, I don't think you'll see us do that. . . [Y]ou've never seen us make radical lurching changes of, sort of, revisiting capital policy and dividend policy, et cetera. I would be pretty surprised if anything changes going forward . . . [E]verything we've done to date, we can fund without going to the market for more capital[.]" ¶159. Of course, Macquarie's very next earnings call—by which time Hooke had left the Company—contradicted this statement completely, as Macquarie announced a massive dividend cut to fix the mess from the Company's concealed reliance on No. 6 fuel oil, in "critical" part because of Macquarie's "limited access to capital markets to fund the continued growth of our business." ¶183; Schreiber Ex. FF at 2.

The Complaint alleges several facts demonstrating plausibly that Hooke's statements concerning the dividend were known to be false when made, including that Defendants' own subsequent disclosures prove that IMTT utilization had **already** cratered by that time. ¶185. *See,*

---

[17] Defendants' continued insistence that the truth was "widely known" makes irrelevant the principle that an opinion "is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way"—which, regardless, does not **foreclose** such opinions as actionable. MIC 22 (quoting *Pretium*, 256 F. Supp. 3d at 472).

*e.g., In re Salix Pharm., Ltd.*, 2016 WL 1629341, at \*12 n.10 (S.D.N.Y. Apr. 22, 2016) (opinions actionable when "predicated upon untrue supporting statements of fact regarding current inventory levels"). Specifically, Macquarie later disclosed that IMTT utilization at the end of the third quarter 2017 was 93.2%, while the utilization at the end of the fourth quarter was 89.6%. To reconcile that decline with the reported average utilization rate for the fourth quarter of 90.6% means that there must have been at least 66 days of 89.6% utilization rate, or that IMTT lost the utilization ***as early as October 25, 2017***. ¶170. Nothing has changed since Macquarie faced public criticism from the proxy advisory firm Institutional Shareholder Services, Inc. for being unable to provide a "conclusive, fact-based argument that definitively disproves" these exact same "calculations" (¶218): Defendants call Plaintiff's utilization calculation "flawed" and "simply wrong" but cannot explain why.[18] Thus, it was at a minimum incredibly reckless for Hooke (who had been both CEO and a Director on Macquarie's board for years) to tell the market that "revisiting capital policy and dividend policy" were inconceivable when he himself knew that IMTT's tanks would require enormous repurposing expenditures—exactly the sorts of costs from "cleaning the tanks and related pipes" to convert away from No. 6 fuel oil that, years before the start of the Class Period, he had told the market Macquarie was ***already*** doing. ¶107. Finally, in asserting that the dividend was slashed "for various reasons" (MIC 20 n. 19), Defendants nonetheless concede that at least one of those main reasons related to No. 6 fuel oil. ¶206.[19]

---

[18] To be clear, Defendants' claim that Plaintiff "concedes that IMTT's tanks were nearly fully leased until the end of 2017 and that the impact of IMO 2020 on IMTT remained uncertain" (MIC 20) is completely incorrect: Defendants' own disclosures contradict the former, while their failure to disclose the latter is a core issue in this dispute.

[19] Defendants repeatedly suggest that the dividend cut was motivated by the tax bill signed into law just weeks earlier, but Macquarie's CEO told investors the opposite: "the tax tail shouldn't wag the dog." *See* Jensen Decl. Ex. B.

### 2.      The Complaint Pleads Scienter.

The Complaint sufficiently pleads scienter through facts showing both "motive and opportunity to commit the fraud" as well as "strong circumstantial evidence of conscious misbehavior or recklessness," including that Defendants "benefitted in a concrete and personal way from the purported fraud," "knew facts or had access to information suggesting that their public statements were not accurate," and "failed to check information they had a duty to monitor." *Novak*, 216 F.3d at 307, 311. Fundamentally, the issue is "whether ***all*** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). The inference of "scienter need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible competing inferences'"—only as likely as any other inference. *Id.* at 324.

Considered holistically, the strong inference is simple: Defendants concealed their reliance on the storage of a dying commodity, enabling them to profit from nearly $235 million in insider sales, earn millions in fees, and complete a critical acquisition to diversify away from the problem fuel using the Company's fraudulently inflated stock. Defendants make limited critiques of some (but not all) of the Complaint's scienter allegations (all of which fail for the reasons discussed below), but ultimately do not offer a more compelling nonculpable inference. *See, e.g., In re Bear Stearns Cos., Inc. Sec., Deriv., and ERISA Litig.*, 763 F. Supp. 2d at 504 (scienter sufficiently pled where "[t]he adverse consequences of . . . disclosures relating to its exposure to declines in the housing market, and the adverse impact of those circumstances on the Company's business going forward, are alleged to have been entirely foreseeable to Defendants").

a.      The Complaint Alleges Motive and Opportunity.

Defendants do not dispute that they had the opportunity to commit fraud, nor could they. As Macquarie's top executives and, in Macquarie Management's case, day-to-day manager of operations, Defendants not only maintained ultimate control over the Company, but also stressed their personal involvement in running IMTT so much so that a federal court ruled that "[t]he level of control exercised by Hooke, May, and the IMTT Board indicates that the 'center of overall direction, control, and coordination'" for IMTT was Macquarie's offices in New York. ¶69 (citing *Rowell v. Shell Chemical, L.P.*, 2015 WL 7306435 (E.D. La. Nov. 18, 2015)). The Complaint also alleges specific, concrete motivations for Defendants to act on these opportunities.

(1)      Defendant Macquarie Managements Sells $235 Million in Stock through Suspiciously Timed Insider Sales

"[T]he Court of Appeals for the Second Circuit has held that motive is adequately pleaded where plaintiffs allege that a defendant sold its own shares while at the same time misrepresenting corporate performance in order to inflate stock prices." *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 420 (S.D.N.Y. 2011). Here, barely a week after IMO 2020 was reaffirmed to proceed on schedule—and Macquarie's peers openly acknowledged its disruptive impact—Defendants made false and misleading statements and omissions that further inflated the price of Macquarie stock to its Class Period **high**, before Macquarie Management profited from nearly $235 million in sales of Macquarie stock—or nearly 40% of its total holdings. ¶¶124-38. These allegations sufficiently plead motive as to Macquarie Management, and as to Defendants Hooke, Stewart, and Davis, all of whom were seconded Macquarie Management employees. ¶¶28-32.[20] *See, e.g., In re EVCI Colleges Holding Corp. Sec. Litig.*, 469 F. Supp. 2d

---

[20] Macquarie Management suggests that Hooke and Stewart had not "acted in their capacity as MIMUSA employees" (MIMUSA 10-11), but it "cannot seriously contend that they did not control these individuals as a matter of law."

88, 100 (S.D.N.Y. 2006) (insider sales of "more than 41%" of holdings were "far too much stock

. . . to wriggle out from a fair inference of motive and opportunity to commit[] fraud").

(2)     Macquarie Management's Fee Structure

Macquarie Management's fee arrangement uniquely incentivized the fraud in several

respects, including most specifically that the fee was "based primarily on [Macquarie's] market

capitalization." ¶60. Defendants argue that the desire to increase its fees "is an entirely proper

incentive" (MIMUSA Br. at 13; *see also* MIC Br. at 26-27), but the Second Circuit has never

categorically rejected an inference of scienter from compensation plans. *ECA & Local 134 IBEW

Joint Pension Trust of Chicago v. JPMorgan Chase Co.*, 553 F.3d 187, 201 (2d Cir. 2009)

(acknowledging possibility of scienter from a "direct link between the compensation package and

the fraudulent statements because of the magnitude of the compensation and the defendants'

motive to sweep problems under the rug"). Courts routinely credit compensation structures

uniquely tethered to the fraud. *See, e.g.*, *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 557-58

(S.D.N.Y. 2010) (possibility of windfall payout); *Darquea v. Jarden Corp.*, 2007 WL 1610146, at

\*10 (S.D.N.Y. May 31, 2007) (incentive payments tied to stock performance).

(3)     Macquarie's Acquisition of Epic Midstream

The Second Circuit has ruled that, "the artificial inflation of stock price in the acquisition

context may be sufficient for securities fraud scienter." *Rothman v. Gregor*, 220 F.3d 81, 94 (2d

---

*Ellison v. Am. Image Motor Co., Inc.*, 36 F. Supp. 2d 628, 644 (S.D.N.Y. 1999). *See also In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 638 (S.D.N.Y. 2007) ("[a]s a matter of logic . . . it makes little sense to say that controlling entities should escape liability on the grounds that other entities in turn controlled them."). Macquarie Management—not Macquarie—paid Hooke and Stewart, and both Macquarie's and Macquarie Management's offices were located at the same address: the same location that Defendants previously prevailed upon a district court to rule was IMTT's "'center of overall direction, control, and coordination.'" ¶69; *Rowell v. Shell Chemical, L.P.*, 2015 WL 7306435, at \*4 (E.D. La. Nov. 18, 2015). *Accord In re Parmalat Sec. Litig.*, 594 F. Supp. 2d 444, 459 (S.D.N.Y. 2009) (finding control where "uncontroverted that several [controlling entity] partners held key leadership positions at [controlled entity], including the position of chief executive officer").

Cir. 2000) (finding scienter even where acquisition "was largely a cash deal"). Here, the Epic Acquisition clearly demonstrates motive. Defendants began looking to buy Epic in early 2017, just after IMO 2020 was reaffirmed to proceed on schedule. ¶153. This timing was no coincidence: Epic would buffer against IMTT's undisclosed risks from the bunker fuel market fallout, and Defendants sealed the deal just as IMTT's utilization began to decline. ¶¶¶153-158.

What's more, the artificial inflation in Macquarie's stock price gave Defendants a strong bargaining position and more valuable currency with which to pay for the Epic Acquisition. FE-5 recalled that Macquarie sought to fund the purchase entirely with stock, and Macquarie ultimately paid nearly three-quarters of the purchase price of $171.5 million in shares of Macquarie stock, with each shared valued at $75.75. ¶155. When the truth about the exposure to No. 6 oil was revealed months later, the price of Macquarie shares plummeted to 50% of that value—meaning that Defendants would have needed to issue up to twice as much stock to complete the purchase. The use of stock was further necessitated by the growing capital shortfall caused by the enormous expenditures required to repurpose the "monster," "obsolete" No. 6 fuel oil tanks. ¶154.

Considered holistically, these allegations plead Defendants' motive sufficiently to raise an inference of scienter. *See, e.g.*, *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 554 (S.D.N.Y. 2017) (finding motive from the "form" and "timeline of events" surrounding stock-based acquisition); *In re Vivendi Universal*, 381 F. Supp. 2d at 185 (imputing scienter "when defendants were motivated to inflate company stock prices as a means to effectuate a specific acquisition"). Defendants have no meaningful response, conceding in a footnote that the Epic Acquisition was "an attempt to diversify." MIC 29 n. 30.

b.    The Complaint Alleges Recklessness or Conscious Misbehavior.

(1)    Defendants' Own Admissions

The Company has admitted the falsity of numerous statements by Defendants, including that: 1) at least 40% of IMTT's storage capacity was in heavy fuel (i.e., No. 6 fuel oil)—rather than the "very little" and/or "about 20%" they told investors in November 2017 (¶¶166-67, 284); 2) a "meaningful contingent" of IMTT's customers were speculative commodity traders—rather than the "major . . . companies" that Defendants said IMTT "only deal[s] with" in May 2016, and contrary to Defendants' claims that IMTT "is not the place where you would store it if you're playing contango or backwardation games" in May 2017 (¶¶115, 147, 285); 3) IMTT's utilization had already declined well below the historical norm by no later than October 25, 2017—making impossible Defendants' November 2017 claim that IMTT would be a "growth driver for 2018" (¶¶168, 170, 262); and 4) Macquarie has "limited access to capital markets to fund the continued growth of our business"—contrary to Hooke's claims that "everything we've done to date, we can fund without going to the market for more capital" (¶¶159, 200). Likewise, the magnitude of the Company's admitted exposure to the risks that are the subject of the misstatements further supports a strong inference of scienter. *See, e.g., Freudenberg*, 712 F. Supp. 2d at 180.

To the extent Defendants even challenge these allegations, Defendants simply label them "woefully insufficient" and claim that they benignly "later turned out to be wrong" and/or that there is not "any sort of 'contradiction.'" MIC 28 & n. 28. But Defendants cannot rebut the plain inconsistency with the Company's later disclosures. These "[a]dmissions of misrepresentations, coupled with defendants' continuous intimate knowledge of company affairs is enough to adequately infer scienter." *Stevelman v. Alias Res. Inc.*, 174 F.3d 79, 84-85 (2d Cir. 1999).

(2)     Defendants' Actual Knowledge

The Complaint further pleads scienter through allegations "that defendants knew facts or had access to nonpublic information contradicting their public statements." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001). Defendants concede their awareness that the market for No. 6 fuel oil was in decline and that IMO 2020 had accelerated that decline. MIC 14-15. The Complaint alleges that Defendants knew about the Company's own susceptibility to this decline from their knowledge of IMTT's storage of No. 6 fuel oil: as described above, Defendant Hooke admitted that Defendants were "***completely joined at the hip***" with IMTT,[21] and repeatedly stressed their "visibility" into IMTT, and Defendants themselves had told the market in 2012 that possible impact on the "demand for storage of heavy oil residual product" had made it in "IMTT's long-term best interests to convert . . . from residual oil or six oil to two oil." ¶¶105, 107. Defendants' prior statements alone sufficiently demonstrate Defendants' access to information. *Celestica*, 455 Fed. App'x. at 10, 14 & n.3 (scienter where "the complaint not only alleges that [the defendants] received information about the inventory buildup . . . but also explains why [they] would have been alert to information"); *Mylan*, 2018 WL 1595985, at *12 ("Construing all inferences in Plaintiffs' favor . . . [i]t requires no stretch of the imagination to infer that, due to their positions at the company and the importance . . . to Mylan's operations, Defendants knew facts or had access to information suggesting that their public statements . . . were not accurate."); *Salix*, 2016 WL 1629341, at *10 (inferring scienter from defendants' claims to have "visibility in the inventories").

---

[21] *See also Rowell*, 2015 WL 7306435, at *4 (noting that Macquarie was responsible for approving contracts over $2.5 million, with Hooke and May responsible for any contracts above $500,000; that "Hooke determined who would be appointed to IMTT's executive positions"; and that Hooke and May "increased the free cash flow of IMTT so that MIC could declare greater dividends to its shareholders.").

Defendants do not actually argue otherwise—rather, Defendants even admit that they had "investigate[d], analyze[d] and assess[ed] potentially negative information" about the impact of IMO 2020. MIC 15. Instead, Defendants primarily take issue with corroborating detail provided by former employees. However, courts routinely credit former employees that raise "a plausible inference that . . . Defendants knew that . . . [the] figures provided a misleading picture," and reject arguments (similar to Defendants' here) as to "the reliability and probative force of [the] Former Employee[] testimony" because "they either raise issues of fact that go beyond the pleadings or misconstrue Plaintiff's pleading obligations[.]" *Signet*, 2018 WL 6167889, at *14. Among other things, FE-1 and FE-2—IMTT's former CFO and St. Rose terminal manager, respectively— explained that IMTT had "monster" storage tanks at St. Rose that had become "obsolete" for storing commodities other than No. 6 fuel oil, and that as a result any "disturbance" concerning those tanks would immediately receive attention from the top. ¶117. FE-1 also revealed that Macquarie had been "meticulous" in tracking IMTT's performance and "knew in great detail" about IMTT's contracts and tanks—information that was available through an inventory system that FE-1 had personally helped develop. FE-1 also explained that IMTT annually assessed contract renewal prospects through information typically provided by Defendant Courtney, who "absolutely" had "constant contact with customers, contracts, and trends" and at times participated in IMTT's monthly meetings that discussed the throughput of IMTT's tanks. ¶290.

Though Defendants claim that this information is "undisputably insufficient," their actual objection (buried in a footnote) is that "any alleged interactions that FE-1 or FE-2 had, in their professional capacities, with any Management Defendant occurred outside the class period." MIC 29 n.29. Defendants, therefore, concede that both that FE-1 and FE-2—both senior employees at IMTT for *decades*—*did* interact with Defendants. The fact that they left IMTT before the start of

40

the Class Period does not weaken the information they provided. Defendants' knowledge is further shown by FE-3, who worked at the St. Rose facility from 2011-2016 and recalled that IMTT told its employees just before the start of the Class Period that things were "a little bit bleak" as customers were moving out of storage rather than buying storage, due largely to industry trends. ¶100. *See Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 301 (S.D.N.Y. 2018) (notwithstanding that no former employees directly stated that the defendants reviewed any reports or data, and that only two former employees had personal contact, finding "sufficient facts showing that the Individual Defendants either had knowledge or information—or had access to information that they should have monitored—contradicting their public statements"); *Freudenberg*, 712 F. Supp. 2d at 197 (scienter pled from "reports of [] Defendants' direct involvement and knowledge."); *Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 638 (S.D.N.Y. 2010) ("Though some of the [confidential witness] allegations concern reports made before the Class Period, the problems identified—concerning millions of dollars of [risk]—persuade the Court that, when drawing all possible inferences in favor of the Lead Plaintiffs, this knowledge remained pertinent to the Defendants' public statements during the Class Period.").[22]

(3)    The Critical Importance of the Information at Issue

Courts routinely find an inference of scienter where the "importance . . . to the company's business" of the information at issue makes it "'exceedingly unlikely' that the executives were not aware of the falsity of their statements." *Sheet Metal Workers Local 32 Pension Fund v. Terex Corp.*, 2018 WL 1587457, at *11 (D. Conn. Mar. 31, 2018). In fact, "[i]n some circumstances, . . .

---

[22] Defendants' authority is inapposite. *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 138-142 (D. Conn. 2007) (cited at MIC 28-29) (disregarding pre-Class Period behavior not alleged to continue during the Class Period); *In re Federated Dep't Stores, Inc. Sec. Litig.*, 2005 WL 696894, at *5 (S.D.N.Y. Mar. 25, 2005) (cited at MIC 28) (concerning awareness of bookkeeping policies at a newly acquired subsidiary; unlike here, where Defendants were admittedly "completely joined at the hip" with IMTT).

scienter may be established based *solely* on the magnitude of the company's problems," such as where former employee accounts revealed that executives "had overstated" demand for their "flagship" product. *Terex*, 2018 WL 1587457, at *11. Here, at Defendants' urging, the market evaluated Macquarie's "total return opportunity" based primarily on the Company's dividend, and also understood that that dividend was largely driven by IMTT, the Company's "bellwether" business. ¶¶204, 247. Defendants do not address this strong inference of scienter. *See also Celestica*, 455 Fed. App'x. at 10, 14 & n.3 (2d Cir. 2011) (scienter pled where "inventory levels" were "key to measuring . . . financial performance and . . . a subject about which investors and analysts often inquired").

### (4)    Hooke's Abrupt Resignation

Courts routinely rule that an unexpected resignation, such as Defendant Hooke's here, "add[s] to the overall pleading of circumstantial evidence of fraud." *See In re Scottish Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 n. 176 (S.D.N.Y. 2007); *see also Salix*, 2016 WL 1629341, at *15. Defendants do not dispute that Hooke's resignation was unexpected, but simply claim in a footnote it is "irrelevant." MIC Br. 29 n. 30. Defendants cannot wave away the suspicious circumstances: Hooke announced his exit in September 2017, right as IMTT's utilization rates began to decline and investors increasingly began to ask direct questions about the impact of IMO 2020. Moreover, the truth finally emerged in the first quarter *after* Hooke's departure—a fact that some analysts noted with suspicion. ¶157 (J.P. Morgan noting that "[t]he rapid decline [in IMTT's utilization] comes as a surprise given mgmt's prior steadfast commentary on the strength of the business," with the "*sharp departure* from prior messaging" around these "*underlying business issues*" coming "the first quarter after the departure of former CEO James Hooke.").

(5)     The Suspicious Timing of Defendant Davis's Statement
that IMTT Stored "Very Little" No. 6 Fuel Oil

Throughout the Class Period, Defendant Davis routinely spoke at investor conferences

hosted by Three Part Advisors and consistently stated that "very little" of IMTT's storage capacity

included "crude or asphalt or unrefined or minimally-refined product." ¶248. Davis deviated from

this well-worn script only once, near the end of the Class Period, stating on November 16, 2017

that "very little" of IMTT's capacity is in "heavy product"—i.e., No. 6 fuel oil. ¶167. The timing

of Davis's conspicuous change is very suspicious, as it occurred alongside non-renewals of No. 6

fuel oil contracts that caused IMTT's utilization to plummet and other fraudulent attempts to

deflect investor concern about IMO 2020. ¶¶170-71. Defendants do not address this timing in their

scienter arguments, and their speculation elsewhere that Davis was misunderstood (MIC 25) does

not raise a more compelling nonculpable inference.

(6)     Reduced Disclosures

Defendants' scienter is further demonstrated from their reductions in historical IMTT

disclosures. Defendant Hooke admitted at the start of the Class Period that Macquarie had "stopped

disclosing year-on-year storage rates for IMTT" to limit interpretations around declines in

utilization. ¶76 (Hooke stating that reduced disclosures were because "people were spooked as to

is it really offline for cleaning and inspection? Will it ever come back or are you just saying that

because your utilization is down?"). Macquarie had also stopped reporting granular capacity for

St. Rose (the location of IMTT's "monster" No. 6 fuel oil tanks and where the No. 6 fuel oil

contract cancellations ultimately occurred) and IMTT's growth capital expenditures, which

Defendants acknowledged related to Macquarie's all-important "cash flow generation and

dividend growth." ¶78. These historical disclosures would have provided insight into the risks

concealed by Defendants, but instead Defendant Stewart even admitted that Macquarie's financial

statements were "not particularly helpful when it comes to determining the cash generated by the enterprise." ¶79. As a result, Defendants' decisions to reduce historical disclosures made investors completely reliant on Defendants to be honest about known risks and trends. *See, e.g.*, *Billhofer v. Flamel Tech., SA*, 663 F. Supp. 2d 288, 303 (S.D.N.Y. 2009) (scienter from "the company's [un]willingness to be forthcoming in matters concerning its flagship" product).

### 3. The Complaint Alleges Loss Causation

The Complaint alleges a staggering 41% one-day decline in the price of the Company's shares following the release of 'new' news. Specifically, after the close of trading on February 21, 2018, Macquarie disclosed for the first time (among other things) that: 1) IMTT's utilization had unexpectedly fallen to just 89.6% (well below the "historical mean" of 94% that Defendants had consistently affirmed throughout the Class Period); 2) Macquarie's free cash flow was below guidance and now expected to *decline* 8-10% in the coming year (rather than *grow* 10-15% as Defendants had guided); and 3) Macquarie was ending over four years of consecutive dividend growth and instead *cutting* its dividend by 31%. ¶¶180-82. Before the start of trading the next day, Macquarie's new CEO stated that "what happened" was No. 6 fuel oil—the first time Macquarie publicly acknowledged its reliance on the commodity since Defendants' pre-Class Period statements six years earlier. ¶¶184-85. In response, over a single trading day, Macquarie's stock price fell *over 41%*, from a closing price of $63.62 per share on February 21, 2018, to close at $37.41 per share on February 22, 2018. ¶201. It has not recovered to date.

The Complaint's allegations "do as [they] must to repel a motion to dismiss: [they] identified an alleged fraud . . . and connected it with a purported loss . . . . That is all that is required to plead loss causation, which is subject to Fed. R. Civ. P. 8's liberal notice pleading requirements." *Signet*, 2018 WL 6167889, at *18. While Defendants *concede* that the stock price "declined upon the announcement" of the impact to Macquarie from the "decline in the demand for storage of No.

44

6 fuel oil" (MIC 2), they nonetheless argue that loss causation is inadequately pled because "the allegedly concealed risks at issue here had in fact been disclosed all along." MIC 29-30. The Court should reject this rehash of their improper "truth-on-the-market" argument for the same reasons stated above (*see infra* Section 1.A.1.a.), including that it is directly rebutted by analysts covering the Company. For example, RBC Capital Markets wrote that "[t]he customer losses, dividend cut and strategic re-purposing of IMTT come as a surprise to us as IMTT utilization was holding up decently in 2017." ¶202. These facts are very different from the few cases cited by Defendants, where "the market had long absorbed the economic difficulties faced by the company" given "the overwhelmingly negative thrust of defendants' disclosures throughout the class period," and as a result the stock decline at issue was "a rather typical occurrence within the general downward trend of [the defendant]'s stock price prior to and during the class period"—as opposed to the unprecedented, one-day decline of 41% at issue here. *See Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp.*, 951 F. Supp. 2d 479, 503-504 (S.D.N.Y. 2013) (cited at MIC 30).

## B.     The Complaint Pleads Control Person Liability Under Section 20(a).

Section 20(a) requires: 1) a predicate violation of the Exchange Act; 2) control of the primary violator; and 3) culpable participation. *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *27 (S.D.N.Y. Dec. 2, 2013). As discussed above, the Complaint sufficiently alleges a predicate violation. The Complaint also sufficiently alleges control and culpable participation.

### 1.     The Complaint Pleads Control.

Macquarie Management and the Officer Defendants[23] dispute their control over MIC, but their principal argument in response—that "Plaintiff attempts to plead control merely by offering

---

[23] The Officer Defendants rely on Macquarie Management's arguments (MIC Opp. 30-31, 35), but Macquarie Management does not contest the well-settled law that the Officer Defendants' roles suffice for pleading control. *See Citiline Holdings, Inc. v. iStar Fin. Inc.*, 701 F. Supp. 2d 506, 516–17 (S.D.N.Y. 2010) (sustaining allegations that defendants "had the power to influence and exercised the same to cause [company] to engage in the conduct

conclusory statements that MIMUSA has a management services agreement with MIC under which . . . [Macquarie Management] acts as manager . . . and *is responsible for MIC's day-to-day operations and affairs and oversight*" (MIMUSA 9)—concedes the point. *See In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 143 (S.D.N.Y 1999) (the defendants' involvement in "day-to-day operations" gave the power to control the activities comprising underlying violation and participated in fraud at least by reaping benefits of insider trading). This is not "conclusory": the Offering Documents that Macquarie Management quotes from describe exactly this control. *See* Schreiber Ex. N at S-17 ("[S]ubject to the oversight and supervision of our Board of Directors, our Manager *manages our day-to-day operations and affairs and oversees the management teams of our operating businesses*."). *See, e.g., Hi-Crush*, 2013 WL 6233561, at *27 (finding control where "the Registration Statement makes it clear that Hi-Crush GP completely controls Hi-Crush" and the individual defendants "acted within the scope of their employment as officers of Hi-Crush GP when they managed the daily affairs of Hi-Crush"). Defendants' cited authorities support— not contradict—the control evident from the plain meaning of these words.[24]

---

complained of"). Defendants also claim Defendant Courtney "is not even alleged to have worked for MIC" (MIC 31 n. 31), but this too fails. *See* ¶¶33, 71, 114-16 (Courtney "has served as the Chief Executive Officer and President of IMTT, a wholly-owned subsidiary of Macquarie, since February 2015"; reported directly to Defendant Hooke; and made statements on the Company's behalf at an investor day presentation). *See, e.g., Freudenberg*, 712 F. Supp. 2d at 180 ("contrary to [d]efendants' argument that [he] had no involvement with issuing statements, [the division president] spoke directly to investors during conference calls").

[24] *See, e.g., In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 492-93 (S.D.N.Y. 2005) (cited at MIMUSA 10-11) (no control where no indication that the defendant could "cause the direction of management," such as "*by contract*" (as here)); *Kalin v. Xanboo, Inc.*, 526 F. Supp. 2d 392, 405 (S.D.N.Y. 2007) (cited at MIMUSA 10-11) (control pled from "mix of substantial ownership, shared officers and principals, and at least some direct involvement"—all present here); *Weintraub v. Texasgulf Inc.*, 564 F. Supp. 1466, 1470 (S.D.N.Y. 1983) (cited at MIMUSA 10) (acknowledging that "knowledge may be imputed to a corporation if the knowledge was acquired pursuant to the director's activities," as here). *U.S. v. Bestfoods* is inapposite. 524 U.S. 51, 55, 70 n.13 (1998) (cited at MIMUSA 10) (acknowledging the "ways in which the Government could show that dual officers or directors were in fact acting on behalf of the parent" under the "Comprehensive Environmental Response, Compensation, and Liability Act of 1980").

## 2.     The Complaint Pleads Culpable Participation.

"Disagreement exists within the Second Circuit . . . as to precisely what conduct, beyond negligence, [culpable participation] entails." *Alstom*, 406 F. Supp. 2d at 490. Even if this Court holds that culpable participation is equivalent to scienter, this requirement is satisfied for the reasons discussed above. *Infra* Section I.A.2. While Macquarie Management also contends that "no particular facts . . . even circumstantially indicate that MIMUSA possessed knowledge of any alleged material misrepresentation or omission by MIC" (MIMUSA 12), this conclusory assertion is rebutted by Macquarie Management's day-to-day management of Macquarie, which provided the knowledge discussed above. *Supra* Section I.A.2.b.2. *See also, e.g., Hi-Crush*, 2013 WL 6233561, at *27 (attributing culpable participation where the individual defendants "acted within the scope of their employment as officers of Hi-Crush GP when they managed the daily affairs of Hi-Crush"). Finally, though Macquarie Management disputes any motive from its fee arrangement (incorrectly, *see supra* Section I.A.2.a.2.), it does not mention its $235 million in unusually-timed insider sales in discussing culpable participation. MIMUSA 11-13.

## C.     The Complaint Pleads Claims Under Exchange Act Section 20A.

Against Macquarie Management only, the Complaint also asserts a claim under Exchange Act Section 20A, which provides that any person "who violates any provision of this chapter or the rules or regulation thereunder by . . . selling a security while in possession of material, nonpublic information shall be liable . . . to any person who, contemporaneously with the . . . sale of securities that is the subject of such violation, has purchased . . . securities of the same class." 15 U.S.C. § 78t–1(a). Here, the Complaint sufficiently pleads a Section 20A claim by alleging: (i) a predicate insider trading violation from Macquarie Management's violation of Exchange Act Section 20(a) at the same time as it earned nearly $235 million dollars from selling Macquarie securities in the Offering; and (ii) Moab's contemporaneous purchase of approximately 20,000

shares of Macquarie common stock sold by Macquarie Management. ¶¶332-33. *See, e.g.*, *Bear Stearns*, 763 F. Supp. 2d at 487; *Refco*, 503 F. Supp. 2d at 665-66.

### 1. The Complaint Sufficiently Pleads a Predicate Violation.

Macquarie Management does not contest that its Section 20(a) violation can suffice for a predicate act, but only disputes the particularity of the allegations. These arguments fail.

*First*, Macquarie Management describes the suspicious timing of its insider sales as "empty verbiage, unsupported by any detail." MIMUSA 17. This curt dismissal cannot overcome the undisputed facts that the sales came *just days after* IMO 2020 was reaffirmed to proceed on schedule, triggering massive disruption in the market for No. 6 fuel oil. ¶¶130-32. *See, e.g., In re APAC Teleservice, Inc. Sec. Litig.*, 1999 WL 1052004, at \*7 (S.D.N.Y. Nov. 19, 1999) ("[F]actual issues concerning whether insider trading was done at suspicious times and/or in suspicious amounts should *not* be considered on a motion to dismiss[.]").

*Second*, Macquarie Management again mischaracterizes its control as "conclusory" (MIMUSA 17)—as discussed above, that Macquarie Management controlled Macquarie is beyond dispute. *Supra* Section I.B.1. Macquarie Management also cannot dispute its knowledge of the information at issue: IMTT's heavy reliance on No. 6 fuel oil and consequential exposure to risks from IMO 2020, the imminent implementation of which was affirmed just *days* before the Offering. *See Bear Stearns*, 763 F. Supp. 2d at 508 (agents' collective knowledge alleged to impute to corporate defendant, ruling that access to information provided basis for Section 20A claim).[25]

---

[25] Macquarie Management claims ignorance by suggesting that its seconded employees, Defendants Hooke and Stewart, acted only "as officers of MIC" and their acts are not "attribute[d]" to it (MIMUSA 10, 12), but this sort of "hypertechnical argument is precisely the type that is considered obstructionist." *Japan Halon Co., Ltd. v. Great Lakes Chem. Corp.*, 155 F.R.D. 626, 628 (N.D. Ind. 1993) ("secondment . . . cannot be used as a screen to disguise the coordinated nature of companies"). *See also Jayne v. Royal Jordanian Airlines Corp.*, 502 F.Supp. 848, 859 (S.D.N.Y. 1980) (to ignore the "close relationship" between companies, including that "[e]xchanges of high management personnel have occurred and appear to continue under [the] program of 'secondment[,]' . . . would be to exalt form over substance"); *Seven Seas Cruises S. De R.L. v. V. Ships Leisure SAM*, 2011 WL 13220299, at \*35 n.16 (S.D. Fla.

**Third**, Macquarie Management claims that the "long gap" between the Offering and the corrective disclosure somehow "makes any inference . . . impermissibly attenuated." MIMUSA 17. Said another way, Macquarie Management asks for exoneration for successfully continuing to conceal the truth for months after its sales (and generating fees from doing so). That is not the law. *See, e.g.*, *Stevelman v. Alias Res. Inc.*, 174 F.3d 79, 86 (2d Cir. 1999) (that "statements . . . continued to be made after the sales . . . could well be probative of an intent to keep the stock price high in order to avoid detection of the alleged fraud"); *comScore*, 268 F. Supp. 3d at 555 (S.D.N.Y. 2017) (rejecting proffered nonculpable explanations about insider sales made months and even years before the revelation of the truth, finding it "more plausible" that the Defendants "unloaded [their] shares at the first opportunity while the stock price was artificially elevated" and "before the scheme unraveled"). The cases cited by Macquarie Management do not hold otherwise. *See, e.g., In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 279 (S.D.N.Y. 2008) (cited at MIMUSA 17) (timing of sales neither tethered to making of false statement nor revelation of truth).[26] In contrast, Macquarie Management's unusual sale of 40% of its holdings for nearly $235 million occurred just days after misleading the market about a "disruption" that had just occurred: the confirmation that IMO 2020 would proceed as scheduled. ¶130-32.

**Finally**, Macquarie Management argues that its Class Period insider sales of nearly 40% of its holdings was not "unusual," based on its conclusory assertion that its comparable prior period sales were "of similar magnitude." Not so: Macquarie Management admits that its prior period sales constituted just 27% of its holdings, meaning that the Class Period insider sales were ***nearly***

---

June 21, 2011) ("whether the seconded employee remains an agent . . . is a factual, case-by-case determination"). Macquarie Management also ignores its knowledge from the employees that it necessarily provided (as Macquarie had no employees of its own) to "head up an expanded financial planning and analysis function at IMTT." ¶72.

[26] *See also Ressler v. Liz Claiborne, Inc.*, 75 F. Supp. 2d 43, 60 (E.D.N.Y. 1998) (cited at MIMUSA 17) (discounting sales both "remote in time from any misstatements ***and*** in amounts that do not necessarily support a claim of fraud").

*50%* greater. This difference is "plausibly unusual." *See comScore, Inc.*, 268 F. Supp. 3d at 555. Moreover, the difference in holdings sold is only one of a wide variety of factors courts consider in determining whether insider trading activity is unusual, such as (as here) the highly suspicious timing of Macquarie Management's sales. *See, e.g.*, *Scholastic*, 252 F.3d at 74–75.

## 2. The Complaint Sufficiently Pleads Contemporaneous Trading.

Macquarie Management tries to create a factual dispute by asking that the Court reject Moab's allegations that it purchased shares in the November 3, 2016 Offering because Macquarie Management later disclosed the nearly 3 million shares it sold in the Offering as if they occurred on just one day, November 9, 2016. MIMUSA 20. This argument is belied by common sense and the Complaint's clear allegations. Consistent with purchases in an offering, Moab executed trade orders for its Offering purchases directly with Barclays at the launch of the Offering on November 3, 2016, and those trade orders settled on the day that Macquarie Management turned its shares over to those who purchased in the Offering, November 9, 2016; further, Moab paid no commission or trading fees. ¶333 n. 9, Jensen Decl. Ex. A.[27] *See, e.g., In re Deutsche Bank AG Sec. Litig.*, 328 F.R.D. 71, 84 (S.D.N.Y. 2018) (noting "absence of any commission charged" as consistent with offering purchase).

Even if the Court credited Macquarie Management's factual dispute—and ignored the simple, uncontested truth that Macquarie Management sold *all* the shares in the Offering, which necessarily includes those shares purchased by Moab—there is no merit to Macquarie Management's argument that Moab did not suffer any injury: the transactions at issue occurred within one week of each other, and therefore were "contemporaneous" under Section 20A. *See,*

---

[27] Jensen Decl. Ex. A is part of Plaintiff's trading records showing its purchases in the Offering, which counsel relied on in drafting the Complaint and is incorporated by reference into the allegations describing Plaintiff's purchases. *See, e.g.,* ¶333. Accordingly, as Defendants acknowledge, this Court may take judicial notice. MIC 5 n. 3.

*e.g.*, *Bear Stearns*, 763 F. Supp. 2d at 509. Relying on a handful of decades-old and out-of-circuit decisions, Macquarie Management incorrectly claims that "contemporaneous" means ***only*** trades that occurred on the same day as the Offering (MIMUSA 20),[28] but Macquarie Management knows this is not the law in the Second Circuit. The *Take-Two* decision on which Macquarie Management heavily relies rejected this "restrictive definition" as "run[ning] contrary to the weight of authority in this Circuit, which maintains that trades are contemporaneous if they occur within a reasonable period of time, usually limited to a few days, of one another." 551 F. Supp. 2d at 311 n. 51.[29] Likewise, Macquarie Management cites no law supporting its arguments that Section 20A applies only to ***some*** contemporaneous transactions or that Plaintiff must plausibly allege that it had been "in privity" with Macquarie Management (MIMUSA 19-20),[30] which contradict the plain language of Section 20A. Macquarie Management's formalistic squabbles do not contradict the plain sufficiency of the allegations. *See Refco*, 503 F. Supp. 2d at 664-66.

## II.   THE COMPLAINT PLEADS CLAIMS UNDER THE SECURITIES ACT

### A.   The Securities Act Claims Are Not Subject To Heightened Standards

Securities Act claims are "ordinary notice pleading case[s], subject only to the 'short and plain statement' requirements of Federal Rule of Civil Procedure 8(a).'" *N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC,* 709 F.3d 109, 120 (2d Cir. 2013). In contending that

---

[28] Macquarie Management cites only cases following a trend in the Ninth Circuit to construe "contemporaneous" very restrictively and in conflict with the Second Circuit. And even courts in the Ninth Circuit have noted that "there is no binding authority suggesting . . . the availability of Section 20A [is limited] to those investors who could have possibly traded with an insider." *Turocy v. El Pollo Loco Holdings, Inc.*, 2018 WL 3343493, at *15 (C.D. Cal. July 3, 2018).

[29] *See also, e.g., Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 495 F.2d 228, 241 (2d Cir. 1974) (four days within "same period"); *In re Pfizer Inc. Sec. Litig.,* 584 F. Supp. 2d 621, 642 (S.D.N.Y. 2008) (six days contemporaneous); *In re Oxford Health Plans,* 187 F.R.D. 133, 144 (S.D.N.Y. 1999) (five days contemporaneous).

[30] *See Wilson v. Comtech Telecommc'ns. Corp.*, 648 F.2d 88, 94-95 (2d Cir. 1981) (cited at MIMUSA 19) (holding only that contemporaneous must be less than one month); *O'Connor & Assocs. v. Dean Witter Reynolds, Inc.*, 559 F. Supp. 800, 803 (S.D.N.Y. 1983) (cited at MIMUSA 19-20) (no causation where trade before any duty to disclose).

Rule 9(b) pleading standards apply to the Securities Act claims (MIC 11, 31-32), Defendants "misread *Rombach*. Unlike the plaintiffs in *Rombach*—whose Section 11 claims incorporated by reference the allegations supporting their Section 10(b) fraud claims—the plaintiffs here went beyond 'nominal efforts' to distinguish their fraud allegations from their strict liability and negligence allegations." *comScore, Inc.,* 268 F. Supp. 3d at 558 (S.D.N.Y. 2017)).[31] That is precisely what Plaintiff did: separate the fraud and non-fraud theories of liability into wholly independent sections, making it "easy to distinguish between the two, and the substance of the allegations keeps the distinction as clear as does the complaint's structure." *EnergySolutions*, 814 F. Supp. 2d at 425. *Compare* ¶¶336-398 (Securities Act) *with* ¶¶317-335 (Exchange Act).

## B. The Complaint Pleads Claims Under Securities Act Sections 11 and 12(a)(2).

"Section 11 was designed to hold those who prepare registration statements in connection with [securities offerings]—such as the Underwriters, Issuers, and Individual Defendants here— to a stringent standard of liability for ***any*** material misrepresentations contained in those statements." *In re Initial Pub. Offering,* 241 F. Supp. 2d 281, 296 (S.D.N.Y. 2003) (emphasis in original); *see also EnergySolutions, Inc.*, 814 F. Supp. 2d at 425 ("Neither Section 11 nor Section 12(a)(2) requires pleading or proof that a defendant acted with intent to defraud or even knew that misrepresentations or omissions had been made.").[32] Defendants rest almost entirely on their Exchange Act arguments, which fail as described above. *Supra* Section I.A.1.

---

[31] Defendants' other cases are inapposite. *See, e.g.*, *Nakahata v. New York-Presbyterian Healthcare System, Inc.*, 723 F.3d 192, 198 (2d Cir. 2013) (applying Rule 9(b) without controversy to RICO, labor, and common law claims); *Ladmen Partners, Inc. v. Globalstar, Inc.*, 2008 WL 4449280, at *11 (S.D.N.Y. 2008) (no Exchange Act claims asserted in the alternative; applying Rule 9(b) to Securities Act claims to complaint "riddled with allegations of essentially fraudulent conduct," with information "deliberately withheld . . . because it needed money[.]"). *Compare, e.g.*, *Refco*, 503 F. Supp. 2d at 632 ("[The] massive fraud . . . does not take away plaintiffs' right to plead in the alternative that defendants violated provisions requiring only negligence.").

[32] Thus, contrary to Defendants' contention, there is no requirement to "plead that ***any possible investigation or exercise of 'reasonable care'*** would have alerted defendants to a misstatement or omission." MIC 33-34 n.33.

In passing, Defendants claim that the "Securities Act claims are even more attenuated, resting as they do on the illogical notion that any reasonable investigation should—or even could—have alerted defendants in the fall of 2016 to what they did not know (and could not have known) would happen until December 2017 and January 2018." MIC 34. Describing the timeframe as "the fall of 2016" glosses over key facts: the statements at issue were made just days after the widely-reported news that IMO 2020 would proceed on schedule—a development that *Reuters* described as "disruptive" and that S&P Global Platts stated led to immediate pricing changes for "a dramatically different fuel oil market." ¶¶120-23. As Defendants knew of IMTT's continuing and primary reliance on storing No. 6 fuel oil, they could fully appreciate the relevance of this news to Macquarie. However, in plain violation of the disclosure requirements of Regulation S-K, the Offering Documents made no mention of the development and instead misleadingly suggested that "strict environmental regulations" ***benefitted*** IMTT as one of "several barriers" to entry that protected IMTT from competition. ¶¶132, 363-365.[33] Defendants' claim that they "could not have known . . . how MIC's dividend policy would be impacted" is a red herring: ***only*** Defendants could accurately assess the conversion (and resultant expenditures) that the "dramatically different fuel oil market" following IMO 2020's confirmation might require. ¶122. Defendants do not even address this plain violation of the requirement under Item 503 to include "discussion of the most significant factors that make the offering speculative or risky," which courts routinely sustain Securities Act claims concerning in similar circumstances. *See, e.g.*, *Citiline Holdings, Inc. v. iStar Financial Inc.*, 701 F. Supp. 2d 506, 514–15 (S.D.N.Y. 2010) ("the Court cannot grant dismissal on the ground that the quarterly reports preceding the secondary offering put the market on notice

---

[33] Macquarie Management's assertion that "Plaintiff does not allege falsity" for this statement (MIMUSA 15-16) is unfounded—the statement is plainly misleading.

of a trend of deteriorating performance . . . these isolated data points do not . . . relieve Defendants of their disclosure obligations in the registration statement").

### C. The Complaint Pleads Control Person Liability Under Section 15.

As described above, the Complaint sufficiently alleges a primary violation by the controlled person and control of the primary violator, which is all that is required for a claim under Section 15. *See BioScrip*, 95 F. Supp. 3d at 746. Defendants also contend that Section 15 requires "culpable participation," even as they acknowledge that the Second Circuit has expressly passed on the opportunity to do so. *See In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 186 (2d Cir. 2011).[34] In any event, even if the Court chooses to extend the requirement to Section 15, the Complaint sufficiently pleads culpable participation for the reasons described above.

### D. Defendants' Other Securities Act Arguments Fail

#### 1. Lead Plaintiff Has Standing.

Plaintiff alleges that it purchased 18,800 shares of Macquarie common stock "in or traceable to the Offering"—purchases that took place on the same day as the Offering began, at the same price as the Offering announced, and without customary traders' fees (demonstrative of an Offering purchase). ¶¶27, 333 n. 9; Jensen Decl. Ex. A. This readily satisfies the pleading requirements for Sections 11 and 12(a)(2) standing that are consistently applied in this Circuit. *See DeMaria v. Andersen*, 318 F.3d. 170, 178 (2d Cir. 2003) (plaintiffs "who can trace their shares to an allegedly misleading registration statement have standing to sue under § 11 of the 1933 [Securities] Act"); *In re SunEdison, Inc. Sec. Litig.*, 329 F.R.D. 124, 133 (S.D.N.Y. 2019) (applying *DeMaria* traceability requirement); *BioScrip*, 95 F.Supp.3d at 745-46 (a plaintiff "need

---

[34] Defendants' reference to the "almost identical" statutory language (MIMUSA 14 n.8) omits that the difference relates to "culpable participation": specifically, ***only*** Section 20(a) expressly excludes liability where "the controlling person acted in good faith and did not directly or indirectly induce the act[.]" *See Refco*, 503 F. Supp. 2d at 660 n.43.

only assert that [it] purchased shared issued pursuant to, or ***traceable to*** the public offerings," finding plaintiff's presentation of a schedule indicating it purchased Defendant stock on day of offering sufficient to show Section 12(a)(2) standing); *MF Global*, 982 F. Supp. 2d at 324 (For §12(a)(2) standing, "[i]t is enough, at this stage . . . to allege that they purchased securities 'in' or 'pursuant to' the relevant offerings[.]"); *In re Lehman Bros. Sec. and ERISA Litig.*, 799 F. Supp. 2d 258, 311 (S.D.N.Y. 2011) (finding §12(a)(2) standing based on "dates and amount of securities [plaintiffs] purchased"). The authorities cited by Defendants do not hold otherwise, but instead at most confirm the unremarkable proposition "that § 12(a)(2) relief is only available for purchasers of securities in public offerings"—which is alleged here. *Freidus v. Barclays Bank PLC*, 734 F.3d 132, 141 (2d. Cir. 2013).

## 2. Macquarie is a Statutory Seller.

Defendant Macquarie[35] claims that it is not a "statutory seller" under Securities Act §12(a)(2) because Macquarie Management "was the sole selling shareholder in the Offering." MIC 35. However, "Congress expressly intended to define broadly" the term "statutory seller" to "encompass the entire selling process," and courts construe "statutory seller" to include any entity that either "(1) 'passed title, or other interest in the security, to the buyer for value,' or (2) successfully solicited the purchase of a security, motivated at least in part by a desire to serve [its] own financial interests or those of the securities' owners.'" *Fed. Hous. Fin. Ag. for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 139 (2d Cir. 2017). On Macquarie Management's behalf, Macquarie was inextricably involved in solicitation, including: 1) the Offering was conducted pursuant to Macquarie's existing registration statement and a Prospectus

---

[35] While Barclays joined in the Macquarie Defendants' arguments, Macquarie argues only that "***MIC*** Was [Not] A Statutory Seller." MIC 34. In any event, the Complaint sufficiently pleads Barclays was a "statutory seller."

Supplement that Macquarie filed (¶132); 2) Macquarie issued multiple press releases concerning the Offering, announcing its commencement and later its pricing (*id.*); and 3) the Offering Documents explicitly directed investors to contact Macquarie with requests for additional documents (Schreiber Ex. N, at S-35). These actions place Macquarie well within the "expansive" definition of "statutory seller." *See, e.g.*, *Balestra v. ATBCOIN LLC,* 2019 WL 1437160, at *9-10 (S.D.N.Y. Mar. 31, 2019) (issuance of press releases and other promotional statements "clearly reflect . . . efforts to solicit the sale"). The cases cited by Macquarie confirm as much.[36]

## CONCLUSION

For all of these reasons, Defendants' motions to dismiss should be denied in their entirety. Alternatively, if the Court chooses to dismiss any part of this Action, Plaintiff respectfully requests leave to amend.

DATED: June 21, 2019                    Respectfully submitted,


                                         _/s/ Salvatore J. Graziano_____

                                         **BERNSTEIN LITOWITZ BERGER
                                           & GROSSMANN LLP**

                                         Salvatore J. Graziano
                                         Lauren A. Ormsbee
                                         Jesse L. Jensen
                                         James M. Fee
                                         1251 Avenue of the Americas
                                         New York, NY 10020
                                         Tel:    (212) 554-1400
                                         Fax:    (212) 554-1444
                                         salvatore@blbglaw.com
                                         lauren@blbglaw.com
                                         jesse.jensen@blbglaw.com

---

[36] *See, e.g.*, *In re Deutsche Telekom AG Sec. Litig.*, 2002 WL 244597 at *5 (S.D.N.Y. Feb. 20, 2002) (cited at MIC 35) (non-issuer selling shareholder defendant—i.e., akin to Macquarie Management here, ***not*** Macquarie—was not sufficiently alleged "statutory seller" given no clear public sale and "no factual allegation of specific conduct on the part of [the defendant] to solicit purchases . . . other than the fact that [its] name appears in the prospectus").

james.fee@blbglaw.com

*Counsel for Lead Plaintiff Moab Partners, L.P., and Lead Counsel for the Class*

**OLSHAN FROME WOLOSKY LLP**

Lori Marks-Esterman
John G. Moon
Nicholas S. Hirst
1325 Avenue of the Americas
New York, New York 10019
Tel:    (212) 451-2300
Fax:    (212) 451-2222
lmarksesterman@olshanlaw.com
jmoon@olshanlaw.com

*Additional Counsel for Lead Plaintiff Moab Partners, L.P.*