## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

CITY OF RIVIERA BEACH GENERAL
EMPLOYEES RETIREMENT SYSTEM, on
behalf of itself and al others similarly situated,

                         Plaintiff,

    v.

MACQUARIE INFRASTRUCTURE
CORPORATION, et al.,

                         Defendants.

Case No. 1:18-cv-03608-VSB

ORAL ARGUMENT REQUESTED

## REPLY MEMORANDUM IN FURTHER SUPPORT OF MACQUARIE INFRASTRUCTURE CORPORATION'S AND THE INDIVIDUAL DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT.......................................................................................................... 4

    I.      PLAINTIFF'S EXCHANGE ACT CLAIMS SHOULD BE DISMISSED ........... 4

        A.     Plaintiff Has Not Adequately Alleged a Strong Inference of
             Scienter ................................................................................................ 4

        B.     Plaintiff Has Not Alleged a Viable Misstatement or Omission................ 10

            1.     The lack of a material omission dooms the Complaint................. 10

            2.     The Complaint does not allege any actionable misstatement. ...... 13

    II.     PLAINTIFF'S SECURITIES ACT CLAIMS SHOULD BE DISMISSED......... 14

CONCLUSION...................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Avon Pension Fund v. GlaxoSmithKline PLC*,
  343 F. App'x 671 (2d Cir. 2009) ........................................................................5, 6

*Billhofer v. Flamel Techs., SA*,
  663 F. Supp. 2d 288 (S.D.N.Y. 2009)......................................................................9

*Darquea v. Jarden Corp.*,
  No. 06-cv-0722 (CLB), 2007 WL 1610146 (S.D.N.Y. May 31, 2007).....................6

*ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir 2009)...........................................................................4, 5, 6

*In re Federated Dep't Stores, Inc. Sec. Litig.*,
  No. 00 CV 6362, 2005 WL 696894 (S.D.N.Y. Mar. 25, 2005).............................8

*Fresno Cty. Empls. Ret. Ass'n v. comScore, Inc.*,
  268 F. Supp. 3d 526 (S.D.N.Y. 2017)......................................................................6

*Freudenberg v. E*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010)......................................................................8

*Galestan v. OneMain Holdings, Inc.*,
  348 F. Supp. 3d 282 (S.D.N.Y. 2018)......................................................................8

*Ganino v. Citizens Utilities Co.*,
  228 F.3d 154 (2d Cir. 2000)...................................................................................10

*Gustafson v. AlloydCo., Inc.*,
  513 U.S. 561 (1995).................................................................................................15

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001).......................................................................................7

*In re Mylan N.V. Sec. Litig.*,
  No. 16-cv-7926 (JPO), 2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) ...................7

*In re N. Telecom Ltd. Sec. Litig.*,
  116 F. Supp. 2d 446 (S.D.N.Y. 2000).......................................................................5

*New Orleans Empls. Ret. Sys. v. Celestica, Inc.*,
  455 F. App'x 10 (2d Cir. 2011) ............................................................................7, 8

*Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.*,
    753 F. Supp. 2d 166 (S.D.N.Y. 2010)..................................................................12

*In re Pretium Res. Inc. Sec. Litig.*,
    256 F. Supp. 3d 459 (S.D.N.Y. 2017)........................................................ *passim*

*Rombach v. Chang*,
    355 F.3d 165 (2d Cir. 2004)..........................................................................5

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000)............................................................................6

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
    573 F.3d 98 (2d Cir. 2009)............................................................................7

*In re Salix Pharm., Ltd.*,
    No. 14-CV-8925 (KMW), 2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)............7, 9

*In re Scottish Grp. Sec. Litig.*,
    524 F. Supp. 2d 370 (S.D.N.Y. 2007)............................................................9

*Sheet Metal Workers Local 32 Pension Fund v. Terex Corp.*,
    No. 3:09-cv-2083 (RNC), 2018 WL 1587457 (D. Conn. Mar. 31, 2018)................8

*In re Signet Jewelers Ltd. Sec. Litig.*,
    No. 16 CIV. 6728 (CM), 2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018)................8

*Sirota v. Solitron Devices, Inc.*,
    673 F.2d 566 (2d Cir. 1982)..........................................................................7

*In re SLM Corp. Sec. Litig.*,
    740 F. Supp. 2d 542 (S.D.N.Y. 2010)............................................................5

*Stevelman v. Alias Research Inc.*,
    174 F.3d 79 (2d Cir. 1999)............................................................................7

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..................................................................................4, 9

*In re Vivendi Universal, S.A.*,
    381 F. Supp. 2d 158 (S.D.N.Y. 2003)............................................................6

*In re Vivendi Universal., S.A.*,
    No. 02–cv-5571 (RJH), 03–cv-2175 (RJH), 2004 WL 876050 (S.D.N.Y. Apr.
    22, 2004)..................................................................................................11

**STATUTES AND RULES**

15 U.S.C. §78u-4 ..........................................................................................4

Fed. R. Civ. P. 9(b) ............................................................................................................15

**OTHER AUTHORITIES**

Gordon Pape, *Macquarie Infrastructure: A "Kitchen Sink" Quarter*, Money Show
(Mar. 19, 2018), https://www.moneyshow.com/articles/tptp072513-48147/...........................1

# PRELIMINARY STATEMENT

Plaintiff's theory of liability, as confirmed by the opening sentences of its opposition brief, is a simple one: it alleges (a) that during the class period, MIC "actively concealed" that one of its subsidiaries, IMTT, relied heavily on revenue from the storage of No. 6 oil, (b) the demand for which "Defendants knew" would soon be "essentially eliminated," and (c) that the "truth" underlying this alleged omission was not "revealed" to the market until February 21, 2018, (d) causing "a staggering 41% one-day decline in the price of the Company's shares." Opp. at 1, 16, 44.[1] There are, as previously explained, a number of fundamental problems with this theory.

***First***, there was (and is) a general consensus that the drop in MIC's stock price that occurred in late February 2018 was a reaction to the Company's announcement that it was reducing its dividend guidance for 2018.[2] That decision was based on a number of longer-term strategic considerations beyond (and unrelated to) an unexpected decline in the demand for storage of No. 6 oil at IMTT. As explained by the Chairman of MIC's Board at its 2018 annual shareholder meeting:

> A significant number of factors influenced our decision to reduce the quarterly dividend. These included the decrease in utilization at IMTT, a desire to enhance balance sheet flexibility, shifts in credit and equity markets, changes in federal tax law and continued opportunities to invest in MIC's portfolio.

Reply Ex. A at 3;[3] *accord* Ex. FF at 2-4, Ex. GG at 3. The decision to repurpose some of IMTT's tanks to accommodate products other than No. 6 oil was certainly not the sole (or even primary) motivating factor in the decision. Indeed, given the relatively immaterial impact repurposing was

---

[1] Defined terms have the same meaning as in the MIC defendants' opening brief ("Br.").

[2] *See, e.g.*, Gordon Pape, *Macquarie Infrastructure: A "Kitchen Sink" Quarter*, Money Show (Mar. 19, 2018), https://www.moneyshow.com/articles/tptp072513-48147/ ("The main culprit was the dividend").

[3] All "Reply Ex." citations refer to the exhibits to the Reply Declaration of John Schreiber, dated July 22, 2019) (the "Schreiber Reply Decl."). Like the exhibits attached to the Schreiber Declaration, all exhibits to the Schreiber Reply Declaration are incorporated by reference into the Complaint, publicly-available SEC filings and/or other documents and information of which this Court may take judicial notice. *See* Br. at 5 n.3.

expected to have in 2018 on IMTT's (and MIC's) earnings, plaintiff's speculation that the decision to repurpose some of IMTT's tanks was the sole motivating factor in the decision to reduce dividend guidance is plainly implausible. Nevertheless, certain investors reacted negatively to the announcement that MIC was reducing its dividend guidance for 2018, causing the Company's stock price to drop more than MIC expected. None of that, however, adds up to securities fraud, as demonstrated in defendants' opening brief and as further discussed below.

*Second*, MIC clearly disclosed that IMTT maintained a "substantial market share" of No. 6 oil storage both before and during the class period. Br. at 6-7. Contrary to plaintiff's characterization of these as "undefined disclosures" and the puzzling suggestion that "black oil" is something other than No. 6 oil (Opp. at 4, 23-24), MIC expressly explained in its SEC filings that "***Black oil includes #6 oil, a heavy fuel used in electricity generation, as bunker fuel for ships and for other industrial uses***." Ex. A at 11 (emphasis added). Indeed, if Moab did not believe that IMTT stored any No. 6 oil (as it claims), why did it ask about No. 6 oil exposure and the cost of reconfiguring tanks used for storage of No. 6 oil in late 2017? Ex. BB. And why should IMTT have repurposed tanks that were being fully utilized any sooner? Contrary to what plaintiff implies, MIC never told the market that IMTT had ceased, or even materially reduced, its storage of No. 6 oil. Rather, what MIC said in 2012 was that "it would be in IMTT's long-term best interest to begin to convert *a portion* of the residual oil storage at Bayonne [IMTT's second largest facility] to clean product storage" (*i.e.*, from "residual oil or six oil to two oil") (Reply Ex. B at 9 (emphasis added)), which MIC promptly proceeded to do.[4] Reply Ex. C at 8; Reply Ex. D at 64. It never said that it would be shutting down all (or even a majority) of its No. 6 oil storage tanks.

*Third*, as plaintiff is also forced to concede, global demand for No. 6 oil began to decline

---

[4] MIC provided no further update on the No. 6 storage conversion because IMTT did not make any such conversion.

in the late 1980s (Compl. ¶84); had "declined significantly" "[b]y the early 2000s" (Opp. at 8); and continued on that downward trajectory after IMO 2020 was announced in 2008 (*id*. at 8-9). And yet – *during that same time frame* – IMTT's business of storing No. 6 oil *continued to grow*, so much so that, throughout much of the class period, IMTT enjoyed utilization rates above historic levels. *See* Br. at 7. In other words, prior to the end of 2017, there had never been *any* direct correlation between global demand for No. 6 oil and the demand for storage of that commodity at IMTT's facilities. Statements made by defendants during the class period – to the effect that *MIC's* "*growth has been achieved despite the volatility in markets broadly*"; that "*none of MIC's businesses are exposed directly to the price of crude oil or petroleum products*"; and that, accordingly, infrastructure "*is an inherently more stable asset class*" (*e.g.*, Compl. ¶¶229, 242) – were thus facially accurate and perfectly consistent with the Company's long-time experience to that point. The Complaint alleges no sufficiently particularized facts contradicting what is clear from the public record: it was not until late in the fourth quarter of 2017 and January 2018 that MIC became aware that a number of IMTT's customers, representing an above average volume of No. 6 oil storage capacity, had unexpectedly decided not to renew their contracts,[5] and MIC disclosed that fact in its very next quarterly filing. It was not required to do so any sooner.[6]

---

[5] In lieu of particularized factual allegations, plaintiff instead continues to put forward a flawed math equation to suggest that the unusually large number of non-renewals disclosed to have occurred late in the fourth quarter of 2017 and early January 2018 must have actually occurred somewhat earlier in the quarter (*i.e.*, in late October). Among the reasons plaintiff's "math" does not work is that it (wrongfully) assumes a steady, linear rate of utilization decline across the entire quarter in an attempt to "show" algorithmically that further utilization decline must have actually started by the end of October—*i.e.*, before MIC's third quarter earnings call. *See* Compl. ¶170. Plaintiff alleges no basis for the Court either to infer such a steady, linear rate of decline or to disbelieve MIC's disclosure that a significant number of non-renewals occurred in the fourth quarter due to "the transition of customers and tanks coming out of service for repairs and inspections." *See* Ex. Z at 11-12.

[6] Nor does plaintiff cite anything in its Complaint to suggest that the downturn in the utilization that occurred beginning in the fourth quarter of 2017 was greater than variations in quarterly utilization rates that had occurred in prior periods.

# ARGUMENT

## I.   PLAINTIFF'S EXCHANGE ACT CLAIMS SHOULD BE DISMISSED

### A.   Plaintiff Has Not Adequately Alleged a Strong Inference of Scienter

As demonstrated in defendants' opening brief (and discussed further below), the Complaint fails to allege adequately any threshold material misstatement or omission.  But even if it did, plaintiff's Section 10b-5 claim would still be subject to dismissal for failure to identify "with particularity facts giving rise to a *strong* inference that" any defendant acted with "an intent to deceive, manipulate, or defraud" MIC investors.  *In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 473 (S.D.N.Y. 2017) (quoting 15 U.S.C. §78u-4(b)(2) and *ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir 2009)); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007) (the inference of scienter "must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent").  This, standing alone, is fatal to plaintiff's claim.

In its opposition, plaintiff first contends that it has established a strong inference of scienter by alleging that MIC and the Management Defendants (the only defendants named for purposes of plaintiff's 10b-5 claim) had a "motive and opportunity" to commit fraud.  Opp. at 35-37.  But to adequately plead scienter on this basis, plaintiff must show that MIC and the Management Defendants "benefitted in some concrete and personal way from the purported fraud."  *ECA*, 553 F.3d at 198 (citation omitted).  The Complaint fails to do so.

As previously explained, neither MIC nor any of the Management Defendants sold *any* MIC stock during the class period; on the contrary, the Management Defendants paid more than $1,371,775 to *purchase* an additional 18,500 shares of MIC common stock in February 2017.[7]  *See*

---

[7] Mr. Hooke paid more than $1 million in February 2017 alone, which is fundamentally at odds with the notion that he was aware that the Company would be forced to cut its dividend.

Reply Exs. E, F, G. This conclusively rebuts any suggestion of a motive to commit fraud. *Avon Pension Fund v. GlaxoSmithKline PLC*, 343 F. App'x 671, 673 (2d Cir. 2009) (no "'cogent and compelling' inference of fraudulent intent" where three of four individual defendants bought company stock during the class period and the fourth did not sell stock); *Rombach v. Chang*, 355 F.3d 165, 177 (2d Cir. 2004) (no motive established where plaintiffs failed to allege "that defendants sold stock or profited in any way during the relevant period"); *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 462 (S.D.N.Y. 2000) (same).

That MIMUSA (which is not a defendant for purposes of the 10b-5 claim) sold some of its stock in 2016 and received contractual management fees (Opp. at 35-36), most of which it reinvested in new shares of MIC (Br. at 26-27), does not qualify as the type of "concrete and personal" benefit to MIC or the Management Defendants necessary to infer scienter. As plaintiff acknowledges, to plead motive based on stock sales, a complaint must "allege that a defendant sold *its own* shares while at the same time misrepresenting corporate performance in order to inflate stock prices." Opp. at 35 (quoting *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 420 (S.D.N.Y. 2011)) (emphasis added). That did not occur here.

Nor does the fact that defendants Hooke, Stewart and Davis were also affiliated with MIMUSA establish a sufficient motive on their part to commit fraud. *ECA*, 553 F.3d at 198 (common motives to corporate officers "such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry."); *Pretium*, 256 F. Supp. 3d at 480-81 (that defendant's bonus was tied to company's market capitalization had "no bearing on [his] motive and opportunity as a matter of law").[8] Plaintiff conveniently ignores the publicly-disclosed fact that MIMUSA

---

[8] Plaintiff's authority (Opp. at 37) is inapposite. *See In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 558 (S.D.N.Y.

reinvested the vast majority of its fees during the class period in new shares of MIC stock (Br. at 26-27), which severely undercuts any inference of improper motive.  *Cf. Avon Pension Fund*, 343 F. App'x at 673 (stock purchases during class period inconsistent with fraudulent intent).

The only other allegation plaintiff points to relates to IMTT's 2017 acquisition of Epic Midstream, a group of terminals that stored jet fuel, including for the Department of Defense.  Opp. at 13, 36-37.  This is a puzzling theory, given that this relatively small acquisition was, by plaintiff's own admission, (a) an attempt to "diversify" IMTT's business into other products (Opp. at 13, 34) – *precisely what plaintiff contends IMTT should have been doing* – and (b) completed in August 2017—four months before the unexpected non-renewals began.  Ex. W at 2-4; Reply Ex. H at 2.  No aspect of the transaction, including the decision to fund some of the purchase price with stock, supports an inference (let alone a strong inference) of scienter.  *ECA*, 553 F.3d at 201 (allegations of generalized desires cannot establish scienter as they "can be attributed to virtually every company seeking to be acquired or to acquire another") (internal quotation marks omitted).[9]

Plaintiff also attempts to establish a strong inference of scienter based on defendants' purported "recklessness" and "conscious misbehavior."  Opp. at 38-44.  As explained in defendants' opening brief, however, conscious misbehavior encompasses deliberate illegal behavior, while "recklessness" is "a state of mind approximating actual intent, and not merely a

---

2010) ($225 million windfall to defendant who made "unusual" stock sales during the class period); *Darquea v. Jarden Corp.*, No. 06-cv-0722 (CLB), 2007 WL 1610146, at *10 (S.D.N.Y. May 31, 2007) ("millions of dollars in incentive payments keyed to … stock price performance" to defendants who made "curiously coincidental [stock] sales").

[9] The facts present in the cases cited by plaintiff (Opp. at 36-37) contrast markedly with those alleged in the Complaint here.  In *Rothman v. Gregor*, 220 F.3d 81, 93-94 (2d Cir. 2000), the court inferred scienter from an acquisition that, unlike here, occurred *after* the defendants allegedly became aware of information contrary to their public statements, but declined to infer scienter from other acquisitions made, as here, *before* defendants became aware of such facts.  *See also Fresno Cty. Empls. Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 554 (S.D.N.Y. 2017) (finding "a direct line between the Merger and the fraud" where defendants' "scheme to inflate revenues … escalated as the Merger negotiations heated up [and] fell apart less than a month after the Merger was consummated"); *In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 185 (S.D.N.Y. 2003) (challenged acquisition "would not otherwise [have been] possible without fraudulently inflating stock prices," an allegation not present here).

heightened form of negligence." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109-10 (2d Cir. 2009) (emphasis and citation omitted); *see Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (if no motive has been shown, "the strength of the circumstantial allegations must be correspondingly greater"). Plaintiff does not come close to meeting this standard.

Plaintiff's main argument – that "[t]he Company has admitted the falsity of numerous statements by Defendants" (Opp. at 38) – is not only untrue,[10] but also conflates the elements of a 10b-5 claim. To establish a claim under Section 10(b) and Rule 10b-5, a plaintiff must plead and prove, among other elements, both a material misstatement or omission *and* scienter. Establishing the former (which plaintiff has not done) does not establish the latter.[11]

Plaintiff's allegations of "actual knowledge" fare no better, as they amount to nothing more than a claim of fraud by hindsight, which has been repeatedly rejected by the Second Circuit. *See* Br. at 27-28 (and authorities cited). While the Complaint alleges in conclusory fashion that defendants "knew" facts or had access to information contradicting their public statements (Opp. at 39-41), plaintiff fails to "*specifically identify the reports or statements containing this information.*" *Pretium*, 256 F. Supp. 3d at 473 (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008)) (emphasis added).[12]

---

[10] See Br. at 24-25 & n.25, 28 n.28 and 21 n.20, and *infra* at 12-14 for clarification of the so-called "admissions" listed on page 38 of plaintiff's opposition brief.

[11] Plaintiff misquotes and misrepresents *Stevelman* (Opp. at 38), which expressly *refused* to base its finding of scienter on defendant's alleged "admissions." *See Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2d Cir. 1999). The misquote itself is of *Stevelman*'s citation to the inapposite *Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 573 (2d Cir. 1982), a pre-PSLRA case.

[12] This failure distinguishes this case from those cited by plaintiff (Opp. at 39). *See New Orleans Empls. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 (2d Cir. 2011) ("CW3 … prepared spreadsheets for senior management – including [the individual defendants] – detailing the extent of excess and obsolete inventory"); *In re Mylan N.V. Sec. Litig.*, No. 16-cv-7926 (JPO), 2018 WL 1595985, at *12 (S.D.N.Y. Mar. 28, 2018) ("the Complaint alleges that 'CMS repeatedly informed Mylan that Mylan was misclassifying the EpiPen' and that Defendants were notified of the DOJ investigation by a subpoena"); *In re Salix Pharm., Ltd.*, No. 14-CV-8925 (KMW), 2016 WL 1629341, at *14 (S.D.N.Y. Apr. 22, 2016) ("Plaintiffs have identified specific reports and statements containing information about Salix's true wholesale inventory level.").

The allegations attributed to former employees (Opp. at 40-41) are insufficient for the same reason: none identifies a specific report or statement contradicting defendants' public statements. *See, e.g.*, *In re Federated Dep't Stores, Inc. Sec. Litig.*, No. 00 CV 6362, 2005 WL 696894, at *5 (S.D.N.Y. Mar. 25, 2005) ("[V]ague allegations of 'discussions' do not support an inference that Defendants had access to specific information contradicting their public statements.").[13]

Plaintiff's remaining allegations likewise fail to establish a strong inference of scienter. Plaintiff's argument based on the "importance … of the information at issue" – *i.e.*, that MIC's stock price is tied to its dividend, which is "largely driven by IMTT," which in turn is MIC's "'bellwether' business." (Opp. at 41-42) – is fatally attenuated. Storage of No. 6 oil is but one aspect of IMTT's business (Br. at 5), IMTT is but one of MIC's operating segments (*id.*), and, most importantly, the decision to reduce MIC's dividend was based on several material factors unrelated to the decision to repurpose some tanks at IMTT's St. Rose facility (*supra* at 1-2).[14]

Nor was there anything "suspicious" about Mr. Hooke's resignation from MIC after more than eight years as CEO (well above the average tenure for CEOs of a NYSE-listed companies). Opp. at 42. As he explained publicly, months before the end of the class period, his decision to

---

[13] Again, plaintiff's own authority (Opp. at 40-41) lays bare the Complaint's failure to plead scienter. *See In re Signet Jewelers Ltd. Sec. Litig.*, No. 16 CIV. 6728 (CM), 2018 WL 6167889, at *13 (S.D.N.Y. Nov. 26, 2018) (deeming "[m]ost compelling" former employee's "allegations that Signet personnel contemplated raising reserves at 'bad debt' meetings, but senior executives … elected not to do so"); *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 301 (S.D.N.Y. 2018) ("[T]he FEs identified which reports were circulated during the Class Period; they stated that these reports reached senior executives; they described the Symphony platform reports to which Defendants had access during the Class Period; and they described the Individual Defendants' attendance at meetings and on conference calls during which integration-related issues were discussed."); *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 197 (S.D.N.Y. 2010) ("Caplan told CW9 that E*TRADE was trying to 'somehow compensate for losses' because they were 'so leveraged out'").

[14] The cases plaintiff cites (Opp. at 41-42) do not support a finding of scienter based on the "critical importance" of the information in question. Key to the courts' findings in those cases was not the "importance" of the information, but rather the fact that it was reported to the individual defendants. *See Sheet Metal Workers Local 32 Pension Fund v. Terex Corp.*, No. 3:09-cv-2083 (RNC), 2018 WL 1587457, at *11-12 (D. Conn. Mar. 31, 2018) (scienter adequately pled as to only one of individual defendants, who allegedly received specific information demonstrating inaccuracy of company's public statements); *Celestica*, 455 F. App'x at 14 (scienter pled as to individual defendants who were alleged to have been "informed about the inventory buildup and the subpar inventory management in the "company").

return to Australia understandably centered on "family issues" and his children's education (Ex. AA at 17)[15] and had nothing to do with No. 6 oil.

There is likewise, as previously explained (Br. at 24-25 & n.25), nothing suspicious about the timing or substance of Mr. Davis's November 16, 2017 statements regarding IMTT's capacity of "heavy product" (Opp. at 43). Nor does the Complaint identify any specific reports or other information that Mr. Davis was provided beforehand that contradicted his statements. *See Pretium*, 256 F. Supp. 3d at 471 ("Falsity is a failure to be truthful – it is not a misapprehension, misunderstanding, or mistake of fact at the time a statement was made.").

Finally, pre-class period changes by MIC to the form and level of detail of certain aspects of its public disclosures (Opp. at 43-44) likewise provide no basis to infer fraudulent intent. Not only were the changes made years before the class period began, but it is well-settled that public companies are under no obligation to disclose all information, no matter how granular, that may conceivably affect stock prices. Br. at 15 (citing cases).[16] And, as plaintiff acknowledges, MIC explained at the time that the admittedly "granular" detail on which plaintiff now focuses was, in its view, "not particularly helpful" and, in some respects, confusing to investors. Opp. at 43-44.[17]

In short, the inference of scienter that plaintiff asks the Court to draw is neither "cogent" nor "as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

---

[15] The facts surrounding Mr. Hooke's decision to return to Australia are very different from those present in the cases cited by plaintiff (Opp. at 42). *See In re Scottish Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 381, 394 n.176 (S.D.N.Y. 2007) ("highly unusual and suspicious" resignations announced the same day as the alleged corrective disclosure); *In re Salix Pharm.*, 2016 WL 1629341, at *15 (resignations "highly unusual or suspicious" where board exercised clawback provisions in resignations agreements and company later restated its financials).

[16] Plaintiff misrepresents *Billhofer v. Flamel Techs., SA*, 663 F. Supp. 2d 288 (S.D.N.Y. 2009). The court was clear that "the company's willingness to be forthcoming in matters concerning its flagship [product]" was "not relevant" to its determination if plaintiff had stated a plausible claim for relief under section 10(b) and Rule 10b-5. *Id.* at 302-03.

[17] The opposition relies on ¶79 of the Complaint, which itself selectively misrepresents the context of Exhibit U.

Accordingly, the Court should dismiss plaintiff's claims under Sections 10(b) and 20(a).[18]

## B. Plaintiff Has Not Alleged a Viable Misstatement or Omission

Aside from its failure to adequately plead scienter, the Complaint, as previously demonstrated, also fails to identify any actionable misstatement or omission. Plaintiff's opposition makes clear that there are only two key questions that this Court needs to consider in this regard. First, did MIC disclose to the market that IMTT stored No. 6 oil? The answer is indisputably yes. Second, did MIC have a duty to disclose the decline in demand for storage of No. 6 oil at IMTT at the end of 2017 earlier than it did? The answer is clearly no. That being the case, plaintiff's theory is simply not viable, and thus this Court should dismiss the entire Complaint.

### 1. The lack of a material omission dooms the Complaint.

It cannot be disputed that this case is based on purported omissions—namely, that MIC "concealed" that IMTT relied on the storage of No. 6 oil, the demand for which would soon be "essentially eliminated." *See, e.g.*, Opp. at 1, 19-20. As explained in defendants' opening brief and discussed above, however, this theory cannot stand because the very facts of which plaintiff complains were disclosed to and/or known by investors throughout the class period. *See* Br. at 12-13. Plaintiff's attempt to portray such disclosures as inadequate for purposes of a "truth on the market" defense misses the point. A "truth on the market" defense presupposes the existence of a misstatement and then questions if, notwithstanding that misstatement, there was sufficient corrective information conveyed to the market to counterbalance the alleged misstatement such that an investor could not have been misled. *See Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167-68 (2d Cir. 2000). Defendants are not relying on such a defense. In fact, far from it.

Here, dismissal is required because the allegedly omitted information is the very

---

[18] The Management Defendants also incorporate by reference the arguments advanced by MIMUSA with respect to plaintiff's claim under Section 20(a).

information that was disclosed to plaintiff and the investing public.  *See, e.g.*, *In re Vivendi Universal., S.A.*, No. 02–cv-5571 (RJH), 03–cv-2175 (RJH), 2004 WL 876050, at *5 (S.D.N.Y. Apr. 22, 2004) (dismissing claim, despite plaintiff's argument that defendants were raising "truth on the market" defense, where the "allegation that the [information was] not disclosed to them is contradicted by the very documents they rely on in bringing their complaint").  Courts – including this one – routinely dismiss securities fraud cases where, as here, the defendant had, in substance, disclosed "the very information Plaintiffs contend [the defendant] to have omitted."  *Pretium*, 256 F. Supp. 3d at 476; *see also* Br. at 13 (citing cases).

Plaintiff has failed to meaningfully explain why *Pretium* – a decision by this Court which is virtually on all fours with this matter – should not control here.  Plaintiff merely suggests (in a footnote) that this case is different "because Defendants did not disclose" the fact and extent of IMTT's storage of No. 6 oil.  Opp. at 26 n.12.  Not true.  As previously explained, for years (even prior to the class period), MIC disclosed that 43% of its revenue from the commodities stored at its Louisiana Terminals was from "black oil," and 32% of its revenue from the commodities stored at its Bayonne Terminal was from "black oil."  "Black oil" was expressly defined by MIC in those disclosures to include "#6 oil."[19]  Ex. A at 11.  Thereafter, in every Form 10-K, including during the class period, MIC disclosed that its Louisiana Terminals continued to "give IMTT substantial market share in the storage of black oil."  *E.g.*, Ex. C at 9, Ex. U at 8.  For plaintiff to now suggest that the market did not know that IMTT stored "substantial" amounts of No. 6 oil is implausible on its face (*see* Compl. ¶164) – particularly in light of the fact that plaintiff itself clearly knew that IMTT stored No. 6 oil.  *See* Ex. BB.  The same is true for the existence of IMO 2020: there is no

---

[19] Plaintiff suggests that what "black oil" means constitutes a factual dispute that cannot be resolved at this stage. Opp. at 24.  But there is no bona fide dispute on this: "black oil" was expressly defined by MIC in its SEC filings to include "No. 6 oil."

dispute that the public was aware of IMO 2020 and the possible impacts it could have on demand in the No. 6 oil market. *See* Compl. ¶¶9, 163; *but see* Ex. O at 3-5 (detailing different options, including the installation of "scrubbers," which would allow ships to continue to use No. 6 oil).

Nor did MIC have a duty to disclose anything regarding the late-fourth-quarter 2017 and early 2018 decline in utilization at IMTT any earlier than it did. Plaintiff alleges that, by November 2017, "significant" contracts had not been renewed. Compl. ¶170. Even accepting this flawed and conclusory allegation as true (*see supra* 3 n.5), MIC disclosed the decline in utilization in its very next quarterly filing, satisfying its obligations under the securities laws. *See* Br. at 13-14.

None of the events cited by plaintiff suggests that, earlier in the class period, IMTT was experiencing (and MIC was concealing) any utilization problems or that MIC had any clairvoyance that an above average decline in the demand for storage of No. 6 oil at IMTT would hit at the end of 2017. On the contrary, as discussed above, for nearly the entirety of the class period (and before), there had been no correlation between demand for *storage* of No. 6 oil at IMTT and end-user market demand for *No. 6 oil* as a commodity. While demand for No. 6 oil started to decline in the 1980s, IMTT's own utilization rates were on the rise, and were at levels that were far higher than its own historical norms for much of the class period.[20] *See* Br. at 7, 14. In fact, as plaintiff concedes, IMTT's year-on-year utilization for 2016 (*i.e.*, after IMO announced that it had "concluded its review" and the new global cap on sulfur would begin in 2020, *see* Compl. ¶120) increased to 96%—above historic levels. *See* Br. at 14. The statements that MIC made along the way concerning IMTT were thus perfectly consistent with the Company's experience to that point. *See Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.*, 753 F. Supp. 2d 166,

---

[20] IMTT's utilization rates were over 96% for the year-over-year average for 2016 and 94% at the end June 2017. *See* Ex. V at 11. By the end of September 2017, while utilization had dropped again to 92.7%, the utilization rate for the year remained above 94.3%, which was still above historic averages. Ex. Z at 12. In other words, with utilization rates in the mid-90s, "nearly all" of IMTT's tanks were leased out until the end of 2017.

184 (S.D.N.Y. 2010) ("Nothing in the second amended complaint contradicts with particularity either the sincerity or the accuracy of the defendants' contemporaneous estimations, and thus the plaintiffs present nothing more than an argument that the defendants should have foreseen the unraveling of their CDSs before they did.").

### 2. The Complaint does not allege any actionable misstatement.

*Most*, if not all, of the affirmative misstatements alleged in the Complaint are simply the flip side of plaintiff's omission theory—*i.e.*, those statements are allegedly false, according to plaintiff, because MIC concealed that IMTT relied on revenue from the storage of No. 6 oil, the demand for which would soon be "essentially eliminated." On this basis, plaintiff contends that the myriad forward-looking statements and/or other statements of opinion and corporate optimism identified in the Complaint are nevertheless actionable. As shown above, and discussed *infra*, plaintiff offers no particularized facts to support such an argument.

For instance, plaintiff focuses on Mr. Hooke's November 2, 2017 statement in which he expresses his personal opinion ("I don't think") regarding whether MIC would cut its dividend after he left. Plaintiff argues that this opinion is actionable because Mr. Hooke "knew" that IMTT's utilization rate "had already cratered by that time" and that MIC would cut its dividend after he stepped down (Opp. at 32). Neither of these conclusory assertions is true or supported by particularized allegations of fact that were known at the time. *See* Br. at 20 n.19.

When it comes to the two November 2017 statements by Mr. Davis, plaintiff essentially asks this Court to ignore the clear context of the statements and view certain excerpts in a vacuum. Opp. at 21-22. The clear context of Davis's email exchange with Moab makes clear that the two parties were specifically discussing IMTT's Bayonne terminal in New York Harbor.[21] *See* Br. at

---

[21] Plaintiff also asserts that Mr. Davis "falsely claim[ed]" in this email that No. 6 oil was "banned" and could "easily"

23-24. Likewise, plaintiff argues (and misquotes the transcript to add an "or" where none exists, *compare* Opp. at 22 *to* Ex. CC at 3) that Davis's comment must be understood to mean that IMTT stores "very little" No. 6 oil. Opp. at 21. Again, the context of the statement belies the interpretation plaintiff offers without factual support. Mr. Davis is simply reiterating the point that he had just made—*i.e.*, that IMTT stores "very little in crude, chemicals and agricultural products." Ex. CC at 3. While plaintiff states "heavy product" cannot refer to crude and asphalt (Opp. at 22), there is not a single citation to support that contention. This Court should not credit it.

Finally, there can be no dispute that plaintiff has not alleged any actionable misstatement by IMTT's CEO, Mr. Courtney. Plaintiff points only to statements made by Courtney at a conference on May 12, 2016—months before IMO made the decision that the global cap on sulfur would go into effect in 2020, and during a time period in which IMTT was experiencing utilization rates far above historic norms. Putting aside the fact that the transcript itself suggests that Courtney did not make the comment in question, *see* Br. at 11 n.14, plaintiff's core contention is that these statements were false because IMTT concealed the fact that it had traders as customers. Later in that conference, however, Courtney expressly stated that it was important that IMTT have some flexibility in its tanks because it needed "to have the optionality for *traders*," thus making clear to investors that IMTT's customers included commodity traders. Ex. H at 20 (emphasis added).[22]

## II.    PLAINTIFF'S SECURITIES ACT CLAIMS SHOULD BE DISMISSED

Plaintiff contends that repeating its fraud allegations under a distinct "Securities Act" section of the Complaint, while disclaiming fraud arising out of the exact same facts (a disclaimer

---

be blended to meet IMO 2020 requirements. Opp. at 26. This is untrue. First, IMO 2020 does not "ban" No. 6 oil, it just limits the level of sulfur that can be used. As Davis explained, ships could install scrubbers, continue to use No. 6 oil and still meet the regulations. And, while he said that another option is that it could be blended with distillate, he never once claimed that such a process was "easy." *See* Ex. BB

[22] As explained (Br. at 29-30), plaintiff also fails adequately to plead loss causation. None of the "new news" that allegedly caused plaintiff's loss (Opp. at 44) revealed the truth underlying any alleged prior misstatement or omission.

that is fundamentally inconsistent with its 10b-5 claim), wrests those allegations from the requirements of Rule 9. Opp. at 51-52. Not so. Plaintiff's nominal effort at distinguishing its Exchange Act claims from its Securities Act claims is no different from the boilerplate disclaimers routinely rejected in this Circuit. *See* Br. at 31-32 & n.32. As explained (Br. at 31-35), plaintiff's Securities Act claims fail to satisfy Rule 9's particularity requirements, and should be dismissed.

Most notably, for the reasons set forth above and in defendants' opening brief (Br. at 33-34), the Court should dismiss plaintiff's Securities Act claims for failing to plead an actionable misstatement or material omission in the Offering Documents. Plaintiff attempts to side-step the inconvenient chasm between the date of the Offering Documents and the date defendants learned of storage contract non-renewals at IMTT by suggesting that "only defendants could accurately assess" and predict the effects of IMO 2020. Opp. at 53. But in light of the increasing demand for No. 6 oil storage that IMTT had experienced since before and during the class period – notwithstanding the market being aware of IMO 2020 *since 2008* – any negative prediction that defendants would have offered in 2016 would have been pure speculation, directly at odds with the Company's historical experience to that point. *See* Br. at 14.[23] Plaintiff's Securities Act claims thus must be dismissed.[24]

## CONCLUSION

For the reasons stated above, the Complaint should be dismissed in its entirety.

---

[23] As explained, with respect to plaintiff's claim under Section 12(a)(2), plaintiff has also not adequately alleged (a) its own standing, or (b) that MIC was a "statutory seller." Plaintiff's allegation with respect to standing – that it purchased MIC stock "in or traceable to the Offering" – is plainly insufficient in light of the Supreme Court's holding that Section 12(a)(2) does not extend to a "private or secondary sale." *See Gustafson v. AlloydCo., Inc.*, 513 U.S. 561, 578, 582 (1995). Plaintiff does not (and cannot) allege that MIC passed title of the securities at issue, and argues instead that MIC "was inextricably involved in solicitation" by filing the Offering Documents and issuing press releases "announcing [the Offering's] commencement and later its pricing." Opp. at 55. But that level of "involvement" – bereft of any contact with plaintiff or meaningful effort to pitch the securities at issue – comes nowhere close to the solicitation necessary to be a statutory seller under Section 12(a)(2). Br. at 35.

[24] The Management Defendants incorporate by reference MIMUSA's arguments with respect to plaintiff's claim under Section 15 of the Securities Act.

Dated:  July 22, 2019                          Respectfully submitted,

                                               **WINSTON & STRAWN LLP**

                                                 s/ John E. Schreiber
                                               Richard W. Reinthaler
                                               John E. Schreiber
                                               Kerry C. Donovan
                                               Frank S. Restagno
                                               200 Park Avenue
                                               New York, New York 10166
                                               Telephone: (212) 294-6700
                                               Facsimile:  (212) 294-4700
                                               rreinthaler@winston.com
                                               jschreiber@winston.com
                                               kcdonovan@winston.com
                                               frestagno@winston.com

                                               *Attorneys for Macquarie Infrastructure*
                                               *Corporation and the Individual Defendants*