# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| CITY OF RIVIERA BEACH GENERAL EMPLOYEES RETIREMENT SYSTEM,<br>on behalf of itself and all others similarly situated,<br><br>       Plaintiffs,<br><br>v.<br><br>MACQUARIE INFRASTRUCTURE CORPORATION, *et al.*<br><br>       Defendants. | Civil Action No. 1:18-cv-03608-VSB<br><br>**Oral Argument Requested** |

# DEFENDANT MIMUSA'S MEMORANDUM OF LAW IN SUPPORT OF <u>RENEWED MOTION TO DISMISS</u>

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................ 1

BACKGROUND ...................................................................................... 2

LEGAL STANDARD ............................................................................... 5

ARGUMENT ........................................................................................... 7

I.      Moab Has Not Pled a Section 20(a) Control Person Claim ............... 7

        A.      Moab Has Not Pled MIMUSA's Actual Control of MIC .................... 8

                *1.*      *Moab Does Not Allege MIMUSA Had Actual Control* ............................ 8

                *2.*      *Managing Day-to-Day Operations Is Not Control* ................................. 9

                *3.*      *Alleging MIMUSA Had "Responsibility" And "Oversight" Does Not Show Control* ............ 10

                *4.*      *Lending Employees Does Not Imply Control* .......................................... 11

                *5.*      *MIC's Officers Are Presumed to Act for MIC, Not MIMUSA* ................ 11

                *6.*      *Moab Does Not Allege MIMUSA Controlled the Alleged Fraud* ........... 13

        B.      Moab Has Not Pled that MIMUSA Culpably Participated in the Alleged Violations ........... 13

                *1.*      *The Complaint Does Not Allege MIMUSA Intended to Deceive or Defraud* ............ 15

                *2.*      *Moab's Motive Theory Based on MIMUSA's Compensation Is Untenable* ............ 15

II.     Moab Has Not Pled a Section 15 Control Person Claim ................................. 16

III.    The Control Person Cases Moab Cited in Its Opposition Do Not Apply Here ............. 18

IV.    Moab Has Not Pled an Insider Trading Claim ................................................. 19

        A.      Moab Has Not Pled MIMUSA Had Insider Knowledge ..................................... 20

        B.      The Circumstances Negate Scienter ................................................................. 22

                *1.*      *MIMUSA Sold Stock More than 15 Months Before the Stock Drop* ....... 22

                *2.*      *MIMUSA's Sale Was Consistent with Prior Sales and MIMUSA Continued to Acquire Significant Amounts of MIC Stock* .......... 23

                *3.*      *Moab's Insider Trading Cases Are Factually Distinguishable* .............. 24

CONCLUSION ...................................................................................... 24

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Acito v. IMCERA Grp., Inc.*,
  47 F.3d 47 (2d Cir. 1995) ...................................................................................16

*Alaska Elec. Pension Fund v. Asar*,
  768 F. App'x 175 (5th Cir. 2019) .........................................................................24

*Alpha Cap. Anstalt v. Schwell Wimpfheimer & Assocs. LLP*,
  No. 1:17-CV-1235-GHW, 2018 WL 1627266 (S.D.N.Y. Mar. 30, 2018),
  *corrected*, 2018 WL 11472420 (S.D.N.Y. Apr. 27, 2018) ...............................11, 12

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...............................................................................................5

*ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d. Cir. 2007) .........................................................................7, 14, 24

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ...............................................................................................5

*Chill v. General Elec. Co.*,
  101 F.3d 263 (2d Cir. 1996) ............................................................................14, 16

*Dawn Donut Co. v. Hart's Food Stores, Inc.*,
  267 F.2d 358 (2d Cir.1959) ...................................................................................12

*DeMaria v. Andersen*,
  153 F. Supp. 2d 300 (S.D.N.Y. 2001) (Pauley, J.) ...............................................17

*DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*,
  323 F. Supp. 3d 393 (S.D.N.Y. 2018) .....................................................................8

*Ellison v. American Image Motor Co.*,
  36 F. Supp. 2d 628 (S.D.N.Y. 1999) (Chin, J.) .................................................17, 19

*Fresno County Employees' Retirement Association v. comScore, Inc.*,
  268 F. Supp. 3d 526 (S.D.N.Y. 2017) ....................................................................24

*Harris v. Mills*,
  572 F.3d 66 (2d Cir. 2009) ......................................................................................5

*In re Alstom SA*,
  406 F. Supp. 2d at 491 ..............................................................................7, 10, 11, 13

*In re Am. Realty Cap. Properties, Inc. Litig.*,
  No. 15-MC-40 (AKH), 2016 WL 11110435 (S.D.N.Y. Aug. 5, 2016) ................................... 17

*In re APAC Teleservice, Inc. Securities Litigation*,
  No. 97 Civ. 9145(BSJ), 1999 WL 1052004 (S.D.N.Y. Nov. 19, 1999) (2019
  Opp. ) ............................................................................................................................................. 24

*In re Authentidate Holding Corp.*,
  No. 05-cv-5323 (LTS)(DFE), 2006 WL 2034644 (S.D.N.Y. July 14, 2006) .......................... 22

*In re Bear Stearns Cos. Sec., Derivative, & ERISA Litig.*,
  763 F. Supp. 2d 423 (S.D.N.Y. 2011) ..................................................................................... 20

*In re BioScrip, Inc. Sec. Litig.*,
  95 F. Supp. 3d 711 (S.D.N.Y. 2015) ........................................................................................ 10

*In re Borders Group*,
  453 B.R. 459 (Bankr. S.D.N.Y. 2011) ..................................................................................... 10

*In re Deutsche Telekom AG Sec. Litig.*,
  No. 00 CIV 9475 SHS, 2002 WL 244597 (S.D.N.Y. Feb. 20, 2002) ....................................... 9

*In re Glob. Crossing, Ltd. Sec. Litig.*,
  No. 02-cv-910 (GEL), 2005 WL 2990646 (S.D.N.Y. Nov. 7, 2005) ................................. 21, 22

*In re Hi-Crush Partners L.P. Securities Litigation*,
  No. 12 CIV 8557, 2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) .............................................. 19

*In re Lehman Bros. Mortg.-Backed Sec. Litig.*,
  650 F.3d 167 (2d Cir. 2011) ............................................................................................... 16, 17

*In re Marsh & McLennan Cos. Sec. Litig.*,
  501 F. Supp. 2d 452 (S.D.N.Y. 2006) ..................................................................................... 17

*In re Oxford Health Plans, Inc.*,
  187 F.R.D. 133 (S.D.N.Y. 1999) ............................................................................................. 19

*In re Parmalat Sec. Litig.*,
  594 F. Supp. 2d 444 (S.D.N.Y. 2009) ..................................................................................... 19

*In re Pretium Res. Inc. Sec. Litig.*,
  256 F. Supp. 3d 459 (S.D.N.Y. 2017) (Broderick, J.) ............................................................... 3

*In re Refco, Inc. Sec. Litig.*,
  503 F. Supp. 2d 611 (S.D.N.Y. 2007) ................................................................................. 15, 19

*In re Sec. Cap. Assur. Ltd. Sec. Litig.*,
   No. 07 Civ. 11086 (DAB), 2011 WL 4444206 (S.D.N.Y. Sept. 23, 2011)
   (Batts, J.) ...................................................................................................................17

*In re Take-Two Interactive Sec. Litig.*,
   551 F. Supp. 2d 247 (S.D.N.Y. 2008) ....................................................13, 16, 20, 22

*In re Thornburg Mortg., Inc. Sec. Litig.*,
   824 F. Supp. 2d 1214 (D.N.M. 2011), *aff'd sub nom. Slater v. A.G. Edwards*
   *& Sons, Inc.*, 719 F.3d 1190 (10th Cir. 2013) ......................................................9, 10

*In re Vale S.A. Sec. Litig.*,
   No. 1:15-cv-9539 (GHW), 2017 WL 1102666 (S.D.N.Y. Mar. 23, 2017) ...........................15

*In re Weight Watchers Int'l Inc. Sec. Litig.*,
   504 F. Supp. 3d 224 (S.D.N.Y. 2020) ...............................................................7, 17

*Japan Halon Co. v. Great Lakes Chemical Corp.*,
   155 F.R.D. 626 (N.D. Ind. 1993) .........................................................................21

*Jayne v. Royal Jordanian Airlines Corp.*,
   502 F. Supp. 848 (S.D.N.Y. 1980) .......................................................................21

*Kalin v. Xanboo, Inc*,
   526 F. Supp. 2d 392 (S.D.N.Y. 2007) ..............................................................12, 13

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001) ...............................................................................15

*Kolmar Korea Co. v. Process Techs. & Packaging, LLC*,
   No. 3:19-cv-01651, 2020 WL 4783080 (M.D. Pa. Feb. 27, 2020) ....................................10, 20

*Kuhns v. Ledger*,
   202 F. Supp. 3d 433 (S.D.N.Y. 2016) ...................................................................10

*Ladmen Partners, Inc. v. Globalstar, Inc.*,
   No. 07-cv-0976 (LAP), 2008 WL 4449280 (S.D.N.Y. Sept. 30, 2008) (Preska,
   J.) ...............................................................................................................17

*McIntire v. China MediaExpress Holdings, Inc.*,
   927 F. Supp. 2d 105 (S.D.N.Y. 2013) .....................................................................7

*P. Stolz Family P'ship, L.P. v. Daum*,
   166 F. Supp. 2d 871 (S.D.N.Y. 2001), *rev'd in part on other grounds*, 355
   F.3d 92 (2d Cir. 2004) ......................................................................................17

*Pub. Emps.' Ret. Sys. of Mississippi v. Merrill Lynch & Co. Inc.*,
   714 F. Supp. 2d 475 (S.D.N.Y. 2010) (Rakoff, J.) ...............................................17, 18

*Ressler v. Liz Claiborne, Inc.*,
 75 F. Supp. 2d 43 (E.D.N.Y. 1998) ...................................................................22

*Rombach v. Chang*,
 355 F.3d 164 (2d Cir. 2004)...............................................................................5

*Rubinstein v. Collins*,
 20 F.3d 160 (5th Cir. 1994) ..............................................................................24

*Russo v. Bruce*,
 777 F. Supp. 2d 505 (S.D.N.Y. 2011)...............................................................19

*SEC v. First Jersey Sec., Inc.*,
 101 F.3d 1450 (2d Cir. 1996)........................................................................7, 15

*Silsby v. Icahn*,
 17 F. Supp. 3d 348 (S.D.N.Y. 2014), *aff'd sub nom. Lucas v. Icahn*, 616 F.
 App'x 448 (2d Cir. 2015) ............................................................................12, 21

*Slayton v. American Exp. Co.*
 604 F.3d 758 (2d Cir. 2010)..........................................................................6, 18

*South Cherry Street, LLC v. Hennessee Grp. LLC*,
 573 F.3d 98 (2d Cir. 2009)...............................................................5, 6, 14, 24

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*,
 33 F. Supp. 3d 401 (S.D.N.Y. 2014)...................................................................7

*Stevelman v. Alias Research Inc.*,
 174 F.3d 79 (2d Cir. 1999).................................................................................24

*Strougo v. Barclays PLC*,
 334 F. Supp. 3d 591 (S.D.N.Y. 2018).................................................................13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
 551 U.S. 308 (2007).................................................................................. *passim*

*U.S. Philips Corp. v. ATI Techs., Inc.*,
 No. 05-cv-8176 (LAP), 2008 WL 2073928 (S.D.N.Y. May 8, 2008).....................12

*United States v. Bestfoods*,
 524 U.S. 51 (1998)...............................................................................2, 12, 21

*Weintraub v. Texasgulf Inc.*,
 564 F. Supp. 1466 (S.D.N.Y. 1983)...................................................................12

*Wilbush v. Ambac Fin. Grp., Inc.*,
 271 F. Supp. 3d 473 (S.D.N.Y. 2017)...............................................................15

**Statutes**

Private Securities Litigation Reform Act of 1995, 109 Stat. 737 .......................................... *passim*

Securities Act of 1933, 15 U.S.C. § 77a et seq. ..................................................................... *passim*

Securities and Exchange Act of 1934, 15 U.S.C. § 78a et seq. ............................................. *passim*

**Other Authorities**

17 C.F.R. § 240.12b–2 ................................................................................................................8

*Day-To-Day Operations of a Business: Definition & Explanation*, STUDY.COM,
    https://study.com/academy/ lesson/day-to-day-operations-of-a-business-
    definition-lesson-quiz.html (last accessed Mar. 30, 2023). ......................................................9

Fed. R. Civ. P. 9(b) ..............................................................................................................5, 7, 20, 24

Prospectus Supplement (Nov. 3, 2016), *available at*
    https://www.sec.gov/Archives/
    edgar/data/1289790/000114420416132114/v452285_424b1.htm ............................................3

## PRELIMINARY STATEMENT

A control person claim must be based on specific and detailed allegations that show actual control over the primary violator *and* the conduct at issue, as well as scienter.  Hence, a control person claim against a corporation is typically based on allegations that the corporation controlled the primary violator's board of directors and thereby the alleged misconduct.  Plaintiff Moab's control person claims against Defendant MIMUSA flout these requirements.[1]  Moab does not allege that MIMUSA controlled MIC's board or the alleged fraudulent statements at issue here. Moab simply alleges in conclusory fashion that MIMUSA managed MIC's day-to-day operations and assigned some of its employees to be MIC officers.  Compl. ¶ 29.

There is no support for Moab's argument that it can be inferred from these allegations that MIMUSA controlled MIC and the allegedly fraudulent statements.  Doc. No. 110 ("2019 Opp.") at 45–46.  Control person liability is not a version of *respondeat superior* that allows imputed liability if a primary violator was employed by another.   Control person liability requires allegations that the purported control person actually controlled the primary violator and the violating conduct *and* culpably participated in the wrongdoing with scienter.  Moreover, to avoid dismissal under the PSLRA, the Complaint must plead facts that create a "strong inference" of such culpable participation and scienter.  It is not enough for the inference to be plausible; it must be cogent and at least as compelling as any nonculpable inference based on all of the facts.

Moab's bare and conclusory allegations, in support of a completely novel control theory, do not come close to meeting this standard.  The allegation that MIMUSA managed MIC's day-to-day operations is unavailing:  day-to-day operations are the ordinary affairs of a business, not

---

[1]     Unless otherwise noted, defined terms are from MIMUSA's prior motion to dismiss.  *See* Doc. No. 103.

its overall management and strategy.  Moab's allegation that some of MIC's officers were MIMUSA employees also holds no water.  It is well settled that a corporate officer is presumed to be acting only on behalf of the company to which the officer's actions relate, even if that officer is an officer or employee of other members of the corporate family.  The courts have recognized that individuals with multiple roles in a corporate family "can and do 'change hats' to represent . . . two corporations separately". *United States v. Bestfoods*, 524 U.S. 51, 69 (1998) (citation and internal quotation marks omitted).  And, critically, the Complaint is devoid of allegations that create the "strong inference" of scienter required by the Private Securities Litigation Reform Act.

Moab's insider trading claim against MIMUSA is unsustainable because it relies on the same conclusory allegations. Moab does not allege that MIMUSA's management services involved evaluating the risk associated with IMO 2020.  Nor does the Complaint allege that the MIMUSA employees who acted as MIC officers transmitted inside information to MIMUSA. Moab simply argues, incorrectly, that these critical details can be inferred from MIMUSA's day-to-day management and assignment of employees to MIC.  Furthermore, any inference of insider trading is impermissibly attenuated because of the long gap between MIMUSA's November 2016 stock sale and the February 2018 price drop and MIMUSA's voluntary acceptance after the sale of MIC stock in lieu of cash for its management fees.

## BACKGROUND

### The Complaint

All of Moab's claims are based on alleged misrepresentations and omissions by MIC and certain of its officers between January 2016 and February 2018.[2]  Moab only added MIMUSA as

---

[2]      A detailed discussion of the facts is contained in the original Memorandum of Law in Support of Macquarie Infrastructure Corporation's and the Individual Defendants' Motion to Dismiss, Doc. No. 101 (the "2019

a defendant when it amended its Complaint.  The amended Complaint asserts control person claims against MIMUSA under Section 20(a) of the Exchange Act (Count II) (Compl. ¶¶ 326–29) and Section 15 of the Securities Act (Count VI) (*id.* ¶¶ 393–98), as well as an insider trading claim under Section 20A of the Securities Act (Count III) (*id.* ¶¶ 330–35).[3]  These claims are based entirely on conclusory allegations that: (i) MIMUSA acted as "manager of [MIC] and is responsible for [MIC]'s day-to-day operations and affairs and oversight of the management teams of Macquarie's operating segments" (Compl. ¶ 29) and (ii) MIC relied on MIMUSA employees who were assigned to MIC, including Individual Defendants James Hooke, Liam Stewart, and Jay Davis.  Compl. ¶¶ 28–32; 2019 Opp. at 35.

Moab does not allege MIMUSA controlled MIC's directors and officers or MIC's allegedly fraudulent statements.  To the contrary, Moab states plainly that MIC was controlled by its directors and officers, who acted in that capacity in relation to the allegedly fraudulent statements.[4]  Moab does not allege that MIMUSA employees assigned to MIC thereafter acted in any capacity for MIMUSA.[5]  Moab also acknowledged that MIMUSA reported to MIC's board.   *See* 2019 Opp. at 55.

---

MIC Brief") at 5–10 and in those defendants' Memorandum of Law in support of their Renewed Motion to Dismiss (the "Renewed MIC Brief") at 4–6.

[3]      The Complaint at one point mistakenly lists MIMUSA as a defendant with respect to Count I, but the parties have stipulated that Plaintiffs do not assert Count I against MIMUSA.  *See* Doc. No. 83 (order granting stipulation to clarify the Complaint).

[4]      *See* Compl. ¶¶ 11–12 ,18, 30, 32, 34, 38, 40–41, 47–50, 52, 55–56, 65, 67, 69–73, 76, 79, 105–13, 124–26, 130, 142, 149–53, 157, 159–61, 168–69, 186, 192–94, 198–99, 222, 228–35, 239–40, 243–46, 250–52, 254–57, 268–78, 286–89, 291–93, 295, 297–98, 310.

[5]      *See also* Prospectus Supplement, S-4, S-17 (Nov. 3, 2016), *available at* https://www.sec.gov/Archives/edgar/data/1289790/000114420416132114/v452285_424b1.html; Compl. ¶¶ 132, 268, 338.  This Court may take judicial notice of publicly available SEC filings.  *See In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 466 n.1 (S.D.N.Y. 2017) (Broderick, J.).

Moab's allegations in support of its claim that MIMUSA engaged in improper insider trading when it sold 40% of its MIC stock in November of 2016 are similarly threadbare.  *See* Compl. ¶¶ 330–35.  The claim is based entirely on Moab's conclusory allegations that MIMUSA managed MIC's day-to-day operations and had employees who acted as MIC officers.  Moab does not specifically allege that MIMUSA possessed any material non-public information, that the MIMUSA employees who worked for MIC communicated material, non-public information back to MIMUSA, or that MIMUSA obtained such information from its day-to-day managerial activities.  Moreover, MIMUSA's November 2016 sale was long before the February 21, 2018 stock price drop.  *Id.* ¶ 201.  MIMUSA had previously sold 27.6% of its MIC stock in June 2015, but Moab alleges no wrongdoing with respect to this sale.  *Id.* ¶ 309.  And MIMUSA continued acquiring MIC stock after the sale and throughout the class period.  Doc. No. 104-14 at S-17 to S-18; Doc. No. 104-35 at 60.

### The Previous Motions to Dismiss

In response to Defendants' original motions to dismiss, the Court dismissed Moab's claims against all Defendants on the grounds that Moab failed to plausibly allege false statements or omissions by MIC or the Individual Defendants or facts from which to draw a strong inference of scienter.  Doc. No. 121 at 13–29.  Because the Court found Moab did not allege any primary violation of the securities laws, the Court did not reach MIMUSA's independent arguments for dismissal.  *See id.* at 28–29; Doc. No. 103.

The Second Circuit vacated the Court's judgment and remanded for further proceedings. Doc. No. 130.  While the Second Circuit agreed with the Court that "the majority of Defendants' alleged misstatements are not actionable," it found MIC failed to make a disclosure required under Item 303 of SEC Regulation S-K and held this was sufficient to establish both an actionable

omission under the securities laws and scienter for purposes of Moab's claim under Section 10(b) of the Exchange Act.  Doc. No. 130 at 5–9.  The Second Circuit did not address MIMUSA's independent arguments for dismissal and stated specifically that it was remanding that part of the case "for further consideration by the District Court."  *Id.* at 10.

## LEGAL STANDARD

"As a general matter, to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *South Cherry Street, LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 110 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (cleaned up). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  The "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "[A]lthough a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (citation and internal quotation marks omitted).

"In a private securities fraud action, however, . . . the plaintiff must do more." *South Cherry Street*, 573 F.3d at 110.  Before the enactment of the Private Securities Litigation Reform Act, the sufficiency of a complaint for securities fraud was governed by Rule 9(b)'s requirement that "the circumstances constituting fraud . . . be stated with particularity," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007).  To satisfy Rule 9(b), at a minimum, a complaint must: (1) identify each allegedly fraudulent statement; (2) identify the speaker; (3) state where and when the statements were made; and (4) explain why the statements were fraudulent. *Rombach v. Chang*,

355 F.3d 164, 170 (2d Cir. 2004).  In 1995, "[a]s a check against abusive litigation by private parties," Congress imposed even more "exacting pleading requirements" in the PSLRA, requiring private securities fraud plaintiffs to state with particularity not only the facts constituting the alleged violation, but also "the facts evidencing scienter, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud.'"  *Tellabs*, 551 U.S. at 313 (citation omitted).  "Under the PSLRA's heightened pleading instructions," any private securities fraud complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Id.* at 321 (quoting 15 U.S.C. § 78u-4(b)(2)).

"To meet the 'strong inference' standard, it is not sufficient to set out 'facts from which, if true, a reasonable person *could* infer that the defendant acted with the required intent." *South Cherry Street*, 573 F.3d at 110–11 (quoting *Tellabs*, 551 U.S. at 314).  The inference of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent," considering "*all* of the facts alleged, taken collectively," without relying on "any individual allegation[] scrutinized in isolation."  *Id.* at 111 (quoting *Tellabs*, 551 U.S. at 314, 323) (emphasis removed).  Because "the strength of an inference cannot be decided in a vacuum," *Tellabs*, 551 U.S. at 323, the court "must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff, . . . but also competing inferences rationally drawn from the facts alleged."  *Id.* (quoting *Tellabs*, 551 U.S. at 314) (emphasis removed).  "A complaint will survive" this threshold inspection "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324; *Slayton v. American Exp. Co.* 604 F.3d 758, 766 (2d Cir. 2010).

We demonstrate below that Moab's claims against MIMUSA do not comply with this strict and rigorous standard.

## ARGUMENT

MIMUSA incorporates and adopts MIC and the Individual Defendants' arguments in support of their renewed motion to dismiss.  MIMUSA also seeks dismissal on the following independent grounds.

### I.  Moab Has Not Pled a Section 20(a) Control Person Claim

"To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  *ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d. Cir. 2007); *see SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472–73 (2d Cir. 1996).  Rule 9(b) and the PSLRA require that Moab allege both the primary violation of securities fraud and MIMUSA's culpable participation with particularity.   To plead culpable participation, Moab must "plead with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind, *i.e.*, scienter."  *McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 122 (S.D.N.Y. 2013) (citation and quotation marks omitted); *see also In re Alstom SA*, 406 F. Supp. 2d 433, 491 (S.D.N.Y. 2005) ("[C]ulpable participation must be pled with particularity."); *In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 264 (S.D.N.Y. 2020) (same).[6]

---

[6]   A "small number of district courts have maintained that the Second Circuit's decision to include 'culpable participation' as an element of a *prima facie* case fails to convert it into a pleading requirement for a Section 20(a) claim because culpable participation is a less demanding standard than scienter," *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 438 (S.D.N.Y. 2014).  Nonetheless, the overwhelming weight of authority in this District holds that Plaintiffs must plead culpable participation with particularity as an element of control person liability.  This approach is more faithful to Second Circuit precedent and gives proper effect to the PSLRA.  *Id.*; *see ATSI*, 493 F.3d at 108; *First Jersey*, 101 F.3d at 1472.

The Complaint fails to meet these threshold standards.  Moab has not plausibly alleged that MIMUSA actually controlled the alleged primary violators and their alleged primary violations.  Nor has Moab alleged MIMUSA's culpable participation in the alleged primary violations.  None of Moab's allegations give rise to a strong inference of scienter on the part of MIMUSA.

### A.      Moab Has Not Pled MIMUSA's Actual Control of MIC

Moab has not alleged with particularity facts that plausibly show MIMUSA had "the power to direct or cause the direction of the management and policies of [MIC], whether through the ownership of voting securities, by contract, or otherwise."  17 C.F.R. § 240.12b–2.

### 1.      Moab Does Not Allege MIMUSA Had Actual Control

As noted above, the Complaint contains no particularized allegations whatsoever regarding how MIMUSA controlled MIC.  Moab merely alleges in conclusory fashion that (i) MIMUSA managed MIC's day-to-day operations, and (ii) some of MIC's officers were MIMUSA employees who had been assigned to MIC.  Compl. ¶ 29.

Moab does not allege that MIMUSA owned a controlling share of MIC, that MIMUSA controlled MIC's board, or that MIMUSA controlled MIC's officers.    Moab does not allege that MIMUSA, rather than MIC's officers and directors, directed MIC's policies or ordered any specific transactions, let alone that MIMUSA directed the alleged fraudulent statements at issue here.  To the contrary, Moab states plainly that MIMUSA reported to MIC's board and that MIC's officers acted for MIC.  2019 Opp. at 46.

These allegations are insufficient.  Control person liability must be based on plausible allegations that MIMUSA had *actual control* over MIC and *actual control* over the allegedly fraudulent statements.  *DoubleLine Cap. LP v. Odebrecht Fin., Ltd*., 323 F. Supp. 3d 393, 460 (S.D.N.Y. 2018) (allegation that parent company had "the power and authority" to cause its

subsidiary to engage in the alleged wrongful conduct was insufficient to make out a control person claim); *see also In re Deutsche Telekom AG Sec. Litig.*, No. 00 CIV 9475 SHS, 2002 WL 244597, at *6 (S.D.N.Y. Feb. 20, 2002) (allegations that defendant had "stock ownership of Deutsche Telekom," "participat[ed] in [Deutsche Telekom's] operations," and had the "power to influence and control and did influence and control the decision-making of [Deutsche Telekom], including the content and dissemination of the [allegedly false] public statements" were conclusory and insufficient to meet the control person test).   Moab's conclusory allegations do not clear this hurdle.   Nor do they support the speculative leaps that Moab urges.

### 2.   *Managing Day-to-Day Operations Is Not Control*

The managers responsible for day-to-day operations do not exercise the type of control over a company, its directors and officers, and its public statements that is required for control person liability.   Rather, day-to-day operations are "the activities that a business and its employees engage in on a daily basis for the purposes of generating a profit and increasing the inherent value of the business as a going concern."[7]   Thus, in a decision on all fours here, the District of New Mexico rejected control person claims where the plaintiffs alleged a defendant "exerted day-to-day control over [the company's] operations at the time of the alleged misstatements," but "fail[ed] to allege any facts" that the defendant "controlled [the COO] at the time of [his] alleged misstatements" or controlled the content of the company's allegedly fraudulent securities filings. *In re Thornburg Mortg., Inc. Sec. Litig.*, 824 F. Supp. 2d 1214, 1293 (D.N.M. 2011), *aff'd sub nom. Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190 (10th Cir. 2013).

---

[7]   *Day-To-Day Operations of a Business: Definition & Explanation*, STUDY.COM, https://study.com/academy/lesson/day-to-day-operations-of-a-business-definition-lesson-quiz.html (last accessed Mar. 30, 2023).

*Thornburg* is consistent with decisions by other courts that have considered the meaning of "day-to-day operations." For example, the court in *Kolmar Korea Co. v. Process Technologies & Packaging, LLC*, No. 3:19-cv-01651, 2020 WL 4783080 (M.D. Pa. Feb. 27, 2020) stated that "[c]ourts . . . typically define 'day to day operations' as ordinary, everyday business tasks." *Id.* at *2. Similarly, the court in *In re Borders Group*, 453 B.R. 459 (Bankr. S.D.N.Y. 2011) stated, "Although the Critical Employees are important to the Debtors' business, none of them has the authority to implement company policies. Instead, they are responsible for running the Debtors' day-to-day operations." *Id.* at 469 (citation omitted).

### 3. Alleging MIMUSA Had "Responsibility" and "Oversight" Does Not Show Control

Moab's conclusory recitations that MIMUSA had "responsibility" and "oversight" with respect to MIC do not suffice to allege control. *See* Compl. ¶¶ 29, 327. The courts have routinely dismissed control person claims that were supported by allegations far more detailed than those Moab offers here. "[E]xercise of influence, without power to direct or cause the direction of management and policies through ownership of voting securities, by contract, or in any other direct way, is not sufficient to establish control for purposes of Section 20(a)." *In re Alstom SA*, 406 F. Supp. 2d at 487; *see also, e.g.*, *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 740–41 (S.D.N.Y. 2015) (though a defendant's appointment of a quarter of the company's board and ownership of a quarter of the company's stock "afforded [the defendant] a great deal of sway over" the company, "that alone does not rise to the level of actual control"); *Kuhns v. Ledger*, 202 F. Supp. 3d 433, 440–41 (S.D.N.Y. 2016) (dismissing control person claims against 47% shareholder because "[a]ctual control, and not merely power to influence managerial decisions is required" (citation and internal quotation marks omitted)). Nor is it sufficient to invoke the term "manager". Compl. ¶ 29.

#### 4.    *Lending Employees Does Not Imply Control*

Although Moab alleges that three MIC officers—James Hooke, Liam Stewart, and Jay Davis—were MIMUSA employees, Moab does not allege that once Hooke, Stewart, and Davis became MIC officers, they acted in their capacity as MIMUSA employees.  Control person liability is not a version of *respondeat superior* that allows imputed liability if a primary violator was employed by another.  *Alpha Cap. Anstalt v. Schwell Wimpfheimer & Assocs. LLP*, No. 1:17-CV-1235-GHW, 2018 WL 1627266, at *20 (S.D.N.Y. Mar. 30, 2018) ("[I]n the context of a Section 20(a) claim, *respondeat superior* does not provide an alternative method of pleading secondary liability under the Exchange Act."), *corrected*, 2018 WL 11472420 (S.D.N.Y. Apr. 27, 2018). Hooke, Stewart, and Davis's actions as described in the Complaint were attributable to MIC, not MIMUSA.[8]  That is the most reasonable reading of the Complaint, and any suggestion that Hooke, Stewart, and Davis were acting for MIMUSA would be speculative as well as a less plausible reading of the Complaint.

#### 5.    *MIC's Officers Are Presumed to Act for MIC, Not MIMUSA*

Moab's argument that the Court should infer that MIMUSA employees assigned to MIC were wearing two hats, without the need for Moab to provide specific allegations, has no support in the applicable case law.  It is established law that "officer or director status alone does not constitute control for the purposes of Section 20(a) liability."  *In re Alstom SA*, 406 F. Supp. 2d at 487 (granting motion to dismiss for, *inter alia*, failure to establish control).  In this regard, the Supreme Court has recognized that individuals with multiple roles in a corporate family "can and do 'change hats' to represent . . . two corporations separately," and, in those circumstances, "courts

---

[8]    *See* Compl. ¶¶ 11–12 ,18, 30, 32, 34, 38, 40–41, 47–50, 52, 55–56, 65, 67, 69–73, 76, 79, 105–13, 124–26, 130, 142, 149–53, 157, 159–61, 168–69, 186, 192–94, 198–99, 222, 228–35, 239–40, 243–46, 250–52, 254–57, 268–78, 286–89, 291–93, 295, 297–98, 310.

generally presume" the person is acting on behalf of the company to which his or her actions relate.

*Bestfoods*, 524 U.S. at 69.  "A person can hold positions as a corporate officer, stockholder, and director of two companies, and yet can be acting in only one of those two roles at a given moment."

*Kalin v. Xanboo, Inc*, 526 F. Supp. 2d 392, 403 (S.D.N.Y. 2007); *see also Weintraub v. Texasgulf Inc.*, 564 F. Supp. 1466, 1470 (S.D.N.Y. 1983) ("[I]t is clear that a director's knowledge may not properly be imputed to a corporation unless it is gained within the scope of his activity with respect to that corporation[.]"); *U.S. Philips Corp. v. ATI Techs., Inc.*, No. 05-cv-8176 (LAP), 2008 WL 2073928, at *2 (S.D.N.Y. May 8, 2008) (knowledge of subsidiary's employee was "insufficient to demonstrate that the plaintiff knew of the defendant's misconduct," because "'to impute an agent's knowledge to a principal in a particular transaction, it must be shown that the agent at some time had some duties to perform on behalf of the principal with respect to the transaction'" (quoting *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 363 (2d Cir.1959))).

Thus, in a decision that is directly on point here, Judge Koeltl held that allegations that a defendant both nominated and employed two of a corporation's directors "len[t] ***no support***" to the plaintiff's allegations that the defendant had "actual control" over the corporation for purposes of Section 20(a), "because [the directors] were not working within the scope of their employment for [the defendant] when acting in their capacity as Directors."  *Silsby v. Icahn*, 17 F. Supp. 3d 348, 371 (S.D.N.Y. 2014) (emphasis added) (dismissing control person claims), *aff'd sub nom. Lucas v. Icahn*, 616 F. App'x 448 (2d Cir. 2015); *see also, e.g., Alpha,*  2018 WL 1627266, at *20– 21 (dismissing control person claims against law firm where firm's managing partner "made the allegedly fraudulent statements in his capacity as [the company's] chairman of the board, and not in his capacity as counsel or as an agent of [the law firm]," rejecting plaintiff's "theory of 'imputation'" which would "expose corporate entities to liability for the fraudulent acts of their

officers, even where those officers have acted fraudulently in their capacity as something other than the officer of that entity").

### 6.    *Moab Does Not Allege MIMUSA Controlled the Alleged Fraud*

Aside from failing to allege that MIMUSA controlled MIC, Moab does not allege that MIMUSA had actual control over the alleged fraud.  "[T]he Section 20(a) defendant must not only have actual control over the primary violator, but have actual control over the transaction in question." *In re Alstom SA*, 406 F. Supp. 2d at 487 (internal quotation marks omitted); *see Kalin*, 526 F. Supp. 2d at 405 ("Actual control over the alleged wrongdoer and the purported transactions at issue is essential for control person liability.").  None of the statements referenced in the Complaint are alleged to have been issued by, attributable to, or directed by MIMUSA.  Moab's control person claim fails on this ground as well.

### B.    Moab Has Not Pled that MIMUSA Culpably Participated in the Alleged Violations

Moab's failure to plead MIMUSA's control is not the only defect in Moab's control person claims.  Moab has also failed to plead that MIMUSA culpably participated in the alleged securities law violations.

"'Culpable participation' . . . is established by alleging scienter on the part of a controlling person to the extent that it would satisfy § 10(b) and Rule 10b-5." *Strougo v. Barclays PLC*, 334 F. Supp. 3d 591, 596 (S.D.N.Y. 2018) (citation omitted).  Thus, "plaintiffs must aver particular facts giving rise to a strong inference that the defendants acted with the requisite scienter, i.e., with the intent to deceive, manipulate or defraud." *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 268–69 (S.D.N.Y. 2008) (citing PSLRA, 15 U.S.C. § 78u-4(b)(2)).  To qualify as "strong," an inference of scienter "must be more than merely plausible or reasonable—*it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent*," considering "*all* of the

facts alleged, taken collectively." *South Cherry Street*, 573 F.3d at 111 (quoting *Tellabs*, 551 U.S. at 314, 323) (emphasis in original); *see supra* at 5–6.  A plaintiff may predicate an inference of scienter by pleading facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."  *ATSI*, 493 F.3d at 99.  But "conscious misbehavior or recklessness" is a demanding standard: it means "a state of mind *approximating actual intent*," not merely a "*heightened form of negligence*."  *South Cherry Street*, 573 F.3d at 109 (citation omitted) (emphases in original).  In the securities fraud context, it requires "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it," or "evidence that  the 'defendants failed to review or check *information that they had a duty to monitor*, or ignored *obvious* signs of fraud,' and hence 'should have known that they were misrepresenting material facts'"—in short, an "*egregious* refusal to see the *obvious*, or to *investigate the doubtful*."  *Id.* (emphases in original) (collecting precedents); *accord Chill v. General Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996)) (same).  Moreover, such an inference is still subject to the PSLRA as interpreted in *Tellabs*: for the complaint to survive, the court must deem the inference "cogent and *at least as compelling* as any opposing inference one could draw" from all of the facts.  *ATSI*, 493 F.3d at 99 (emphasis in original).  "[I]t is not sufficient to allege goals that are 'possessed by virtually all corporate insiders,'" such as "sustain[ing] the appearance of corporate profitability" or "maintain[ing] a high stock price."  *South Cherry Street*, 573 F.3d at 109.

### 1. The Complaint Does Not Allege MIMUSA Intended to Deceive or Defraud

Here, the Complaint contains *no* allegations that create *any* inference, let alone a strong inference, that MIMUSA possessed intent to deceive or defraud.  Most notably, the Complaint does not even allege that MIMUSA engaged in any wrongful conduct, intentionally or otherwise.  The Complaint does not attribute any of the actions of Hooke, Stewart, or Davis to MIMUSA.  Rather, it plainly states they were acting in their capacity as MIC officers.  *See* Section I.A.4 & n.8, *supra*; *In re Vale S.A. Sec. Litig.*, No. 1:15-cv-9539 (GHW), 2017 WL 1102666, at *34 (S.D.N.Y. Mar. 23, 2017) (individual's scienter imputed to entity only where the individuals were "acting within the scope of their authority").  At most the Complaint appears to attribute vicarious liability to MIMUSA through its employment of Hooke, Stewart and Davis and/or to attribute negligence liability to MIMUSA based on its contractual responsibility for MIC's "day-to-day operations."  Compl. ¶ 29.  Neither theory comes close to the "strong inference" of scienter required by the PSLRA and *Tellabs*.

### 2. Moab's Motive Theory Based on MIMUSA's Compensation Is Untenable

Nor does any such "strong inference" arise under a motive theory based on Moab's assertion that under MIMUSA's fee arrangement with MIC, MIMUSA "benefitted directly from paying out as much cash to investors as possible."  Compl. ¶ 304.  *First*, MIMUSA continued to voluntarily reinvest the vast majority of its fees in new primary shares of MIC throughout the class period.  Doc. No. 104-14 at S-17 to S-18; Doc. No. 104-35 at 60.

*Second*, the desire to reward investors is a legitimate motivation, "common to all corporate executives," which is "too generalized to demonstrate scienter."  *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 645 (S.D.N.Y. 2007); *accord Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001); *Wilbush v. Ambac Fin. Grp., Inc.*, 271 F. Supp. 3d 473, 485 (S.D.N.Y. 2017) (same).  Indeed, it is

entirely appropriate to link fees to positive share performance.  *See In re Take-Two*, 551 F. Supp. 2d at 273 (allegation that executive's compensation was tied to company's year-end earnings was insufficient to allege scienter); *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) ("[T]he existence, without more, of executive compensation dependent upon stock value does not give rise to a strong inference of scienter.").

*Finally*, MIMUSA's fee structure was contractual and publicly disclosed.  Even accepting the pled facts favorably to Moab, the Complaint merely alleges that MIMUSA wished to increase its fees by rewarding shareholders.  That is an entirely proper incentive.  Indeed, MIMUSA had no motive to misrepresent IMTT's business or mislead shareholders, because doing so would put those fees at risk.  Moab has done no more than show "a generalized motive, one which could be imputed to any publicly-owned, for-profit endeavor."  *Chill*, 101 F.3d at 268.

Moab's argument that "the Second Circuit has never categorically rejected an inference of scienter from compensation plans" is disingenuous.  *See* 2019 Opp. at 36.  There is nothing about MIMUSA's compensation plan or fee structure that would or could give rise to a strong inference of scienter under the PSLRA.  Moab has not cited any case, much less a post-PSLRA case, that found a strong inference of scienter from a similar fee structure.

## II.     Moab Has Not Pled a Section 15 Control Person Claim

It is well-settled that Section 15 of the Securities Act and Section 20 of the Securities Exchange Act are parallel provisions.  *In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 185–86 (2d Cir. 2011).  Hence, a number of well-reasoned decisions in this District have held that the pleading requirements for a control person claim under Section 15 are identical to those for a Section 20(a) claim.  A plaintiff must allege: (1) a primary violation, (2) control of the primary

violator by the defendant, and (3) culpable participation by the controlling person.[9]   In particular,

courts in this District have required a showing of culpable participation where, as here, the claims

sound in fraud.   *See, e.g.*, *In re Am. Realty Cap. Properties, Inc. Litig.*, No. 15-MC-40 (AKH),

2016 WL 11110435, at *3 (S.D.N.Y. Aug. 5, 2016) ("Although the Second Circuit has not

addressed the issue, the district court decisions require, where fraud is alleged, specific acts of

culpable participation under [Section 15]."); *In re Marsh & McLennan Cos. Sec. Litig.*, 501 F.

Supp. 2d 452, 494 (S.D.N.Y. 2006) (dismissing Section 15 claims because they were based on

claims "sounding in fraud" and the plaintiffs had "not raised a strong inference of scienter for any

of the named Section 15 defendants").

Some district courts in this Circuit have reached a different conclusion regarding culpable

participation, and the Second Circuit has left open the question of whether a plaintiff must show

culpable participation by an alleged control person for purposes of Section 15.   *See In re Lehman

Bros.*, 650 F.3d at 186.   However, the decisions imposing the same pleading requirements for

Section 15 and Section 20(a) claims have better support in the statutory language, which is almost

identical; in the legislative history, which shows that Sections 15 and 20(a) were intended to be

parallel provisions; and in Second Circuit case law, which has recognized that Sections 15 and

20(a) are analogues and that culpable participation must be pled in a Section 20(a) claim.

Regardless of which standard applies, Moab has failed to plead control person liability.

---

[9]     *See In re Sec. Cap. Assur. Ltd. Sec. Litig.*, No. 07 Civ. 11086 (DAB), 2011 WL 4444206, at *7 (S.D.N.Y. Sept. 23, 2011) (Batts, J.); *Pub. Emps.' Ret. Sys. of Mississippi v. Merrill Lynch & Co. Inc.*, 714 F. Supp. 2d 475, 485 (S.D.N.Y. 2010) (Rakoff, J.); *Ladmen Partners, Inc. v. Globalstar, Inc.*, No. 07-cv-0976 (LAP), 2008 WL 4449280, at *10 (S.D.N.Y. Sept. 30, 2008) (Preska, J.); *P. Stolz Family P'ship, L.P. v. Daum*, 166 F. Supp. 2d 871, 873 (S.D.N.Y. 2001), *rev'd in part on other grounds*, 355 F.3d 92 (2d Cir. 2004); *DeMaria v. Andersen*, 153 F. Supp. 2d 300, 314 (S.D.N.Y. 2001) (Pauley, J.); *In re Weight Watchers*, 504 F. Supp. 3d at 245, 264 (Pauley, J.); *Ellison v. American Image Motor Co.*, 36 F. Supp. 2d 628, 642 (S.D.N.Y. 1999) (Chin, J.).

For the reasons stated in the MIC Brief, Moab has not adequately alleged a primary violation of the Securities Act. The Complaint does not allege that Moab purchased MIC stock directly in the November 2016 offering, or that MIC acted as a statutory seller. *See* MIC Renewed Motion Brief at 12–15. Without a primary violation of the Securities Act, no Section 15 liability can exist. *Cf. Slayton*, 604 F.3d at 778 (affirming dismissal of Section 20(a) control person claim where the claim of a primary violation was dismissed because the statement fell within a statutory safe harbor).

The same result obtains because, as discussed in Section I.A, *supra*, Moab has failed to allege that MIMUSA exercised control over MIC with respect to the November 2016 offering. *See Pub. Emps.' Ret. Sys. of Mississippi*, 714 F. Supp. 2d at 485 (dismissing Section 15 claims because "plaintiffs have failed to allege beyond 'formulaic recitation' how [Defendants] exercised control").

Finally, Moab has failed to allege culpable participation by MIMUSA in any alleged violation of the Securities Act for the reasons discussed in Section I.B, *supra*. With one exception, Moab relies on the same alleged misrepresentations or omissions for its Exchange Act claims and Moab's claims in connection with the November 2016 offering. And Moab does not allege falsity with respect to the lone alleged misstatement unique to Moab's Securities Act claims: a reference to "strict environmental regulations" that serve as "'barriers' to entry." Compl. ¶ 355. For the reasons discussed in Section I.B, *supra*, these allegations cannot give rise to the "strong inference" of scienter required to plead culpable participation.

## III. The Control Person Cases Moab Cited in Its Opposition Do Not Apply Here

The cases Moab cited in its 2019 Opposition miss the point. Unlike the Complaint here, the complaints in those cases contained detailed and specific allegations describing how the control

person defendants controlled the primary violator and the conduct at issue.  *See* 2019 Opp. at 36

n.20, 46:

- The complaint in *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133 (S.D.N.Y. 1999), alleged that defendants "were aware of the internal control and accounting problems" and "participated directly in disseminating the false and misleading financial statements and other statements."  *Id.* at 143; *see* 2019 Opp. at 46.  Moab has not made similar particularized allegations regarding MIMUSA in the Complaint.

- The plaintiff in *In re Hi-Crush Partners L.P. Securities Litigation*, No. 12 CIV. 8557, 2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013), alleged that the controlling corporation's co-CEOs, CFO, and COO had committed primary violations and had "acted within the scope of their employment as officers" of the controlling corporation when they managed the daily affairs of the controlled corporation.  *Id.* at *20, *27; *see* 2019 Opp. at 46.  No such allegations are contained in Moab's Complaint.

- In *In re Refco, Inc. Securities Litigation*, 503 F. Supp. 2d 611 (S.D.N.Y. 2007), the defendants argued they could not be control persons because they were themselves controlled by another individual.  *Id.* at 638.  By contrast, MIMUSA is arguing that there are no specific allegations in the Complaint that MIMUSA continued to control Hooke, Stewart, and Davis after they were seconded to MIC and began reporting to MIC's Board of Directors.  *See* 2019 Opp. at 36 n.20.

- The employees in *Ellison v. American Image Motor Co.*, 36 F. Supp. 2d 628 (S.D.N.Y. 1999), were each affiliated with a single company, a broker-dealer, and were alleged to have acted in their capacity as employees of the broker-dealer in the conduct at issue.  *Id.* at 633, 644; *see* 2019 Opp. at 36 n.20.

- The plaintiff in *In re Parmalat Securities Litigation*, 594 F. Supp. 2d 444 (S.D.N.Y. 2009), unlike Moab here, offered specific allegations that the controlling corporation provided a large portion of the controlled corporation's funding and controlled a key decision made by the controlled company.  *Id.* at 459–60; *see* 2019 Opp. at 36 n.20.

## IV.    Moab Has Not Pled an Insider Trading Claim

"To establish . . . insider trading liability pursuant to Section 20A, [a] plaintiff[] must show

a primary violation of the securities laws."  *Russo v. Bruce*, 777 F. Supp. 2d 505, 528 (S.D.N.Y.

2011).  A plaintiff's "failure to establish a violation of Section 10(b) and Rule 10b–5 necessitates

dismissal of [its] Section . . . 20A claims."  *Id.*  "Not all violations of the Exchange Act can serve

as predicate violations for purposes of § 20A; the predicate violation must be an act of insider

trading."  *In re Refco*, 503 F. Supp. 2d at 665.  A "predicate claim requires proof that [Defendants]

possessed, *i.e.*, knew, material, nonpublic information," *In re Take-Two*, 551 F. Supp. 2d at 311 n.50 (citation and quotation marks omitted).

Furthermore, "claims under § 20A must comply with the heightened pleading standards of Fed. R. Civ. P. 9(b) and the PSLRA." *In re Bear Stearns Cos. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 487 (S.D.N.Y. 2011). Among other things, the proponent of an insider trading claim must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4.

The Complaint's insider trading allegations fall far short of these standards.

### A.    Moab Has Not Pled MIMUSA Had Insider Knowledge

The Complaint does not allege with particularity that MIMUSA obtained insider knowledge regarding MIC's exposure to risk associated with IMO 2020. Nor has Moab offered any specifics as to how MIMUSA obtained such inside knowledge. Rather, similar to its control person claims, Moab relies on an inference that MIMUSA had inside knowledge because it performed "day-to-day" management services for MIC and assigned certain employees to work for MIC as officers and in other positions. *See* 2019 Opp. at 48 & n.25.

As with its control person claims, Moab's inferences and presumptions are untenable.

Moab's argument that MIMUSA's day-to-day management included responsibility for the overall impact of regulatory affairs on MIC's businesses flies in the face of the well-accepted definition of day-to-day management. As explained in Section I.A above, "day-to-day operations" means the quotidian, ordinary affairs of a business. In other words, what a company's middle managers do. Day-to-day operations are not overall strategy and legal affairs, such as the impact of anticipated new regulations. Those activities are the responsibility of the company's board of directors and officers. *See Kolmar Korea*, 2020 WL 4783080, at *2 ("Courts . . . typically define 'day to day operations' as ordinary, everyday business tasks.").

Moab's reliance on MIMUSA's assignment of its employees to MIC is also unavailing. First, the Complaint contains no factual allegations from which it can be inferred that the knowledge and actions of those employees can be attributed to MIMUSA. *See* 2019 Opp. at 48–49 n.25. Moab has not alleged that after being seconded the employees acted in any role or capacity for MIMUSA. To the contrary, the Complaint plainly states that these employees acted as MIC officers and reported to MIC's Board.[10]

Furthermore, there is no presumption that MIMUSA employees assigned to MIC were wearing two hats and that knowledge they gained can be imputed to MIMUSA. As discussed in Section I.A.5, *supra*, the opposite presumption prevails. "[C]ourts generally presume" a corporate officer is acting on behalf of the company to which his or her actions relate because individuals with multiple roles in a corporate family "can and do 'change hats' to represent . . . two corporations separately". *Bestfoods*, 524 U.S. at 69; *see also Silsby*, 17 F. Supp. 3d at 371.

Courts in this District have repeatedly dismissed insider trading claims based on the kind of flimsy allegations of control that Moab offers here. *In re Glob. Crossing, Ltd. Sec. Litig.*, No. 02-cv-910 (GEL), 2005 WL 2990646 (S.D.N.Y. Nov. 7, 2005) is on point. That case involved insider trading claims premised on the defendant's alleged control of the issuer. The plaintiff alleged the defendant designated five board members, owned a significant quantity of stock, and provided financial services to the company through subsidiaries. The court held that these allegations did not show that the defendant had inside information because plaintiffs "d[id] not

---

[10]      *Japan Halon Co. v. Great Lakes Chemical Corp.*, 155 F.R.D. 626 (N.D. Ind. 1993) and *Jayne v. Royal Jordanian Airlines Corp.*, 502 F. Supp. 848 (S.D.N.Y. 1980), cited in Plaintiff's 2019 Opposition, are inapposite. *Japan Halon* says nothing about insider trading; it involved a discovery dispute in a trade secrets case. *Jayne* addressed whether personal jurisdiction would extend to a subsidiary, in light of "the easy interchange between the two companies in financial, promotional, and operational matters." 502 F. Supp. at 859.

adequately allege that [the defendant] had access to inside information and awareness of fraud under a heightened standard that requires facts supporting a strong inference of such culpability."[11] *Id.* at \*9–10.

### B.     The Circumstances Negate Scienter

#### 1.     *MIMUSA Sold Stock More than 15 Months Before the Stock Drop*

MIMUSA's November 2016 stock sale was more than fifteen months before the February 21, 2018 stock drop and occurred before most of the misrepresentations or omissions alleged in the Complaint.  *See* Compl. ¶¶ 245–67 (identifying statements made in 2017).  Time lapses like this have repeatedly been held fatal to insider trading claims because they negate an inference of scienter.  For example, a court in this District held in *In re Authentidate Holding Corp.*, No. 05-cv-5323 (LTS)(DFE), 2006 WL 2034644 (S.D.N.Y. July 14, 2006) that "any connection between [a] February 2004 stock offering and failures to update a September 2004 statement" was "too attenuated to support a reasonable inference of scienter."  *Id.* at \*6.  Similarly, a court in this District held in *In re Take-Two* that "[t]he lapsing of nearly three months between [the] issuance of the alleged false statement and the lion's share of [insider's] stock sales, and of approximately four months between these substantial sales and the revelation of the alleged falsity, inescapably attenuates any inference of scienter that may be drawn in Lead Plaintiffs' favor."  551 F. Supp. 2d at 279; *see also Ressler v. Liz Claiborne, Inc.*, 75 F. Supp. 2d 43, 60 (E.D.N.Y. 1998) (granting

---

[11]      The *Global Crossing* court noted that, as is true here, "the facts alleged in support of plaintiffs' insider trading claim are identical to the facts alleged in support of the Section 20(a) claim," and found that "for the same reasons, those facts do not support a 'strong inference' that [the defendant] not only had access to inside information about [Global Crossing's] true financial status but was in receipt of such information when it sold its [Global Crossing] shares."  *Id.* at \*10.

motion to dismiss insider trading claims because the "stock sales at issue took place, for the most part, over six months prior to the release of the negative disclosure.").

Moab's conclusory allegation that the timing of MIMUSA's offering was "highly suspicious" does not save its claim. Compl. ¶ 307. Both before and after November 2016, MIC's IMTT division had record high utilization and increased storage of No. 6 oil despite downward trends in the market. *See* Doc. No. 101 at 7. MIC's stock price was robust well into 2017. Indeed, MIC raised its quarterly dividends by 10% in November 2017. Compl. ¶ 158.

Nor is Moab's claim supported by the fact that MIMUSA's November 2016 sale came a month after the October 2016 announcement that IMO 2020 would proceed on schedule. Moab's argument is contradicted by its allegation that the IMO 2020 announcement in October 2016 had been "widely expected." Compl. ¶ 123. The Complaint does not allege that the announcement had any effect on the stock prices of MIC's competitors, who Moab asserts made appropriate disclosures.

### 2. MIMUSA's Sale Was Consistent with Prior Sales and MIMUSA Continued to Acquire Significant Amounts of MIC Stock

In fact, the Complaint's allegations show on their face that MIMUSA's stock sale was simply an ordinary-course sale designed to raise money. Moab acknowledges that in the previous year MIMUSA had engaged in a sale of similar magnitude and sold another large block of its MIC stock (27.6%). Compl. ¶ 309. That earlier sale supports a more plausible explanation: that MIMUSA sold stock in November 2016 to generate revenue, just as it had done in the past. Indeed, after its November 2016 sale, MIMUSA continued to voluntarily reinvest the vast majority of its fees in new primary shares of MIC throughout the class period. Doc. No. 104-14 at S-17 to S-18; Doc. No. 104-35 at 60.

The Court must consider this nonculpable explanation for the stock sale in assessing whether Moab's allegations meet the heightened pleading standards of Rule 9(b) and the PSLRA. *See ATSI*, 493 F.3d at 104 (affirming dismissal of insider trading claim because there was a "plausible nonculpable explanation for the defendants' actions that is more likely than any inference that the defendants intended to manipulate the market") (quotation marks and alteration omitted); *accord Tellabs*, 551 U.S. at 323–24; *South Cherry Street*, 573 F.3d at 110–11 (discussed *supra* at 5–6).

### 3.    *Moab's Insider Trading Cases Are Factually Distinguishable*

Moab's cases are off point.  There was only a three-month gap between stock sale and stock drop in *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 86 (2d Cir. 1999).  *See* 2019 Opp. at 49.  In *Fresno County Employees' Retirement Association v. comScore, Inc.*, 268 F. Supp. 3d 526 (S.D.N.Y. 2017), the defendants sold most of their stock and did not reinvest in the company.  *See* 2019 Opp. at 49–50.  *In re APAC Teleservice, Inc. Securities Litigation*, No. 97 Civ. 9145(BSJ), 1999 WL 1052004, at *7 (S.D.N.Y. Nov. 19, 1999) (2019 Opp. at 48) relies on a pre-PSLRA Fifth Circuit case, *Rubinstein v. Collins*, 20 F.3d 160, 170 n.38 (5th Cir. 1994) that is no longer good law after *Tellabs*.  *See Alaska Elec. Pension Fund v. Asar*, 768 F. App'x 175, 182 n.36 (5th Cir. 2019) ("*Rubenstein* was decided before the Supreme Court, in *Tellabs*, required weighing the plausibility of alternate explanations.").

### CONCLUSION

For the foregoing reasons, MIMUSA requests the Court dismiss the Complaint as to MIMUSA with prejudice.

Dated:  New York, New York          /s/ *Christopher M. Paparella*
        April 6, 2023                  Christopher M. Paparella
                                        Justin Ben-Asher
                                        Evan Goldstick

STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, New York 10036
Telephone: (212) 506-3900
cpaparella@steptoe.com
jbenasher@steptoe.com
egoldstick@steptoe.com

*Attorneys for Defendant Macquarie Infrastructure
Management (USA) Inc.*